# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CNX MIDSTREAM DEVCO I, LP,

    Plaintiff,

v.

APPLIED CONSTRUCTION SOLUTIONS, INC.,

    Defendant.

Civil Action No.: 2:20-cv-00290

Magistrate Judge Lisa Pupo Lenihan

## DEFENDANT'S MEMORANDUM SUPPORTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT REGARDING CONTRACTUAL ELEMENTS

Defendant Applied Construction Solutions ("ACS"), by its undersigned counsel, supports *Defendant's Motion for Summary Judgment* as follows:

## INTRODUCTION

This case arises out of a construction project to expand CNX Midstream Devco I, LP's ("CNX") Morris Natural Gas Compressor Station (the "Project"). ACS was the prime contractor selected for this Project after an extensive bid period. ACS completed the project at a total invoiced amount of $19,578,615.76. After receiving the final invoice, CNX refused to pay more than $15,225,857.23 and raised the claim that there was a not to exceed ("NTE") component in the contract that precluded any demand for compensation above that figure. CNX filed suit in January 2020 seeking declaratory relief to prevent ACS from exercising its statutory rights to place a lien on the Morris Station. Since filing suit, CNX neglected this case by answering discovery over five months late (after the expiration of its extension), not taking depositions, placing boilerplate discovery objections, and not meaningfully participating in discovery. The discovery that did take place has now determined that this matter is ripe for summary judgment in ACS favor.

1

## FACTUAL BACKGROUND

CNX solicited bids for the Project on or around October 9, 2018 through a document titled "Invitation for Bids" (Appendix Exhibit B). The first page of this Invitation for Bids contains a "Project Scope Statement" which dictated that:

> CNXM is requesting a pricing for the work detailed in this and all accompanying documents based on the current schedule and 60% design set. The structure of this bid is T&M plus fixed markup of labor and materials. The lump sum will be compared to other CONTRACTOR bid pricing as well as the budgeted amount. The CONTRACTOR is required to include all assumptions and completely fill out the SOV document based on experience and provided documentation. Once IFC drawings have been developed, the CONTRACTOR will have the opportunity to apply pricing to the updated plansets [sic] quantities to firm up the project cost. CNXM and the CONTRACTOR will work together to agree on final pricing prior to a final PO being issued.

The Invitation for Bid's Section 6(a) required a bidding contractor to submit a Schedule of Values attached to the invitation. CNX provided a Schedule of Values template to the bidders, complete it predetermined line items.

The Invitation for Bids document was revised and resubmitted on or about October 24, 2018. The only changes were to delete one sentence that is not material to this dispute, and to delay the project bid timeline. The above-quoted portion of the Project Scope Statement remained. A "90% complete" drawing package was later uploaded by CNX on or about October 26, 2018. That "90% description was an internal CNX designation and not the amount of drawing available.[1]

---

[1] The "90% complete" drawing package did not quantify the amount of drawings available. It was rather a CNX internal designation identifying the stage of CNX's review of available drawings. CNX had three review stages 30%, 60% and 90%. This indicated that CNX believed it was 90% through its review of the *available* drawings. When asked about CNX's representation that the design drawings available prior to bid were 90% complete, CNX's project manager and site foreman, Kevin Dunn stated "[n]o, I don't believe that." *Kevin Dunn Deposition*. 131:15-20 (Appendix Exhibit F). *See Defendant's Concise Statement of Material Fact No. 2* for further clarification.

According to *Plaintiff's Answer and Defenses to Defendant's Counterclaims* ¶10, a document titled "CNXM Station RFP Questions 20181024"[2] was uploaded to CNX's document sharing platform on or about November 5, 2018. *See* Appendix Exhibit C attached. This document contained the questions:

> Can you clarify if this contract will be a T&M or a Lump Sum contract? T&M.
>
> Do you want all SOV [schedule of values] lines as T&M Not to Exceed? Yes.
>
> […]
>
> If this is T&M, is this a T&M not to exceed amount based upon our submitted lump sum Budget? Yes.

CNX's legal position is built around this one undated document that contains no detail on who proposed the question, who answered, or how this document would be incorporated into the Project. The timing of this document is important.

ACS submitted its initial bid on November 6, 2018 – only one day after the only document referencing any "not to exceed" allegedly came into existence. *See* Appendix Exhibit D. ACS's bid document's first line reads "ACS is pleased to submit our T&M plus Fixed Markup of Labor and Materials proposal for the above referenced project as detailed within the scope documents, clarified within this proposal, and based on the following." Nowhere in this document does the term "not to exceed" appear, nor its acronym "NTE." CNX continued to upload designs to the "90% complete" design folder between November 6, 2018 and November 15, 2018, materially changing the 90% designs after ACS submitted its bid. *Plaintiff's Answer and Defenses to Defendant's Counterclaims* ¶ 25.

---

[2] Upon information and belief, "RFP" stands for "Request for Proposals," referencing CNX's bid request.

CNX chose not to award the project by its own November 9, 2018 deadline. Instead, CNX requested that contractors submit revised bids to lower the original price. On November 26, 2018, ACS submitted a letter to CNX containing a revised, lower price together with explicit conditions attached to this new price. *See* Appendix Exhibit E. Specifically,

> [ACS's] Original proposal of $**14,108,760.00** submitted November 6, 2018 was a number that sought to mitigate all concerns [listed] above and other unforeseen issues. Essentially, we included contingencies and risk against tie-in delays and subsequent schedule delays and slippages. We included a contingency for inclement weather, snow or rain. Our goal was to take care of any makeup days. *Basically, we tried to cover all possible issues to avoid any additional cost to CNX.*

*Id.* (*emphasis added*). ACS's reduced its bid by removing these protections. ACS clarified that "[i]f ACS removes the 10% contingency our number is $12,826,145.50 and obviously removes the mitigation controls mentioned above." *Id*. Without additional protections in place, ACS stated that "[o]bviously at this level any change or deviation from scope as it stands now [November 26, 2018], or schedule would be addressed very transparently between ACS and CNX." *Id*. This number was again reduced when CNX provided ACS with a revised schedule of values for $12,418,545 on November 30, 2018 – the day CNX awarded the project to ACS.

This revised bid removed protections for CNX. The initial bid outlined that the original price covered additional cost to CNX, which functioned similar to an NTE price and based upon the conditions and information presented to the bidders. However, because CNX requested a lower bid with the changes coming from the contractor's side (not the Owner's),[3] ACS was only able to lower its bid by removing the built-in cost protections for CNX. This placed the risk of unforeseen

---

[3] A key aspect of the bid is that the parties maintained the same "Time and Material Rates for Labor and Equipment" (a/k/a the rate sheet) and the project was billed for the same amount of hours. So, the input information based on the original scope of work remained the same. The bid did not change the amount of work necessary or how that work was billed. The lower bid was created by removing contingency protections from the final price. That is contrary to how an NTE price is implemented.

4

issues or changes to the project on CNX – not ACS. CNX's benefit for doing this was a lower bid price that was presumably easier for CNX's upper management to approve.

An NTE price is a tool to protect project owners from cost overruns. Such a protection is only feasible when the bidding contractor has all information necessary to appropriately appraise the project – and that protection only applies to the scope of the project covered by the NTE price, not later scope changes. Such concern was memorialized in this letter through ACS's good-faith statement that "any change or deviation from scope as it stands now, or schedule would be addressed very transparently."

On or about December 5, 2018, CNX uploaded the document alleged to be the parties' contract ("Contract") to its "Hubawoo" platform where the bid documents were previously made available. *See* Appendix Exhibit A. This Contract was unilaterally drafted by CNX without ACS's input. There are no signed copies. Upon information and belief, the contract was acknowledged by an unidentified individual at ACS checking a box online. It is unknown who drafted this contract, who provided input, and who had access to or knowledge of its contents.

CNX's project manager and site foreman, Kevin Dunn, was ACS's on-site contact for this project. Mr. Dunn was not familiar and aware of the Project's main contract document language. *Kevin Dunn Deposition* 75:10-24 (Appendix Exhibit F). Instead, his change process was based upon his understanding of the project – rather than his reading of the contract on how the Project was supposed to operate. *Id.*

Mr. Dunn clarified the project design status when the project was bid by confirming that "what we [CNX] called a 60 percent model. It – it was not complete." *Kevin Dunn Deposition* 41:6-10. It was Mr. Dunn's opinion that the project was bid without more developed designs because CNX was trying to secure a contractor ahead of time due to concerns regarding the busy

5

market for contractors and time constraints. *Id.* 41:18-42:20. Mr. Dunn agreed in his deposition that the project designs "were less developed than the other projects that [Mr. Dunn] worked on." *Id.* 155:12-16. When asked about CNX's representation that the design drawings available prior to bid were 90% complete, Mr. Dunn stated "[n]o, I don't believe that." *Id*. 131:15-20.

As a result of the design issues and premature bid, Mr. Dunn verified that "ACS provide[d] additional services to make up for [the design] deficiency in this project" and "work that [ACS] did in response to design changes would be an extra" that is entitled to compensation. *Id.* 155:20-22; *Id.* 144:13-15. CNX now maintains a different position from its on-site project manager who actively made the decisions regarding additional compensation until he was taken off the job by CNX.

## CONCISE STATEMENT OF MATERIAL FACTS

ACS incorporates its Concise Statement of Material facts herein.

## LEGAL AUTHORITY

**A. Summary Judgment.**

Rule 56(a) of the *Federal Rules of Civil Procedure* states that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A principal purpose of summary judgment is to isolate and dispose of meritless litigation." *Allstate Ins. Co. v. Ashley*, 833 F.Supp. 583 (S.D.W. Va. 1993). Summary Judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits to show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The facts must be viewed in a light most favorable to the non-moving party, and all reasonable inferences must be drawn in its favor. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278(3d

Cir. 2000). "There must, however, be sufficient evidence for a jury to return a verdict in favor of the non-moving party; if the evidence is merely colorable or not significantly probative, summary judgment should be granted." *Bouriez v. Carnegie Mellon University*, F.3d 2009 U.S. App. LEXIS 23473, at *14(3d Cir. Oct. 26, 2009) (quoting *Armbruster v. Unisys Corp.*, 32 F. 3d 768, 777 (3d Cir. 1994). Further,

> Where the non-moving party will bear the burden of proof at trial, the moving party's burden can be discharged by showing that there is an absence of evidence to support the non-moving party's case. If the moving party has carried this burden, the burden shifts to the non-moving party to point to sufficient cognizable evidence to create material issues of fact "such that a reasonable jury could find in its favor."

*Id.* (Internal quotation marks, ellipses and citations omitted). Here, Defendant ACS submits that based on this standard and its arguments set forth below, it is entitled to summary judgment.

## DISCUSSION

Based on the undisputed facts, CNX's admissions, and the established law, ACS is entitled to judgment as a matter of law. All facts necessary to support ACS's claims are established and undisputed. CNX had the opportunity to participate in the development of those facts but chose not to do so by refusing to participate in this litigation and neglecting to respond to ACS's discovery requests until after discovery closed. CNX had every opportunity to respond to written discovery, take depositions, send subpoenas, or file discovery motions. However, it demonstrated no interest in this matter.

Summary judgment is appropriate because regardless of how the contract is interpreted, CNX is contractually obligated to pay ACS either the time and material spent on the job or the difference in cost between the scope/schedule of the Project at bid versus the Project as realized a project completion. Here, the difference in cost would also be the amount spent on the project, and

claimed by ACS, as the additional cost is attributed to out-of-scope work and related changes CNX made and directed ACS to perform.

**I.   Contractual Language.**

The rule of *contra proferentem* states that "any ambiguous language in a contract is construed against the drafter and in favor of the other party if the latter's interpretation is reasonable." *Restatement (Second) of Contracts § 296*; *State Public School Building Authority v. Quandel*, 585 A.2d 1136, 1144 (Pa. 1991). CNX unilaterally drafted this contract and sent it to ACS through CNX's own platform. ACS did not draft this contract which is ambiguous and contradictory to itself.

**a. The Contract that CNX attached to its Complaint as Exhibit A has no NTE component.**

CNX attached a document to its complaint that it claims is the contract governing this project (the "Contract"). That Contract describes the "CONTRACT PRICE" in Article 4 as:

> COMPANY SHALL PAY CONTRACTOR, AND CONTRACTOR SHALL ACCEPT IN FULL PAYMENT AND CONSIDERATION FOR THE FULL PERFORMANCE OF CONTRACTOR'S OBLIGATIONS HEREUNDER, SUBJECT TO ANY ADDITIONS AND DEDUCTIONS PERMITTED BY THE CONTRACT DOCUMENTS, IN ACCORDANCE WITH THE BID SHEET SCHEDULES PLUS THE SUM OF: $12,418,545.00; TWELVE MILLION FOUR HUNDRED EIGHTEEN THOUSAND FIVE HUNDRED FORTY-FIVE DOLLARS AND ZERO CENTS. ALL LUMP SUM AND UNIT PRICING IS FIRM THROUGH PROJECT COMPLETION.
>
> CN1 6/28/2019: $2,400,000
>
> SEE EXHIBIT "A" FOR COST BREAKDOWN OF PROJECT SCOPE OF WORK.

*See* Appendix Exhibit A. Article 4 does not mention any NTE element. Rather, it explicitly contemplates additions to the lump sum price. There are a few subparts of this Article worth discussing in detail.

### i. The "CONTRACT PRICE" is $12,418,545.00 plus additional costs priced under the bid's rate sheet.

The "CONTRACT PRICE" Article of the contract explicitly states that the price is "subject to any additions and deductions permitted by the Contract Documents, in accordance with the Bid Sheet Schedules *plus* $12,418,545.00." (*emphasis added*). *Id.* A plain reading of this article prescribes that the $12,418,545 figure ACS bid is essentially a budget amount, subject to change. The "plus" language is very important because it ties the "any additions and deductions permitted by the contract documents" into the final figure. This is a stark contrast to a hardline "NTE" element that would bar ACS from increasing the project price. In fact, CNX acknowledged ACS's right to additional compensation when it stated "[p]ursuant to the Contract, ACS was entitled to change orders increasing the Contract Price to the extent that the scope of work for the Project increased beyond that scope-of-work contained in the Contract Documents as of December 5, 2018." *Complaint* at ¶11.

### ii. The defined "Contract Documents" do not incorporate the NTE figure.

ACS claims the NTE figure was incorporated into the contract through the aforementioned November 5, 2018 document containing the questions and answers quoted in the factual background section. This basis arises from the Contract's Article 2 which defines the term "Contract Documents" through a list referencing specific documents by name. *Appendix Exhibit A*. The document "Morris CS RFP Questions 208124" is listed as item "l" in the list. *Id.*

However, the November 26, 2018 letter which removed any contingencies, such as an NTE component, was also incorporated by reference. This document (titled "ACS Revised Pricing –

11-26-18.pdf") is found in the fifth bullet point under Article 2. Likewise, the invitation to bidders lacked any NTE reference. This invitation and other documents incorporated by reference are contrary or inconsistent with CNX's claimed NTE. The Contract itself clarifies that "THE PROVISIONS OF THIS CONSTRUCTION AGREEMENT SUPERSEDE ALL INCONSISTENT PROVISIONS OF OTHER CONTRACT DOCUMENTS, AND THE PARTICULAR PROVISIONS OF OTHER CONTRACT DOCUMENTS SUPERSEDE ALL INCONSISTENT PROVISIONS CONTAINED IN GENERAL SPECIFICATIONS OR CONDITIONS INCORPORATED BY REFERENCE." *Id.*

Therefore, either (i) there is no NTE because the later-in-time November 26, 2018 revised pricing explicitly removed contingencies and because the bid itself did not reference any NTE price, or at worst, (ii) the terms of the contract documents are inconsistent with respect to the NTE term and therefore, the terms of the Contract supersede any inconsistent Contract Documents. In the later scenario, Article 4's price terms would apply. Those terms establish a $12,418,545.00 price plus any allowed additions or subtractions. There is no NTE term in the body of the Contract itself. This court should find in ACS's favor over CNX since CNX drafted the ambiguous contract.

### iii. Contract Exhibit A outlines the Scope of Work and CNX Must Compensate ACS For Any Work Outside this Scope.

The Contract itself contains an Exhibit A, which is the Schedule of Values (SOV) CNX provided to the bidders. The version incorporated into the contract is the SOV that ACS submitted along with its lower, revised bid based on drawings at the time. The line items in Exhibit A aggregate to the project's initial price of $12,418,545.00. It is undisputed that CNX must compensate ACS for any out-of-scope work. CNX acknowledged this when it stated "[p]ursuant to the Contract, ACS was entitled to change orders increasing the Contract Price to the extent that the scope of work for the Project increased beyond that scope-of-work contained in the Contract

10

Documents as of December 5, 2018." *Complaint* at ¶11. ACS does not agree with the December 5, 2018 date but applies the principle. CNX then admitted that "the Project drawings were not 90% designed when CNX accepted ACS's Project proposal on November 20, 2018." *Request for Admission No. 13* (deemed admitted). CNX next admitted that "any work not included in the drawings as they existed on or about November 26, 2018 (when ACS submitted its revised Project proposal) is out-of-scope work." *Request for Admission No. 16* (deemed admitted). The SOV represents the individual components of ACS's November 26, 2018 bid based on the drawing documents existing at that time. CNX's Project Supervisor testified that "[i]f there was something that wasn't identified in the – in the model or the PNIDs or in the isos or in the orthos, that item would be determined by me to be out of scope."[4] *Kevin Dunn Deposition* 70:16-19.

CNX admitted "the Project designs that were submitted contained deficiencies, such as inaccurate measurements and pipe sizes, that required ACS to make changes to the design to ensure the Project was built as intended." *Request for Admission No. 19* (deemed admitted). These design deficiencies drastically increased ACS's cost – which was then billed to CNX – and meant that additional out-of-scope work was necessary, even on drawings that did exist. Compounding this factor is that new and revised documents were delivered late throughout the entire project, with the final drawing coming on June 7, 2019 – over seven months after ACS's accepted bid. The core takeaway is that the engineering/design of this project was in disarray from the start and ACS is entitled for compensation for its work.

---

[4] The term "PNIDs" or "P&IDs" are "Piping and instrument diagrams." The term "isos" refer to "isometric" drawings which are a three-dimensional visual representation of an object using three planes of view. The term "orthos" refers to "orthographic" drawings which represent a three-dimensional object by using several plains of view.

ACS quantified these discrepancies to show the expansion from what it bid to what CNX received:

|  | *Material Bid* | *Material Installed* | *Percentage Increase* |
|---|---|---|---|
| *Linear Feet of Pipe* | 12,119 | 12,448 | **2.71%** |
| *Linear Feet of Tubing* | 1,000 | 2,880 | **188.00%** |
| *Valves* | 887 | 1,809 | **103.95%** |
| *Instruments* | 140 | 162 | **15.71%** |
| *Total Material and Equipment* | $ 2,837,160.00 | $ 4,838,198.00 | **70.53%** |

The cost of additional material alone was $2,001,038 above the bid amount. The cost of pipe fabrication is one of the largest price increases. The accepted bid anticipated a $1,473,160 cost. The actual realized cost was $2,692,948 – an 82.8% increase. This is indicative of the growth in material quantified in the table above. More material used naturally creates more fabrication costs. Third-party subcontractors experienced similar cost growth:

|  | *Subcontractor Bid* | *Subcontractor Invoiced* | *Percentage Increase* |
|---|---|---|---|
| *Foundations (MONCO)* | $ 3,324,250 | $ 4,592,973.00 | **38.17%** |
| *Electrical (BOLT)* | $ 967,500 | $ 1,798,915.00 | **85.93%** |
| *Pipe Fabrication (Mountaineer Fab)* | $ 451,335 | $ 526,410.00 | **16.63%** |
| *Total Subcontracts* | $ 5,636,985 | $ 8,099,072.00 | **43.68%** |

These subcontractor costs are outside ACS's direct control and thus independently support ACS's claim that this project required additional work. These three categories combined (materials, fabrication, and subcontractors) added an additional $5,682,913. That figure alone is above what CNX claims it will pay despite being clearly outside ACS's control. ACS had additional costs outside these three categories that CNX likewise refuses to pay.

ACS itself expended 106,858 manhours on the project after bidding said project at 57,556 manhours – an 85.66% increase. CNX admitted it "directed ACS to increase its manpower on the site and increase the number of shits ACS work." *Request for Admission No. 28* (deemed admitted

and partially admitted). Kevin Dunn confirmed that if ACS adds persons or hours to make up for lost time due to causes outside ACS's fault, that would qualify as an extra under the contract. *Kevin Dunn Deposition* 137:8-14. The extra manpower was necessitated by changes to the work, late design drawings, CNX-caused delays due to at least eleven emergency shutdowns of the plant, and other out-of-scope work CNX directed or induced ACS to perform. Mr. Dunn even confirmed that ACS "was asked to do [work] completely unrelated to this project." *Id*. 137:23-5.

Such a drastic increase in manhours is another indicator of the vast difference between the information available at the time of bid and what CNX actually received. CNX's own agent, Mr. Dunn, confirmed that additional hours outside ACS's control qualify for extra compensation. Yet, CNX refuses to compensate ACS for such.

ACS invoiced a total project cost to ACS of $19,478,615.76:

| SUBMITTED TO (AT CNX) | SUBMITTED BY (AT ACS) | INVOICE NUMBER | INVOICE AMOUNT | DATE INVOICE SUBMITTED | RETAINIAGE HELD (10%) | 1% PAYMENT DISCOUNTS | AMOUNT PAID | AMOUNT UNPAID |
|---|---|---|---|---|---|---|---|---|
| K. Dunn/C. Hansen | V. Nyswaner | 18103.01 | $ 813,288.83 | JAN 31, 2019 | $ 81,328.88 | $ 7,319.60 | $ 724,640.35 | |
| K. Dunn/C. Hansen | V. Nyswaner | 18103.02 | $ 342,274.82 | FEB 18, 2019 | $ 34,227.48 | $ - | $ 308,047.34 | |
| K. Dunn/C. Hansen | D. Larkin | 18103.03 R1 | $ 893,212.76 | MAR 19, 2019 | $ 89,321.28 | $ 8,038.91 | $ 795,852.57 | |
| K. Dunn/C. Hansen | D. Larkin | 18103.04 R1 | $ 972,190.30 | APR 01, 2019 | $ 97,219.03 | $ 8,749.71 | $ 866,221.56 | |
| K. Dunn/C. Hansen | D. Larkin | 18103.05 | $ 1,102,870.12 | APR 05, 2019 | $ 110,287.01 | $ 9,925.83 | $ 982,657.28 | |
| K. Dunn/C. Hansen | D. Larkin | 18103.06 R1 | $ 1,456,409.07 | APR 23, 2019 | $ 145,640.91 | $ 13,107.68 | $ 1,297,660.48 | |
| K. Dunn/C. Hansen | D. Larkin | 18103.07 | $ 1,040,888.98 | MAY 02, 2019 | $ 104,088.89 | $ 9,368.00 | $ 927,432.04 | |
| K. Dunn/C. Hansen | D. Larkin | 18103.08 | $ 1,425,822.17 | MAY 24, 2019 | $ 142,582.22 | $ 12,832.40 | $ 1,270,407.55 | |
| K. Dunn/C. Hansen | D. Larkin | 18103.09 | $ 2,322,433.46 | JUNE 07, 2019 | $ 232,243.35 | $ - | $ 2,090,190.11 | |
| K. Dunn/C. Hansen | D. Larkin | 18103.10 | $ 1,084,896.22 | JUNE 13, 2019 | $ 108,489.62 | $ 9,764.07 | $ 966,642.53 | |
| K. Dunn/C. Hansen | D. Larkin | 18103.11 | $ 1,999,094.62 | JULY 01, 2019 | $ 199,909.46 | $ 9,920.84 | $ 1,789,264.32 | |
| *C. Hansen | D. Larkin | 18103.12 R1 | $ 1,667,521.87 | OCT 01, 2019 | $ 166,752.19 | $ - | $ 1,500,769.68 | |
| *C. Hansen | D. Larkin | 18103.13 | $ 891,385.53 | OCT 01, 2019 | $ - | $ - | $ - | $ 891,385.53 |
| *C. Hansen | D. Larkin | 18103.14 | $ 508,198.58 | OCT 01, 2019 | $ - | $ - | $ - | $ 508,198.58 |
| *C. Hansen | D. Larkin | 18103.15 | $ 527,678.52 | OCT 01, 2019 | $ - | $ - | $ - | $ 527,678.52 |
| *C. Hansen | D. Larkin | 18103.16 | $ 919,367.03 | OCT 01, 2019 | $ - | $ - | | $ 919,367.03 |
| *C. Hansen | D. Larkin | 18103.17 | $ 465,553.93 | OCT 01, 2019 | $ - | $ - | | $ 465,553.93 |
| *C. Hansen | D. Larkin | 18103.18 | $ 539,208.18 | OCT 01, 2019 | $ - | $ - | | $ 539,208.18 |
| Via ShareFile | D. Larkin | 18103.21 | $ 506,320.77 | JAN 21, 2020 | | | | $ 506,320.77 |
| | Total Cost of Project to ACS: | | $ 19,478,615.76 | | $ 1,512,090.32 | $ 89,027.05 | $ 13,519,785.81 | $ 4,357,712.54 |

CNX owes ACS the balance between $19,478,615.76 and the amount CNX actually paid for the project. That amount outstanding is **$4,357,712.54**, plus interest accumulating by law, including under Pennsylvania's Contractor and Subcontractor Payment Act, 73 P.S. § 501 et seq.

## II. Pure Time and Material.

The Contract itself establishes that "THE PROVISIONS OF THIS CONSTRUCTION AGREEMENT SUPERSEDE ALL INCONSISTENT PROVISIONS OF OTHER CONTRACT DOCUMENTS, AND THE PARTICULAR PROVISIONS OF OTHER CONTRACT DOCUMENTS SUPERSEDE ALL INCONSISTENT PROVISIONS CONTAINED IN GENERAL SPECIFICATIONS OR CONDITIONS INCORPORATED BY REFERENCE." *Appendix Exhibit A,* Article 2. The document that CNX claims establishes an NTE price is plainly inconsistent with other "contract documents" – explicitly ACS's revised bid price which removed contingencies. Under the Contract's own terms, the provisions of the Contract itself supersede inconsistent provisions in the Contract documents.

There are no "NTE" or "not to exceed" terms located in the Contract itself. Rather, the lone price term reads:

> Company shall pay Contractor, and Contractor shall accept in full payment and consideration for the full performance of Contractor's Obligations hereunder, subject to any additions and deductions permitted by the Contract Documents, in accordance with the Bid Sheet Schedules ***plus*** $12,418,545.00 […] All Lump sum and unit pricing is firm through project completion.

*Id.* Article 4 (***emphasis added***). The contract plainly reads that Contractor will be paid in accordance with the bid sheet schedules ***plus*** $12,418,545.00. That emphasizes that ACS was to be compensated for its work under the rate sheet schedule provided with its bid, on top the $12.4 million base figure. That is contrary to any notion of an NTE figure, and this language supersedes that one-off document referencing an NTE cap.

The time & material rate sheet known as the "Schedule of Equipment and Labor Rates" was provided to CNX at bid and ACS billed this project in accordance with such. CNX admitted that "T&M items should be billed under" the rates on the Schedule of Equipment and Labor Rates.

*Request for Admission No. 19* (deemed admitted and actually admitted). Due to CNX's deficiencies with how the project was bid and with how it *unilaterally* drafted its own contract which contained inconsistent and contradictory terms, there is no NTE cap. Thus, the project should be billed on a pure T&M basis under the Schedule of Equipment and Labor Rates.

ACS prepared and submitted its invoices using these rates. Therefore, ACS is entitled to the full amount it billed to CNX since this is the same figure a pure T&M method would reach. The remaining difference between what was paid and what was properly invoiced is the same **$4,357,712.54**, plus interest accumulating by law, including under Pennsylvania's Contractor and Subcontractor Payment Act, 73 P.S. § 501 et seq.

## CONCLUSION

Regardless of how the contract is construed, the outcome remains the same. The Contract at issue is ambiguous, inconsistent, and not reflective of the parties' agreement. This contract cannot have an NTE term due to how the contract was drafted and used. In the alternative, if this Honorable Court finds there is an NTE term, then that only applied to the original scope of work which CNX's own project manager, Kevin Dunn, admitted was underdeveloped, consistently changed, and not applicable to additional work CNX required ACS to do. ACS completed and billed the project appropriately under the agreed upon Schedule of Equipment and Labor Rates. Whether or not there is an NTE term, ACS is due the same **$4,357,712.54**, plus interest accumulating by law, including under Pennsylvania's Contractor and Subcontractor Payment Act, 73 P.S. § 501 et seq.

                                                **APPLIED CONSTRUCTION SOLUTIONS, INC.**
                                                **By Counsel,**

/s/ Evan S. Aldridge
Robert C. James, Esq. (PA #80393)
FLAHERTY SENSABAUGH BONASSO PLLC

1225 Market Street/P.O. Box 6545
Wheeling, WV 26003
rjames@flahertylegal.com
and

Christopher A. Brumley, Esq. (*Admitted Pro Hac Vice*)
Evan S. Aldridge, Esq. (*Admitted Pro Hac Vice*)
FLAHERTY SENSABAUGH BONASSO PLLC
P.O. Box 3843
Charleston, WV 25338
(304) 347-3798
cbrumley@flahertylegal.com
ealdridge@flahertylegal.com

**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA**

**CNX MIDSTREAM DEVCO I, LP,**

        **Plaintiff,**                              Civil Action No.: 2:20-cv-00290

v.                                                     Magistrate Judge Lisa Pupo Lenihan

**APPLIED CONSTRUCTION SOLUTIONS,
INC.,**

        **Defendant.**

## CERTIFICATE OF SERVICE

I, the undersigned, counsel for Defendant Applied Construction Solutions, Inc. do hereby certify that on this 19th day of February 2021, a true and correct copy of the foregoing **Defendant's Memorandum Supporting Defendant's Motion For Summary Judgment Regarding Contractual Elements** was served upon the following counsel of record via the Court's CM/ECF System:

                William D. Clifford, Esquire
                Gregory C. Michaels, Esquire
            DICKIE, MCCAMEY & CHILCOTE, P.C.
                  Two PPG Place, Suite 400
                  Pittsburgh, PA  15222-5402
                      *Counsel for Plaintiff*

/s/ Evan S. Aldridge
Robert C. James, Esq. (PA #80393)
FLAHERTY SENSABAUGH BONASSO PLLC
1225 Market Street/P.O. Box 6545
Wheeling, WV 26003
rjames@flahertylegal.com

and

Christopher A. Brumley, Esq. (*Admitted Pro Hac Vice*)
Evan S. Aldridge, Esq. (*Admitted Pro Hac Vice*)
FLAHERTY SENSABAUGH BONASSO PLLC
P.O. Box 3843
Charleston, WV 25338
(304) 347-3798
cbrumley@flahertylegal.com
ealdridge@flahertylegal.com