**EXHIBIT A**
*CNX-produced Contract*

REVISED 06.8.2018

THIS AGREEMENT SUPERSEDES THE TERMS AND CONDITIONS OF THE GENERAL TERMS AND CONDITIONS AGREEMENT FOR ELECTRONIC COMMERCE.

IF YOU HAVE RECEIVED THIS THROUGH HUBWOO, THIS PURCHASE ORDER MAY ONLY BE ACCEPTED BY THE VENDOR SAVING AND SENDING THIS PURCHASE ORDER THROUGH HUBWOO WITHOUT CHANGES TO THE PURCHASER. PERFORMANCE SHALL NOT CONSTITUTE ACCEPTANCE OF THE PURCHASE ORDER. INVOICES ISSUED TO THIS PURCHASE ORDER WILL NOT BE PAID UNLESS CONFIRMATION OF ACCEPTANCE IS PROVIDED BY VENDOR TO PURCHASER AS PROVIDED IN THIS PARAGRAPH. IN THE EVENT OF ANY CONFLICT BETWEEN THIS ITEM TEXT AND ANY OTHER CONTRACT DOCUMENT OR PROVISION, THIS ITEM TEXT SHALL CONTROL. PLEASE SEND ALL INVOICE BACK-UP DOCUMENTATION (E.G. TIMESHEETS AND PODS) TO <Carissa Hansen> AT <CarissaHansen@CNX.com>.

IF YOU RECEIVE THIS CONTRACT THROUGH EMAIL, AND NOT THROUGH CNX'S HUBWOO SYSTEM, YOU ARE REQUESTED TO REPLY TO THIS EMAIL TO CONFIRM ACCEPTANCE OF THE TERMS AND CONDITIONS OF THE ATTACHED PURCHASE ORDER OR CHANGE NOTICE. IF YOU DO NOT CONFIRM ACCEPTANCE OF THE TERMS AND CONDITIONS BY REPLYING TO THIS EMAIL BUT YOU INITIATE PERFORMANCE OF THE PURCHASE ORDER OR CHANGE NOTICE, YOUR PERFORMANCE WILL CONSTITUTE ACCEPTANCE OF THE TERMS AND CONDITIONS.

IF NOT REQUIRED BY CNX TO BE A MEMBER OF ISNETWORLD, PLEASE SUBMIT THE FOLLOWING VIA EMAIL TO GASVENDORS@CNX.COM:

1. VALID INSURANCE CERTIFICATE- THE CONTRACTOR SHALL FURNISH TO THE COMPANY A CERTIFICATE OF HIS GENERAL LIABILITY, AUTOMOBILE, UMBRELLA, BLACK LUNG IF APPLICABLE, AND WORKMEN'S COMPENSATION INSURANCE COVERAGE, COVERING SERVICES IN THE STATE SPECIFIED UPON RECEIPT OF THE PURCHASE ORDER.

2. CONTRACTOR REGISTER INFORMATION- THE CONTRACTOR SHALL SEND THE FOLLOWING NUMBERS VIA EMAIL TO COMPLY WITH SAFETY INSPECTION REGULATIONS FOR EACH PURCHASE ORDER RECEIVED. INSTRUCTION BELOW:
SUBJECT OF EMAIL MUST INCLUDE: "PO NUMBER AND LOCATION OF JOB
(Name of Pad Site)"
- CONTRACTOR'S FEDERAL EMPLOYER I.D. NUMBER:
- CONTRACTOR'S I.D. NUMBERS (IF APPLICABLE):
- MSHA CONTRACTOR'S I.D. NUMBER:
- STATE CONTRACTOR'S LICENSE NUMBER:
    PAD API NUMBER:
BOTH INSURANCE AND CONTRACTOR REGISTER INFORMATION CAN BE CNXIDATED IN ONE EMAIL, BUT THE SUBJECT MUST BE "PO NUMBER AND LOCATION OF JOB."
CONSTRUCTION AGREEMENT
-
MADE THIS     5TH DAY OF     DECEMBER, A.D 2018
-

-
B E T W E E N

CNX MIDSTREAM DVCO I LP, ORGANIZED AND EXISTING UNDER AND BY VIRTUE OF THE LAWS OF THE STATE OF DELAWARE, HEREINAFTER CALLED "COMPANY"
-
A N D
-

-
APPLIED CONSTRUCTION SOLUTIONS INC, ORGANIZED AND EXISTING UNDER AND BY VIRTUE OF THE LAWS OF THE STATE OF WEST VIRGINIA, HEREINAFTER
CALLED "CONTRACTOR"

WITNESSETH:

THAT THE PARTIES HERETO, IN CONSIDERATION OF THE MUTUAL COVENANTS HEREIN CONTAINED AND INTENDING TO BE LEGALLY BOUND HEREBY, COVENANT AND AGREE AS FOLLOWS:



EXHIBIT

A

ARTICLE 1. -- SCOPE OF THE WORK:  CONTRACTOR SHALL
FURNISH ALL LABOR, SUPERVISION, MATERIAL, SUPPLIES, TOOLS,
UTILITIES, TRANSPORTATION, PLANT, EQUIPMENT, FACILITIES, AND
SERVICES NOT SPECIFICALLY REQUIRED IN THE CONTRACT DOCUMENTS TO BE FURNISHED BY
COMPANY AND SHALL PERFORM AND COMPLETE ALL THE WORK FOR THE CONSTRUCTION AND
COMPLETION OF:

ON LAND OF COMPANY SITUATE:

ALL IN ACCORDANCE WITH THE CONTRACT DOCUMENTS AND TO THE SATISFACTION AND APPROVAL OF
COMPANY.

ARTICLE 2. -- CONTRACT DOCUMENTS:  THE FOLLOWING DOCUMENTS FORM THE AGREEMENT BETWEEN
THE PARTIES AND ARE HEREIN REFERRED TO AS THE "CONTRACT DOCUMENTS":  THE
INVITATION TO BIDDERS, THE INSTRUCTIONS TO BIDDERS, THIS CONSTRUCTION AGREEMENT, THE
GENERAL CONDITIONS, DRAWINGS AND SPECIFICATIONS, AND THE FOLLOWING:

Reference: ShareFile Bid: 0660 - 180925 - CNXM Morris Station Exp RFP
• (ACS) 0660 - 180925 - CNXM Morris Station Exp RFP
• REV1
o Morris CS SOV_10032018 Rev2.xlsx
o Clarification.pdf
o ACS Revised Pricing - 11-26-18.pdf

BID DOCUMENTS:
a) Invitation Letter CNXM Morris Station RFP
b) CNX-MRX-10-0050_Redlined
c) CNX-MRX-50-2000_DEMO
d) CNX-MRX-50-3000_Redlined
e) Morris Bid Presentation_10092018
f) Morris CS RFP_10092018
g) Morris CS SOV_10032018
h) Bid Clarification_Piping Quantity_10302018
i) Bid Timeline _10222018
j) CNXM Morris RFP Questions_11012018
k) CNXM Morris RFP Questions_11052018
l) CNXM Station RFP Questions 20181024
m) Morris CS RFP_10222018
n) Morris Foundnations in Question
o) MORRIS EXP 2019 - PRELIM - 9-19-18.nwd
p) CNX-MOR-60-3001-RC
q) CNX-MOR-60-3002-R4B
r) CNX-MOR-60-3003-RC
s) CNX-MOR-60-3004-RC
t) CNX-MOR-60-3008-RA
u) CNX-MOR-60-3009-RA
v) CNX-MOR-60-3010-RA
w) CNX-MOR-60-LL05-RB
x) CNX-MOR-60-LL06-RB
y) CNX-MOR-60-LL07-RB
z) CNX-MOR-60-LL08-RA
aa) PIT.14.8885.12.T003
bb) CNX-MOR-40-3000
cc) CNX-MOR-40-3001
dd) CNX-MOR-40-3002
ee) CNX-MOR-40-3003
ff) CNX-MOR-40-3004
gg) CNX-MOR-40-3005
hh) CNX-MOR-40-3006
ii) CNX-MOR-40-3007
jj) CNX-MOR-40-3008
kk) CNX-MOR-40-3009
ll) CNX-MOR-40-3010

```
mm)   CNX-MOR-40-3011
nn)   CNX-MOR-40-3012
oo)   CNX-MOR-40-3013
pp)   CNX-MOR-40-3014
qq)   CNX-MOR-40-3015
rr)   CNX-MOR-40-3016
ss)   CNX-MOR-40-3017
tt)   CNX-MOR-40-3018
uu)   CNX-MOR-40-3019
vv)   CNX-MOR-40-3020
ww)   CNX-MOR-40-3021
xx)   CNX-MOR-40-3022
yy)   CNX-MOR-40-3023
zz)   CNX-MOR-40-3024
aaa)  CNX-MOR-40-3025
bbb)  CNX-MOR-40-3040
ccc)  CNX-MOR-60-3031_Rev A
ddd)  CNX-MOR-60-3032_Rev A
eee)  CNX-MOR-60-3033_Rev A
fff)  CNX-MOR-60-3034_Rev A
ggg)  CNX-MOR-60-3035_Rev A
hhh)  CNX-MOR-60-3036_Rev A
iii)  CNX-MOR-60-3037_Rev A
jjj)  CNX-MOR-60-3037_Rev A
kkk)  CNX-MOR-60-3051_Rev B
lll)  CNX-MOR-60-3052_Rev B
mmm)  CNX-MOR-60-3053_Rev B
nnn)  CNX-MOR-60-3054_Rev B
ooo)  CNX-MOR-60-3055_Rev B
ppp)  CNX-MOR-60-3056_Rev B
qqq)  CNX-MOR-60-3057_Rev A
rrr)  CNX-MOR-60-3058_Rev A
sss)  CNX-MOR-60-3059_Rev B
ttt)  CNX-MOR-60-3060_Rev A
uuu)  CNX-MOR-60-3061_Rev A
vvv)  CNX-MOR-60-3062_Rev A
www)  CNX-MOR-60-3070_Rev A
xxx)  CNX-MOR-60-3071_Rev A
yyy)  CNX-MOR-60-3072_Rev A
zzz)  CNX-MOR-60-3073_Rev A
aaaa) CNX-MOR-60-3074_Rev A
bbbb) CNX-MOR-60-3075_Rev A
cccc) CNX-MOR-60-3076_Rev A
dddd) CNX-MOR-60-3077_Rev A
eeee) PIT.14.8885.12.T004
ffff) CNX-MOR-50-3000-RB
gggg) CNX-MOR-50-3001-RB
hhhh) CNX-MOR-50-3002-RB
iiii) CNX-MOR-50-3003-RB
jjjj) CNX-MOR-50-3004-RB
kkkk) CNX-MOR-50-3005-RB
llll) CNX-MOR-50-3006-RB
mmmm) CNX-MOR-50-3007-RB
nnnn) CNX-MOR-50-3008-RB
oooo) CNX-MOR-50-3009-RB
pppp) CNX-MOR-50-3010-RB
qqqq) CNX-MOR-50-3010-RB
rrrr) CNX-MOR-50-3011-RB
ssss) CNX-MOR-50-3012-RB
tttt) CNX-MOR-50-3013-RA
uuuu) CNX-MOR-50-3014-RA
vvvv) CNX-MOR-50-3015-RA
wwww) CNX-MOR-50-3016-RA
```

xxxx) CNX-MOR-50-3017-RA
yyyy) CNX-MOR-50-3018-RA
zzzz) CNX-MOR-50-3019-RA
aaaaa) CNX-MOR-50-3020-RA
bbbbb) CNX-MOR-50-3021-RA
ccccc) CNX-MOR-50-3022-RA
ddddd) CNX-MOR-50-3023-RA
eeeee) CNX-MOR-50-3024-RA
fffff) CNX-MOR-50-3025-RA
ggggg) CNX-MOR-50-3026-RA
hhhhh) CNX-MOR-50-3027-RA
iiiii) MORRIS EXP 2019 - PRELIM - 10-29-18
jjjjj) MORRIS P&IDs HIGHLIGHTED SET 10-26-18
kkkkk) PIT.14.8885.12.T005
lllll) CNX-MOR-40-CivilCombined_11132018
mmmmm) Bill of Materials-2018-11-15 - NO    CONTROL VALVES
nnnnn) CNX-MOR-50-PipingCombined_11152018
ooooo) CNX-MOR-60-Electrical_11152018
ppppp) CNX-MOR-70-IC_11152018
qqqqq) Morris Equipment Delivery_11152018
rrrrr) PID Cause Effect Morris 2019_Expansion
sssss) 1659-B-GA-18-B
ttttt) 1666-B-GA-18-A PRELIMINARY
uuuuu) 1668-B-GA-18-0
vvvvv) B-129348 R0
wwwww) D-129346 R2
xxxxx) B-129461 R0
yyyyy) D-129459 R0
zzzzz) 18-10253-01-0-00 Rev. 2
aaaaaa) 18-10253-01-0-32 Rev. 1
bbbbbb) 18-10253-01-0-70 Rev. 1
cccccc) 18-10253-01-0-71 Rev. 2
dddddd) 18-10253-01-0-71 Rev_1
eeeeee) 403669-GA Rev C
ffffff) CNX Gas Submittal
gggggg) eds-1063
hhhhhh) epa-1097
iiiiii) n18d573epa
jjjjjj) 72HS5 Model_R2
kkkkkk) 940004-r2 General Arrangment AB 200 Standard Combustion Flare
llllll) T400-83 SHEET 1 OF 3 CNX MIDSTREAM
mmmmmm) T400-83 SHEET 2 OF 3  CNX MIDSTREAM
nnnnnn) T400-83 SHEET 3 OF 3  CNX MIDSTREAM
oooooo) T450-01 SHEET 1 OF 3 CNX MIDSTREAM
pppppp) T450-01 SHEET 2 OF 3 CNX MIDSTREAM
qqqqqq) T450-01 SHEET 3 OF 3 CNX MIDSTREAM

TOGETHER WITH ALL PRINTS, DOCUMENTS, AND PAPERS REFERRED TO IN ANY OF THE FOREGOING,
ALL OF WHICH ARE INCORPORATED HEREIN BY REFERENCE THERETO AS FULLY AS THOUGH SET FORTH
IN
THIS CONSTRUCTION AGREEMENT. THE PROVISIONS OF THIS CONSTRUCTION AGREEMENT SUPERSEDE
ALL INCONSISTENT PROVISIONS OF OTHER CONTRACT DOCUMENTS, AND THE PARTICULAR PROVISIONS
OF OTHER CONTRACT DOCUMENTS SUPERSEDE ALL INCONSISTENT PROVISIONS CONTAINED IN GENERAL
SPECIFICATIONS OR CONDITIONS INCORPORATED BY REFERENCE. THE CONTRACT DOCUMENTS SHALL
CONSTITUTE THE ENTIRE AGREEMENT BETWEEN THE PARTIES AND SHALL NOT BE MODIFIED,
CHANGED, OR AMENDED EXCEPT BY WRITTEN INSTRUMENT EXECUTED BY COMPANY AND CONTRACTOR,
AND CONSENTED TO BY THE SURETY OR SURETIES ON ALL BONDS PROVIDED IN
CONNECTION HEREWITH, IF ANY; PROVIDED, HOWEVER, THAT THIS PROVISION SHALL NOT LIMIT OR
AFFECT THE RIGHT TO MAKE CHANGES OR VARIATIONS IN THE WORK AS PERMITTED IN THE
CONTRACT DOCUMENTS.

CONTRACTOR SHALL FURNISH, FOR COMPANY'S APPROVAL, NECESSARY GENERAL FACILITY
ARRANGEMENT AND CONSTRUCTION DETAIL DRAWINGS WHICH SHALL BECOME PART OF THE CONTRACT
DOCUMENTS. DEVIATION FROM CONTRACT DOCUMENTS WILL BE MADE ONLY WITH
COMPANY'S WRITTEN APPROVAL; AND, EXCEPT IN EMERGENCY SITUATIONS WHERE THERE IS AN
IMMEDIATE THREAT OF INJURY OR SERIOUS DAMAGE TO PERSONS OR PROPERTY, NO WORK SHALL BE
PERFORMED ON ANY SUCH DEVIATIONS INVOLVING EITHER A CREDIT OR AN ADDITIONAL CHARGE TO
COMPANY UNTIL THE AMOUNT OF SUCH CREDIT OR CHARGE HAS BEEN MUTUALLY AGREED UPON IN
WRITING.
CONTRACTOR, SUBJECT TO THE WRITTEN APPROVAL OF COMPANY, SHALL HAVE THE RIGHT TO
SUBSTITUTE EQUIPMENT OF EQUAL QUALITY AND PERFORMANCE IN PLACE OF THE MAKE SPECIFIED
IN
THE CONTRACT DOCUMENTS. UNLESS OTHERWISE SPECIFICALLY STATED IN WRITING, ANY APPROVAL
REQUIRED TO BE GIVEN BY COMPANY PURSUANT TO THE CONTRACT DOCUMENTS IS REQUIRED IN
ORDER TO GIVE COMPANY AN OPPORTUNITY TO CONSULT WITH CONTRACTOR. SUCH APPROVAL SHALL
BE ADVISORY ONLY AND SHALL NOT BE BINDING UPON NOR RELIEVE CONTRACTOR FROM
RESPONSIBILITY FOR THE ENGINEERING OR FACILITIES DESCRIBED HEREIN.

ARTICLE 3. -- WORK SCHEDULE: UNDER NO CIRCUMSTANCES
SHALL WORK BE STARTED OR MATERIALS DELIVERED TO THE PREMISES
UNTIL (A) THE REQUIRED CERTIFICATES OF INSURANCE (AND BONDS, IF
REQUIRED)HAVE BEEN DELIVERED TO COMPANY; AND (B) CONTRACTOR HAS FURNISHED COMPANY
EVIDENCE TO THIS EFFECT. CONTRACTOR AGREES TO COMMENCE WORK HEREUNDER WITHIN SEVEN (7)
DAYS AFTER EXECUTION OF THIS CONSTRUCTION AGREEMENT AND RECEIPT OF WRITTEN NOTICE FROM
COMPANY TO PROCEED. CONTRACTOR SHALL SUBMIT TO COMPANY WITHIN SEVEN (7) DAYS FROM THE
EXECUTION HEREOF AND ON A MONTHLY BASIS THEREAFTER A SCHEDULE, DESIGNED SUBJECT TO
COMPANY'S APPROVAL, OF THE WORK. SPECIFICALLY THE WORK SHALL BE SCHEDULED TO CHART THE
PROGRESS OF EACH PHASE ON A CALENDAR DAY BASIS AND ON A MANPOWER REQUIRED AND EXPENDED
BASIS. CONTRACTOR SHALL PROMPTLY NOTIFY COMPANY OF ANY CHANGES IN ANY PHASE OF THE
SCHEDULE. IN ANY EVENT, CONTRACTOR AGREES TO COMPLETE ALL OF THE WORK IN ACCORDANCE
WITH THE CONTRACT DOCUMENTS AND TO THE SATISFACTION AND APPROVAL OF COMPANY ON OR
BEFORE NOVEMBER 1, 2019 OR SUCH OTHER DATE AS MAY BE ESTABLISHED BY SAID WRITTEN
NOTICE TO PROCEED, SUBJECT TO THE LIMITATIONS AS SET FORTH IN SECTION 19 OF THE
GENERAL CONDITIONS, TIME BEING OF THE ESSENCE.

ARTICLE 4. -- CONTRACT PRICE: COMPANY SHALL PAY CONTRACTOR, AND CONTRACTOR SHALL
ACCEPT IN FULL PAYMENT AND CONSIDERATION FOR THE FULL PERFORMANCE OF CONTRACTOR'S
OBLIGATIONS HEREUNDER, SUBJECT TO ANY ADDITIONS AND DEDUCTIONS PERMITTED BY THE
CONTRACT DOCUMENTS, IN ACCORDANCE WITH THE UNIFORM BID SHEET SCHEDULES PLUS THE SUM
OF: $12,418,545.00; TWELVE MILLION FOUR HUNDRED EIGHTEEN THOUSAND FIVE HUNDRED FORTY-
FIVE DOLLARS AND ZERO CENTS. ALL LUMP SUM AND UNIT PRICING IS FIRM THROUGH PROJECT
COMPLETION.

CN1 6/28/2019: $2,400,000

SEE EXHIBIT "A" FOR COST BREAKDOWN OF PROJECT SCOPE OF WORK.

PROGRESS PAYMENTS SHALL BE MADE FOR THE WORK COMPLETED IN EACH CALENDAR MONTH BASED
UPON 90% OF THE VALUE THEREOF.
SUBJECT TO REASONABLE RETAINAGE HELD BY COMPANY TO SECURE
COMPLETION OF THE WORK IN ACCORDANCE WITH THE CONTRACT
DOCUMENTS, THE FINAL 10% SHALL BE PAID BY COMPANY TO
CONTRACTOR WITHIN _____THIRTY (30)_____ DAYS AFTER COMPANY'S DESIGNATED
REPRESENTATIVES CERTIFY THAT THE WORK IS "SUBSTANTIALLY" COMPLETED TO THE SATISFACTION
OF COMPANY.
PROGRESS PAYMENTS SHALL BE MADE IN ACCORDANCE WITH THE CONTRACT DOCUMENTS AND UPON
PROPER CERTIFICATION BY COMPANY'S DESIGNATED ENGINEER THAT SUCH PAYMENT IS DUE.
EACH APPLICATION FOR A PROGRESS PAYMENT SHALL BE
ACCOMPANIED BY A CONTINGENT LIEN WAIVER IN THE FORM OF
EXHIBIT B-1 HERETO. UPON RECEIPT OF A PROGRESS PAYMENT
CONTRACTOR SHALL PROVIDE TO COMPANY A NON-CONTINGENT
LIEN WAIVER IN THE FORM OF EXHIBIT B-2 HERETO. UPON
RECEIPT OF FINAL PAYMENT CONTRACTOR SHALL PROVIDE TO
COMPANY A FINAL WAIVER OF LIEN IN THE FORM OF EXHIBIT B-3

HERETO. IF YOU HAVE RECEIVED THIS CONSTRUCTION AGREEMENT THRU HUBWOO, ALL INVOICING MUST BE SUBMITTED THRU THE HUBWOO SYSTEM. CONTRACTOR SHALL NOT BE ENTITLED TO ANY LOSS OF ANTICIPATED PROFITS IF THE QUANTITIES OF ANY ITEMS OR WORK ARE DECREASED OR ENTIRELY OMITTED. NEITHER THE MAKING OF PROGRESS PAYMENTS NOR ACCEPTANCE OF THE WORK AND FINAL PAYMENT SHALL RELIEVE CONTRACTOR OF ANY OBLIGATION IMPOSED ON CONTRACTOR BY THE CONTRACT DOCUMENTS. IN ADDITION TO ITS OTHER REMEDIES, COMPANY IS AUTHORIZED TO DEDUCT OUT OF MONIES WHICH MAY BE DUE OR BECOME DUE TO CONTRACTOR UNDER CONTRACT DOCUMENTS, AS DAMAGES FOR NON-COMPLETION OF WORK WITHIN TIME STIPULATED FOR ITS · COMPLETION, N/A DOLLARS PER DAY FOR EACH AND EVERY DAY TIME EMPLOYED ON SAID WORK MAY EXCEED TIME STATED IN THE CONTRACT DOCUMENTS FOR ITS COMPLETION, WHICH IN VIEW OF DIFFICULTIES OF ESTIMATING SUCH DAMAGES, THE PARTIES HEREBY AGREE UPON AS THE LIQUIDATED DAMAGES THAT COMPANY WILL SUFFER BY REASON
OF SUCH DEFAULT AND NOT BY WAY OF PENALTY, AND TO
RETAIN FROM TIME TO TIME OUT OF MONIES DUE CONTRACTOR
HEREUNDER SUCH AMOUNTS AS MAY BE REASONABLY REQUIRED TO
COMPENSATE COMPANY FOR ANY LOSS OR DAMAGES IT SUSTAINS OR
MAY SUSTAIN BY REASON OF CONTRACTOR'S BREACH OF THIS CONSTRUCTION AGREEMENT OR BY REASON OF ANY OTHER CLAIMS COMPANY MAY HAVE AGAINST CONTRACTOR.

ARTICLE 5. -- QUALITY OF MATERIALS AND PERFORMANCE:
CONTRACTOR SHALL EMPLOY ONLY COMPETENT AND SKILLED WORKMEN
CAPABLE OF PERFORMING THE DUTIES ASSIGNED TO THEM, SHALL
PERFORM THE WORK AND FULFILL ALL ITS OBLIGATIONS UNDER THIS CONSTRUCTION AGREEMENT IN A GOOD AND WORKMANLIKE MANNER,
SHALL USE THE HIGHEST DEGREE OF CARE WHICH IS COMPATIBLE
WITH THE WORK TO BE PERFORMED, AND ACKNOWLEDGES THAT IT HAS
INVESTIGATED THE SITE WHERE THE WORK IS TO BE DONE AND IS
AWARE OF AND SATISFIED WITH ALL CONDITIONS EXISTING AT THE
SITE. ALL MATERIALS USED SHALL BE THE BEST OF THEIR
RESPECTIVE KIND AND THEIR APPLICATION SHALL BE ENTIRELY IN
ACCORDANCE WITH STANDARD PRACTICE. WITHIN FIFTEEN (15) DAYS
FROM EXECUTION HEREOF, CONTRACTOR SHALL SUBMIT TO COMPANY FOR
COMPANY'S APPROVAL, A LIST OF ALL CONTRACTORS, SUBCONTRACTORS AND MATERIALMEN THAT
WILL BE USED ON THIS WORK. ALL OF SAID WORK AND LABOR SHALL BE DONE AND PERFORMED IN
THE BEST AND WORKMANLIKE MANNER IN STRICT AND ENTIRE CONFORMITY, IN EVERY RESPECT,
WITH THE CONTRACT DOCUMENTS AND SHALL BE SUBJECT TO THE INSPECTION AND APPROVAL OF
COMPANY. IN CASE ANY OF SAID MATERIAL OR LABOR SHALL BE REJECTED BY COMPANY, AS
DEFECTIVE OR UNSUITABLE, THEN THE REJECTED MATERIALS SHALL
BE MOVED OFF THE SITE AND REPLACED WITH APPROVED MATERIALS, AND THE REJECTED LABOR
SHALL BE DONE ANEW TO THE SATISFACTION AND
APPROVAL OF COMPANY OR ITS AGENTS, AT THE COST AND EXPENSE
OF CONTRACTOR. CONTRACTOR SHALL REMEDY WITHOUT COST TO
COMPANY ANY AND ALL DEFECTS CAUSED BY DEFECTIVE OR INFERIOR
MATERIALS OR WORKMANSHIP WHICH MAY DEVELOP WITHIN ONE (1)
YEAR FROM THE DATE OF FINAL ACCEPTANCE BY COMPANY OF THE
WORK PERFORMED HEREUNDER. THE FOREGOING SHALL NOT LIMIT THE
PERIOD OF ANY ADDITIONAL WARRANTY, GUARANTY, OR OTHER
UNDERTAKING ON THE PART OF CONTRACTOR, ANY SUBCONTRACTOR, SUPPLIER, OR MANUFACTURER
WHETHER CONTAINED IN THESE CONTRACT DOCUMENTS OR NOT.

ARTICLE 6. -- LIENS: CONTRACTOR SHALL PROMPTLY PAY ITS
SUBCONTRACTORS AND MATERIALMEN. CONTRACTOR SHALL PROVIDE ALL EVIDENCE OF PAYMENT UPON
REQUEST OF COMPANY AND AS PROVIDED IN ARTICLE 4 HEREOF.

ARTICLE 7. -- COMPLIANCE WITH LAWS; INDEMNIFICATION:
CONTRACTOR, ITS EMPLOYEES, AGENTS, AND SUBCONTRACTORS, SHALL
COMPLY WITH ALL LAWS, RULES, REGULATIONS, ORDERS, AND ORDINANCES OF FEDERAL, STATE,
AND LOCAL GOVERNMENTS' OFFICES AND AUTHORITIES.
CONTRACTOR, ITS EMPLOYEES, AGENTS, AND SUBCONTRACTORS MUST COMPLY WITH THE INDEMNITY
REQUIREMENTS ATTACHED TO THIS CONTRACT AS EXHIBIT D. CONTRACTOR IS RESPONSIBLE FOR
COMPLIANCE BY ITS SUBCONTRACTORS WITH THE INDEMNITY REQUIREMENTS ATTACHED TO THIS
CONTRACT AS EXHIBIT D.

SHOULD COMPANY RECEIVE PENALTIES, FINES, OR OTHER CHARGES
RESULTING FROM VIOLATIONS OR ALLEGED VIOLATIONS OF LAWS,
RULES, REGULATIONS, ORDERS, AND ORDINANCES OF FEDERAL,
STATE, AND LOCAL GOVERNMENTS' OFFICES AND AUTHORITIES, WHICH
RELATE TO WORK PERFORMED HEREUNDER BY CONTRACTOR, ITS
EMPLOYEES, AGENTS, OR SUBCONTRACTORS, COMPANY SHALL PROMPTLY
GIVE WRITTEN NOTICE TO CONTRACTOR WHO SHALL HAVE THE RIGHT
TO PURSUE AN ADMINISTRATIVE REMEDY AT CONTRACTOR'S SOLE COST AND EXPENSE.  CONTRACTOR
AND COMPANY AGREE TO CONFER ON ANY SUCH ADMINISTRATIVE ACTION.

CONTRACTOR AT ITS COST SHALL APPLY PROMPTLY FOR THE
ISSUANCE, TRANSFER, AND/OR RENEWAL OF ANY AND ALL PERMITS, BONDS, AND LICENSES
REQUIRED FOR THE WORK TO BE PERFORMED HEREUNDER.

CONTRACTOR AGREES TO BE A MEMBER OF ISNETWORLD AND TO MEET ALL OF COMPANY'S INSURANCE
(AS ADDRESSED IN EXHIBIT C) AND HEALTH/SAFETY REQUIREMENTS. THIS INCLUDES MAINTAINING
A DASHBOARD GRADE OF "A" IN ISNETWORLD.

CONTRACTOR AGREES TO PROVIDE AND RECORD IN ISNETWORLD THE PREVIOUS MONTH'S MAN HOURS
PER OSHA/MSHA STANDARDS FOR ALL CNX SITES BY THE 15TH DAY OF EACH MONTH.

ON ALL CNX GAS SITES WITHIN 150 FEET OF GAS CONTAINING FACILITIES, CONTRACTOR IS TO
PROVIDE GAS MONITORING FOR OXYGEN, COMBUSTIBLE GAS, HYDROGEN SULFIDE, AND CARBON
MONOXIDE.  THIS CAN BE EITHER AREA OR PERSONAL MONITORING.

FOR ALL CNX GAS SITES, CONTRACT EMPLOYEES ENGAGED IN OIL AND GAS
INDUSTRY WORK MUST HAVE OSHA 10 HOUR TRAINING OR A NATIONALLY RECOGNIZED EQUIVALENT
(HAZWOPPER, SAFELAND, ETC.).  PROOF OF TRAINING WILL BE REQUIRED PRIOR TO START OF
WORK.

IN ORDER TO INSURE A SAFE WORK ENVIRONMENT, TO BE ABLE TO TIMELY REACT IN SAFETY
EMERGENCIES, AND TO PROMOTE EFFECTIVE COMMUNICATION IN THE WORK PLACE, ALL EMPLOYEES
OF CONTRACTOR AND ANY SUBCONTRACTORS WHO WILL PERFORM WORK ON COMPANY PROPERTY MUST BE
ABLE TO READ, SPEAK AND
UNDERSTAND WRITTEN AND ORAL DIRECTIONS IN THE ENGLISH LANGUAGE;
PROVIDED THAT IF ANY EMPLOYEE OF A CONTRACTOR OR SUBCONTRACTOR IS NOT ABLE TO READ,
SPEAK OR UNDERSTAND WRITTEN OR ORAL DIRECTIONS IN THE ENGLISH LANGUAGE, THE CONTRACTOR
OR SUBCONTRACTOR IS REQUIRED TO HAVE ANOTHER EMPLOYEE WHO IS BI-LINGUAL (THAT IS, WHO
READS, UNDERSTANDS AND SPEAKS ENGLISH AND WHO IS ABLE TO TRANSLATE AND GIVE DIRECTIONS
IN TO THOSE EMPLOYEES WHO CANNOT READ, SPEAK OR UNDERSTAND
WRITTEN OR ORAL DIRECTIONS IN THE ENGLISH LANGUAGE) PRESENT AT ALL TIMES THAT
EMPLOYEES WHO NOT ARE ABLE TO READ, SPEAK AND UNDERSTAND WRITTEN AND ORAL DIRECTIONS
IN THE ENGLISH LANGUAGE ARE PRESENT ON COMPANY PROPERTY.

ARTICLE 8. -- INDEPENDENT CONTRACTOR:  STANDARD OF
CARE:  CONTRACTOR AGREES THAT IN THE PERFORMANCE OF THE WORK
UNDER THE CONTRACT DOCUMENTS, IT SHALL ACT AS AN INDEPENDENT
CONTRACTOR, AND ALL OF ITS AGENTS AND EMPLOYEES, AND THE
AGENTS AND EMPLOYEES OF ITS SUBCONTRACTORS, SHALL BE SUBJECT
SOLELY TO THE CONTROL, SUPERVISION, AND AUTHORITY OF
CONTRACTOR OR ITS SUBCONTRACTORS -- THE RIGHT OF INSPECTION
BEING RESERVED HEREIN BY COMPANY IS SOLELY TO DETERMINE WHETHER THE WORK IS DONE IN
ACCORDANCE WITH THE CONTRACT DOCUMENTS AND TO EVALUATE COMPLETED WORK IN CONNECTION
WITH PAYMENTS.

ARTICLE 9. -- INSURANCE:

1.  CONTRACTOR, ITS EMPLOYEES, AGENTS, AND SUBCONTRACTORS MUST COMPLY WITH THE
INSURANCE REQUIREMENTS ATTACHED TO THIS CONTRACT AS EXHIBIT C. CONTRACTOR IS
RESPONSIBLE FOR COMPLIANCE BY ITS SUBCONTRACTORS WITH THE INSURANCE REQUIREMENTS
ATTACHED TO THIS CONTRACT AS EXHIBIT C.

THE INSURANCE REQUIREMENTS IN EXHIBIT C ARE "MINIMUM" AND DO NOT

CONSTITUTE ANY RECOMMENDATION BY COMPANY REGARDING THE TYPES AND AMOUNTS OF INSURANCE COVERAGE ACTUALLY NEEDED BY THE CONTRACTOR AND ANY SUBCONTRACTOR TO PROTECT THEIR OWN INTERESTS. CONTRACTOR SHALL NOT COMMENCE WORK UNTIL INSURANCE CERTIFICATES EVIDENCING THE REQUIRED COVERAGE ARE SUBMITTED AND APPROVED BY COMPANY. INSURANCE CERTIFICATES MUST INCLUDE SPECIFIC COVERAGE FOR THE INDEMNITY CLAUSE (ARTICLE 7 - EXHIBIT D, HEREOF) AND CONTAIN AN UNDERTAKING BY THE INSURER NOT TO CANCEL OR MODIFY SUCH POLICIES WITHOUT FIRST GIVING AT LEAST THIRTY(30) DAYS' PRIOR WRITTEN NOTICE TO COMPANY.

2. BUILDER'S RISK INSURANCE: IF REQUIRED BY COMPANY, DURING THE PERIOD THAT WORK IS CARRIED ON HEREUNDER, CONTRACTOR SHALL ASSUME THE RISKS NORMALLY COVERED BY BUILDER'S RISK INSURANCE IN "ALL RISK" FORM, SUBJECT TO THE USUAL SPECIFIC EXCLUSIONS WHICH APPLY TO SUCH "ALL RISK" PROPERTY DAMAGE INSURANCE. SAID ASSUMPTION OF RISK SHALL APPLY TO COMPLETED WORK, WORK IN PROGRESS, AND MATERIALS STORED ON THE PREMISES WHICH ARE TO BE INCORPORATED INTO THE COMPLETED WORK. SAID ASSUMPTION OF RISK SHALL NOT APPLY TO ANY EQUIPMENT, SUPPLIES, AND MATERIALS OWNED BY CONTRACTOR, ANY SUBCONTRACTOR, OR ANY OTHER PERSON OR COMPANY EXCEPT FOR SUCH EQUIPMENT, SUPPLIES, AND MATERIALS WHICH ARE TO BE INCORPORATED INTO THE COMPLETED WORK. SAID ASSUMPTION OF RISK SHALL APPLY TO ALL BUILDER'S RISK-TYPE LOSSES.

ARTICLE 10. -- CHANGES IN THE WORK: COMPANY, WITHOUT INVALIDATING THE CONSTRUCTION AGREEMENT, MAY ORDER EXTRA WORK OR MAKE CHANGES BY ALTERING, ADDING TO, OR DEDUCTING FROM THE WORK. SUCH CHANGES SHALL BE EXECUTED UNDER THE CONDITIONS OF THE ORIGINAL CONTRACT DOCUMENTS EXCEPT THAT ANY CLAIM FOR EXTENSION OF TIME CAUSED THEREBY SHALL BE ADJUSTED AT THE TIME OF ORDERING SUCH CHANGE. PRIOR TO THE PERFORMANCE OF ANY EXTRA WORK BY CONTRACTOR, COMPANY WILL DETERMINE WHICH OF THE METHODS OF PAYMENT DEFINED IN THE CONTRACT DOCUMENTS WILL BE APPLICABLE. EXTRA WORK IS ANY WORK PERFORMED WHICH IS BEYOND THE SCOPE OF THE WORK DEFINED IN THESE CONTRACT DOCUMENTS. EXCEPT IN ANY EMERGENCY ENDANGERING LIFE OR PROPERTY, NO EXTRA WORK OR CHANGE SHALL BE MADE UNLESS PURSUANT TO COMPANY'S WRITTEN PURCHASE OR CHANGE ORDER, AND NO CLAIM FOR AN ADDITION TO THE CONTRACT SUM SHALL BE VALID UNLESS SO ORDERED.

ARTICLE 11. -- COMPANY'S RIGHT TO TERMINATE:

11.1 FOR CAUSE - NOTWITHSTANDING ANYTHING CONTAINED IN THE CONTRACT DOCUMENTS TO THE CONTRARY, SHOULD CONTRACTOR, IN THE SOLE JUDGMENT OF COMPANY'S DESIGNATED ENGINEER, NEGLECT, REFUSE, OR BE UNABLE TO PROSECUTE THE WORK IN A PROPERLY EXPEDIENT AND WORKMANLIKE MANNER TO THE SATISFACTION OF COMPANY OR FAIL TO PERFORM ANY PROVISIONS OF THE CONTRACT DOCUMENTS AFTER SEVEN(7) DAYS WRITTEN NOTICE TO CONTRACTOR TO CORRECT THE SAME, OR SHOULD CONTRACTOR BECOME BANKRUPT OR INSOLVENT, THEN COMPANY MAY, AT ITS ELECTION AND WITHOUT PREJUDICE TO ANYOTHER REMEDY IT MAY HAVE, MAKE GOOD THE DEFICIENCIES AND DEDUCT THE COST THEREOF FROM THE PAYMENT THEN OR THEREAFTER DUE CONTRACTOR; AND IN ADDITION TO THE ABOVE, COMPANY MAY TERMINATE THIS CONSTRUCTION AGREEMENT, IN WHICH EVENT CONTRACTOR COVENANTS TO PEACEABLY VACATE THE PREMISES. FOR ANY OF THE FOREGOING PURPOSES, COMPANY MAY TAKE POSSESSION OF ANY OR ALL MATERIALS, TOOLS, AND EQUIPMENT AND DO THE WORK OR CAUSE THE WORK TO BE DONE BY SUCH MEANS AS IT SEES FIT, AND IF THE COST OF FINISHING THE WORK EXCEEDS THE CONTRACT PRICE (INCLUDING ANY ALTERNATES AND CHANGES), SUCH EXCESS SHALL BE PAID BY CONTRACTOR TO COMPANY; BUT IF SUCH EXPENSE IS LESS THAN SAID CONTRACT PRICE (INCLUDING ANY ALTERNATES AND CHANGES), COMPANY SHALL PAY THE DIFFERENCE TO CONTRACTOR.

11.2 AT THE CONVENIENCE OF COMPANY - COMPANY SHALL HAVE THE RIGHT TO TERMINATE CONTRACTOR'S PERFORMANCE OF THIS CONTRACT AT ANY TIME BY WRITTEN NOTICE TO CONTRACTOR. IN SUCH EVENT, CONTRACTOR SHALL BE ENTITLED TO FULL PAYMENT FOR WORK DONE IN COMPLIANCE WITH THE TERMS OF THIS CONTRACT UP TO THE TIME OF SUCH TERMINATION, PROVIDING EVIDENCE SATISFACTORY TO COMPANY IS SUBMITTED SHOWING COMPLIANCE WITH THE APPLICABLE PROVISIONS OF SECTION 5 HEREOF DEALING WITH PAYMENTS TO SUBCONTRACTORS AND MATERIAL MEN AND WAIVERS OF LIENS. SUBJECT TO SATISFACTORY SETTLEMENT WITH CONTRACTOR FOR WORK PERFORMED UP TO

THE DATE OF TERMINATION, COMPANY, WITH RESPECT TO THE WORK REMAINING TO BE DONE, SHALL
ASSUME THE REASONABLE OBLIGATIONS WHICH CONTRACTOR HAD IN GOOD FAITH UNDERTAKEN
HEREUNDER.

ARTICLE 12. -- COMPANY'S RIGHT TO AUDIT:  COMPANY SHALL
HAVE THE RIGHT, AT ITS SOLE EXPENSE, TO AUDIT CONTRACTOR'S
RECORDS INCLUDING ALL BOOKS, PAPERS, DOCUMENTS, AGREEMENTS,
AND OTHER DATA THAT MAY IN COMPANY'S SOLE JUDGMENT HAVE ANY
BEARING OR PERTAIN TO ANY BUSINESS CONDUCTED BETWEEN THE PARTIES EXCEPT AS CONCERNS
CONTRACTOR'S PROFIT MARGIN ON MERCHANDISE OR SERVICES PURCHASED.  CONTRACTOR SHALL
COOPERATE FULLY IN FURNISHING ALL SUCH REQUESTED RECORDS. ALL AUDITS WILL BE CONDUCTED
IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

ARTICLE 13. -- NO ASSIGNMENT: CONTRACTOR SHALL NOT
ASSIGN THIS CONSTRUCTION AGREEMENT NOR ANY PART THEREOF
WITHOUT THE WRITTEN CONSENT OF COMPANY AND NO MONIES DUE OR
TO BECOME DUE HEREUNDER SHALL BE ASSIGNABLE WITHOUT THE
PRIOR WRITTEN CONSENT OF COMPANY.  IN THE EVENT AN
ASSIGNMENT IS MADE WITH THE CONSENT OF COMPANY, CONTRACTOR
SHALL NOT BE RELIEVED FROM THE RESPONSIBILITY HEREUNDER BUT SHALL REMAIN LIABLE IN THE
SAME MANNER AS IF NO TRANSFER HAD BEEN MADE.

ARTICLE 14. -- DESIGNATED ENGINEER:  COMPANY SHALL FROM
TIME TO TIME DESIGNATE IN WRITING ONE OR MORE "DESIGNATED
ENGINEERS", EACH OF WHOM SHALL HAVE FULL AUTHORITY TO ACT
FOR COMPANY IN ALL MATTERS RELATING TO THIS CONSTRUCTION
AGREEMENT UNTIL NOTICE IS GIVEN TO CONTRACTOR THAT SUCH
AUTHORITY HAS BEEN REVOKED.  CONTRACTOR MAY RELY UPON THE
WRITTEN CERTIFICATION OF ANY VICE PRESIDENT OF COMPANY AS TO THE APPOINTMENT OF A
DESIGNATED ENGINEER OR THE REVOCATION OF HIS AUTHORITY.

ARTICLE 15. --  NOTICES:  ALL NOTICES BETWEEN THE
PARTIES SHALL BE IN WRITING AND, UNTIL OTHERWISE NOTIFIED,
SHALL BE SERVED OR MAILED TO THE FOLLOWING ADDRESSES:

(A) IN THE CASE OF COMPANY, TO:
CNX Midstream DVCO I LP
Chase Davis
1000 CONSOL Energy Drive
Canonsburg, PA 15317
724-485-3801

(B) IN THE CASE OF CONTRACTOR, TO:
APPLIED CONSTRUCTION SOLUTIONS INC
David Alvarez
P.O. Box 430
Clarksburg, WV 26301
304-423-8760

ARTICLE 16. --
THIS CONTRACT SHALL BE CONSTRUED IN ACCORDANCE WITH THE
LAWS OF PENNSYLVANIA.  ANY AND ALL ACTIONS AT LAW OR
OTHER PROCEEDINGS FOR ANY BREACH OF OR ENFORCEMENT OF
ANY PROVISION OF THIS CONTRACT SHALL BE ONLY IN A STATE OR FEDERAL COURT OF COMPETENT
JURISDICTION LOCATED IN ALLEGHENY OR WASHINGTON COUNTY, PENNSYLVANIA, RESPECTIVELY AND
EACH PARTY HEREBY WAIVES ANY RIGHT TO ANY CHANGE OF VENUE.

ARTICLE 17. -- USE OF COMPANY PROPERTY:  THE UNAUTHORIZED
USE OF COMPANY'S PROPERTY IS STRICTLY PROHIBITED.  THIS POLICY
APPLIES TO ALL OF COMPANY'S PROPERTY INCLUDING, BUT NOT LIMITED TO, COMPANY'S
COMPUTERS, FILES/PAPERWORK, AND EQUIPMENT.  ANY USE, REVIEW, COPYING, DISTRIBUTION,
DISTURBANCE AND/OR REMOVAL OF ANY COMPANY'S PROPERTY IS FORBIDDEN UNLESS PRIOR WRITTEN
AUTHORIZATION IS OBTAINED FROM THE RESPONSIBLE COMPANY'S EMPLOYEE.  IF THIS POLICY IS

NOT ADHERED TO IN EVERY RESPECT,THEN COMPANY SHALL HAVE THE RIGHT TO TERMINATE THIS CONTRACT WITHOUT ANY FURTHER LIABILITY OR OBLIGATION TO CONTRACTOR.

ARTICLE 18. --INUREMENT. -- THIS CONSTRUCTION AGREEMENT SHALL BE BINDING UPON THE PARTIES HERETO AND UPON THEIR RESPECTIVE HEIRS, ADMINISTRATORS, SUCCESSORS, AND ASSIGNS.

ARTICLE 19 - ETHICS AND CONFLICTS OF INTEREST: CONTRACTOR SHALL NOT HIRE ANY EMPLOYEE OR OFFICER OF COMPANY OR ITS AFFILIATED COMPANIES WHILE THAT EMPLOYEE OR OFFICER IS AN EMPLOYEE OR OFFICER OF COMPANY.
CONTRACTOR SHALL NOT PAY ANY SALARIES, COMMISSIONS OR FEES, OR MAKE ANY PAYMENTS OR REBATES, TO ANY EMPLOYEE OR OFFICER OF COMPANY, OR ANY DESIGNEE OF ANY SUCH EMPLOYEE OR OFFICER, OR FAVOR ANY SUCH EMPLOYEE, OFFICER, OR DESIGNEE WITH GIFTS OR ENTERTAINMENT OF SIGNIFICANT COST OR VALUE OR WITH SERVICES OR GOODS SOLD AT LESS THAN FULL MARKET VALUE.
CONTRACTOR'S OBLIGATIONS TO COMPANY UNDER THIS ARTICLE NUMBER 19 SHALL ALSO BE BINDING UPON ANY SUBCONTRACTORS AND SUB-SUBCONTRACTORS OF THE WORK.

ARTICLE 20- CONTRACTOR BACKGROUND CHECK GUIDELINES (EFFECTIVE JUNE 1, 2013): ALL "A" AND "B" CONTRACTORS AND THEIR SUBCONTRACTORS, AND ALL CONTRACTORS REQUIRED BY CNX TO BE MEMBERS OF (ISNETWORLD) AND THEIR SUBCONTRACTORS ARE REQUIRED TO COMPLY WITH THE CONTRACTOR BACKGROUND CHECK GUIDELINES FOR NEW HIRED EMPLOYEES AS ATTACHED TO THIS CONTRACT AS EXHIBIT G.
ARTICLE 21 - ALL CONTRACTORS PROVIDING HORIZONTAL DRILLING RIGS,
HYDRAULIC FRACTURING SERVICES AND WATER/WASTE HAULING SERVICE AND THEIR SUBCONTRACTORS ARE REQUIRED TO COMPLY WITH AIR PERFORMANCE STANDARDS SET FORTH BY THE COALITION FOR SUSTAINABLE SHALE DEVELOPMENT AS ATTACHED TO THIS CONTRACT AS EXHIBIT H.
WITNESS THE DUE EXECUTION HEREOF AS OF THE DATE FIRST ABOVE WRITTEN.


WITNESS
_____

_____

BY
_____           _____
DIRECTOR
SUPPLY CHAIN MANAGEMENT
CNX RESOURCES CORPORATION

ATTORNEY IN FACT
_____


DATE:_____

WITNESS

_____


CONTRACTOR

_____

BY_____


DATE:_____
          CONSTRUCTION AGREEMENT

X X X X X X X X X X X X X X

GENERAL CONDITIONS
------------------
1. GENERAL:
THE INTENT OF THESE GENERAL CONDITIONS IS TO SET FORTH THE BASIC ADMINISTRATIVE
PROVISIONS OF AND PROCEDURES UNDER THE AGREEMENTS BETWEEN THE PARTIES.

2. DRAWINGS AND SPECIFICATIONS:

2.1 ANYTHING SHOWN ON THE DRAWINGS OR MENTIONED IN THE SPECIFICATIONS OR OTHER
CONTRACT DOCUMENTS SHALL
HAVE THE SAME EFFECT AS IF SHOWN AND MENTIONED IN
ALL THE DOCUMENTS.  ALL DRAWINGS AND SPECIFICATIONS
ARE TO BE CONSIDERED COOPERATIVE.  ANY AMBIGUITIES
OR CONFLICTS BETWEEN SAID DOCUMENTS SHALL BE
PROMPTLY CALLED TO THE ATTENTION OF AND RESOLVED BY
COMPANY'S DESIGNATED ENGINEER.  ANY SUCH DISCREPANCIES ADJUSTED BY CONTRACTOR WITHOUT
THE APPROVAL OF COMPANY'S DESIGNATED ENGINEER SHALL BE AT CONTRACTOR'S OWN RISK AND
EXPENSE.

2.2 CONTRACTOR SHALL VERIFY ALL DIMENSIONS AND
INFORMATION SET FORTH ON ANY DRAWINGS AND SPECIFICATIONS SUBMITTED TO IT AND SHALL
TAKE ALL NECESSARY FIELD MEASUREMENTS PRIOR TO THE INSTALLATION OF ALL WORK.

2.3 CONTRACTOR SHALL PROVIDE SHOP DRAWINGS AND SUCH
OTHER DRAWINGS AND SPECIFICATIONS AS MAY BE
NECESSARY FOR THE PROSECUTION OF THE WORK IN THE
SHOP AND IN THE FIELD.  SHOP DRAWINGS SHALL BE
DEFINED AS DRAWINGS, DIAGRAMS, ILLUSTRATION
PERFORMANCE DATA, BROCHURES, CERTIFIED EQUIPMENT DRAWINGS, AND OTHER DATA WHICH ARE
PREPARED BY CONTRACTOR OR ANY SUBCONTRACTOR, MANUFACTURER, SUPPLIER, OR DISTRIBUTOR
AND WHICH ARE REQUIRED TO PROPERLY DEFINE SOME PORTION OF THE WORK.

2.4 CONTRACTOR SHALL PROMPTLY REVIEW AND SUBMIT TO COMPANY IN AN ORDERLY SEQUENCE FOUR
APPROVED COPIES OF ALL NECESSARY DRAWINGS AND SPECIFICATIONS.

2.5 BY APPROVING AND SUBMITTING DRAWINGS AND/OR
SPECIFICATIONS, CONTRACTOR THEREBY REPRESENTS THAT
IT HAS DETERMINED AND VERIFIED ALL DESIGN
REQUIREMENTS, ALL FIELD MEASUREMENTS, FIELD
CONSTRUCTION CRITERIA, MATERIALS, CATALOG NUMBERS,
AND SIMILAR DATA AND THAT IT HAS CHECKED AND COORDINATED EACH DRAWING WITH THE
REQUIREMENTS OF THE WORK AND THE CONTRACT DOCUMENTS.

2.6 COMPANY SHALL PROMPTLY REVIEW AND APPROVE DRAWINGS
AND SPECIFICATIONS SO AS TO CAUSE NO DELAY IN THE
WORK. THE APPROVAL OF COMPANY SHALL BE FOR
CONFORMANCE WITH THE DESIGN CONCEPT AND SHALL NOT
RELIEVE CONTRACTOR OF RESPONSIBILITY FOR ANY
DEVIATION FROM THE REQUIREMENTS OF THE CONTRACT
DOCUMENTS NOR SHALL COMPANY'S APPROVAL RELIEVE CONTRACTOR FROM RESPONSIBILITY FOR
ERRORS OR OMISSIONS IN THE DRAWINGS AND SPECIFICATIONS.

2.7 ALL WORK  AND  PORTIONS THEREOF REQUIRING DRAWING OR SPECIFICATION SUBMISSION
SHALL BE APPROVED BY COMPANY BEFORE COMMENCEMENT.

2.8 CONTRACTOR SHALL MAINTAIN AT THE SITE FOR COMPANY'S USE ONE COPY OF ALL DRAWINGS,
SPECIFICATIONS,
ADDENDA, APPROVED SHOP DRAWINGS, CHANGE ORDERS, AND OTHER MODIFICATIONS IN GOOD ORDER
AND MARKED TO RECORD ALL CHANGES MADE DURING CONSTRUCTION.

2.9 UPON COMPLETION OF THE WORK, CONTRACTOR SHALL

DELIVER TO COMPANY ONE REPRODUCIBLE SET OF AS-BUILT
DRAWINGS. ALL DESIGN DRAWINGS AND SHOP DRAWINGS SUPPLIED BY CONTRACTOR SHALL BECOME
THE PROPERTY OF
COMPANY, AND COMPANY SHALL BE ENTITLED TO USE ALL
OR ANY PORTION OF THE DRAWINGS FOR ANY PURPOSE,
INCLUDING THE DUPLICATION OF FACILITIES UNDER CONSTRUCTION OR THE CONSTRUCTION OF ANY
NEW PLANT OR FACILITY.

2.10 ALL OFFICE STANDARDS AND PROCEDURES OF CONTRACTOR
FOR PREPARATION AND HANDLING OF DRAWINGS AND
SPECIFICATIONS ARE SUBJECT TO REVIEW AND APPROVAL
BY COMPANY. CONTRACTOR SHALL MAKE ALL DRAWINGS ON DRAWING SHEETS THAT SHALL INCLUDE
COMPANY'S STANDARD TITLE BLOCK FORMAT.

3. BENCH MARKS AND REFERENCE POINTS:
WORK SITE: COMPANY SHALL PROVIDE ANY REQUIRED BENCH
MARKS AND REFERENCE POINTS. CONTRACTOR SHALL CAREFULLY
PRESERVE SAME. SHOULD SAID BENCH MARKS AND REFERENCE
POINTS BE DESTROYED DUE TO CONTRACTOR'S CONDUCT,
CONTRACTOR SHALL BE CHARGED WITH THE RESULTING EXPENSE
OF REESTABLISHING THE SAME. CONTRACTOR SHALL ALSO BE
RESPONSIBLE FOR ANY CONSTRUCTION MISTAKES ARISING FROM
THE DESTRUCTION OR LOSS OF SAID MARKS AND POINTS. ALL
LINES AND LEVELS NECESSARY TO THE LOCATION AND
CONSTRUCTION OF THE WORK UNDER THE CONTRACT DOCUMENTS
SHALL BE ESTABLISHED AND MAINTAINED FROM SAID BENCH
MARKS AND REFERENCE POINTS AND CERTIFIED BY A COMPETENT
REGISTERED SURVEYOR OR ENGINEER WHO SHALL BE EMPLOYED
AND PAID BY CONTRACTOR. CONTRACTOR SHALL COMPARE
CAREFULLY ALL LEVELS GIVEN ON DRAWINGS WITH EXISTING
LEVELS AND SHALL CALL ATTENTION TO DISCREPANCIES BEFORE
PROCEEDING WITH THE WORK. CONTRACTOR SHALL CONFINE ALL
ITS ACTIVITIES AND OPERATIONS TO SUCH CONTRACT DOCUMENTS OR AS DESIGNATED FROM TIME TO
TIME BY COMPANY'S DESIGNATED ENGINEER.

4. UTILITIES AND SERVICES FURNISHED BY COMPANY:
WHEN ELECTRIC CURRENT, WATER, GAS, OR OTHER UTILITIES OR
SERVICES ARE FURNISHED BY COMPANY, COMPANY ASSUMES NO
RESPONSIBILITY OR LIABILITY FOR LOSS OF OR DAMAGE TO THE
EQUIPMENT OR MATERIALS OF CONTRACTOR, OR SUBCONTRACTORS,
IF ANY, RESULTING DIRECTLY OR INDIRECTLY FROM THE USE OF
SAME BY CONTRACTOR OR SUBCONTRACTOR. COMPANY IS NOT
OBLIGATED TO FURNISH ANY SUCH UTILITIES OR SERVICES UNLESS SPECIFICALLY REQUIRED TO
PROVIDE THE SAME BY THE CONTRACT DOCUMENTS.

5. NON-DISCLOSURE:
ALL CONTRACT DOCUMENTS AND/OR INFORMATION FURNISHED
HEREWITH SHALL BE HELD CONFIDENTIAL AND SHALL NOT BE
USED BY CONTRACTOR FOR ANY PURPOSE OTHER THAN THOSE FOR WHICH THEY HAVE BEEN SUPPLIED
OR PREPARED.

6. COOPERATION; COORDINATION:
CONTRACTOR AND ITS SUBCONTRACTORS, IF ANY, SHALL
COOPERATE WITH COMPANY AND OTHER CONTRACTORS, IF ANY, ON
THE PREMISES AND SHALL SO CARRY ON THEIR WORK THAT OTHER COOPERATING CONTRACTORS SHALL
NOT BE HINDERED, DELAYED,
OR INTERFERED WITH IN THE PROGRESS OF THEIR WORK, AND SO THAT ALL OF SUCH WORK SHALL
BE A FINISHED AND COMPLETE
JOB OF ITS KIND. CONTRACTOR SHALL AFFORD TO COMPANY AND
SAID OTHER CONTRACTORS REASONABLE OPPORTUNITY FOR THE
INTRODUCTION AND STORAGE OF MATERIALS AND FOR THE
EXECUTION OF THEIR WORK. CONTRACTOR SHALL AT ALL TIMES
PROPERLY CONNECT AND COORDINATE ITS WORK WITH THE WORK

OF COMPANY AND OTHER CONTRACTORS. IF ANY PART OF THE CONTRACTOR'S WORK DEPENDS FOR PROPER EXECUTION AND
RESULTS UPON THE WORK OF COMPANY OR ANY OTHER
CONTRACTOR, CONTRACTOR SHALL INSPECT AND REPORT TO COMPANY ANY DEFECTS IN SUCH WORK
THAT RENDER IT UNSUITABLE FOR PROPER EXECUTION AND RESULTS.
CONTRACTOR'S FAILURE TO INSPECT AND REPORT SUCH WORK
SHALL CONSTITUTE AN ACCEPTANCE BY IT OF THE SAME. IN
THE EVENT A DEFECT DEVELOPS OR IS DISCOVERED AFTER
COMPLETION OF SUCH WORK BY COMPANY OR SUCH OTHER
CONTRACTORS, CONTRACTOR SHALL IMMEDIATELY REPORT TO
COMPANY IN WRITING SUCH DEFECT. ANY CONTROVERSY WHICH
MAY DEVELOP BETWEEN ANY TWO OR MORE CONTRACTORS WITH
RESPECT TO WHETHER OR NOT WORK HAS BEEN PROPERLY
EXECUTED WILL BE DETERMINED BY COMPANY WHOSE DECISION
WILL BE FINAL AND BINDING UPON ALL PARTIES. SIMILAR
PROVISIONS WILL BE INCLUDED IN COMPANY'S CONTRACTS FOR
OTHER WORK IN THE AREA. AT REGULAR INTERVALS OR AT SUCH
TIMES AND PLACES AS COMPANY'S DESIGNATED ENGINEER MAY
DIRECT, MEETINGS SHALL BE HELD OF THE VARIOUS
CONTRACTORS AND SUBCONTRACTORS ENGAGED IN THE PROJECT FOR THE PURPOSE OF FURTHERING
THE PROGRESS OF THE WORK. WHERE CONTRACTORS OR THEIR REPRESENTATIVES FAIL TO
ATTEND SUCH MEETINGS OR TO EXECUTE ORDERS GIVEN THEM,
SUCH REPRESENTATIVES SHALL BE DISMISSED FROM THE WORK
WITHIN 12 HOURS AFTER REQUEST FOR DISMISSAL BY SAID
DESIGNATED ENGINEER; AND OTHER REPRESENTATIVES SHALL BE
IMMEDIATELY SUBSTITUTED, OR WHEN APPROPRIATE IN THE OPINION OF COMPANY, THE
CONSTRUCTION AGREEMENT MAY BE TERMINATED.

7. INSPECTION:
COMPANY SHALL AT ALL TIMES HAVE THE RIGHT TO INSPECT THE
WORK WHEREVER IT IS IN PREPARATION OR PROGRESS TO
DETERMINE IF THE SAME IS IN ACCORDANCE WITH THE CONTRACT
DOCUMENTS AND TO EVALUATE THE WORK IN CONNECTION WITH
PAYMENTS, AND CONTRACTOR SHALL PROVIDE SAFE AND PROPER FACILITIES FOR ACCESS AND
INSPECTION. WHEN WORK IS
BEING DONE AWAY FROM THE PREMISES, CONTRACTOR SHALL GIVE
COMPANY'S DESIGNATED ENGINEER REASONABLE NOTICE OF THE
TIME AND PLACE WHERE SUCH WORK IS TO BE DONE AND ALSO
WHEN THE SAME WILL BE AVAILABLE FOR INSPECTION; SO THAT
COMPANY'S DESIGNATED ENGINEER MAY, IF HE SO DESIRES,
INSPECT THE SAME FROM TIME TO TIME BEFORE DELIVERY TO
THE PREMISES. IF COMPANY'S DESIGNATED ENGINEER DEEMS IT INEXPEDIENT TO CORRECT WORK
DAMAGED OR NOT DONE IN
ACCORDANCE WITH THE CONTRACT DOCUMENTS, AN EQUITABLE
DEDUCTION SHALL BE MADE FROM THE PRICE. NO FAILURE OF
COMPANY'S DESIGNATED ENGINEER DURING THE PROGRESS OF THE
WORK TO DISCOVER OR REJECT MATERIALS OR WORK NOT IN
ACCORDANCE WITH THE CONTRACT DOCUMENTS SHALL BE DEEMED AN ACCEPTANCE THEREOF OR A
WAIVER OF DEFECTS THEREIN.

8. PROTECTION OF WORK AND MATERIALS:
FROM THE COMMENCEMENT TO THE COMPLETION OF EVERY PART OF
THE WORK, ALL WORK AND MATERIALS UPON OR NEAR THE
PREMISES, WHETHER OR NOT INCORPORATED INTO THE WORK,
SHALL BE DEEMED TO BE AND SHALL BE THE PROPERTY OF
COMPANY. HOWEVER, SUCH MATERIALS SHALL BE IN THE CARE,
CUSTODY, AND CONTROL OF CONTRACTOR, AND IT SHALL BE THE
RESPONSIBILITY OF CONTRACTOR TO PROTECT AND PRESERVE THE
SAME. CONTRACTOR SHALL BE RESPONSIBLE FOR ANY SUCH
MATERIAL WHICH IS LOST, STOLEN, DAMAGED, DESTROYED, OR
INJURED RESULTING FROM CONTRACTOR'S FAILURE TO PROTECT THE PROPERTY, INCLUDING BUT NOT
LIMITED TO DIRECT LOSS FROM WEAR, GRADUAL DETERIORATION AND CHANGES IN TEMPERATURE.

## 9. REPORTING ACCIDENTS:

CONTRACTOR SHALL IMMEDIATELY REPORT TO COMPANY'S
DESIGNATED ENGINEER ALL ACCIDENTS AND INJURIES IN ANY
WAY RELATED TO CONTRACTOR'S OR ANY SUBCONTRACTOR'S
OPERATIONS ON THE PREMISES. IN THOSE CASES WHERE ACCIDENT
REPORTS ARE FURNISHED TO LOCAL AND/OR STATE BUREAUS, AS
APPLICABLE, CONTRACTOR SHALL ALSO FURNISH A COPY TO
COMPANY'S DESIGNATED ENGINEER.  CONTRACTOR SHALL INCLUDE
ITS OWN STATISTICS AND STATISTICS ON ITS SUBCONTRACTORS IN ITS MAN HOURS WORKED
SUBMISSIONS TO COMPANY'S CONSULTANT ISNETWORLD.

## 10. SAFETY DEVICES:

CONTRACTOR SHALL EQUIP THE WORK COVERED BY THE CONTRACT
DOCUMENTS WITH ALL PROPER SAFETY DEVICES FOR THE
PROTECTION OF WORKMEN AND SHALL PROVIDE SUITABLE,
REMOVABLE SAFETY GUARDS FOR ALL EXPOSED MOVING PARTS,
SUCH AS GEARS, ROLLER CHAINS, BELTS, BRAKE WHEELS,
COUPLINGS, AND THE LIKE.  CONTRACTOR WARRANTS THAT THE
COMPLETED WORK WILL MEET THE OPERATING REQUIREMENTS OF,
AND BE IN CONFORMITY WITH ANY AND ALL APPLICABLE FEDERAL, STATE, AND LOCAL LAWS,
RULES, REGULATIONS, AND ORDINANCES.

ALL SIDE-BOOM DOZERS FOR PIPELINE PROJECTS MUST BE EQUIPPED WITH ROLLOVER PROTECTION.

## 11. FAIR LABOR STANDARDS ACT:

CONTRACTOR AGREES TO PAY THE PERSONS EMPLOYED BY IT AND TO  REQUIRE EACH SUBCONTRACTOR
TO PAY THE PERSONS EMPLOYED BY IT  IN PERFORMING THE CONSTRUCTION AGREEMENT IN
ACCORDANCE WITH  THE REQUIREMENTS OF THE FAIR LABOR STANDARDS ACT OF
1938, AS AMENDED, AND TO KEEP ALL SUCH RECORDS AS ARE
REQUIRED BY SUCH ACT. CONTRACTOR CERTIFIES THAT ALL
GOODS NOW IN ITS POSSESSION, WHICH ARE TO BE USED IN
CARRYING OUT THE PROVISIONS OF THE CONSTRUCTION
AGREEMENT, WERE PRODUCED IN COMPLIANCE WITH ALL THE
APPLICABLE REQUIREMENTS OF SECTIONS 6, 7, AND 12 OF THE
FAIR LABOR STANDARDS ACT OF 1938, AS AMENDED, AND OF
REGULATIONS AND ORDERS OF THE ADMINISTRATOR OF THE WAGE AND HOUR DIVISION ISSUED UNDER
SECTION 14 THEREOF.
CONTRACTOR AGREES THAT AT THE TIME GOODS NOT NOW IN ITS
POSSESSION ARE FURNISHED TO COMPANY IN CARRYING OUT THE
PROVISIONS OF THE CONSTRUCTION AGREEMENT, IT WILL FURNISH COMPANY WITH SIMILAR
CERTIFICATIONS OF COMPLIANCE WITH RESPECT TO SUCH GOODS.

## 12. WORKABLE SYSTEM:

ALL INSTALLATIONS SHALL BE MADE SUCH THAT THE COMPONENT
PARTS WILL FUNCTION TOGETHER AS A WORKABLE SYSTEM,
COMPLETE WITH ALL ACCESSORIES NECESSARY FOR ITS
OPERATION, AND SHALL BE LEFT WITH ALL EQUIPMENT PROPERLY
ADJUSTED AND IN WORKING ORDER. THE WORK SHALL BE
EXECUTED IN CONFORMITY WITH BEST PRACTICE AND SO AS TO
CONTRIBUTE TO THE EFFICIENCY OF OPERATION, MINIMUM
MAINTENANCE, ACCESSIBILITY, AND APPEARANCE, AND SO THAT
THE INSTALLATION WILL CONFORM AND ACCOMMODATE ITSELF TO THE BUILDING STRUCTURE,
BUILDING AND PROCESS EQUIPMENT, AND USAGE.

## 13. TURNKEY:

IF THE TERM "TURNKEY" OR "TURNKEY CONTRACT" IS USED IN
THE CONTRACT DOCUMENTS (AND SUCH TERM IS NOT MODIFIED OR
OTHERWISE DEFINED), IT SHALL MEAN THAT CONTRACTOR FOR
THE CONSIDERATION STATED, SHALL FURNISH ALL MATERIALS
AND LABOR AND DO ALL WORK REQUIRED TO COMPLETE THE
FACILITY IN A WORKMANLIKE MANNER, PUT THE FACILITY TO
USE OR INTO PRODUCTION, AND TURN IT OVER TO COMPANY
TESTED AND READY TO "TURN THE KEY".  CONTRACTOR SHALL

MAKE SUFFICIENT TEST RUNS TO DETERMINE THAT THE FACILITY
MEETS THE STANDARDS SET FORTH IN THE CONTRACT DOCUMENTS
AND SHALL BE RESPONSIBLE FOR ANY ADJUSTMENTS WHICH MAY
BE NECESSARY DURING THE FIRST YEAR OF OPERATION TO ASSURE THAT THE FACILITY PERFORMS
IN ACCORDANCE WITH SAID STANDARDS.

14. HAZARDS:
CONTRACTOR SHALL ANTICIPATE THE HAZARDS OF INCLEMENT
WEATHER, FLOOD WATER CONDITIONS, AND THE GENERAL RISKS
OF THIS TYPE OF CONSTRUCTION TO THE END THAT PERSONNEL
AND PROPERTY WILL BE PROTECTED AND THE INCIDENTAL
HINDRANCES AND DELAYS WILL NOT JEOPARDIZE THE COMPLETION
ON SCHEDULE.  IT IS UNDERSTOOD AND MUTUALLY AGREED THAT ANY UNUSUAL EXPENDITURE FOR
PROTECTIVE EQUIPMENT AND OPERATION SHALL BE PROVIDED FOR IN THE CONTRACT PRICE.
WHILE ON COMPANY'S PROPERTY, CONTRACTOR, ITS EMPLOYEES,
AGENTS, AND SUBCONTRACTORS, SHALL COMPLY WITH ALL RULES, DIRECTIVES, POSTED SIGNS, AND
BULLETINS RELATING TO HAZARD AVOIDANCE AND SAFE WORK PRACTICES.

15. USE OF COMPLETED PORTION:
COMPANY SHALL HAVE THE RIGHT TO TAKE POSSESSION OF AND
USE ANY COMPLETED OR PARTIALLY COMPLETED PORTIONS OF THE
WORK, WHETHER OR NOT THE TIME FOR COMPLETING THE ENTIRE
WORK OR SUCH PORTIONS MAY HAVE EXPIRED, BUT SUCH TAKING
POSSESSION AND USE SHALL NOT BE DEEMED AN ACCEPTANCE OF
ANY WORK NOT COMPLETED IN ACCORDANCE WITH THE CONTRACT
DOCUMENTS.  IF SUCH PRIOR USE INCREASES THE COST OF OR
DELAYS THE WORK, CONTRACTOR SHALL BE ENTITLED TO SUCH EXTRA COMPENSATION AND/OR
EXTENSION OF TIME AS COMPANY'S DESIGNATED ENGINEER MAY DETERMINE.

16. SUPERINTENDENCE:
CONTRACTOR SHALL CAUSE THE WORK TO BE SUPERVISED AT ALL
TIMES BY A JOB SUPERINTENDENT. IF THE JOB
SUPERINTENDENT PROVES UNSATISFACTORY TO COMPANY, HE SHALL BE PROMPTLY REPLACED UPON
REQUEST OF COMPANY.

17. HOUSEKEEPING:
CONTRACTOR SHALL STORE MATERIALS AND EQUIPMENT IN AN
ORDERLY MANNER AND SHALL KEEP THE PREMISES AT ALL TIMES
IN A CLEAN AND SANITARY CONDITION, FREE FROM DEBRIS AND
OBSTRUCTIONS. UPON COMPLETION OF THE WORK, CONTRACTOR
SHALL REMOVE ALL TEMPORARY BUILDINGS OR FACILITIES
ERECTED BY CONTRACTOR AND ITS SUBCONTRACTORS, ALL
CONSTRUCTION EQUIPMENT, SURPLUS MATERIALS, AND SUPPLIES
BELONGING TO CONTRACTOR OR SUBCONTRACTORS, AND SHALL LEAVE THE PREMISES AND THE WORK
IN PERFECT ORDER, CLEAN, SANITARY, AND READY FOR USE.

18. WAIVER OF BREACH:
ANY FAILURE BY COMPANY AT ANY TIME, OR FROM TIME TO
TIME, TO ENFORCE OR REQUIRE PERFORMANCE IN ACCORDANCE
WITH THE STRICT CONDITIONS OF THE CONTRACT DOCUMENTS,
SHALL NOT CONSTITUTE A WAIVER BY COMPANY OF ANY BREACH
OF ANY SUCH TERMS OR CONDITIONS AND SHALL NOT AFFECT OR
IMPAIR SUCH TERMS OR CONDITIONS IN ANY WAY, OR THE RIGHT
OF COMPANY AT ANY TIME TO AVAIL ITSELF OF SUCH REMEDIES AS IT MAY HAVE FOR ANY SUCH
BREACH OR BREACHES OF SUCH TERMS OR CONDITIONS.

19. TIME OF THE ESSENCE: SCHEDULES, FORCE MAJEURE:
UNLESS SPECIFICALLY WAIVED BY COMPANY IN WRITING, ALL
TIMES FOR PERFORMANCE BY CONTRACTOR WHETHER SPECIFIED IN
ARTICLE 3 OF THE CONSTRUCTION AGREEMENT, IN THIS CLAUSE
OR ELSEWHERE IN THE CONTRACT DOCUMENTS SHALL BE OF THE
ESSENCE.  IT IS UNDERSTOOD AND AGREED THAT THE
SCHEDULING, COMPLETION, AND DELIVERY OF THE WORK

HEREUNDER SHALL BE FACILITATED THROUGH THE USE OF THE
PRECEDENCE DIAGRAM, CRITICAL PATH, PERT, OR OTHER METHOD
AGREEABLE TO COMPANY.  CONTRACTOR AGREES TO FURNISH
COMPANY A COMPLETE CHART OF THE WORK SCHEDULE PREPARED BY SUCH METHOD AND TO PROMPTLY
ADVISE COMPANY OF ANY
TIME THE WORK FALLS MORE THAN ONE WEEK BEHIND SCHEDULE.
IN THE EVENT THE WORK IS, AT ANY TIME, MORE THAN ONE
WEEK BEHIND, CONTRACTOR AGREES TO ADD, AT ITS OWN
EXPENSE, SUFFICIENT MAN-HOURS, MATERIAL, MACHINERY,
SUPPLIES, AND EQUIPMENT SO THAT WITHIN ONE WEEK THE WORK
WILL BE RETURNED TO ITS SCHEDULED TIME.  IN THE EVENT
ALL WORK IS NOT COMPLETED ON OR BEFORE THE AGREED
COMPLETION DATE AS SET FORTH IN THE CONSTRUCTION
AGREEMENT, THE CONTRACTOR SHALL BEAR ALL ESCALATION
COSTS RELATING TO MATERIAL AND/OR LABOR WAGE RATES
INCURRED SUBSEQUENT TO THE COMPLETION DATE.  SHOULD THE
PROGRESS OF THE WORK BE UNDULY DELAYED DUE TO NEGLIGENCE
OR DEFAULT ON THE PART OF COMPANY, STRIKES AT THE JOB
SITE OR IN THE SHOPS OF A SUPPLIER, FIRE, FLOODS, ACTS
OF GOVERNMENT, ACTS OF GOD, OR ANY UNPREVENTABLE
ACCIDENT, CONTRACTOR SHALL HAVE THE RIGHT TO CLAIM
EXTENSION OF THE AGREED COMPLETION DATE; PROVIDED,
HOWEVER, THAT ANY SUCH CLAIM SHALL NOT BE HONORED UNLESS
NOTICE THEREOF IS DELIVERED IN WRITING TO COMPANY'S
DESIGNATED ENGINEER; NOR SHALL ANY EXTENSION BE GRANTED FOR ANY PERIOD OF DELAY
OCCURRING MORE THAN 72 HOURS
PRIOR TO THE TIME COMPANY RECEIVES NOTICE OF THE CLAIM.

20. DISCRIMINATION CLAUSE EXECUTIVE ORDER 11246, DATED SEPTEMBER 24, 1965:
THE ARTICLES, MATERIALS, AND/OR SERVICES COVERED BY THIS
ORDER ARE TO BE PRODUCED, FURNISHED, AND BILLED IN
COMPLIANCE WITH ALL APPLICABLE LAWS, PROCLAMATIONS,
ORDERS, RULES, AND REGULATIONS, INCLUDING WITHOUT LIMITATION, EXECUTIVE ORDER 11246,
SIGNED BY THE
PRESIDENT OF THE UNITED STATES OF AMERICA ON SEPTEMBER 24, 1965, AS AMENDED, AND THE
RULES, REGULATIONS, AND ORDERS ISSUED THEREUNDER.

DURING THE PERFORMANCE OF THE CONSTRUCTION AGREEMENT,
AND TO THE EXTENT REQUIRED BY EXECUTIVE ORDER 11246, OR BY ANY CONTRACT BETWEEN
COMPANY AND ANY GOVERNMENT CONTRACTING AGENCY, THE CONTRACTOR AGREES AS FOLLOWS:

CONTRACTOR SHALL NOT DISCRIMINATE AGAINST ANY EMPLOYEE
OR APPLICANT FOR EMPLOYMENT BECAUSE OF RACE, CREED, SEX,
RELIGION, COLOR, OR NATIONAL ORIGIN. CONTRACTOR WILL
TAKE AFFIRMATIVE ACTION TO ENSURE THAT APPLICANTS ARE
EMPLOYED AND THAT EMPLOYEES ARE TREATED, DURING
EMPLOYMENT WITHOUT REGARD TO THEIR RACE, CREED, SEX, RELIGION, COLOR, OR NATIONAL
ORIGIN. SUCH ACTION SHALL INCLUDE, BUT NOT BE LIMITED TO THE FOLLOWING:
EMPLOYMENT, UPGRADING, DEMOTION OR TRANSFER, RECRUITMENT
OR RECRUITMENT ADVERTISING, LAYOFF OR TERMINATION, RATES
OF PAY OR OTHER FORMS OF COMPENSATION AND SELECTION FOR
TRAINING, INCLUDING APPRENTICESHIP. CONTRACTOR AGREES
TO POST IN CONSPICUOUS PLACES, AVAILABLE TO EMPLOYEES
AND APPLICANTS FOR EMPLOYMENT, NOTICES TO BE PROVIDED BY THE CONTRACTING OFFICER
SETTING FORTH THE PROVISIONS OF THIS NON-DISCRIMINATION CLAUSE.

CONTRACTOR SHALL, IN ALL SOLICITATIONS OR ADVERTISEMENTS
FOR EMPLOYEES PLACED BY OR ON BEHALF OF CONTRACTOR,
STATE THAT ALL QUALIFIED APPLICANTS WILL RECEIVE
CONSIDERATION FOR EMPLOYMENT WITHOUT REGARD TO RACE, CREED, SEX, RELIGION, COLOR, OR
NATIONAL ORIGIN.

CONTRACTOR SHALL SEND TO EACH LABOR UNION OR

REPRESENTATIVE OF WORKERS WITH WHICH IT HAS A COLLECTIVE
BARGAINING AGREEMENT OR OTHER CONTRACT OR UNDERSTANDING,
A NOTICE TO BE PROVIDED BY THE AGENCY CONTRACTING
OFFICE, ADVISING THE LABOR UNION OR WORKERS'
REPRESENTATIVE OF CONTRACTOR'S COMMITMENTS UNDER SECTION
202 OF EXECUTIVE ORDER 11246 OF SEPTEMBER 24, 1965, AND
SHALL POST COPIES OF THE NOTICE IN CONSPICUOUS PLACES
AVAILABLE TO EMPLOYEES AND APPLICANTS FOR EMPLOYMENT.

CONTRACTOR SHALL COMPLY WITH ALL PROVISIONS OF EXECUTIVE
ORDER 11246 OF SEPTEMBER 24, 1965, AND OF THE RULES, REGULATIONS, AND RELEVANT ORDERS
OF THE SECRETARY OF LABOR.

CONTRACTOR SHALL FURNISH ALL INFORMATION AND REPORTS
REQUIRED BY EXECUTIVE ORDER 11246 OF SEPTEMBER 24, 1965,
AND BY THE RULES, REGULATIONS, AND ORDERS OF THE
SECRETARY OF LABOR, OR PURSUANT THERETO, AND SHALL
PERMIT ACCESS TO ITS BOOKS, RECORDS, AND ACCOUNTS BY THE
CONTRACTING AGENCY AND THE SECRETARY OF LABOR FOR PURPOSES OF INVESTIGATION TO
ASCERTAIN COMPLIANCE WITH SUCH RULES, REGULATIONS, AND ORDERS.

IN THE EVENT OF THE CONTRACTOR'S NON-COMPLIANCE WITH THE
NON-DISCRIMINATION CLAUSES SET FORTH HEREIN OR WITH ANY
SUCH RULES, REGULATIONS, OR ORDERS, THE CONSTRUCTION
AGREEMENT MAY BE CANCELED, TERMINATED, OR SUSPENDED IN
WHOLE OR IN PART, AND THE CONTRACTOR MAY BE DECLARED
INELIGIBLE FOR FURTHER GOVERNMENT CONTRACTS IN
ACCORDANCE WITH PROCEDURES AUTHORIZED IN EXECUTIVE ORDER
11246 OF SEPTEMBER 24, 1965, AND SUCH OTHER SANCTIONS
MAY BE IMPOSED AND REMEDIES INVOKED AS PROVIDED IN
EXECUTIVE ORDER 11246 OF SEPTEMBER 24, 1965, OR BY RULE, REGULATION, OR ORDER OF THE
SECRETARY OF LABOR, OR AS OTHERWISE PROVIDED BY LAW.

CONTRACTOR SHALL INCLUDE THE PROVISIONS OF THE PRECEDING
PARAGRAPHS IN EVERY SUBCONTRACT OR PURCHASE ORDER UNLESS
EXEMPTED BY RULES, REGULATIONS, OR ORDER OF THE
SECRETARY OF LABOR ISSUED PURSUANT TO SECTION 204 OF
EXECUTIVE ORDER 11246 OF SEPTEMBER 24, 1965, SO THAT
SUCH PROVISIONS WILL BE BINDING UPON EACH SUBCONTRACTOR
OR VENDOR.  CONTRACTOR SHALL TAKE SUCH ACTION WITH
RESPECT TO ANY SUBCONTRACT OR PURCHASE ORDER AS THE CONTRACTING AGENCY MAY DIRECT AS A
MEANS OF ENFORCING SUCH PROVISIONS INCLUDING SANCTIONS FOR NON-COMPLIANCE.
PROVIDED HOWEVER, THAT IN THE EVENT CONTRACTOR BECOMES
INVOLVED IN, OR IS THREATENED WITH, LITIGATION WITH A
SUBCONTRACTOR OR VENDOR AS A RESULT OF SUCH DIRECTION BY
THE CONTRACTING AGENCY, CONTRACTOR MAY REQUEST THE UNITED STATES TO ENTER INTO SUCH
LITIGATION TO PROTECT THE INTERESTS OF THE UNITED STATES.

TO THE EXTENT REQUIRED BY EXECUTIVE ORDER 11246 AND ANY
RULES OR REGULATIONS OR ORDERS ISSUED THEREUNDER, OR ANY
CONTRACTS BETWEEN COMPANY AND ANY GOVERNMENT CONTRACTING
AGENCY, CONTRACTOR AGREES TO DEVELOP, SIGN, AND MAINTAIN
A WRITTEN AFFIRMATIVE ACTION COMPLIANCE PROGRAM FOR EACH
OF ITS ESTABLISHMENTS AND TO FILE COMPLETE AND ACCURATE REPORTS ON STANDARD FORM 100
(EE 01), OR SUCH FORM AS MAY BE PROMULGATED IN ITS PLACE.

21. SUBSTANCE ABUSE:  CONTRACTOR, ITS EMPLOYEES, AGENTS, AND
SUBCONTRACTORS MUST HAVE A DRUG AND ALCOHOL TESTING PROGRAM THAT
SHALL, AT A MINIMUM, MEET THE REQUIREMENTS SET FORTH IN THE ATTACHED
EXHIBIT E.  CONTRACTOR IS RESPONSIBLE FOR COMPLIANCE BY ITS EMPLOYEES, AGENTS, AND
SUBCONTRACTORS WITH SUCH SUBSTANCE ABUSE REQUIREMENTS.
CONTRACTOR SHALL ENSURE THAT NONE OF ITS EMPLOYEES OR AGENTS, OR THE EMPLOYEES OR
AGENTS OF ANY SUBCONTRACTOR, SHALL EITHER POSSESS OR USE ALCOHOLIC BEVERAGES, ILLEGAL

DRUGS OR DRUG PARAPHERNALIA WHILE ON COMPANY'S PROPERTY OR COME ONTO COMPANY'S PROPERTY WHILE UNDER THE INFLUENCE OF ALCOHOL OR ILLEGAL DRUGS. COMPANY SHALL HAVE THE RIGHT TO EJECT FROM COMPANY'S PROPERTY ANY PERSON WHO IS INTOXICATED OR UNDER THE INFLUENCE OF ILLEGAL DRUGS OR WHO HAS IN HIS POSSESSION, WHILE ON COMPANY PROPERTY, ANY ALCOHOLIC BEVERAGE OR ILLEGAL DRUG OR DRUG PARAPHERNALIA.

22.PERSONAL PROTECTIVE EQUIPMENT REQUIREMENTS:

CONTRACTOR, ITS EMPLOYEES, AGENTS, AND SUBCONTRACTORS MUST COMPLY WITH THE PERSONAL PROTECTIVE EQUIPMENT REQUIREMENTS ATTACHED TO THIS CONTRACT AS EXHIBIT F.  CONTRACTOR IS RESPONSIBLE FOR COMPLIANCE BY ITS EMPLOYEES, AGENTS, AND SUBCONTRACTORS WITH COMPANY'S PERSONAL PROTECTIVE EQUIPMENT REQUIREMENTS.  IF REQUIRED ON A PROJECT BY PROJECT BASIS, CONTRACTOR WILL PROVIDE A FULL TIME SAFETY SUPERVISOR FOR PROJECT.

EXHIBIT A - COST BREAKDOWN OF PROJECT SCOPE OF WORK (INSERT OR LIST LINE ITEMS)

Line Item Description Unit Qty. Unit Cost
1  Mob/Demob    Subtotal
1.1  Mobilization LS 1 $525,000
1.2  Demobilization LS 1 $55,000

2  Civil / Structural
2.1 Survey Support  LS 1 $23,000
2.2 Foundations for 72" Horizontal Type Slug Catchers ea. 2 $3,508
2.3 Foundations for Filter Separators (42" & 48") ea. 5 $16,836
2.4 Foundations for 72" Contact Tower ea. 2 $28,175
2.5 Foundations for 3608 Engine & Compressor ea. 5 $255,128
2.6 Deep Foundations for 3608 Engine & Compressor ea. 1 $713,345
2.7 Foundations for Glycol Regenerator and Thermal Oxidizer ea. 1 $563,385
2.8 Compressor Building Foundations LS 1 $0
2.9 Foundations for MCC Building & Instrument Air Buidling LS 1 $104,880
2.10 Foundations for Generator ea. 1 $26,680
2.11 Pipe supports & racks and foundations LS 1 $86,940
2.12 Cable Trays and foundations LS 1 $144,900
2.13 Excavation and Backfill for steel pipe LS 1 $0
2.14 Excavation and backfill for electrical conduits LS 1 $0
2.15 Flowable Fill for electrical conduits & below grade pipe LS 1 $0
2.16 Below Grade Sleepers LS 1 $0
2.17 Misc. Foundations - Bollards, Stair Pads, Sonotubes, Light poles, Equipment Racks, etc.. LS 1 $11,500
2.18 Filter Separator Platforms - Material/Fabrication/Installation LS 1 $0
2.19 Tank Sand Base and Containments LS 1 $186,472
2.20 Final Pad Grading including fabric and stone installation LS 1 $0
2.21 Fence LS 1 $0

3 Mechanical
3.1 Off loading and setting Filters & Slug Catcher LS 1 $150,000
3.2 Off Loading and setting Contact Tower , Regen, & Thermal Oxidizer LS 1 $200,000
3.3 Off Loading and setting Compressors  LS 1 $800,000
3.4 Off Loading and setting MCC Building, Air Building, and Generator LS 1 $100,000
3.5 Fabrication, Testing, and Coating  of pipe/valves/fittings that are 2" and smaller ND LS 1 $290,000
3.6 Fabrication, Testing, and Coating  of pipe/valves/fittings that are greater than 2" ND LS 1 $700,000
3.7 Installation of pipe/valves/fittings that are 2" and smaller ND LS 1 $500,000
3.8 Installation of pipe/valves/fittings that are greater than 2" ND LS 1 $2,400,000
3.9 Field Hydro testing - Includes Drying on Discharge Lines,Fuel Gas, and Instrument Air LS 1 $400,000
3.10 Compressor Unit Assembly - Assitance from Packager will be provided LS 1 $980,000
3.11 Installation of ALL Instrumentation, SS tubing, Vessel Aux Kits, Misc. piping/tubing LS 1 $400,000
3.12 Insulation - Material & Installation LS 1 $407,016
3.13 Supply of pipe/valves/fittings 2" and smaller ND and ALL SS tubing LS 1 $0

3.14 Supply of ALL studs, nuts, bolts, gaskets, and insulating flange kits LS 1 $0
3.15 Commissioning Support LS 1 $80,000

4 Electrical    Subtotal
4.1 Supply conduit , conduit & electrical materials LS 1 $347,394
4.2 Installation of conduit and cable LS 1 $567,256
4.3 Terminations LS 1 $57,893
4.4 Supply of ALL grounding material LS 1 $40,655
4.5 Installation of grounding system LS 1 $89,683
4.6 Testing grounding system LS 1 $2,115
4.7 Supply of ALL Cathodic Protection material LS 1 $0
4.8 Installation of Cathodic Protection system LS 1 $0
4.9 Provide and Install Heat Trace LS 1 $42,248
4.10 Provide and Install Yard Lights LS 1

5 Additional Cost (TO BE COMPLETED BY CONTRACTOR IF NECESARRY/APPLICABLE)    Subtotal
5.1  LS 1 $0
5.2  LS 1 $0
5.3  LS 1 $0
5.4  LS 1 $0
5.5  LS 1 $0

EXHIBIT B-1
PARTIAL WAIVER OF LIEN - CONTINGENT

STATE OF _____
COUNTY OF

TO WHOM IT MAY CONCERN:

WHEREAS THE UNDERSIGNED (NAME OF PARTY)
_____ OF

(NAME OF CONTRACTOR/SUPPLIER) _____ AT

(STREET) _____ (CITY) _____

(STATE) _____ (ZIP) _____ BEING FIRST DULY SWORN THAT HE/SHE IS THE

_____ OF _____

(HEREIN AFTER REFERRED TO AS THE "COMPANY") AND IS FAMILIAR WITH THE WORK/MATERIALS
PERFORMED OR SUPPLIED TO THE PREMISES KNOWN AS
_____

_____ (HEREIN AFTER REFERRED TO AS THE "PREMISES".

THE UNDERSIGNED, PENDING THE RECEIPT OF THE SUM OF $
_____
AND OTHER GOOD AND VALUABLE CONSIDERATION, THE RECEIPT WHEREOF IS HEREBY ACKNOWLEDGED,
DOES HEREBY WAIVE AND RELEASE ANY AND ALL LIENS, RIGHTS OF LIENS, CLAIMS OR DEMANDS
WITH RESPECT TO SAID PREMISES, ON ACCOUNT OF SAID LABOR OR MATERIAL, OR BOTH,
FURNISHED UNDER CONTRACT BY THE UNDERSIGNED TO OR ON ACCOUNT OF
_____FOR SAID PREMISES.

THE UNDERSIGNED FURTHER WARRANTS THAT ALL LABORERS EMPLOYED BY THEM UPON THE AFORESAID
PREMISES HAVE BEEN FULLY PAID TO THE EXTENT OF THIS RELEASE AND THAT ALL SUPPLIES OF
MATERIALS FROM THE SUPPLIERS HAVING ANY CLAIM, DEMAND, OR LIEN AGAINST SAID PREMISES,
AND FURTHER, THAT NO CHATTEL MORTGAGE, CONDITIONAL BILL OF SALE OR RETENTION OF TITLE
AGREEMENT HAS BEEN GIVEN OR EXECUTED FOR OR IN CONNECTION WITH ANY MATERIAL (S),

APPLIANCES, MACHINERY, FIXTURES OR FURNISHINGS AND/OR SERVICES PLACED OR INSTALLED IN THE AFORESAID PREMISES.

SIGNED THE _____ DAY OF, _____ IN

_____

THE STATE OF _____, COUNTY OF

_____
NAME OF CONTRACTOR/SUPPLIER

_____
AUTHORIZED REPRESENTATIVE

_____
NOTARY

MY COMMISSION EXPIRES

_____ TITLE

EXHIBIT B-2
PARTIAL WAIVER OF LIEN - NON-CONTINGENT

STATE OF _____
COUNTY OF
TO WHOM IT MAY CONCERN:

WHEREAS THE UNDERSIGNED (NAME OF PARTY)
_____ OF
(NAME OF CONTRACTOR/SUPPLIER) _____ AT
(STREET) _____ (CITY) _____
(STATE) _____ (ZIP) _____ BEING FIRST DULY SWORN THAT HE/SHE IS THE
_____ OF
(HEREIN AFTER REFERRED TO AS THE "COMPANY") AND IS FAMILIAR WITH THE
WORK/MATERIALS
PERFORMED OR SUPPLIED TO THE PREMISES KNOWN AS

_____ (HEREIN AFTER REFERRED TO AS THE "PREMISES".
THE UNDERSIGNED, FOR AND IN CONSIDERATION OF THE SUM OF $

_____
AND OTHER GOOD AND VALUABLE CONSIDERATION, THE RECEIPT WHEREOF IS HEREBY ACKNOWLEDGED,
DOES HEREBY WAIVE AND RELEASE ANY AND ALL LIENS, RIGHTS OF LIENS, CLAIMS OR DEMANDS
WITH
RESPECT TO SAID PREMISES, ON ACCOUNT OF SAID LABOR OR MATERIAL, OR BOTH, FURNISHED
UNDER CONTRACT BY THE UNDERSIGNED TO OR ON ACCOUNT OF

_____

_____ FOR SAID PREMISES.

THE UNDERSIGNED FURTHER WARRANTS THAT ALL LABORERS EMPLOYED BY THEM UPON THE A
FORESAID PREMISES HAVE BEEN FULLY PAID TO THE EXTENT OF THIS RELEASE AND THAT ALL
SUPPLIES OF MATERIALS FROM THE SUPPLIERS HAVING ANY CLAIM, DEMAND, OR LIEN AGAINST
SAID PREMISES, AND FURTHER, THAT NO CHATTEL MORTGAGE, CONDITIONAL BILL OF SALE OR
RETENTION OF TITLE
AGREEMENT HAS BEEN GIVEN OR EXECUTED FOR OR IN CONNECTION WITH ANY MATERIAL
(S),APPLIANCES,MACHINERY,FIXTURES OR FURNISHINGS AND/OR SERVICES PLACED OR INSTALLED
IN THE AFORESAID PREMISES.

SIGNED THE _____ DAY OF, _____ IN

THE STATE OF _____, COUNTY OF

NAME OF CONTRACTOR/SUPPLIER

_____

AUTHORIZED REPRESENTATIVE

_____

NOTARY
MY COMMISSION EXPIRES

_____TITLE

EXHIBIT B-3
FINAL WAIVER OF LIEN

STATE OF _____
COUNTY OF

TO WHOM IT MAY CONCERN:

WHEREAS THE UNDERSIGNED (NAME OF PARTY)
_____ OF

(NAME OF CONTRACTOR/SUPPLIER) _____ AT
(STREET)_____ (CITY)
_____(STATE)_____(ZIP)_____ BEING FIRST DULY SWORN
THAT HE/SHE IS THE
_____OF_____
(HEREIN AFTER REFERRED TO AS THE "COMPANY") AND IS FAMILIAR WITH THE WORK/MATERIALS
PERFORMED OR SUPPLIED TO THE PREMISES KNOWN AS (HEREIN AFTER REFERRED TO AS THE
"PREMISES". THE UNDERSIGNED, FOR AND IN CONSIDERATION OF THE ENTIRE CONTRACT SUM OF $
PENDING THE RECEIPT OF THE SUM OF AND OTHER GOOD AND VALUABLE CONSIDERATION DOES
HEREBY WAIVE AND RELEASE ANY AND ALL LIENS, RIGHTS OF LIENS, CLAIMS OR DEMANDS WITH
RESPECT TO SAID PREMISES, ON ACCOUNT OF SAID LABOR OR MATERIAL, OR BOTH, FURNISHED
UNDER CONTRACT BY THE UNDERSIGNED TO OR ON ACCOUNT OF _____
FOR SAID PREMISES.

THE UNDERSIGNED FURTHER WARRANTS THAT ALL LABORERS EMPLOYED BY THEM UPON THE AFORESAID
PREMISES HAVE BEEN FULLY PAID TO THE EXTENT OF THIS RELEASE AND THAT ALL SUPPLIES OF
MATERIALS FROM THE SUPPLIERS HAVING ANY CLAIM, DEMAND, OR LIEN AGAINST SAID PREMISES,
AND FURTHER, THAT NO CHATTEL MORTGAGE, CONDITIONAL BILL OF SALE OR RETENTION OF TITLE
AGREEMENT HAS BEEN GIVEN OR EXECUTED FOR OR IN CONNECTION WITH ANY MATERIAL (S),
APPLIANCES, MACHINERY, FIXTURES OR FURNISHINGS AND/OR SERVICES PLACED OR INSTALLED IN
THE AFORESAID PREMISES.

SIGNED THE  DAY OF_____IN THE STATE OF _____, COUNTY OF

_____

NOTARY
MY COMMISSION EXPIRES

_____TITLE

_____

AUTHORIZED REPRESENTATIVE

_____

NAME OF CONTRACTOR/SUPPLIER

EXHIBIT C - INSURANCE

Unless and until written notice is provided to Contractor by Company, all contracts entered into between Company and Contractor will be subject to this Exhibit C (Insurance) and this Exhibit C (Insurance) will be the same for all such contracts.

Contractor shall obtain and maintain the following basic types and minimum amounts of insurance during the term of this Agreement:

1. Workers' Compensation and Employer's Liability
a Coverage A - Statutory for states of operation
b Coverage B - Employer's Liability with the following limits:

$1,000,000 Bodily Injury
$1,000,000 Bodily Injury by Disease
$1,000,000 Bodily Injury by Disease (Aggregate)

Broad form Employer's Liability endorsement required if performing services in WV.

2. Commercial General Liability
a $1,000,000 per occurrence / $2,000,000 aggregate
b Endorsement include:
i Premises / Operations
ii Products and Completed Operations
iii Blanket Contractual Liability
iv Blowout and Cratering
v Explosion, Collapse and Underground
vi Time Element Pollution

3. Automobile Liability
a $1,000,000 CSL (combined single limit)
b Endorsements include:
i Any Auto - Symbol 1, or
ii All Owned, Non-Owned and Hired
iii MCS 90 Endorsement for FHWA and ICC Hazmat transport compliance
iv $100,000 Cargo Insurance for transport of Company property

4. Excess or Umbrella Liability
a $5,000,000 per occurrence / $5,000,000 aggregate
b Endorsements include:
i Scheduling the underlying policies (CGL, Auto and EL)
ii Premises/Operations
iii Products and Completed Operations
iv Blanket Contractual Liability
v Blowout and Cratering
vi Explosion, Collapse and Underground
vii Time Element Pollution

Contractual indemnity insurance providing coverage to Company Group for Contractor's indemnity obligation under Exhibit D indemnity hereof. The policies required herein above, other than coverage for Workers' Compensation and Employer's liability, shall explicitly (a) list Company and the Company Group as an additional insured, including coverage for Company's joint or concurrent negligence; (b) provide coverage to Company for claims made by the Contractor's employees; and (c) shall provide coverage to Company notwithstanding Contractor being afforded immunity from its employees' claims by reason of being a subscriber under the Workers Compensation Act.

All of the above insurances shall be (i) primary and non-contributory; (ii) written on an occurrence basis; (iii) maintained without interruption from the date of this Agreement until the expiration or termination of this Agreement; and (iv) issued from a reputable insurance company with a minimum financial rating from a.m. best of A-, VII or better. The Commercial General Liability, Automobile Liability and Excess or Umbrella Liability insurance shall contain a waiver of subrogation against Company and each member of the Company Group.

Contractor shall provide Company, prior to executing the Agreement hereunder, with either an endorsement to the policy naming CNX Resources Corporation, CNX Midstream Partners LP, their Affiliates, and Subsidiaries and their officers, directors and employees (the CNX Parties) as additional insured; or a certificate of insurance naming the CNX Parties as additional insured. If required by ISNetWorld, Contractor shall provide to ISNetWorld evidence in the form of copies of insurance endorsements or certificates of insurance establishing that the policies required herein above (other than coverage for Workers' Compensation and Employer's liability) include a blanket additional insured endorsement for contracts between Contractor and Company.

Any ISNetworld contractor must provide the Certificate Holder listed as:

CNX Resources Corporation, CNX Midstream Partners LP, their Affiliates, and Subsidiaries
C/O ISNetworld

All policy endorsements or applicable certificates shall evidence this coverage and these terms and shall provide written notice to Company at least thirty (30) days prior to the policies being canceled.
Contractor shall be responsible for ensuring that all subcontractors are insured in accordance with the above insurance requirements while at the project site and/or performing any portion of the work.

EXHIBIT D - INDEMNITY

CONTRACTOR SHALL INDEMNIFY AND HOLD THE COMPANY, ITS PARENT, AFFILIATES AND SUBSIDIARY COMPANIES, THEIR SHAREHOLDERS, OFFICERS, DIRECTORS, AGENTS, AUTHORIZED REPRESENTATIVES, AND ALL THEIR EMPLOYEES (COMPANY GROUP), HARMLESS FROM THE PAYMENT OF ANY SUM OF MONEY WHATSOEVER (INCLUDING REASONABLE ATTORNEYS' FEES AND OTHER FEES AND EXPENSES INCURRED IN CONNECTION THEREWITH) ON ACCOUNT OF ANY LABOR, MECHANICS', MATERIALMEN'S OR OTHER LIENS AGAINST THE COMPANY'S PROPERTY BY REASON OF ANYTHING DONE OR FURNISHED IN ANY MANNER IN AID OF THE PERFORMANCE OF THE WORK UNDER THIS CONTRACT OR ANY PART THEREOF. CONTRACTOR AGREES TO AND SHALL INDEMNIFY AND DEFEND COMPANY GROUP FROM ANY AND ALL CLAIMS AND LIABILITY FOR PROPERTY DAMAGE, ENVIRONMENTAL DAMAGE OR DEGRADATION, AND/OR INJURY OR DEATH OF ANY PERSON, CAUSED, OR ALLEGED TO HAVE BEEN CAUSED, IN WHOLE OR IN PART, BY ANY CONDITION OF ANY PROPERTY UNDER THE USE OR CONTROL OF CONTRACTOR, BY ANY FAILURE OF CONTRACTOR, ITS EMPLOYEES, AGENTS, AND SUBCONTRACTORS, TO COMPLY WITH ANY APPLICABLE LAW, REGULATION, GOVERNMENTAL ORDER, OR PROVISION OF THIS CONTRACT, OR BY ANY OTHER CAUSE RELATED TO PERFORMANCE OF WORK UNDER THIS CONTRACT, INCLUDING THOSE CLAIMS AND LIABILITIES ALLEGED OR PROVEN TO INVOLVE COMPANY GROUP'S JOINT OR CONCURRENT NEGLIGENCE.
CONTRACTOR SHALL INDEMNIFY COMPANY PARTIES FOR CLAIMS MADE BY THE CONTRACTOR'S EMPLOYEES NOTWITHSTANDING CONTRACTOR BEING AFFORDED IMMUNITY FROM ITS EMPLOYEES' CLAIMS BY REASON OF BEING A SUBSCRIBER UNDER THE WORKERS COMPENSATION ACT.

EXHIBIT E - DRUG AND ALCOHOL TESTING POLICY

CNX RESOURCES CORPORATION CONTRACTOR AND SUB-CONTRACTOR DRUG & ALCOHOL TESTING POLICY

In June of 2008, CNX RESOURCES CORPORATION (CNX) implemented a company-wide drug and alcohol testing program for all employees. CNX is committed to maintaining a safe, healthy and productive work environment that is free from the adverse effects of drugs and alcohol. The importance of work performed is such that the work environment at every location must be free from the adverse effects of drugs and alcohol. Due to the integral role contractors and sub-contractors play at CNX sites, CNX feels strongly that its contractors and sub-contractors share CNX's commitment to a drug and alcohol free workplace. This can be accomplished only by establishing drug and alcohol testing programs that maintain such an environment.

CONTRACTOR AND SUB-CONTRACTOR DRUG & ALCOHOL REQUIREMENTS:

1. All contractors/sub-contractors must have an independent drug and alcohol testing program or belong to a consortium that complies with CNX requirements as well as applicable federal, state and local laws.

2. All contractors/sub-contractors having an independent drug and alcohol testing program must have a MEDICAL REVIEW OFFICER (MRO). A medical review officer is a licensed physician with the requisite knowledge, experience, training and qualifications, who is responsible for receiving and reviewing laboratory results generated by an employer's drug testing program and evaluating medical explanations for certain drug test results.

3. Drug and alcohol testing sample collection must be performed by a certified collector or a certified third party collector (TPA).

4. Analysis of urine samples must be performed by a Health and Human Services (HHS) / Substance Abuse and Mental Health Services Administration (SAMHSA) CERTIFIED LAB in compliance with Title 49 CFR Part 40 (even for non-DOT-mandated drug and alcohol tests).

5. "Quick Tests" and/or "Rapid Tests" are NOT acceptable for Pre-employment, Reasonable
Suspicion, and Random Testing. "Quick Tests" may be used for Post-Accident testing ONLY provided that all urine samples are sent to a certified lab for confirmation, and "Quick Tests" are acceptable per applicable state and federal laws.

6. All contractor/sub-contractor employee(s) whose drug and/or alcohol tests are verified POSITIVE by a medical review officer or refuse testing are NOT permitted to work at a CNX site now or anytime in the future The contractor will prevent any employee who fails testing under the program from working on a site owned or operated by CNX RESOURCES CORPORATION or any of its affiliates.

7. Contractors/sub-contractors currently testing under DOT regulations must test per DOT requirements/thresholds and must ALSO test under CNX's drug and alcohol requirements for Pre-Employment, Random, Post-Accident and Reasonable Suspicion. This may mean the administration of two tests to an employee under some circumstances.

8. All contractors are responsible for their sub-contractors' compliance with CNX's Contractor and Sub-contractor Drug & Alcohol Testing Policy requirements.

9. The contractor will make available to CNX, or its designee, upon request, certified laboratory results that prove the existence of a drug and alcohol testing program that complies with CNX requirements.

TESTING REQUIREMENTS:

1. Pre-Employment/Pre-Access Testing: All contractor/sub-contractor employee(s) that will or may work at a CNX site are required to be tested prior to employment. An employee who is subject to pre-employment testing for drugs or alcohol under the DOT preemployment testing program must also be subject to CNX's drug testing requirements.

2. Reasonable Suspicion Testing: All contractor/sub-contractor employee(s) assigned to a CNX site suspected of being impaired by drugs and/or alcohol may be drug and alcohol tested immediately, removed from the CNX site and banned from returning upon confirmation of a positive drug or alcohol test. This includes, but is not limited to, the following:
- Reporting for work after having used drugs and/or alcohol.
- Possessing illegal substances/paraphernalia/alcohol on a CNX site.

3. Post-Accident/Incident Testing: All contractor/sub-contractor employee(s) involved in an accident at a CNX site resulting in off-site medical treatment to himself/herself or another employee, or an incident resulting in significant disruption of the operations at the facility (as determined by CNX and its affiliates), are required to be tested for drugs and alcohol upon receiving treatment.

Additionally, all other contractor/subcontractor employees involved in the accident must be tested immediately after the accident. An employee who is subject to post-accident testing for drugs or alcohol under the DOT postaccident testing program also is subject to CNX's post-accident drug and alcohol testing requirements, which are broader than DOT's requirements.

4. Random Testing: All contractors/sub-contractors are required to randomly drug and alcohol test at least 25% of their employees that perform or may perform work at a CNX site, annually. This requirement is separate and apart from, and in addition to, DOT's random drug and alcohol testing requirements.

5. Alcohol Testing: All contractor/sub-contractor employee(s) must be subject to alcohol testing via breathalyzer or blood alcohol test ONLY. DOT testing must be conducted via breathalyzer. Alcohol testing must be performed as part of reasonable suspicion, postaccident and random drug and alcohol testing.

MINIMUM REQUIRED SUBSTANCES:

1. Alcohol
2. Amphetamine or Methamphetamine
3. Cannabinoids
4. Benzoylecgonine
5. Opiates
6. Phencyclidine
7. Barbiturates
8. Benzodiazepines
9. Methadone
10. Methaqualone
11. Expanded Opiates / Synthetic Narcotics
12. Propoxyphene
13. 6-Acetylmorphine
14. Ecstasy

MINIMUM REQUIRED TESTING THRESHOLDS FOR DRUGS:

The following cutoff levels will be used when initially screening a urine specimen for drugs:

Substance  Threshold
Amphetamine  500 ng/ML
Methamphetamine  500 ng/ML
Barbiturates  200 ng/ML
Benzodiazepines  200 ng/ML
Cannabinoids ("Marijuana", THC metabolites)  50 ng/ML
Benzoylecgonine (Cocaine metabolite)  150 ng/ML
Methadone  300 ng/ML
Methaqualone  300 ng/ML
Opiates  300 ng/ML
Expanded Opiates/Synthetic Narcotics  300 ng/ML
Phencyclidine  25 ng/ML
Propoxyphene  300 ng/ML
6-Acetylmorphine  10 ng/ML
Ecstasy  500 ng/ML
A test yielding a concentration at or greater than the concentrations shown above will be considered a laboratory positive test result and will be subject to confirmation.

Laboratory positive test results based on the above initial screening will be confirmed using Gas Chromatography/Mass Spectrometry (GC/MS), or other forms of Mass Spectrometry as approved by HHS / SAMHSA, at the following cutoff levels:

Substance  Threshold
Amphetamine  250 ng/ML
Methamphetamine*  250 ng/ML

Barbiturates  200 ng/ML
Benzodiazepines  200 ng/ML
Cannabinoids ("Marijuana", THC metabolites)  15 ng/ML
Benzoylecgonine (Cocaine metabolite)  100 ng/ML
Methadone  200 ng/ML
Methaqualone  200 ng/ML
Opiates  300 ng/ML
Expanded Opiates/Synthetic Narcotics**  300 ng/ML
Phencyclidine  25 ng/ML
Propoxyphene  200 ng/ML
6-Acetylmorphine  10 ng/ML
Ecstasy***  250 ng/ML


* - Specimen must also contain Amphetamine at a concentration equal to or greater than 100ng/ML.
** - Expanded Opiates include: Hydrocodone, Hydromorphone and Oxycodone
*** - MDMA (Methylenedioxymethamphetamine)
*** - MDA (Methylenedioxyamphetamine)
*** - MDEA (Methylenedioxyethylamphetamine)

ALCOHOL TESTING:

- For a (non-DOT-mandated) Post-Accident test; a breath or blood alcohol test yielding a 0.02 BAC or greater will be considered a positive result.

- For all other tests, including all DOT-mandated alcohol tests; a breath or blood alcohol test yielding a 0.04 BAC or greater will be considered a positive result.

AUDITING:

- CNX has the right to audit records to determine compliance with the CNX's Contractor and Sub-contractor Drug & Alcohol Testing Policy requirements.

CONTRACTOR/SUB-CONTRACTOR COMPLIANCE MONITORING:

CNX has established a business relationship with TEAM Alert to serve as CNX's Non-DOT Contractor Drug & Alcohol Compliance Monitoring provider. As a result of this partnership, all contract companies are required to become subscribers to TEAM Alert's system.  All contract companies will be subjected to an Initial, Bi-Annual Statistical, Quarterly Compliance and On-site Audits through TEAM Alert.

The following steps are needed to comply with CNX's Drug and Alcohol requirements:
1. Subscribe to TEAM Alert's system at www.tpsalert.com.
2. Adopt/Acknowledge the CNX Contractor Drug & Alcohol Drug Free Workplace Policy Addendum (occurs during the electronic registration at www.tpsalert.com).
3. Select one of two options for complying with the Contractor Drug & Alcohol Compliance Monitoring.  These options include:
a. Option 1: Your organization can utilize Team Professional Services (TEAM) as your third party administrator (TPA) for your company's D&A Policy/Program.  TEAM will then provide CNX with the data required to establish conformance with CNX's requirements. Pricing for this service will be determined between each Contractor Company and Team.
b. Option 2: Your organization can continue to utilize existing systems to administer your D&A Policy/Program and establish conformance with CNX's requirements by providing reports documenting compliance to TEAM Alert.  The reports will be audited by TEAM Alert and results reported to CNX.

Regardless of which option is selected, your organization's compliance status will be determined by TEAM Alert and then reported to CNX though ISNet World.  Status will be based on timely reporting of data and compliance with the CNX requirements outlined in the Contractor Drug and Alcohol Drug Free Workplace Policy Addendum.  Any company with a failing grade will be prohibited from performing services on CNX property until corrective action is taken to become fully compliant.

EXHIBIT F - CONTRACTOR PERSONAL PROTECTIVE EQUIPMENT REQUIREMENTS

*REMEMBER*- YOU MUST BE WEARING -ALL- OF THE FOLLOWING PROTECTIVE ITEMS BEFORE YOU
ENTER OR LEAVE YOUR STAGING AREA. THIS PPE WILL NOT BE PROVIDED BY THE FACILITY.

CONTRACTORS PERSONAL PROTECTIVE EQUIPMENT REQUIREMENTS:

HARD HAT - EVERY EMPLOYEE MUST WEAR AN APPROVED HARDHAT. IT MUST BE IN GOOD CONDITION
WITH NO CRACKS. IT MUST HAVE AT LEAST 6 INCHES OF BLUE REFLECTIVE TAPE ON BOTH SIDES
AND THE BACK. THE EMPLOYEES FIRST AND LAST NAME IN AT LEAST 1/2" LETTERS AND THE
COMPANY NAME OR LOGO MUST BE ON THE HARD HAT.(ON THE SURFACE, WHEN OPERATING IN
TOTALLY ENCLOSED CABS, WORKING IN PROCESSING PLANT CONTROL ROOMS, AND ON RIVER BARGES,
HARD HATS MAY BE REMOVED ONLY FOR THOSE TASKS.)

EYE PROTECTION - SAFETY GLASSES WITH SIDE SHIELDS MUST BE WORN AT ALL TIMES.
PRESCRIPTION EYE GLASSES MUST MEET THE ANSI STANDARD. ADDITIONAL EYE PROTECTION MAY BE
REQUIRED BY SITE/TASK  SPECIFIC HAZARD TRAINING.(WHEN OPERATING IN TOTALLY ENCLOSED
CABS, SAFETY GLASSES MAY BE REMOVED ONLY WHILE IN CONFINES OF THE CAB.) EYE PROTECTION
FOR CNX GAS WORK ONLY- SAFETY GLASSES WITH EYE  PROTECTION MUST BE WORN AT ALL TIMES
DURING WORKING HOURS, EXCEPT IN THOSE LOCATIONS SITE MANAGEMENT DETERMINES SUCH IS
UNNECESSARY.  ADDITIONAL EYE PROTECTION MAY BE REQUIRED BY SITE/TASK SPECIFIC HAZARD
TRAINING. WHEN OPERATING IN TOTALLY ENCLOSED CABS, SAFETY GLASSES MAY BE REMOVED ONLY
WHILE IN THE CONFINES OF THE CAB.  SUNGLASSES OR TINTED LENSES SHALL NOT BE WORN IN
LOW LIGHT AREAS.  EXCEPTIONS MUST BE APPROVED IN WRITING BY THE VICE PRESIDENT-SAFETY
AND THE VICE PRESIDENTOPERATIONS.

HEARING PROTECTION - EVERY EMPLOYEE MUST HAVE HEARING PROTECTION AVAILABLE FOR USE AT
ALL TIMES.  IT IS POLICY THAT YOU MUST WEAR YOUR HEARING PROTECTION IN DESIGNATED
AREAS.

CLOTHING - ALL EMPLOYEES ARE REQUIRED TO WEAR APPROPRIATELY FITTING CLOTHING.  THIS
MEANS NO CLOTHING THAT IS EXCESSIVELY BAGGY OR LOOSE.  LONG SLEEVE SHIRTS (WHICH
COVERS THE ENTIRE ARM) ARE REQUIRED WHILE WORKING ON THE SURFACE.  AT THIS TIME,
EMPLOYEES WORKING IN ENCLOSED CABS AND PERSONS WORKING IN PREPARATION PLANTS ARE
EXCLUDED FROM THIS REQUIREMENT.  THE USE OF COTTON OR FLAME RESISTANT CLOTHING IS
RECOMMENDED.  FIRE RESISTANT CLOTHING MAY BE MANDATED ON SITE SPECIFIC LOCATIONS.

DRILLING OPERATIONS - PERSONNEL ARE REQUIRED TO WEAR FLAME
RESISTANT CLOTHING (LONG SLEEVED) AS REQUIRED ON SITE/TASK
SPECIFIC LOCATIONS SUCH AS OIL & GAS DRILLING, WELL SERVICING OR OIL
AND GAS PRODUCTION-RELATED OPERATIONS WHEN THERE IS A POTENTIAL
FOR FLASH FIRE HAZARDS AS OUTLINED IN OSHA MEMORANDUM DATED
MARCH 19, 2010 (ID 27296).  THIS INCLUDES DRILLING OPERATIONS FOR BOREHOLES,
COREHOLES, WELLS, AND WELL PLUGGING.  FLAME RESISTANT CLOTHING IS REQUIRED WHILE ON
THE PAD SITE.

ESTABLISHED SITES - FLAME RESISTANT CLOTHING (LONG SLEEVED)
CLOTHING IS REQUIRED WHEN PERFORMING ANY DUTIES INSIDE THE FENCE AT ANY ESTABLISHED
DEGAS PUMP, DEGAS BOREHOLE, CCR HOLE AND SURFACE SEAL MONITORING BORE HOLE.

IN THE EVENT THE BOREHOLE, WELL, PUMP OR BOREHOLE IS NOT PROVIDED WITH FENCING
PERSONNEL SHALL NOT APPROACH WITHIN 25' WITHOUT FR CLOTHING

CLOTHING FOR CNX GAS WORK ONLY- ALL EMPLOYEES ARE REQUIRED TO WEAR APPROPRIATELY
FITTING CLOTHING. THIS MEANS NO CLOTHING THAT IS EXCESSIVELY BAGGY OR LOOSE. *THE USE
OF FLAME RESISTANT CLOTHINGS IS REQUIRED ON SITE/TASK SPECIFIC LOCATIONS SUCH AS OIL
AND GAS DRILLING, WELL SERVICING OR PRODUCTION-RELATED OPERATIONS WHEN THERE IS A
POTENTIAL FOR FLASH FIRE HAZARDS AS OUTLINED IN OSHA MEMORANDUM DATED MARCH 19,
2010(ID 27296). SITE SPECIFIC HAZARD TRAINING WILL FURTHER DEFINE SPECIFIC
LOCATIONS/TASKS.*

REFLECTIVE MATERIAL - THERE MUST BE A MINIMUM OF 24 SQUARE INCHES OF HIGH-VISIBILITY (REFLECTIVE AND FLUORESCENT) MATERIAL ON THE UPPER TORSO OF THE FRONT AND BACK OF THE OUTER LAYER OF CLOTHING. ADDITION REFLECTIVE HIGH-VISIBILITY (REFLECTIVE AND FLUORESCENT) MATERIAL IS REQUIRED ON EACH SIDE (ARMS AND/OR TORSO) OF THE OUTER LAYER OF CLOTHING TO PROVIDE 360 VISIBILITY. REFLECTIVE MATERIAL INCORPORATED ON SUSPENDERS DOES NOT COUNT AS PART OF THE 24 SQUARE INCH REQUIREMENT.
REFLECTIVE MATERIAL FOR CNX GAS WORK ONLY- HIGH VISIBILITY CLOTHING- AT A MINIMUM THERE MUST BE SUFFICIENT REFLECTIVE AND HIGH VISIBILITY MATERIAL TO PROVIDE VISIBILITY FROM ALL DIRECTIONS ON THE OUTERMOST LAYER OF CLOTHING ON ARMS AND OR/TORSO. YOU HAVE SEVERAL MEANS AVAILABLE TO COMPLY WITH THIS STANDARD SUCH AS REFLECTIVE VESTS, BELT SHOULDER STRAPS, SEW ON OR IRON ON MATERIAL, ETC. (NOTE: IN AREAS WHERE FLAME RESISTANT CLOTHING IS REQUIRED, THIS HIGH VISIBILITY CLOTHINGS MUST ALSO BE FLAME RESISTANT.)EVERY PERSON WITH LESS THAN SIX MONTHS OF RELEVANT FIELD EXPERIENCE MUST AFFIX A 1" DIAMETER ORANGE REFLECTIVE DOT ON THE REQUIRED REFLECTIVE TAPE ON BOTH SIDES AND THE BACK.

METACARPAL GLOVES FOR CNX GAS WORK ONLY - METACARPAL GLOVES MUST BE WORN AT ALL TIMES BUT MAY BE REPLACED WITH OTHER APPROPRIATE GLOVES(AS DETERMINED BY SITE MANAGEMENT) WHEN PERFORMING SPECIALITY TASKS SUCH AS ELECTRICAL WORK, HANDLING OILY AND/OR GREASY MATERIAL, HANDLING CERTAIN CHEMICALS, OPERATING CONTROLS, WELDING ETC. IMMEDIATELY UPON COMPLETING THE "SPECIALTY TASK" METACARPAL GLOVES MUST BE WORN. (WHEN OPERATING IN TOTALLY ENCLOSED CABS, METACARPAL GLOVES MAY BE REMOVED ONLY WHILE IN THE CONFINES OF THE CAB).

LEG BANDS - PANT LEGS BOTTOMS MUST BE SECURED OR BLOUSED AT ALL TIMES.

METATARSAL BOOTS FOR CNX GAS WORK ONLY- METATARSAL BOOTS- METATARSAL BOOTS ARE REQUIRED AT ALL TIMES UNLESS A WRITTEN APPROVED EXCEPTION HAS BEEN GRANTED BY THE VP OPERATIONS AND VP-CORPORATE SAFETY.

Exhibit G- Background Check Guidelines
Introduction and purpose
CNX RESOURCES CORPORATION, (CNX) strives to provide a safe and secure workplace for its employees, customers, shareholders, and the communities in which they operate. A key factor is to know who is working on CNX property and that a proper background screening has been performed on such persons. To that end, CNX has adopted Contractor Background Check Guidelines (the "Guidelines") effective June 1, 2013 which are required for "A" and "B" contractors to follow for all newly hired employees who will work on CNX property.
Elements
The following areas are required "core" elements to be performed by the contractor.
1. Social Security Number (SSN) verification (instant address link or skip trace)
This verifies a person's social security number and address provided on his/her application.

2. I-9 form identification and citizenship verification
This is required under federal employment law and is included in this list of requirements as an auditable program element.

3. Federal, state, and county/local criminal history check This searches court records based on the applicant's past locations of residence and employment for criminal convictions for the maximum time period permitted by applicable state law.

4. Employment history check
Contractor must submit to CNX Resources by email at brcheck@cnx.com a complete roster of all of Contractor's and its subcontractor's employees who will be working on CNX property prior to the commencement date of any work if practical, but in any event no later than five (5) days after the commencement date.

5. Education verification
This requirement verifies that a job applicant possesses and maintains all required diplomas, degrees, licenses and/or certifications required for his/her position with

Contractor and that the applicant is in good standing with any licensing authority responsible for regulating such license, certification or other requirement.

6. Department of motor vehicles
This requires a check for driving records under applicable state law for persons who will be driving a Contractor-owned vehicle on CNX property or for the contractor while providing services to CNX. The check would verify current operator status and/or suspension status of driving privileges.

7. Other
Certain job-specific types of checks, not detailed here, that may be appropriate to add in certain cases to the "core" requirements include: credit check, bankruptcy search, liens and judgments, and reference checks, in each case, in compliance with applicable federal, state and local law.

8. Sound business judgment
Sound business judgment should be used by the contractor in making hiring decisions based on the above elements, including the applicant's suitability for the position.
CNX reservation of rights; right to audit; certification of contractor
CNX reserves the right to reject an individual employee proposed by contractor for work on CNX property, subject to applicable federal, state and/or local law (if any). CNX reserves the right to audit contractor's compliance with these guidelines. Contractor shall be required periodically to certify its compliance with these guidelines at the request of CNX or its designee.
Independent contractor: no joint venture, etc.
Contractor is and shall remain at all times an independent contractor. No joint venture, partnership, joint employment or similar relationship exists between contractor and CNX. Questions
If you have any questions regarding these guidelines, please contact:
TEAM Alert
E-mail:  cnxbackground@tpsalert.com
Phone: 918-970-4990

**EXHIBIT B**
*CNX's Invitation for Bids*



**Project Scope Statement**:  CNX Midstream Partners LLC (CNXM) is requesting bids from qualified CONTRACTORS to provide labor, materials, tools and equipment necessary for the expansion of Morris Compressor Station detailed below. The CONTRACTOR is intended to act as the General CONTRACTOR responsible for all civil, mechanical, electrical and instrumentation work.  CONTRACTOR is expected to be proactive in planning with all other CNXM groups and CONTRACTORs.

Station expansion will handle (3) Tiers of Service (inlet gas pressures) as follows, Free Flow: 600-1440 psig, Tier 1: 300-600 psig, and Tier 2: 150-300 psig. Free flow and Tier 1 services are ANSI 600 systems rated for 1440 psig. Expansion of the station includes Tier 1 and Tier 2 service with inlet filtration, compression and dehydration with anticipated TIL date of 6/1/2019.

The CNXM Engineering team is currently at the 60% review milestone with the design drawings. Most equipment has been purchased and other equipment and long lead materials are in the process of being bid out. The intent of this RFP is to pick a CONTRACTOR in the early phases to ensure availability for the construction phase of the project. CNXM is requesting a pricing for the work detailed in this and all accompanying documents based on the current schedule and 60% design set. The structure of this bid is T&M plus fixed markup of labor and materials. The lump sum will be compared to other CONTRACTOR bid pricing as well as the budgeted amount. The CONTRACTOR is required to include all assumptions and completely fill out the SOV document based on experience and provided documentation. Once IFC drawings have been developed, the CONTRACTOR will have the opportunity to apply pricing to the updated plansets quantities to firm up the project cost. CNXM and the CONTRACTOR will work together to agree on final pricing prior to a final PO being issued. CNXM has developed a list of Key Performance Indicators (KPIs) that the CONTRACTOR will be graded on. Upon award CNXM and the CONTRACTOR will develop an agreed upon bonus based on KPI performance.

1. **Instruction to Bidders**
    a. COMPANY is referring to CNX Midstream
    b. CONTRACTOR is referring the successful bidder.
    c. All bids are to be entered into your respective company Response Folder in the ShareFile Bid System.  Do not email your bid, it must be submitted into the system for acceptance.
    d. Bids shall be submitted to ChaseDavis@CNX.com and must include all CONTRACTOR submittals described in section 6 "CONTRACTOR Submittals".
    e. COMPANY maintains the right to award this project to any CONTRACTOR.
    f. All questions shall be emailed to ChaseDavis@CNX.com. Chase will combine questions and distribute to the COMPANY team to answer and be redistributed to all bidders.

2. **Communication**
    a. The COMPANY will have a dedicated Project Engineer and Construction Foreman throughout project.

EXHIBIT

1

exhibitsticker.com

| Name | Phone Number | Email Address |
|------|--------------|---------------|
| Chase Davis – Supply Chain | (724) 485-3801 | ChaseDavis@cnx.com |
| Aaron Currey – Supply Chain | (724) 485-3031 | AaronCurrey@cnx.com |
| Carissa Hansen – Project Engineer | (724) 485-3050 | CarissaHansen@cnx.com |
| Kevin Dunn – Construction Foreman | (724) 350-4259 | KevinDunn@cnx.com |
| Ryan Aubuchon – Supervisor Engineering | (314) 304-7922 | RyanAubuchon@cnx.com |
| Dennis Koscho- Construction Manager | (724) 464-1597 | DennisKoscho@cnx.com |

3. **Project Description**
   a. Summary
      i. Morris Compressor Station expansion includes,
         1. Pig Receivers
         2. Suction piping header for new Tiers of service
         3. Inlet Slug Catchers
         4. Inlet Filtration
         5. Compression
            a. Remove (2) 3516 leased gas fired compressors
            b. Install (3) 3608 (gas fired with electric powered coolers)
         6. Dehydration
            a. Install (1) 200MM dehy contact tower
            b. Install (1) 2.5 MMBTU Reboiler
         7. Post Dehydration filtration
         8. Tanks
            a. Remove existing tank farm
            b. Install new tank farm (2) 400 BBL tanks and (1) 450BBL tank
         9. Metering, control valves
         10. Electrical and Instrumentation and grounding
            a. Powerline and substation (provided by others)
         11. Air Compressor building and process piping
         12. Fuel gas conditioning skid and associated piping
         13. Discharge piping
   b. Status
      i. The current AQ permit allows for the installation of the second dehy and the replacement of the (2) 3516's for 3608's. The AQ permit modification will require approval before construction of the new tank farm can begin, affecting when the exiting tanks can be removed and deep foundations installed for additional compression. Construction for work already approved is expected to start immediately, with the remainder to follow as soon as the AQ permit is approved. The AQ permit is anticipated to be approved by 2/9/19.
   c. Address
      i. 293 Stringtown Road, Graysville, PA
   d. Coordinates
      i. 39.944927, -80.371284
   e. Approved Haul Routes will be provided prior to mobilization

4. **Scope of Work**
    a. This project includes civil, structural, mechanical, electrical and instrumentation construction of the above-mentioned facility per the provided drawings and requirements described in this document. The pad, access road, powerline, and substation will be completed by others.
    b. Mobilize to site and provide survey support, layout and install all foundations.
    c. Offload and set/install all major equipment including,
        i. (2) – NDS 72" Horizontal Type Slug Catcher
        ii. (1) – PECO Gemini 54" Horizontal Filter Separator (Tier 2b Inlet)
        iii. (2) – CAT 3608 / Ariel Compressor Packages
        iv. (3) – PECO Gemini 42" Horizontal Filter Separators (Dehy)
        v. (1) – Shultz 40" Horizontal Filter Separators (Dehy)
        vi. (2) – 72" Contact Tower – instrumentation provided.
        vii. (1) - 2.5 MMBTU/hr Glycol Regenerator and Envirotherm Enclosed Ground Flare
        viii. (1) - Instrument Air Building
        ix. (1) MCC Building & Backup Generator
        x. (2) 400bbl and (1) 450bbl produced water tanks
        xi. (1) – Aeron VDU unit
        xii. All Interconnect Piping, Valves, Pipe Supports, Steel Structures, Buildings, Etc. per provided drawings
        xiii. Instrumentation, including mounting, tubing, and electrical terminations
        xiv. Electrical cable/conduit, cable racks, cable trays and all electrical terminations
        xv. Cathodic Protection and Grounding System
        xvi. Yard Lights
        xvii. Fencing and Vehicle Barriers
    d. Final Pad Grading

5. **Schedules**
    a. Use Table 1 and Table 2 below for bidding purposes. Major equipment delivery schedules are subject to change.
    b. CONTRACTOR is responsible for providing schedule and manpower necessary to meet TIL date.
    c. Posted blackout times must be strictly observed.
    d. Normal weather conditions for the time of year should be considered in the proposal. CONTRACTOR should prepare for anticipated weather events for effective schedule management.
    e. CONTRACTOR is required to maintain a detailed construction schedule to meet the Mechanically Complete, Electrically Complete, and fully commissioned project schedules. This schedule should be in GANTT chart form and updated at weekly construction meetings and distributed to everyone involved with the project. Any changes to the originally agreed upon milestones above must be cleared with the Manager of Construction and the Project Engineer prior to sending out the updated schedule.

Table 1 : Bid Schedule

| Date | Description |
|------|-------------|
| 10/9/18 | Issue RFP |
| 10/9/18 | Bid Review Meeting |
| 10/16/18 | Site Visit |
| 10/19/18 | Bid Questions Due |
| 10/26/18 | Bids Due |
| 10/30/18 | Clarifications |
| 11/1/18 | Award Project |

Table 2: Project Schedule

| Date | Description |
|------|-------------|
| 11/5/18 | Construction Kickoff Meeting |
| 11/19/18 | IFC Equipment Drawings – Approval to Start Shop Fabrication |
| TBD | PVF – Delivery to CONTRACTOR Fabrication Shop |
| 10/15/2018 | 90% Drawing Package Review |
| 02/09/19 | AQ Permit Approved |
| 2/1/19 | Compressor Delivery (earliest) |
| 2/1/19 | Slug Catcher Delivery |
| 2/15/19 | Dehy Train Delivery |
| 12/15/18 | Filters Delivered |
| 2/15/19 | Ground Flare Delivery |
| TBD | MCC Building |
| TBD | Instrument Air Building |
| TBD | Back Up Generator |
| TBD | Building Erection – By Others |
| TBD | Powerline and Substation Complete |
| 5/4/2019 | Mechanically Complete |
| 5/4/2019 | Electrically Complete |
| 5/30/2019 | Commissioning Complete |
| 5/31/2019 | PSSR |
| 6/1/2019 | Expansion Complete – Safe to flow |

**6. Bid Instructions**

   a. CONTRACTOR is required to complete the attached Schedule of Values (SOV) to provide Lump Sum pricing for the facility work. Sections labeled T&M are to be filled out as a lump sum. Completion of T&M work must be agreed upon in the field by CONTRACTOR and COMPANY Foreman prior to invoicing. The following documents are required at time of bid submittal.

   b. Proposal Letter

   c. Completed SOV in Excel format

   d. Proposed Project Schedule

    e.  Resumes for expected Superintendent, Project Manager, and other project leadership, including subcontractors.

    f.  List of subcontractors that will be utilized

    g.  Time and Material rates for Labor and Equipment

    h.  List of all assumptions and clarifications.

    i.  Submittals must be uploaded to your respective COMPANY Response Folder in the ShareFile Bid System no later than 5PM on the day bids are due. Please contact Chase Davis with any ShareFile issues prior to the time bids are due.

## 7. COMPANY Responsibilities

    a.  Pad and Access Road Construction

    b.  Powerline and Substation Construction

    c.  SOW, SOV, and detailed drawings (IFC Drawings)

    d.  COMPANY Design & Construction Standards

    e.  Inspection Services

    f.  NDT Services

    g.  Major Equipment – Filters, Meter, Tanks, Control Valves, etc.

    h.  Pipe, valves, fittings, nuts, bolts, and gaskets that are 8" and larger.

    i.  Instruments

    j.  Anodes, Test Stations, and SSD's

    k.  Structural Steel

## 8. General Requirements

    a.  CNX Safety Training for all personnel working on site including subcontractors.

    b.  Attend Weekly Construction Meetings

    c.  Provide an office trailer

    d.  CONTRACTOR's work and storage areas are to be kept clean, neat, and orderly. CONTRACTOR will be responsible for providing a dumpster and trash containers throughout the work space.

    e.  CONTRACTOR is responsible for providing survey services to confirm spacing, elevations, etc. Permanent benchmark information will be provided by CNXM. CONTRACTOR is responsible for preserving established stakes or benchmarks.

    f.  CONTRACTOR is responsible for providing appropriate sanitation facilities to accommodate staffing for the project as outlined by OSHA.

    g.  A Project Status Update call will be held weekly with all stakeholders until project closeout is complete. Project control documentation needs submitted by COB on day prior to call. The call schedule shall be established upon project kickoff.

    h.  A detailed schedule with Gantt chart is required detailing construction plan and construction progress. The schedule should be updated weekly after the weekly construction meeting and distributed to the project team. Any deviations in the schedule should be highlighted.

    i.  The CONTRACTOR's Project Management representative is required for maintaining Percent Complete, Request for Information, Change Order Request, and Change Order Log documentation.

j.  Percent Complete documentation shall be submitted every two weeks. CONTRACTOR can invoice against the agreed amount once approved and returned by the Construction Foreman.

k.  CONTRACTOR is to notify the Construction Foreman and Facilities Engineer immediately upon identifying the potential for exceeding the established Purchase Order. No unbudgeted work is to be performed.

l.  Daily time logs are to be filled out to include equipment, labor, and materials for unbudgeted work and approved by the Construction Foreman in preparation for change order.

## 9. Safety / Environmental Requirements

a.  2018 CNXM Hazard Training is required for all CONTRACTOR employees and subcontractors. Hazard training is conducted weekly at CNX Gas Training Academy.

b.  OSHA 10 hr or approved equivalent is required prior to CNXM Hazard Training.

c.  CONTRACTOR must comply with all COMPANY PPE requirements including but not limited to FR clothing, metatarsal gloves, metacarpal boots, safety glasses, hard hat, and hearing protection.

d.  An on-site kickoff meeting will be conducted with field crews prior to starting the job.

e.  Morning safety meetings followed by a superintendent's coordination meeting.

f.  Daily Paperwork- Risk Assessments, Equipment Inspections, Hot Work Permits, Lift Plans, etc.

g.  Gas detectors are required and must be bump tested daily.

h.  CONTRACTOR shall conduct at minimum a weekly safety review and provide a report to CNXM.

i.  Smoking is only permissible in designated smoking areas.

j.  All personnel must familiarize themselves of the station alarms and respond appropriately. Muster point signs are posted and shall be identified.

k.  Spill kits must be made available to adequately address LOPC incidents.

l.  Secondary containment must be provided for generators, light plants, fuel tanks, chemical storage areas, air compressors, and other fixed equipment.

m.  Storage containers must be labeled.

n.  Trigger locks must be removed from refueling equipment.

o.  All incidents, regardless of severity, must be immediately reported to on site CNXM construction representative and site management.

p.  CONTRACTOR to conduct E/S inspections weekly, after significant weather events, and provide maintenance for E/S controls.

## 10. Material Requirements

a.  Tracking of all materials, MTRs, delivery documents, and verification that they meet the design requirements.

b.  Most equipment and materials will be delivered to site, but CONTRACTOR is expected to make runs to COMPANY Rice's Landing yard or supply houses as needed.

c. Pipe, Valves, Fittings that are smaller than 8" N.D are CONTRACTOR responsibility, but must adhere to COMPANY AML.

d. One off needs of 8" and larger will be the CONTRACTOR's responsibility to procure. The COMPANY has an agreement with DNOW that the CONTRACTOR can procure these parts directly to a COMPANY PO. If the part is unavailable the CONTRACTOR may go elsewhere to procure with COMPANY approval and following the COMPANY AML.

e. Flange bolt up kits (studs, nuts, washers & gaskets) smaller than 8" N.D.

f. Insulating Gasket Kits

g. Stainless Steel Tubing

h. Coating Materials

i. All electrical material, including grounding, heat trace, and insulation.

j. All civil material

k. All structural steel

l. Fencing and vehicle barriers

m. Yard Lights

n. The CONTRACTOR shall provide all tools, equipment, competent labor, supervision, consumables, and services for the successful completion of work as outlined in the RFB and Bid Documents.

o. All Material and Services not listed in "COMPANY RESPONSIBILITES"

## 11. Civil Requirements

a. CONTRACTOR is responsible for performing the One Call

b. CONTRACTOR is responsible for installation of fabric and final pad grading per drawings

c. CONTRACTOR is responsible for all excavation and back fill

d. CONTRACTOR is responsible for all foundation material and installation

e. CONTRACTOR is responsible for all civil materials including stone, sand, flowable fill, concrete, rebar, anchor bolts, forms, structural steel, padding material etc.

f. CONTRACTOR is responsible for seed and mulch in areas that previously contained vegetation and were disturbed by the CONTRACTOR.

g. CONTRACTOR is responsible for verifying foundation locations and elevations and maintaining survey control during construction of the project. If "randoms" or Field Weld Tie-Ins are not designed into shop fabricated spools, the CONTRACTOR is responsible for surveying tie-in points and confirming shop fabrications will fit up prior to installation.

h. CONTRACTOR is responsible for securing all piping and equipment to foundations per provided drawings.

i. Third party testing for concrete is to be provided by the CONTRACTOR. The third party's scope of work is to include collection of samples and break analysis for each foundation per CNXM's Concrete Specification 10-15-15 REV3 document (7 days, 28 days, and hold). Data is to be submitted to CNXM as soon as breaks are conducted and included with the completed job book.

## 12. Mechanical Requirements

a. CONTRACTOR is responsible for the material, fabrication and installation of all pipe supports, foundations, and installation of COMPANY provided maintenance platforms, steps, and staircases.
b. CONTRACTOR shall submit a lift plan to COMPANY 48 hours prior to lift, COMPANY maintains the right to classify any lift as a "Critical Lift".
c. CONTRACTOR is responsible for providing appropriate sanitation facilities to accommodate staffing for the project as outlined by OSHA.
d. Specialty items and equipment such as cranes, forklifts, man lifts, rigging materials, welding rigs, welding consumables, scaffolding, fuel, coating materials, pressure testing materials, PPE, spill kits, temporary containments, etc. shall be the responsibility of the CONTRACTOR and included in the proposal cost submission. CONTRACTOR should note accessibility constraints for the project and be willing to coordinate site work with other parties.
e. CONTRACTOR is to provide temporary office space with internet communication.
    i. Power is scheduled to be installed prior to mobilization; however, the CONTRACTOR is to assume providing a temporary generator with grounding and containment for bid purposes.
    ii. The CONTRACTOR is encouraged to supply a break trailer for their staff.
f. Escorts must be used for tractor trailer deliveries. Blackout times must be observed and the roadway kept clean at the entrance of location.
g. Commissioning support includes (2) pipe fitters, (1) electrician, and applicable equipment (i.e., man basket, fork lift, telehandler) for during commissioning phase through TIL.
h. The As-Built job book is considered a living document and should be assembled during the project as fabrication is underway. A third party will be hired by the COMPANY to QA/QC the job book for completeness and verify material standards. The CONTRACTOR is responsible for taking lead at assembling, organizing, and verifying all documentation is correct including MTR's, test records, weld maps, bills of lading, X-Ray reports, etc. Refer to the As-built documentation guide provided with the bid for full details.
i. **Materials**
    i. All material is to have the proper paper work (MTR', etc.) before installation. Documentation is to be organized and incorporated into the job book upon installation.
    ii. A materials manager is responsible for accounting for all materials, verifying material meets specs, verifying all paperwork is accounted for, identifying missing or extra parts, and ordering missing materials.
    iii. All material and equipment is to be visually inspected for integrity prior to use. Defective or damaged material needs reported to the Construction Foreman immediately.
j. **Equipment**
    i. CONTRACTOR is responsible for offloading all equipment, Crane and equipment loading details shall be provided with bid.

**k. Piping**

    i. CONTRACTOR is responsible for fabrication, pressure testing, drying, coating, and installation of all pipe, valves, and fittings.

    ii. CONTRACTOR is responsible for holiday inspection for all buried pipe.

    iii. All below grade piping shall have a minimum cover depth of 36" to top of pipe.

    iv. All below grade piping must have a written cathodic protection plan provided by the COMPANY.

    v. CONTRACTOR supplied valves that are 2" and smaller ND shall be rated for 3,000 psig Working Pressure.

    vi. Glycol lines are to be 2" flanged connections.

    vii. Threaded pipe to have unions every 40'.

    viii. CONTRACTOR supplied 1" and 2" pipe and fittings shall be Schedule XS, Grade B.

    ix. All piping 2" and larger shall be flanged connections unless approved by Supervisor of Engineering.

**l. Bolting/Torqueing**

    i. A torque map shall be provided with the as built documentation.

    ii. Lineup pins shall be made available by the CONTRACTOR to assist with pipe installation. Drive pines are not preferred.

    iii. Stud bolts for flanges should be 1/4" longer than standard so that 2-3 threads are showing after tightening

    iv. CONTRACTOR is to confirm torque value with the Construction Foreman.

    v. Three passes shall be made for each flanged connection in a 30%, 60%, and 100% value process at a minimum.

    vi. CONTRACTOR is required to supply at a minimum a pneumatic and hydraulic torque package with two torque heads per each flange size.

    vii. CONTRACTOR is to fill out COMPANY provided torque reports for the As-Built documentation.

**m. Coating**

    i. CONTRACTOR shall adhere to CNX Coating Specifications.

    ii. CONTRACTOR is responsible for all coating material, including paint, below grade coating, wraps, rock shield, soil/air transitions wraps, etc.

    iii. CONTRACTOR is to provide coating for all pipe, fittings, valves, and CONTRACTOR provided small bore pipe supports.

    iv. CONTRACTOR is to comply with CNXM's Above Ground Coating SOP and Below Ground Coating SOP

    v. Top coat/finish coat is not required for insulated piping. Base and intermediate only.

    vi. Coating needs applied to all new and reworked fabrication.

    vii. Coating reports are to be performed and documented for all applications.

    viii. A non-spark media is to be used if CONTRACTOR elects to apply coating on site.

**n. Welding**

    i. CONTRACTOR shall adhere to CNX provided welding procedure which meets API 1104 requirements.

    ii. CONTRACTOR shall obtain CNX Welding Certifications prior to any welding.

    iii. Welding to be performed in designated hot work areas. Hot work permits and fire watch personnel are required.

    iv. All fabrication shall be performed in accordance to the CNX-SMAW-X42/X65-8010-1.1 procedure.

    v. Testing material is provided by CNXM and made available for pick up at the Rice's Landing warehouse.

    vi. Shop welding procedures and proposed field fabrication procedures need to be submitted, reviewed, and approved prior to use.

    vii. Measurements shown in isometric drawings must be field verified.

**o. Non Destructive Examination (NDE)**

    i. All welds shall be 100% NDT at expense of the COMPANY.

    ii. CONTRACTOR is responsible for coordinating with COMPANY provided NDT Vendor.

    iii. X-Ray and NDT services from a CNXM approved vendor to be provided by CONTRACTOR. Inspection to be in accordance with ASME B31.8. All correspondence and scheduling with NDT personnel shall be communicated with CNXM.

    iv. Inspection is to be performed on 100% of all welds and read to ASME B31.8. All butt-welds are to be 100% X-Ray. MT and PT are suitable for other welding applications.

    v. Weld maps are required to display the MTR, heat number, welder stencil, and NDT numbering.

    vi. X-Ray film shall be submitted with the completed job book. Digital copies are also accepted.

**p. Pressure Testing**

    i. Pressure tests must adhere to the COMPANY O&M 1003 and SWP-501.

    ii. All above ground pressure testing shall be 4-hour hydrostatic tests unless otherwise specified in writing from a COMPANY representative. Refer to COMPANY O&M and SWP for detailed pressure test requirements.

    iii. Pressure testing shall NOT take place without prior written approval from COMPANY.

    iv. Pressure testing shall NOT take place without a COMPANY representative witnessing the test.

    v. CONTRACTOR shall provide COMPANY with a Pressure Test Procedure for approval 72 hours prior to starting the test.

    vi. CONTRACTOR is responsible for providing a pressure test report to COMPANY Engineering for approval prior to commencing with test. Test report requirements are detailed in O&M 1003 and SWP-501, but includes details of pressure testing equipment, calibrations records, materials, associated documentation such as MTRs and calibration records.

    vii. CONTRACTOR is responsible for providing and disposing of test water and providing manifests for sourcing and disposal.

      viii. CONTRACTOR is responsible for providing all DOT required documentation before and after the pressure test.

      ix. MTR's are required for all components included in the pressure test, including temporary test headers, caps, blinds, etc.

      x. CONTRACTOR is responsible for all material, consumable, and labor associated with dewatering, cleaning, and drying to COMPANY standards.

## 13. Electrical Requirements

a. Electrical construction shall adhere to NEC code and CNX and Industry Standards.

b. CONTRACTOR is responsible for providing all electrical material.

c. CONTRACTOR is responsible for installing all electrical material.

d. Heat Trace must be rated for Class 1 Division 2 Locations and installed per NEC and NFPA codes.

e. Heat Trace shall be 5 watt/ft and include end light kits.

f. Buried electrical conduits must be installed at 18" cover depth with 6" flowable fill concrete and red warning ribbon.

g. CONTRACTOR is responsible for terminations at end devices.

h. COMPANY will assist CONTRACTOR in terminations at RTU and PLC cabinets.

i. CONTRACTOR is responsible for pouring all conduit seals.

j. CONTRACTOR is responsible for installing and testing the grounding system.

k. CONTRACTOR is responsible for redlines and as-built drawings.

## 14. Project Specific Notes

a. CONTRACTOR shall construct this project to COMPANY standards. This project is not an interconnect requiring adherence to another company's standards.

b. CONTACATOR is responsible for making sure they adhere to the superseding standards.

c. This project will have interaction with multiple parties to ensure it's success. It is the CONTRACTOR's responsibility to work with other COMPANY contractors to ensure a timely delivery of the fully commissioned facility.

d. Archer Road is shared with CONSOL Coal Company whom will be upgrading the Archer Road for the local coal portal. Tight coordination of road use will be responsibility of the CONTRACTOR. The CONTRACTOR is responsible for working with other local crews, pre-planning deliveries, and providing traffic control on the access road when/if required. COMPANY will also assist in keeping the access road clear.

e. Due to COMPANY workload during the first two quarters of 2019, it is requested that CONTRACTOR begin what work is permissible by the AQ permit immediately.

## 15. Job Book Documentation

a. A Third-party COMPANY provided contractor will perform QA/QC of CONTRACTOR package. CONTRACTOR is responsible for developing a complete package and self-performing QA/QC prior to turning documentation over to third party. CONTRACTOR is responsible for communicating with third party to ensure a timely and complete package.

    b. CONTRACTOR is responsible for providing a hard copy and electronic copy of the following within two weeks of project completion. Some documents may be requested in advance based on project requirements.
        i. Red Lined As-Built Drawings
        ii. Pressure Test Pressure Charts and Drawings
        iii. Pressure Test equipment certifications
        iv. MTR's
        v. Bills of lading
        vi. Heat Number Drawing
        vii. Welder Certifications
        viii. Weld Map & Weld Reports including NDT tracking
        ix. All Qualified Personnel Certifications
        x. Coating Reports
        xi. Torque Reports
        xii. All additional DOT required documentation.

## 16. Extra Work

    a. There shall not be any changes in the Scope of Work without written permission from a COMPANY representative.
    b. COMPANY and CONTRACTOR shall agree upon an estimated cost provided by the CONTRACTOR prior to approving any extra work.
    c. COMPANY will not pay for extra work that was not approved in writing by COMPANY
    d. All change orders will require T&M back up documentation at time of invoicing. COMPANY will not approve any Change Order Invoices without T&M back up documentation and proof of COMPANY authorization of additional work.
    e. CONTRACTOR is responsible for keeping a Change Order Log in excel format and sending it to COMPANY Project Manager and Construction Representative on a weekly basis.

## 17. Payment Terms

    a. Net 60 or per preestablished payment term discounts.
    b. Retainage:
        i. A retainer of 10% of the total PO will be held as a line item upon completion of the project.
            1. 5% will be paid out once the project is completed
            2. Remaining 5% will be paid out once all job books are turned in by the CONTRACTOR
        ii. Invoices should be submitted with total amount but should include a comment referencing the 10% retainage and the amount that will be withheld from each invoice. (Do not deduct retainage from the amount invoiced, only reference the retainage amount)
        iii. Retainage invoices will be submitted to construction supervisor for approval. Construction foreman will send approved retainage invoices to AP for release.

**EXHIBIT C**
*"CNXM Station RFP Questions 20181024"*
*November 5, 2018*

Can you please clarify if this contract will be a T&M or a Lump Sum contract? T&M

Do you want all SOV lines as T&M Not to Exceed? Yes

If it is T&M, will it be billed through our submitted Labor and Equipment Rates with a standard mark-up on Subcontractors and Materials? Yes, but we expect the labor rates to roll up into the line items listed in the SOV.

If it is T&M, is this a T&M not to exceed amount based upon our submitted lump sum Budget? Yes

What exactly are the KPI's and how does apply toward a bonus? Please disregard this in the original RFP. A revised RFP has been uploaded with this language removed.


**Morris**

For the tank battery, will we be reusing demoed pipe, structural steel, pipe supports, or will we be fabricating new? Construct new. The new tank farm needs constructed and in operation before we can tear the old one out. CNXM will purchase the SS. Equipment from the old tanks needs transported to Rice's Landing

If we are fabricating new, who will be handling/discarding demoed material? CNMX will provide dumpster for disposal of pipe and one for concrete.

Can we expect to receive any civil drawings for the deep compressor foundations? Yes, 10/26

Bid form calls out compressor building foundation, will we receive any drawings for this foundation? Yes, 10/26

Section 7 in the SOW states that the company will supply structural steel, but Section 10 makes is sound like the structural steel is on the contractor. Clarification? CNXM purchases SS. Contractor to purchase anchor bolts.

Are we simply removing the compressors? Or will we be removing the associated piping as well? Pipe racks and tanks next to the demoed compressors? Remove the (2) 3516's and rework pipe along the pipe header for all (5) units. This is shown in the model with colored pipe.

Is everything in shaded purple on the NavisWorks model to be demoed in our scope of work? Yes. The scope of work does not mention this, but it is included on the model, so we would like clarification on whether or not the contractor is responsible for this demo? It was mentioned in the bid meeting and on-site. The contactor will be responsible for removing existing pipe/equipment that is no longer needed and replacing as necessary. For example, at the beginning of the site meeting, we looked at the inlet and discussed removing the 12" and 10" inlets and replacing with 72"x30' S/S horizontal slug catchers.


**Archer**

Section 7 in the SOW states that the company will supply structural steel, but Section 10 makes is sound like the structural steel is on the contractor. Clarification? <span style="color:red">CNXM purchases SS. Contractor to purchase anchor bolts.</span>

It doesn't look like we have been provided with any civil foundation or structural steel drawings for this site. Can we be expecting to receive those? If not, how should we proceed in including pricing for the foundations and structural steel in our bid? <span style="color:red">These were uploaded under 90% Drawings</span>

**EXHIBIT D**
*ACS's Initial Bid*
*November 6, 2018*

November 6, 2018

Chase Davis, PMP
Strategic Sourcing Specialist
CNX Midstream
1000 CONSOL Energy Drive
Canonsburg, PA 15317

Dear Mr. Davis:

Subject:          Morris Station Expansion
                  ACS Bid No. 18056

ACS is pleased to submit our T & M plus Fixed Markup of Labor and Materials proposal for the above referenced project as detailed within the scope documents, clarified within this proposal and based on the following:

| | | |
|---|---|---|
| Attachment 1 | Schedule of Values | |
| Attachment 2 | Clarifications | |
| Attachment 3 | Exclusions | |
| Attachment 4 | Preliminary Project Schedule | |
| Attachment 5 | Organizational Chart | |
| Attachment 6 | Resumes | |
| Attachment 7 | List of Sub-Contractors | |
| Attachment 8 | Time and Material Rates for Labor and Equipment | |

Should you require any further information or have any questions, please feel free to contact me at 906.280.9328.

Very truly yours

*Jim Glass*

Jim Glass
Vice President - Estimating

DA/JG/JC/DJ   CC



Morris Station Upgrade

Attachment 1

Schedule of Values



# Morris Station Upgrade

Attachment 2

<u>Clarifications</u>

1. Proposal is based on Request for Quotation dated 10/05/2018. Also includes the 60% Drawings, 90% Drawings and all subsequent Updates received 10-9-18, 10-22-18, 10-24-18, 10-26-18 and 10-29-18.

2. ACS's proposal is based on all work being performed on a 1-10-6 work schedule. Overtime, Sundays and holidays are excluded.

3. The work will be phased due to the AQ Permits. The current permit allows for the installation of the second DEHY and the replacement of the (2) 3516's for 3608's.

4. Once the AQ Permit Modification is approved by February 9th, 2019, the construction of the new Tank Farm can begin. The existing Tanks can then be removed and the Deep Foundations for the additional compression can be installed.

5. Includes Survey Services to confirm spacing, elevations, etc. Owner to provide Control Points.

6. All welding to be in accordance with CNXM Specifications which meets API 1104 requirements. CNXM is responsible for procuring all NDT services.

7. A 4-hour Hydrotest of the piping is included in the shop and in the field. Includes supply and disposal of the test water and test materials.

8. Our T & M proposal is based on piping qty's derived from Model included in the 90% Bid Package. No additional piping has been allowed.

9. Installation of only the equipment called out in Section 3. Project Description Item a. Summary and Section 4. Scope of Work Item c. of the Invitation for Bids dated 10/9/2018.

10. Provide labor and equipment to offload and set/install all major equipment listed in Section 4. Scope of Work Item c. of the Invitation for Bids dated 10/9/2018.

11. Due to the delivery dates of the DEHY, it is very important that the MCC and Backup Generator arrive in the same time frame. We have included the use of a 500 Ton crane to set the DEHY due to the setting radius of approximately 160 feet. We have included a 230 Ton Crawler Crane that will handle a maximum of 120,000 lbs. at a 35-foot radius to set the Generator Skids. Once an accurate schedule of delivery dates is provided, we will be able to determine our crane needs.



12. Provide Pipe, Valves, Fittings, Flange Bolt Up Kits (Studs, Nuts, Washers & Gaskets) smaller than 8" Nominal Diameter. The cost of this material is not included in this bid. At this point, we are only proposing a 15% mark-up of this material when we purchase it.

13. Provide labor and equipment to install all sizes of Pipe, Valves, Fittings and Flange Bolt Up Kits.

14. Provide labor, material and equipment to install Pipe Supports and Buildings as shown and described.

15. Provide labor and equipment only to install Company provided Steel Structures, Company provided Maintenance Platforms, Steps and Staircases.

16. Provide transportation for material from Rice's Landing yard to site.

17. Includes offloading all equipment utilizing crane and necessary equipment.

18. Provide and install Insulating Gasket Kits and Stainless Steel Tubing.

19. Furnish and install all Insulation as required.

20. Provide labor and equipment only to install Instrumentation.

21. Provide and apply Coating Material. All Pipe, Fittings, Valves and Small-Bore Pipe Supports will be coated. This also includes all new and reworked fabrications.

22. Electrical work includes supplying and installing all electrical material. This includes Heat Trace, Conduit, Conduit Seals, Cable, Cable Racks, Cable Trays and Grounding Systems.

23. This proposal includes terminations at Electrical End Devices, Redlines and As-Built Drawings.

24. Main feeders for MCC A1 and A2 are based on installing 1/C#750 from the load side of the switchgear (installed by others). A total of 600 LF of cable has been included for both feeders.

25. Seals have been included per NEC.


26. Conduits have been sized per NEC. Conduit Fill has been included per NEC. Multiple circuits have been included in one circuit.

27. Skid packages are assumed to have Instrumentation mounted, tubed and wired complete to an on-skid junction box provided by skid manufacturer.

28. MCC Building is assumed to have all components pre-installed, pre-wired and tested by the building manufacturer.

29. Loop Check is based on point to point Continuity Checks.

30. Includes 1,940 LF of tray has been included. NOTE: the model does not indicate tray from the MCC Building over to the pipe rack. We have included two 36" trays.

31. Instrument wiring and new instrument installation have been based on Drawing CNX-MOR-70-IOL3 (I/O List – Instrument Additions and Relocations).

32. Power Wiring has been based on the new one lines and the Load List for Panel PDP-HS1.

33. Heat Tracing is limited to a total of 600 LF of Heat Trace Cable with a total of a 6 Power Connections.

34. Provide and install Vehicle Barriers as required.

35. Civil work includes performing the One Call, furnishing and installing Fabric and Final Pad Grading, Excavation and Backfill, Concrete Foundations, Third-Party Concrete Testing, Stone per our disturbed areas, Sand, Flowable Fill, Rebar, Anchor Bolts and Padding Material.

36. Proposal includes Temporary Office Space with Internet Connection, Temporary Generator with Grounding and Containment.

37. Provide Commissioning Support consisting of (2) Pipefitters, (1) Electrician and applicable equipment for Commissioning Phase through TIL. We assume this time frame to be approximately 3 weeks.

38. Proposal assumes Regen Skid is provided assembled except for the oversized stacks.

39. Includes F2 Foundations shown decide the Compressor Blocks per Addendum #2.



40. Proposal is based on Approved Haul Routes being provided by others prior to mobilization.

41. There are (37) Tie-ins on this project. This proposal does not allow for any delays. Any costs associated with delays will be in addition to this proposal and could potentially impact the schedule. No contingency has been allowed for any delays.

42. This proposal has no allowance or consideration for delays or interruptions due to other contractors work activities onsite.

43. This proposal set forth assumes that both ACS and CNXM will reach mutually agreeable Terms & Conditions.

44. Cost breakdown given per Schedule of Values is for Accounting purposes only.

45. This proposal assumes immediate issue and receipt of a Purchase Order due to the time critical schedule. Any delays to issue of a purchase order is a change to our schedule day for day. No acceleration or additional cost to mitigate such delay has been included in this proposal.



# Morris Station Upgrade

Attachment 3

<u>Exclusions</u>

1. Permits

2. Liquidated/Consequential Damages

3. Rock Removal as defined by any material encountered that cannot be ripped from the ground with a 290 Excavator. If required ACS can provide you with unit prices for rock removal

4. Testing, Abatement and or removal of any materials deemed hazardous or toxic. Including but not limited to Asbestos, Lead, PCB's. Contaminated soil

5. Pad and Access Road Construction (by others)

6. Powerline and Substation (by others)

7. Inspection Services (by others)

8. NDT Services (by others)

9. Supply of Major Equipment – Filters, Meter, Tanks, Control Valves, etc. (by others)

10. Supply of Pipe, Valves, Fittings, Nuts, Bolts and Gaskets that are 8" and larger (by others)

11. Supply of Instruments (by others)

12. Supply of Anodes, Test Stations & SSD's (by others)

13. Supply of Structural Steel (by others)

14. Equipment to load trucks at the Rice's Landing Yard

15. Permanent Benchmark Survey Information (by others)

16. Epoxy Grouting of Compressor Skids

17. Equipment Insulation

18. Fencing

19. Additional High Point Vents and Low Point Drains

20. The Cooler Grade Beams shown on Drawing CNX-40-MOR-3017 due to lack of detail

21. Foundations F12, F13, F16, F17, F18 and F27 which are assumed to be existing

22. Supply and installation of Cathodic Protection

23. Installation of underground piping

24. Supply of I & E Enclosures (by others)



25. Specialty Systems such as Security System, Camera system, Access Control System and Lightning Protection



# Morris Station Upgrade

Attachment 4

<u>Preliminary Project Schedule</u>



Morris Station Upgrade

Attachment 5

Organizational Chart



---

Morris Station Upgrade

Attachment 6

Resumes



# Morris Station Upgrade

Attachment 7

<u>List of Subcontractors</u>



Morris Station Upgrade

Attachment 8

<u>Time and Material Rates</u>

**EXHIBIT E**
*ACS's Revised Bid*
*November 26, 2018*



November 26, 2018

CNX Morris Team,
Thank you for your continued consideration in this project. ACS leadership would like to once again reassure you that our project and safety teams are committed to assisting CNX on this project and others. Our commitment to this region is to provide the best service with a commitment to safety and environment, including where possible to leave it better than we found it.

ACS is a minority owned vendor with a strong commitment to promoting diversity, veterans and region. This spirit resonates in both the work place and in the community.

Per recent conversations we request to submit a revised number for your review. We have included a few brief comments on how we arrived at our revised price.

Our original proposal was based on a 90% issue package. Questions were asked and answered to the extent possible. Clarifications were carried in our proposal along with assumptions made utilizing many years of experience in the Oil & Gas industry.

One concern we have is the 37 tie ins that have to be made. Working with Operations and minimizing downtime to production schedules is always the goal. However, it becomes difficult to account for a lost production across a job when we are not able to make the planned tie-ins. This results in stacking of trades and compounded costs. With indirect cost alone, it is $1500.00 per hour of lost time between supervision and equipment. Additionally, equipment delivery dates may cause some delays which push the planned work past the schedule dates and could affect indirect cost.

Our Original proposal of **$14,108,760.00** submitted November 6th, 2018 was a number that sought to mitigate all concerns above and other unforeseen issues. Essentially, we included contingencies and risk against tie-In delays and subsequent schedule delays and slippages. We included a contingency for inclement weather, snow or rain. Our goal was to take care of any makeup days. Basically, we tried to cover all possible issues to avoid any addition cost to CNX.

When asked we responded that our number was a Plus Minus 10% Number and after further review of the documents that were provided since the bid due day. That statement is true still. After reviewing the documents, we feel we have a viable number that provides a budget to CNX that they can be used for budgeting purposes. It allows for construction activities, weather delays, equipment and material delays, schedule slips regarding tie ins.

If ACS removes the 10% contingency our number is $12,826,145.50 and obviously removes the mitigation controls mentioned above. Also when removing delays related to tie ins included our number the total further reduces.

EXHIBIT

5

exhibitsticker.com



ACS management has had several rounds of discussion and feel that with in depth planning, and holding agreed upon dates for equipment & tie-ins, our number would be closer to **$11.5 million** than to **$12 million.** Obviously at this level any change or deviation from scope as it stands now, or schedule would be addressed very transparently between ACS and CNX.

Here are some ways in which money could be saved. 1.CNX could purchase all materials and save the 10-15% margin on materials. 2. Push your equipment vendors to move up your delivery dates to meet your schedules. The possible savings are in crane time and in indirect cost.

We look forward to speaking with you in-depth about this project and how we, as a team could move forward and make this project a huge success.

A few informational items

**PIPING SUMMARY**

Lineal Ft Pipe – 12,119

Valves - 877

Average Pipe Size - 8.2 inch

Field welds per hundred ft. – 8.8

**OTHER**

Instruments installed – 140

Tubing – 1000ft

Equipment to Install or Relocate 35 pieces (1.8 million lbs.)

Equipment to Demo – 10 pieces

Civil Approx. 2800 yd (includes engineered base qty)

Structural Steel Approx. – 92,000lbs

Misc. Steel – 35,000 lbs.

Coating

Torqueing

Hydro-test

Line Drying

Punch out

Startup Support

Tie-Ins - 37

Thank you once more for considering us. We look forward to discussing this project further with you.

Jim Glass

Vice President Estimating @ ACS the 8760 Company

9062809328

**EXHIBIT F**
*Kevin Dunn Deposition*
*w/o exhibits*

*CNX MIDSTREAM DEVCO 1 v.*

*APPLIED CONSTRUCTION SOLUTIONS, INC.*

*KEVIN DUNN*

*12/22/2020*



713 LeeStreet
Charleston, WV 25301

(304) 344-8463
schedulerealtime@gmail.com

Realtimereporters.net

**Page 1**

```
 1              IN THE UNITED STATES COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA
 2
 3
 4   CNX MIDSTREAM DEVCO 1,
     LP,
 5
          Plaintiff,
 6
 7
     v.                 CIVIL ACTION NO. 2:20-CV-00290
 8                  Magistrate Judge Lisa Pupo Lenihan
 9
10   APPLIED CONSTRUCTION
     SOLUTIONS, INC.,
11
          Defendant.
12
13
14
15        The Zoom deposition of KEVIN DUNN, taken
     upon oral examination, pursuant to notice and
16   pursuant to the West Virginia Rules of Civil
     Procedure, before Jaime L. Stroud, Registered
17   Professional Reporter and Notary Public in and for
     the State of West Virginia, on Tuesday, December
18   22, 2020, at 9:30 a.m.
19
20
                 REALTIME REPORTERS, LLC
21               Jaime L. Stroud, RPR
                    713 Lee Street
22               Charleston, WV 25301
                   (304) 344-8463
23               www.realtimereporters.net
24
```

**Page 2**

```
 1   APPEARANCES:
 2   On behalf of the Plaintiff:
 3        Gregory C. Michaels, Esquire
          gmichaels@dmclaw.com
 4        DICKIE, MCCAMEY & CHILCOTE, P.C.
          Two PPG Place, Suite 400
 5        Pittsburgh, Pennsylvania  15222
          412.281.7272
 6
 7
     On behalf of the Defendant:
 8
          Christopher A. Brumley, Esquire
 9        cbrumley@flahertylegal.com
          Evan S. Aldridge, Esquire
10        ealdridge@flahertylegal.com
          FLAHERTY SENSABAUGH BONASSO PLLC
11        200 Capitol Street
          Charleston, West Virginia  25301
12        304.347.4249
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 3**

```
 1              EXAMINATION INDEX
 2
 3   KEVIN DUNN
 4        BY MR. BRUMLEY . . . . . . . . . . . . . .   6
          BY MR. MICHAELS  . . . . . . . . . . . . . 157
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 4**

```
 1              EXHIBIT INDEX
 2
 3                                          MAR
     Deposition Exhibit Number
 4   1    Invitation to Bid                  57
 5   2    Project Status Report from Orbital 87
 6   3    ACS Extra Work Field Report dated March  97
          26th, 2019
 7
     4    Schedule of Values                104
 8
     5    ACS Revised Pricing               130
 9
     6    Photograph                        134
10
     7    Email dated October 2, 2019       142
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 5

1	THE VIDEOGRAPHER:  This is the
2	deposition of Kevin Dunn recorded on video for the
3	record taken by the defendant in the matter of CNX
4	Midstream Devco 1, LP, versus Applied Construction
5	Solutions, Inc., being Civil Action Number
6	2:20-CV-00290.
7	This deposition is being conducted
8	remotely via Zoom conferencing taking place on this
9	22nd day of December, 2020.
10	My name is Adam Hager.  I'm the legal
11	video specialist.  The court reporter is Jaime
12	Stroud.
13	We're now on the record.  The time is
14	9:30 a.m.  Would counsel please introduce
15	themselves, who they represent, and please confirm
16	that you have no objection to the witness being
17	sworn remotely.
18	MR. BRUMLEY:  We have Chris Brumley
19	and Evan Aldridge on behalf of ACS, and we do not
20	have objection to the remote swearing in.
21	MR. MICHAELS:  Gregory Michaels,
22	Dickie, McCamey & Chilcote representing CNX
23	Midstream, Devco 1, LP, and no objection to the
24	witness being sworn in remotely.

Page 6

1	THE VIDEOGRAPHER:  Would the court
2	reporter please swear the witness.
3	* * *
4	KEVIN DUNN,
5	was called as a witness by the Defendant, pursuant
6	to notice, and having been first duly sworn,
7	testified as follows:
8	EXAMINATION
9	BY MR. BRUMLEY:
10	Q.  Mr. Dunn, we've not met personally and only
11	gotten acquainted by poor video connection here
12	over the last ten minutes or so, but my name is
13	Chris Brumley, and I represent ACS, and we're here
14	to take your deposition today relating to the
15	project -- what we refer to internally as CNX
16	Morris Expansion Project.
17	So let's -- to get started, would you
18	please state your full name, proper name, as it
19	appears like on a birth certificate or driver's
20	license?
21	A.  Kevin Lee Dunn.
22	MR. MICHAELS:  Chris, if I may
23	interject, are we taking this -- are you taking
24	this in total for Mr. Dunn, or as we to the

Page 7

1	limited --
2	(Crosstalk.)
3	Q.  So as -- Mr. Dunn, maybe a little -- I
4	didn't know how much you got into this with Greg,
5	but in this suit, the Court has currently directed
6	us to do discovery relating to the contract between
7	the parties and what may constitute the agreement,
8	the legal agreement.
9	It has several different elements to
10	that, and I don't expect you to quite follow that,
11	but for the purposes of today's deposition, my
12	inquiry will be limited for the most part to the
13	agreement that existed between the party, and that
14	is -- also gets into some of the pattern and
15	practices and conduct of the parties during the
16	project.
17	I'm going to reserve the right to come
18	back, and if we need to, get into some of the
19	nitty-gritty, which -- which I will call the muddy
20	part of this case, like how much money is actually
21	owed.  We're going to talk about that today just
22	because they have to do with amounts of change
23	orders and things like that, but all of the
24	questions that I've presented in my outline have to

Page 8

1	do with trying to establish what actual agreement
2	existed between CNX and ACS.  Okay?
3	So you don't have to understand that,
4	but we -- just so you understand that there's a lot
5	of things we're not going to talk about in detail
6	that you probably are going to believe are
7	pertinent, but it's just not time for us to do that
8	yet.  Okay?
9	A.  Understood.
10	Q.  Mr. Dunn, where -- where are you joining us
11	from video-wise here today?
12	A.  Washington, Pennsylvania.
13	Q.  Okay.  And is that your residence that
14	you're in?
15	A.  It is, yes.
16	Q.  Okay.  What is that address?
17	A.  1395 Park Avenue, Washington, PA 15301.
18	Q.  And how long have you -- how long have you
19	resided at that address (audio distortion)?
20	A.  25 years.
21	Q.  And who's your current employer?
22	A.  CNX Resources.
23	Q.  All right.  And corporate America has a
24	habit of changing names and identities but kind of

Page 9

1 maintaining the same core group of management.
2          How long have you been with CNX
3 Resources group?
4     A.  They just changed their name here I think
5 recently.  I just -- I really don't know exactly
6 the -- the -- the actual name they're going under
7 now to be honest with you.
8     Q.  Okay.  Have you given a deposition before?
9     A.  I have, yes.
10    Q.  How many times?
11    A.  Once.
12    Q.  All right.  When was that?
13    A.  It was seven years ago.
14    Q.  Was it in relation to a business matter for
15 CNX or some other type of issue?
16    A.  It was a -- it was a business matter for
17 CNX, yes.
18    Q.  Okay.  Do you remember the name of that
19 case or a project that that deposition related to?
20    A.  I remember the -- you know, what -- what it
21 related to.  I don't -- I don't remember the actual
22 name of the case.
23    Q.  Okay.  Was it related to --
24          (Crosstalk.)

Page 10

1     A.  I know the name of the person that it was
2 against, you know, but -- or --
3     Q.  Okay.  All right.  Was it a specific
4 project or was it like a personal injury suit of
5 some type?
6     A.  It had to do with a specific project.
7     Q.  Okay.  What project would that have been,
8 just generally?
9     A.  Majorsville.  Majorsville Compressor
10 Station, I guess you'd say.
11    Q.  Okay.  Well, so, you may have had a
12 discussion with Greg about your deposition today,
13 and it's not my intention to ask you any questions
14 that have to do with the substance of your
15 conversations with Greg.  So if I ask you a
16 question and your answer would somehow require you
17 to divulge conversations or communications with
18 counsel, I want you to not answer with that
19 information.
20          We're in a, you know, tech world.
21 Sometimes visibility to object can be delayed or --
22 I just want you to understand that rule.
23          In general, you are -- understand
24 you're under oath today?

Page 11

1     A.  That's understood, yes.
2     Q.  Okay.  And are you under the influence --
3 are you on any medications, or have any medical
4 conditions that would otherwise affect your ability
5 to reasonably hear and understand at least
6 cognizable questions if I'm able to ask those?
7     A.  No, I'm not.
8     Q.  Okay.  So at least as far as you know,
9 there's nothing prohibiting you from having a fair
10 and honest conversation with us today on the
11 record.
12    A.  That's correct.
13    Q.  All right.  So a lot of the issues in this
14 case are of technical nature, which of the six
15 people that are sitting here in this video
16 chatroom, you're probably the only one that has the
17 skill, knowledge, and experience.  So I may ask you
18 questions today that aren't technically correct as
19 you would understand them with your experience in
20 the -- in the -- in the CNX construction
21 superintendent management world.
22          What I ask of you is, is that if
23 there's any part of my question you don't
24 understand, or any part of my question that isn't

Page 12

1 technically accurate, although tedious, please
2 correct me on it.  Okay?  Don't -- don't figure out
3 what I'm trying to ask and just go ahead and answer
4 it.  Let me know that you don't understand the
5 question or somehow the question doesn't make
6 technical sense to you.  Okay?
7     A.  Okay.
8     Q.  All right.  And, likewise, you know, you're
9 here under oath to tell the truth and the whole
10 truth as to what Kevin Dunn knows.  I may ask you
11 things about other people, but I'll try to clarify.
12 I really want to know what Kevin Dunn's firsthand
13 knowledge is today.  And if we get outside of that,
14 you just have to say well, you understand this to
15 be true, but you don't -- it's not your knowledge.
16 All right?
17    A.  That's understood.
18    Q.  Okay.  Otherwise, if I ask you a base
19 question and you answer it, you agree it's fair
20 that if you don't tell me it's wrong, that you
21 understand the question.  Do we have that agreement
22 between you and I today?
23    A.  Yes.
24    Q.  All right.  This is not a marathon.  I

1 don't -- I hope not to be here more than -- you
2 know, not all day with you, but any time you need a
3 break or there's something that you need to do, or
4 we're having technical difficulties, all you --
5 just raise that point and we'll take that break and
6 move on.
7        I'm going to have -- my client is
8 going to be in and out of the facility here today,
9 Dave Alvarez. So, you know, there may be times
10 where we have to take a break and mute up. But any
11 time you need to take a minute, just please let us
12 know that. Okay?
13    A. Okay.
14    Q. All right. So getting back to your CNX
15 career. How long have you been with CNX, whether
16 it's this company that we just talked about that
17 may be newer, but, you know, as the big company,
18 CNX, what's that career span been?
19    A. It's coming up on seven years.
20    Q. Okay. And what is -- what is your date of
21 birth?
22    A. 10/29/57.
23    Q. Okay. So what did you do before that?
24 What company were you with?

1    A. I was with a industrial contractor called
2 Hartman & Hartman.
3    Q. Okay. And -- and how long were you with
4 them?
5    A. 20 -- almost 30 -- 29 years.
6    Q. Okay. And what -- what business were they
7 in?
8    A. Industrial construction.
9    Q. Okay. Well, that's pretty broad. Like,
10 building facilities, doing pipe work, exactly what
11 was that company involved in?
12    A. They were an industrial general contractor.
13 So they had an electrical division, a mechanical
14 division, a civil conv -- division. You know, they
15 had a broad -- pretty broad work, you know.
16 Different -- different types of different phases of
17 projects.
18    Q. Okay. Did they specialize in energy, oil
19 and gas, or were they, you know, just general
20 industrial?
21    A. I mean, yes. They -- they were and are
22 specialists in oil and gas as well as others.
23    Q. What was your job title with them? Like if
24 I was going to ask you what your background is,

1 what -- on your resume, you know, what
2 responsibilities did you have with that entity?
3    A. When I left there, I was a superintendent.
4    Q. And did you leave there in about 2013?
5 Would that -- that be correct?
6    A. Yeah, the beginning of '14. Early -- early
7 in '14.
8    Q. What's your educational background?
9    A. I have 30 years' experience in industrial
10 construction. I don't -- I don't have a college
11 education.
12    Q. Okay. Did you grow up in PA? I mean, did
13 you go to high school there or?
14    A. Yes, I did. Yeah.
15    Q. Okay. What year did -- I like to do a
16 timeline here just so I can understand your
17 background and I don't miss anything.
18        So I assume you graduated in '73 or '2
19 or '4. What year did you graduate high school?
20    A. '77.
21    Q. And you said you were born in '57?
22    A. That's correct.
23    Q. Okay. So 30 years -- this will probably be
24 easier to do it this way. 30 years in industrial

1 construction experience. Take me through -- it
2 sounds like we know CNX for the last seven. We
3 know, we have a big group of the Hartman group
4 before that.
5        What was the -- did you have work
6 prior to that in industrial construction?
7    A. Yes. I mean, we worked extensively. When
8 I say, "we," I mean Hartman & Hartman as I worked
9 there. We worked extensively in -- in coal; coal
10 mining industry, the steel industry, the glass
11 industry.
12        Worked in the power industry such as,
13 you know, power plants and substation-type work.
14 You know, those would -- those would be the -- the
15 key -- the key things, and that was before oil and
16 gas became so popular, prevalent. I would say the
17 last five years that I was there, it was
18 extensively primarily oil and gas. Yeah.
19    Q. Okay. So was -- was Hartman your first gig
20 in the industrial construction field?
21    A. Yes, it was.
22    Q. Okay. So did you kind of come up through
23 the ranks there as a field laborer and move up
24 through, you know, the -- the layers of project

Page 17

1  control until you became superintendent?
2      A.  Yes, that's correct.
3      Q.  The -- the Morris project that we're
4  involved here, as I understand it, involves a -- an
5  expansion to a compressor station; is that
6  accurate?
7      A.  That is accurate, yes.
8      Q.  Okay.  We're not going to get
9  hypertechnical except that I need to have a little
10  bit of background of that to talk about how the
11  bids and the contract came to be.
12          But did you have any experience at
13  Hartman with the type of facility that was at the
14  Morris location?
15      A.  Yes.  I was very familiar with the Morris
16  location.
17      Q.  So would Hartman -- (Crosstalk) --
18      A.  I lived there -- I had worked on that
19  particular location when I was with Hartman.
20      Q.  Okay.  All right.  Well, that's kind of
21  what I was asking.
22          So take me through how Hartman was
23  affiliated with the Morris location prior to you
24  coming to CNX.

Page 18

1      A.  So we -- we did the original build there on
2  that project as -- as a greenfield site.  We come
3  in and installed all the original equipment, you
4  know, and did all the -- all the utility work.  We
5  did not do the -- the primary excavation, like the
6  road leading into the pad and the pad itself.  That
7  was done by others.
8          But we did all the foundation work,
9  all the -- all the structural work, set all the
10  equipment, did all the piping in the first phase of
11  that project.
12      Q.  Okay.  So, essentially, Hartman was one of
13  the primary contractors that built that facility
14  then?
15      A.  Yes.  The first phase and then another
16  phase.  There were quite a few phases, maybe
17  possibly five.
18      Q.  What -- what time frame are we talking
19  about there?
20      A.  That would have been probably around 2011.
21  2010, 2011.
22      Q.  Okay.  So you went from Hartman to CNX.
23  Did that have to do with essentially your knowledge
24  of the Morris project and the facility?  I mean,

Page 19

1  they hired you out from somebody that built it and
2  knew how it worked?
3      A.  They hired me to -- for -- I think more
4  because of my knowledge of construction,
5  industrial-type construction, the oil and gas
6  industry, and managing, that type of work.  I think
7  they were -- they were wanting somebody like that
8  to -- to work for them.
9      Q.  While you were at Hartman, did you
10  have an involvement in any other CNX facility
11  buildouts or modifications?
12      A.  Yes, there were many.  So I was -- I was
13  like the CNX guy for -- for Hartman.  I -- I
14  managed and oversaw most all of the CNX projects
15  for Hartman & Hartman.  And at times there was more
16  than one going on at a time.
17      Q.  Okay.  So in some of the materials that
18  were in the bids and other information in this
19  case, requests and the like, I saw a reference to,
20  like, a Buckland job.
21          Was that a Hartman original buildout
22  project?
23      A.  No, that was not.
24      Q.  Okay.

Page 20

1      A.  Buckland actually came after -- after
2  Morris.
3      Q.  Okay.  So tell me why you left Hartman to
4  go work for CNX.
5      A.  Less hours and more money.
6      Q.  And do you remember -- I mean, am I correct
7  that your start date would have been around 2013?
8  Do you actually know when that was precisely?
9      A.  Yeah, it was -- my start day was March 14th
10  of '14.  Or I'm sorry, March 17th of '14.
11      Q.  Okay.  When you started at CNX, what was
12  your job title when you were hired?
13      A.  I was a -- it's a four word title, so I
14  have to try to remember it here.  I never had a
15  four word title before this.  It was a --
16      Q.  That gets you less hours and more money?
17      A.  I believe it does, yeah.
18      Q.  Oh, then I'm going to change mine.
19      A.  I was a -- I was a facility coordinator.
20  Got two.  Those are two of the -- two of the four
21  words.
22      Q.  Okay.  What about as you sit there today,
23  what's your -- what's your title there today?
24      A.  Well, they changed management at one point

1  in time, and they -- the management changed our
2  titles to foreman, so I'm considered a foreman.
3      Q.  And does your title change based on
4  specific jobs?  Like can you be a project foreman
5  for a job and then be a project foreman for another
6  job?  I mean, is that generally how your -- your
7  job responsibilities go?  I mean, you're just
8  assigned as foreman to construction projects, or do
9  you have job responsibilities for regular facility
10 operations as well?
11     A.  No.  I'm -- I work strictly for the
12 construction -- our construction department.  So
13 all of my work involves some type of construction.
14     Q.  Okay.  Sounds like Hartman and CNX covers
15 most of your construction career.
16         Do you have any other, like, technical
17 degrees, you know, welding certificates, OSHA
18 safety certificates, any type of other training
19 that --
20     A.  Yes.
21         (Crosstalk.)
22     Q.  -- you hold out?
23     A.  There's a long list of training that I -- I
24 couldn't sit here and recite it, you know, without

1  actually putting a list in front of myself.
2      Q.  Since you've been at CNX -- I know it's
3  been -- you know, we're going on six and a half
4  years, and I'm just asking for an estimate.
5          And one of our rules today, Mr. Dunn,
6  is I don't want you to wholesale guess at answers,
7  right?  But if I say has it been 50 or 100, it's
8  fair for you to give me an estimate knowing that,
9  you know, this isn't -- this isn't something we're
10 going to hold you to, you know, to the precise
11 number.
12         But how many projects would you
13 estimate that you've been involved with on the
14 construction side for CNX since you went there in
15 2014?
16     A.  Well, some of them were quite large and
17 lengthy, so the number would be probably in the ten
18 range.
19     Q.  Okay.  The -- and before we get into this
20 project, I just want to understand.  Outside of
21 conversations with Mr. Michaels or other counsel
22 for CNX, what did you do to prepare for your
23 testimony here today?
24     A.  Nothing.

1      Q.  Okay.  So --
2      A.  Just tried to recall some of the -- some of
3  the events, I guess.  Some -- just tried to replay
4  the job in my mind a bit, but I didn't do any
5  researching or anything like that.
6      Q.  Okay.  So you haven't reviewed any of
7  the -- you're the first witness in this case to be
8  deposed, and it's a little -- it's always a little
9  bit more of a labor intensive for the first person
10 to give testimony, but -- so you're sort of the
11 sacrificial lamb on that respect, I apologize.
12         But you haven't reviewed, for
13 instance, documents that we have provided in
14 discovery to CNX, or that CNX produced in the
15 lawsuit itself to us in preparation for your
16 deposition; is that accurate?
17     A.  I -- I don't know what documents CNX has
18 provided, so I mean --
19     Q.  Okay.
20     A.  -- I don't know that I've looked at, you
21 know, anything provided or not.
22     Q.  Okay.  Do you maintain any records of your
23 own relating to the Morris Expansion Project that
24 we're in this lawsuit about that was let out in

1  2018 and was constructed from late '18 through
2  2019?
3      A.  I -- yes.  I have some files, yes.
4      Q.  Okay.  Describe for me what you posses with
5  respect to that project.
6      A.  I have some paper files that -- my wife was
7  -- is my office assistant, and she files some
8  papers, and I don't even know exactly what she has.
9  I know -- I know she has a folder, and I have --
10     Q.  Okay.
11     A.  -- I have not looked at it.
12     Q.  Is your wife Robin?
13     A.  Yes.
14     Q.  I saw her name on some e-mails in this
15 case, so I wondered whether she was obviously --
16 pretty good chance she was a relation of yours.
17     A.  Yes.
18     Q.  Does she formally work for CNX?
19     A.  No, she doesn't.
20     Q.  Okay.  So she just helps you facilitate
21 documents and other things, and has an e-mail
22 address that might have appeared in e-mails to you
23 and otherwise; is that fair?
24     A.  That's correct, yes.

1    Q.   Okay.  Are you a direct employee of CNX,
2 Mr. Dunn, or you have an individual -- like a
3 contractor relationship?
4    A.   No, I'm a direct employee.
5    Q.   So there -- there's a -- there's a -- you
6 have a folder of some type, and you're not sure
7 what's in it; you didn't review it in preparation
8 for today's deposition?
9    A.   That's correct, yeah.
10    Q.   Okay.  Besides Mr. Michaels, when is the
11 last time you had any conversation about the Morris
12 Expansion Project?
13    A.   Last week.
14    Q.   Okay.  Did that relate to this lawsuit?
15    A.   Yes, it did.
16    Q.   And with whom was that conversation had?
17    A.   Carissa Hansen.
18    Q.   Okay.  Did that have to do with preparation
19 of your understanding of this deposition today?
20    A.   No, it didn't.
21    Q.   Okay.  Well, then, if it doesn't relate to
22 your deposition, why -- what is the basis of a
23 communication with Carissa a week ago?
24    A.   I'm not sure.  I mean, she had some

1 questions; if I remembered certain things about the
2 project, and she was asking me if I recollect this
3 or that --
4    Q.   Okay.
5    A.   -- and --
6    Q.   The -- when is the last time you had
7 communication with anybody from the ACS side?
8    A.   I really don't remember.
9    Q.   Okay.  And just to be sure, when I say,
10 "communication," that could be e-mail, text
11 message, phone call, Zoom meeting, any type of
12 information exchanged with anybody at ACS.
13    A.   It was --
14    Q.   Even if it doesn't (audio distortion) to
15 the Morris project.
16    A.   There -- there was an e-mail earlier this
17 year from a James Putman asking me if I would --
18 I'm trying to think of the right word -- give a
19 reference for one of his employees basically.
20    Q.   Okay.  So he had a -- he had an employee
21 looking to get on somewhere else and asking you to
22 support his qualifications type interaction?
23    A.   Yes.
24    Q.   Didn't have --

1    A.   Something like that.
2    Q.   -- anything to do with the Morris --
3    A.   No.
4    Q.   -- issue that we have?
5    A.   No.  And I did not -- I -- I didn't reply
6 to James himself but the -- the request for a
7 recommendation came through and I gave the
8 recommendation.
9         (Court reporter admonition.)
10    Q.   Okay.  Mr. Dunn, I didn't go over this.  On
11 this Zoom call -- I say this in most depositions --
12 but as we're talking, for the court reporter's
13 benefit, we have to -- and it's mostly going to be
14 my fault, but we have to pretend like we're on a CB
15 radio.  Only one person can hold the button down at
16 a time.  So we'll try not to talk over each other.
17         In a room, the court reporter usually
18 figures that out.  On Zoom she just can't hear us,
19 so I'll do my best to let you finish your answer,
20 and if there's any question that you're answering
21 and I rudely interject, just please hold your hand
22 up and I'll -- I'll go back and let you finish.
23 It's not intentional.  It's just a -- you know, a
24 23-year habit.

1    A.   Okay.
2    Q.   And there's also -- I've done a few of
3 these now.  There's going to be times where the
4 stream stutters and there's like pauses, like you
5 have -- like you're watching something on your
6 phone and it's got a bad connection.  If that
7 occurs, please let me know as well so if you -- you
8 know, if not all the question came through clearly.
9         So my basic understanding is that --
10 what do you call the Morris facility?
11    A.   Morris.  Just Morris.
12    Q.   Okay.  So my understanding is that the
13 project at issue in this suit had to do with
14 developing and expanding the facility so it might
15 be able to handle different input pressures into
16 the compress -- is it -- it's a compressor station.
17 Am I using that term correctly?
18    A.   Yes.  That's part of it, yes.
19    Q.   Okay.  If you would, just describe for me
20 what the general plan was for this project.  What
21 were we hoping to do at the Morris facility?
22    A.   We were looking to increase throughput, and
23 we were adding compression.  We were also adding a
24 new tier of service, and we were also adding to the

Page 29

1 dehy capabilities.
2    Q.  Okay.  And there are -- there will be
3 times -- even though I probably know the answer --
4 we're going to have a transcript of this thing when
5 we're done, and I may ask you to explain some terms
6 that we're familiar with, but just to make sure
7 it's on the same record.
8         When we talk about a dehy ability or
9 function, what is that?
10    A.  Dehydration.  So your gas stream has liquid
11 hyrdrocarbons and water as it comes -- you know, it
12 comes from the well pad to the compressor site.
13 And you have to dry that -- that gas and it's --
14 it's a process, you know, that's used to dry the
15 gas stream.
16    Q.  Okay.  So in a -- in a very broad sense,
17 there's gas production from gathering lines and
18 wells in the area around the Morris station, and
19 that facility's function is to separate, clean,
20 and -- and make the gas useable for -- is it sale
21 into a production line?  Is that what the final
22 result is?
23    A.  Yeah.  We sell it to, like, a transmission
24 company that would use it for many different

Page 30

1 purposes.  They may -- they may refine it further
2 or they may sell it, you know, as pretty much of a
3 raw product as well.
4    Q.  Okay.  So the -- the -- so this is
5 essentially an improvement to the Morris station to
6 help it operate at a better capacity and more
7 efficiently.  Is that just a -- is that a fair
8 generalization?
9    A.  Yes, I guess.
10    Q.  Okay.  Had you overseen any projects for --
11 ever, going even back to Hartman, that the -- the
12 purpose was essentially the same as it was at the
13 Morris expansion that we're here about in this
14 case?
15    A.  Yes.
16    Q.  Okay.  Tell me what those were.
17    A.  We had, you know, upgrades to the dehy
18 system, at Hopewell and we added dehydration.  We
19 had upgrades to -- many upgrades to our Majorsville
20 plant which included dehydration, compression,
21 separation, heat -- heat exchange, that type of
22 stuff.  So there were many phases to Majorsville
23 that I was involved in.
24         Upgrades to the McQuay plant.

Page 31

1 Upgrades to, you know, Maymont.
2    Q.  So you named four of those.  Were all of
3 those at CNX, or is that a mix of Hartman and CNX
4 projects?
5    A.  That's a mix of Hartman and CNX projects.
6    Q.  Okay.  Which of those would have been --
7 but those are all CNX facilities?
8    A.  That's correct.
9    Q.  Okay.
10    A.  Yeah.
11    Q.  Were you generally a foreman or a
12 superintendent on all those jobs?
13    A.  Yes.
14    Q.  I'd -- I've seen in the materials for the
15 Morris job you being referred to as the project
16 manager.  Is -- was that --
17    A.  (Crosstalk).
18    Q.  -- your role or is that a misstatement?
19    A.  I'm basing it on my title as CNX calls it.
20 My --
21    Q.  Okay.
22    A.  My duties include some type of management
23 obviously.
24    Q.  Okay.  So at the Morris pad, were you

Page 32

1 on-site daily?
2         I said "pad."  That's a misstatement.
3 I'm sorry.
4         The Morris facility, were you on-site
5 frequently and even daily?
6    A.  Yes.
7    Q.  Okay.
8    A.  Up to a point.
9    Q.  All right.  And when you say, "up to a
10 point," is that when you were transferred off of
11 that project?
12    A.  That's correct.
13    Q.  Okay.  Do you remember about -- I know -- I
14 think that was in July of '19 that you were taken
15 off the Morris project.
16         Do you remember the -- with any more
17 specificity exactly when you left the Morris
18 project?
19    A.  I don't remember the exact day.  I believe
20 it was in July.
21    Q.  Okay.  And where did you go to after the
22 Morris project?  Were you transferred to another
23 construction job?
24    A.  Yes.  The Dry Ridge project.

Page 33

1    Q.  Dry Ridge?
2    A.  Yes.
3    Q.  Okay.  Do you -- what -- whose decision was
4  it that you were transferred from the Morris
5  Project to the Dry Ridge project?
6    A.  I'm not sure whose decision it was, sir,
7  but I know who told me or who instructed me.
8    Q.  Okay.  Who is that?
9    A.  Dennis Koscho.
10    Q.  And at what -- at what stage, if you can
11  explain to me as a layperson -- at what stage of
12  construction completion was the Morris project when
13  you left in July of '19?
14    A.  We were -- we -- I mean, we were about
15  probably two-thirds of the way through the project,
16  based on installing five units of compression, and
17  we had -- we had installed three of the five, so we
18  were -- we were at like 60 percent of the project.
19    Q.  Okay.  And do -- were you advised as to why
20  you were being transferred from the Morris project
21  to the Dry Ridge project when you were in July of
22  '19?
23    A.  Yes, there was -- there was some
24  explanation there.

Page 34

1    Q.  Okay.  I had a -- I had a technical glitch
2  there, Mr. Dunn.  I think it's on my end because
3  everybody froze but me.
4         Can you repeat that last answer,
5  please?
6    A.  Yes, it was explained to me why.
7    Q.  What was that explanation?
8    A.  That I was needed on the other project
9  because there were some issues that needed my
10  attention.
11    Q.  Okay.  Who would have replaced you at the
12  Morris project when you left?
13    A.  I'm not sure how they decided who -- who
14  would fill my role.
15    Q.  Okay.  And I see in the materials we've
16  been provided, you are still on some e-mail
17  communications following you leaving the Morris
18  project.
19         Do you recall still getting
20  communications even though you had left to go to
21  the Dry Ridge project?
22    A.  Yes.
23    Q.  What was the purpose of the -- you still
24  being communicated with, if you were at the other

Page 35

1  project?  Did you have some -- still maintain some
2  responsibilities for the Morris project?
3    A.  No.  I -- I think I was probably on the
4  group message and I was -- I was being copied,
5  just -- just to be kept up to speed with some of
6  the, you know, e-mails going back and forth.  They
7  were -- I was being copied.
8    Q.  Okay.  Well, it's hard to get off the
9  e-mail string or a text string once you're on
10  there.  I understand.
11    A.  Yeah.
12    Q.  Did -- did you provide any guidance on the
13  remaining stages to the Morris project after you
14  formally left to go to the Dry Ridge project?
15    A.  I don't remember, to be honest with you.  I
16  may have -- I may have answered an e-mail or
17  something or interjected something at some -- some
18  of my thoughts, but I don't remember, to be honest
19  with you.
20    Q.  Okay.  To the extent you received e-mails
21  post your departing the project, did you read those
22  e-mails?  I mean, did you keep up to speed if they
23  were sent to you?
24    A.  I did not read all of them.  I may have --

Page 36

1  I may have read them briefly, but probably did not
2  respond to them.
3    Q.  Okay.  All right.  I'm going to take --
4         MR. BRUMLEY:  Greg and Realtime, and
5  Kevin, we're going to take -- I'm going to take
6  like a couple minute break here.
7         THE DEPONENT:  Okay.
8         MR. BRUMLEY:  Get another cup of
9  coffee, stretch my legs.  Let's reconvene in like 5
10  minutes.  Okay?
11         THE DEPONENT:  Okay.
12         THE VIDEOGRAPHER:  Going off the
13  record.  The time is 10:14 a.m.
14         (A recess was taken after which the
15         following proceedings continued as
16         follows.)
17         THE VIDEOGRAPHER:  Now begins media
18  unit 2 in the deposition of Kevin Dunn.  We're back
19  on the record.  The time is 10:25 a.m.
20  BY MR. BRUMLEY:
21    Q.  Okay.  Mr. Dunn, with respect to the Morris
22  station expansion, when did you first become aware
23  that that project was in -- in the making?
24    A.  It was in the fourth quarter of '18.

1     Q.   Okay.  So if we establish -- we have a
2   timeline, and if I'm -- trust me, if I'm off base,
3   please correct me, but it looked like that bids
4   were solicited in October of '18.
5          How long before whenever the bid
6   information packets were released and solicited
7   were you aware that the Morris expansion was on the
8   table for CNX?
9     A.   I -- I had known for some time.  You know,
10  I knew the job was up and coming.  I was not aware
11  that I was going to be involved in it until the
12  fourth quarter, till -- just before bedtime, I
13  attended a couple meetings.
14    Q.   Okay.  The -- so up until the bids were
15  solicited, I take it you had some role in the
16  project?
17    A.   Yes.  Just -- yes, I had a -- in the bid
18  selection process, and deciding who would be
19  selected to be on the bidder's list.
20    Q.   Okay.
21    A.   Reviewing the -- reviewing the model and
22  the drawings.
23    Q.   So take me through for the Morris project.
24  I understand that Orbital was a design group that

1   worked on this project.  Do you recall them?
2     A.   Yes, I do.
3     Q.   What was Orbital's role?
4     A.   They were the designer, design engineering
5   firm, that CNX had hired to -- to do that -- that
6   type of work for them.
7     Q.   Okay.  To your knowledge, had Orbital done
8   similar projects for CNX as the designer?
9     A.   Yes, they had.
10    Q.   Okay.  So does CNX have its own design
11  group that also works on design of the project?
12    A.   They do, yes, but it's limited.  So on a
13  project of this size, they would go to a
14  third-party firm to do it and then our people would
15  manage that.
16    Q.   Okay.  When you say your people, who from
17  the CNX side would be interacting with Orbital to
18  get the -- the design needs met?
19    A.   Well, the project engineer was Carissa
20  Hansen, so she was in direct communication with
21  Orbital.
22    Q.   All right.  Were you part of --
23         (Court reporter clarification.)
24    A.   So I said Carissa Hansen was in our -- on

1   our engineering team as the lead -- lead engineer
2   on the project.
3     Q.   How many people are in the CNX engineering
4   team?  I mean, do they have 50 engineers, or do
5   they have Carissa and three or four more?  How big
6   is that group generally?
7     A.   It's not very big.  It's maybe five or six.
8     Q.   Okay.  And had you worked with Orbital
9   before in projects?
10    A.   Yes.
11    Q.   What project would that have been?  Or
12  projects?
13    A.   I don't remember the specific projects, but
14  I have worked with them in the past, yes.
15    Q.   So you were involved in identifying the
16  entities that would be solicited to provide bids
17  for the Morris expansion.  Were you on that
18  decision train, so to speak?
19    A.   I'm sorry, could you restate the question,
20  please?
21    Q.   Yeah.
22         So when -- when the project was going
23  to be let out for bids to, you know, construction
24  teams like ACS, were you part of the group that

1   decided what companies would be solicited to bid on
2   this work?
3     A.   Yes.
4     Q.   Okay.  Who else was on that -- who else was
5   in that group that was determining who would be
6   asked to do bids?
7     A.   Carissa Hansen, Dennis Koscho, Ryan
8   Aubuchon, Adam Beck, and Chase Davis.
9     Q.   Okay.  And so in addition to ACS, who else
10  was solicited to bid on this project for the
11  construction side?
12    A.   I don't remember specifically.  I could --
13  it would be a guess if I -- if I -- I think I --
14    Q.   Well --
15    A.   I think I know, but I don't know for sure.
16    Q.   Okay.  Would it have been three or four
17  other groups or would it have been 50?  What --
18  give me an idea of what the competition was for
19  bidding this work?
20    A.   I think there were five or six that
21  received bid packages, and then it was narrowed
22  down to just two or three that actually were called
23  in for bid clarification.
24    Q.   Okay.  Were you able to review the design

1 that was made available to bidders for doing
2 responses for bids on this project? Like did you
3 get to sit down with whatever existed for
4 contractors, like ACS, to review to produce a bid?
5     A. Yes. I had access to the bid documents.
6     Q. Okay. Tell me generally what's in -- what
7 were in the bid documents that all the entities
8 bidding would have received?
9     A. There was a model, what we called a 60
10 percent model. It -- it was not complete.
11     Q. Tell me what 60 -- what does 60 percent
12 mean?
13     A. There was 40 percent of it that was not
14 shown in the model.
15     Q. Okay. Is that -- as far as the model, was
16 that done by Orbital; to your knowledge?
17     A. Yes, it was.
18     Q. And on the 60 percent model, from your work
19 on projects such as this, is that the standard
20 information that is typically provided to bidders,
21 a 60 percent model?
22     A. It's not uncommon to see a bid go out with
23 bid documents going out at 60 percent. It's always
24 more desirable to have a complete design available

1 for bidding purposes, but that's -- that's really
2 not -- I mean, in that -- in that particular time
3 frame, that was not what -- you know, what we did.
4 It's because --
5     Q. Okay.
6     A. -- because of time constraints.
7     Q. Okay. That -- that's my next question.
8         What limitations were there that
9 prohibited or -- or made it such that a 60 percent
10 design was available as opposed to something that
11 was more developed? Why was it that way?
12         MR. MICHAELS: Objection to form.
13         You can answer, Kevin.
14     A. Strictly my opinion only, but just trying
15 to secure a -- get a contractor to -- an -- on
16 board ahead of time because of the -- the way the
17 market was, you know. There was -- everybody was
18 very busy at that time, so we were -- we were
19 trying to establish, you know, a contractor to get
20 somebody on board sooner rather than later.
21     Q. Did you build upon the initial model, you know,
22 Orbital to build upon the initial model, you know,
23 to make the 60 percent more complete as it went
24 forward? Was that part of your job or -- or not?

1     A. I had very limited input, but it was -- it
2 was mostly Carissa.
3     Q. Okay. So if we were to talk about the
4 reason be -- behind potential time delays of
5 Orbital producing design documents, do you have
6 information as to whether, for instance, that would
7 be them waiting on information from CNX
8 Engineering, or them just not producing design
9 documents in a timely fashion?
10         Do you have any information relating
11 to that subject matter?
12     A. No, sir.
13     Q. Okay. So that's not -- when you got less
14 hours and more pay, that wasn't put into your
15 hourly base then.
16     A. That's correct, yes.
17     Q. Okay. Did you have a direct communication
18 with anybody at Orbital?
19     A. Yes, I did.
20     Q. Who was that contact?
21     A. Jeff Metzger.
22     Q. Okay. And what was the nature -- I mean,
23 what reasoning did you have to communicate with
24 Jeff Metzger?

1     A. He would visit the -- the job site
2 occasionally. My job was more geared to how -- how
3 are we going to achieve the goals that we set and
4 not really decide what -- you know, what we were
5 going to do but how we were going to do it.
6         So Jeff would come out and visit the
7 site and get some of my thoughts on how we would,
8 you know, do our tie-ins to the existing piping,
9 and -- and how we would -- you know, different --
10 you know, which -- which particular different
11 tie-ins we would do, like, at any particular
12 outage, and which ones, you know, we would wait to
13 a later time.
14         So we -- it was more like a
15 coordinating -- coordinating the effort, you know,
16 to kind of give him an idea of what -- you know,
17 what we wanted to do first.
18     Q. Okay. So was he more of a as you proceeded
19 in the construction process, and back and forth for
20 detail so that it could be added to design
21 components of the project?
22     A. I don't understand the question. Sorry.
23     Q. Well, so, I guess if we have Carissa
24 communicating with Orbital as the project engineer,

1 so to speak, I'm just trying to get an idea as to
2 what part of the information you were providing to
3 Orbital or getting from Orbital that helped you as
4 the, you know, the project foreman?
5 　　A.　Well, any of the -- you know, as the job
6 unfolded, you know, we got 60, 70, you know, 80
7 percent more -- you know, the more information as
8 it unfolded, it certainly helped to -- schedule.
9 It helped to determine which -- which particular
10 items needed done first, second, third, that type
11 of thing.　Just managing the schedule, the
12 manpower, and that kind of thing.
13 　　Q.　Okay.　There were multiple change orders
14 issued from Orbital to CNX throughout the project.
15 Were you ever part of the communication string when
16 Orbital said they had to do a design change that
17 resulted in a change order?
18 　　A.　No, I was not part of that.
19 　　Q.　Okay.　So let's go back to the bid process.
20 The projects led out to bid in October of '18, were
21 you part -- I understand there was a PowerPoint
22 that was provided to potential bidders as an
23 initiation description overview, so to speak, of
24 the project.　Are you aware of that?

1 　　A.　I am, but not -- I don't remember the
2 details of it.
3 　　Q.　Okay.
4 　　A.　I don't remember.
5 　　Q.　You didn't put that together, but you
6 probably saw it; is that fair?
7 　　A.　That's fair, yes.
8 　　Q.　Okay.　And in the -- in the bid process,
9 were you involved in evaluating the bids that were
10 provided by construction entities for this project?
11 　　A.　Yes.
12 　　Q.　Okay.
13 　　　　THE VIDEOGRAPHER:　This is the
14 videographer.　I'm sorry to interrupt.　Mr. Dunn,
15 is it possible you could tilt your camera down just
16 a little bit?
17 　　　　THE DEPONENT:　Okay.
18 　　　　THE VIDEOGRAPHER:　It's kind of
19 cutting off your chin a little bit there.
20 　　　　THE DEPONENT:　Is that better?
21 　　　　THE VIDEOGRAPHER:　That's perfect.
22 Thank you.
23 BY MR. BRUMLEY:
24 　　Q.　Take me through what steps that were

1 undertaken by CNX in the evaluation of the bids
2 that were submitted by the people that placed bids
3 on this project.
4 　　A.　So the bid -- the proposal would -- would
5 be put on -- online, put on a share site that we
6 could go and read through the proposal of each
7 particular contractor.　And, you know, I had access
8 to that and I could go in and see, you know,
9 where -- you know, what they excluded from the
10 project, what they clarified, what, you know,
11 different questions that were asked, and I was able
12 to review those -- those particular proposals.
13 　　　　And, of course, the -- their estimated
14 cost, of course, was there as well.
15 　　Q.　Do you re -- for instance, do you recall
16 the type of bid system that was utilized for this
17 project as far as what you were asking the
18 proposals to encompass?
19 　　A.　Yes.　So we --
20 　　Q.　Describe -- as a lay person -- hold on a
21 second.
22 　　　　As a lay person, describe for me the
23 information that you were soliciting and how you
24 would have gotten to compare sort of the bids to

1 each other.　What were you asking people to provide
2 you?
3 　　A.　So being that we are offering the 60
4 percent documents, we were looking for a contractor
5 that had experience and knowledge to hypothesize
6 what the final outcome would be based on their
7 experience and knowledge of building compressor
8 plants and dehys.
9 　　　　And a lot of that went, you know, as
10 part of, you know, our decision making of who --
11 who presented the best forecast of, you know, what
12 the overall cost would be at a hundred percent.
13 And, you know, that's -- that's -- you know, that's
14 where the final number was coming from, you know,
15 with the -- use the 60 percent and estimate your
16 final buildout number.
17 　　　　And, you know, we used their proposal
18 to kind of see, you know, what they foresaw coming,
19 you know, like what was going to be needed that was
20 not shown on the 60 percent.　And, you know, you
21 can get a pretty good feel for who knows what
22 they're doing by doing -- by, you know -- by
23 reviewing that proposal.
24 　　Q.　Okay.　So you were looking at -- I would

1 assume that the cost and projected project costs
2 were one of the factors that you were evaluating in
3 the bids you received (audio distortion)?
4    A.  Yes.
5    Q.  And do you -- do you remember what my
6 client's initial bid price was?
7    A.  I don't remember the exact number, no, but
8 I had a -- I have an idea what it was, but I don't
9 remember the exact number.
10        UNIDENTIFIED SPEAKER:  14, 1.
11    Q.  My recollection -- and we're not going to
12 hold you to the dollar amounts because this isn't
13 part of the deposition, but it is important for the
14 concept of how we got to this project
15 operationally.
16        I think it was over 14 million for the
17 whole project at that point.  Does that sound about
18 right to you from the initial bid?
19    A.  Yes.
20    Q.  And where were the other bidders in
21 relation to AC&S's bid?  Were they higher, lower,
22 or mixed?
23    A.  Yeah.  They were mixed, yes.
24    Q.  Okay.  The records would reflect that the

1 bids were received by CNX in and about November of
2 2018.  Does that meet with your recollection?
3    A.  Yes.
4    Q.  Let's try to use a little technology here
5 just as a fun demo.
6        MR. BRUMLEY:  Evan, I've got Exhibit D
7 up.  Can you bring up the Invitation for Bids dated
8 October 9th, 2018.
9        Greg, this is the CNX Invitation for
10 Bids for Expansion of the Morris Compressor Station
11 in Green County.
12        MR. MICHAELS:  Okay, Kevin, just so
13 you know, I did -- I know you probably -- you've
14 been testifying and the e-mails did come through to
15 us and I have forwarded them on to you as well.
16 BY MR. BRUMLEY:
17    Q.  Okay.  So, Mr. Dunn, are you able to see
18 the document as we placed the first part of the
19 first page on the screen?
20    A.  Yes.
21    Q.  Is it -- most importantly, is it readable
22 to you?  Are you able to see it?  It's not --
23    A.  It's -- you know, it's -- it's readable
24 until my eyes go crossed and then I can't read it.

1    Q.  Well, we'll have a race for that one, I
2 think.
3    A.  It's a little small, I guess, is what I'm
4 saying.
5        (Crosstalk)
6        THE VIDEOGRAPHER:  This is the
7 videographer.  If I can make a suggestion, if
8 you're able to maximize that window there, it may
9 make that document a little easier to see.  Zoom
10 it.  Perfect.
11        MR. MICHAELS:  Can we -- Chris, can we
12 give him a chance to take a look --
13        (Crosstalk.)
14        MR. BRUMLEY:  Yeah.
15    Q.  Mr. Dunn, this is in an e-mail that we sent
16 that it sounds like Greg has sent to you.
17        MR. BRUMLEY:  And in their exhibits,
18 is it D.?
19        MR. MICHAELS:  Yes.
20    Q.  Okay.  If you want to open it on your own
21 to review.  The problem we have with us putting it
22 on the screen is we have to scroll for you to read
23 it, so that's why I wanted to give you the e-mails.
24 But see if you can open the e-mail.

1    A.  Okay.  Can I -- can I just hit leave?  I'm
2 not familiar with --
3    Q.  Well, I think you can just minimize.
4        MR. MICHAELS:  Yeah, Kevin.  You can
5 minimize and it won't -- you know, we won't follow
6 you.  We won't see what you're doing.
7    Q.  Yeah, don't -- just -- just minimize the
8 screen and open your e-mail.
9    A.  Yeah, I'm not seeing minimize on my screen
10 here.  It's typically up in the right hand corner
11 and I don't see it there.
12        THE VIDEOGRAPHER:  When a screen share
13 is active, if you move your cursor to the top
14 portion of your screen, you may have a little menu
15 or a little button that will allow you to exit the
16 full screen.
17        You may also try hitting the escape
18 key on your keyboard, and that may shrink that down
19 to a regular size Zoom window as opposed to a full
20 screen.  Sometimes screen sharing will just open up
21 full screen.
22        THE DEPONENT:  Okay.  I just opened
23 the view options.  Would I hit "Hide video panel"?
24 Would that -- would that work?  Oh, no, that's

Page 53

1 just -- okay. I see what that did. Let's see
2 here.
3          THE VIDEOGRAPHER: Yeah. It may have
4 an option that says full screen during screen share
5 or something like that.
6          THE DEPONENT: Yeah. Exit full
7 screen. Still don't see where to minimize here.
8          Can I just hit, like, "Stop video" and
9 go to my e-mail or -- I don't see how to minimize
10 it.
11         THE VIDEOGRAPHER: Do you have Zoom
12 full screen right now? Is that the problem?
13         THE DEPONENT: Let's see. I don't --
14 I can't --
15         MR. MICHAELS: You know what -- hey,
16 Chris, is it -- could Evan stop sharing his screen
17 just for a minute? That may help Kevin get where
18 he needs to get.
19         THE DEPONENT: Yeah.
20         MR. MICHAELS: Would that make it a
21 little easier?
22         THE DEPONENT: Now I can minimize,
23 yeah.
24         MR. MICHAELS: Okay. There we go.

Page 54

1 Okay.
2          THE DEPONENT: Yeah -- okay. What --
3 what particular exhibit am I looking for?
4          MR. MICHAELS: Exhibit C is how
5 they're labeled if you go open up the file.
6          THE DEPONENT: Yeah, I got -- yeah, I
7 gotta download it.
8          It's not letting me open it. I know
9 CNX has a -- has a lock on zip files because
10 security reasons. I may need -- I may need some IT
11 help to open this.
12         MR. MICHAELS: Hey, Kevin, I did send
13 it to your wife's e-mail address that you
14 instructed just to --
15         THE DEPONENT: Okay. Let's see here.
16         MR. MICHAELS: (Audio distortion)
17 around that problem.
18         MR. BRUMLEY: Greg, maybe as we can go
19 through it, you could -- if you can unzip it, send
20 him the individual exhibits, and that way he can
21 open them one at a time.
22         MR. MICHAELS: That's not a problem.
23 Sure.
24         All right, Kevin, I just sent it to

Page 55

1 you to your CNX e-mail with just Exhibit C.
2          THE DEPONENT: Okay.
3 BY MR. BRUMLEY:
4     **Q.  Mr. Dunn, when you're able to open that,**
5 **just go ahead and tell us when you've -- you know,**
6 **you don't have to read it word for word, but I want**
7 **you to be comfortable with what the document is, so**
8 **--**
9          **Just let us know when you're ready.**
10         THE DEPONENT: Yeah. That last e-mail
11 you sent me, Greg, it's just -- it's not just
12 Exhibit C. It's --
13         MR. MICHAELS: Well, there should be
14 another one. I just sent you another one, so you
15 can give it one more shot. The other one (Audio
16 distortion) I did sent you just exclusively Exhibit
17 C.
18         THE DEPONENT: Yeah, it hasn't -- it
19 hasn't came through yet. I just still have the
20 list of the -- all the -- all the different files
21 here.
22         MR. MICHAELS: Got you.
23         We'll give that a minute, but it
24 should be coming through to you.

Page 56

1          THE DEPONENT: Okay.
2          Yeah, the last one I got, Greg, was at
3 10:44.
4          MR. MICHAELS: Okay, I sent you one at
5 10:54.
6          THE DEPONENT: Okay. I do not have it
7 yet there.
8          MR. MICHAELS: Let's see.
9          THE DEPONENT: Yeah, I'm connected.
10 All my folders are up to date. The last one was
11 10:44.
12         MR. MICHAELS: Yeah, and that was --
13         THE VIDEOGRAPHER: Would you-all like
14 to go off the record so we can sort this out, or
15 would you like to stay on the record?
16         MR. MICHAELS: It's Chris's call. I'm
17 happy to go off for a minute here.
18         MR. BRUMLEY: Yeah, let's go off the
19 record for a minute.
20         THE VIDEOGRAPHER: Going off the
21 record. The time is 10:57 a.m.
22         (A recess was taken after which the
23         following proceedings continued as
24         follows.)

Page 57

1      THE VIDEOGRAPHER:  Now begins media
2  unit 3 in the deposition of Kevin Dunn.  We're back
3  on the record.  The time is 11:05 a.m.
4      MR. BRUMLEY:  And, Jaime, we'll mark
5  this as -- it's attachment D for our set, but just
6  let's mark it as Dunn Depo Exhibit 1.
7      COURT REPORTER:  Okay.
8      DUNN DEPOSITION EXHIBIT NO. 1
9      (Invitation to Bid was marked for
10     identification as Dunn Deposition
11     Exhibit No. 1.)
12  BY MR. BRUMLEY:
13     Q.  So, Mr. Dunn, the document that we've just
14  been off the record and you've reviewed, do you
15  recognize that document generally?
16     A.  Yes.
17     Q.  What is it?
18     A.  It's -- it's an Invitation for Bid as it
19  states on the top there.
20     Q.  Okay.  So every --
21     A.  (Audio distortion) -- the work.  I'm sorry.
22     Q.  Go ahead.  I'm sorry for interrupting.
23     A.  No.  It describes the work that's going to
24  be performed.

Page 58

1      MR. MICHAELS:  Hey, Chris, I don't
2  want to stop.  You mentioned this was attachment D,
3  but I think you had referenced it being Exhibit C.
4  I know they're the -- they're kind of same
5  document, so which one --
6      MR. BRUMLEY:  So to avoid confusion, C
7  and D are essentially the same document.  One was
8  the initial bid, and the other -- I think C is the
9  subsequent October 26th, perhaps, revised bid
10  document that only revises some of the dates in the
11  middle, but we're using C that you sent to him and
12  reviewed for this purpose, which I believe is the
13  second revised document.  So it's the same
14  document, just with one more revision.
15     Q.  Okay, Mr. Dunn.  Going back to what we were
16  saying.  The -- all the bidders would have received
17  this document along with the model that we referred
18  to before that was a 60 percent design model; is
19  that correct?
20     A.  Yes.
21     Q.  And the -- if you look at the third
22  paragraph there, it -- halfway down, it says that,
23  "CNXM is requesting a pricing for the work detailed
24  in this, and all company documents based on the

Page 59

1  current schedule and 60 percent design set."
2      Do you see that sentence?
3     A.  Yes.
4     Q.  And the next sentence, "The structure of
5  this bid is T&M plus fixed markup of labor and
6  materials."
7      What does that mean?  What is a
8  structure of "T&M plus fixed markup of labor and
9  materials mean"?
10     A.  It's -- it means cost plus to me.
11     Q.  Well, I mean, do you know of any other
12  interpretations of that, or is that what it means
13  generally in the construction area?
14     A.  (Crosstalk) time and material plus your
15  markup on your -- that you've agreed to through
16  your Master Service Agreement, whatever that markup
17  may be.
18     Q.  Okay.  And the next sentence is, "A lump
19  sum will be compared to other contractor bid
20  pricing as well as the budgeted amount."
21      What is the lump sum?
22     A.  I think that -- well, I'm not sure to be
23  honest with you.  I -- I know that T&M was
24  different than lump sum, so I'm not sure what that

Page 60

1  means.
2     Q.  Did -- the next line says, "The contractor
3  is required to include all assumptions and
4  completely fill out the SOV document based on
5  experience and provided documentation."
6      What does SOV stand for?
7     A.  Schedule of values.
8     Q.  Okay.  And were you familiar with that
9  document as it was provided by the bidders and
10  filled out by the bidders for this project?
11     A.  Yes.  I don't remember in detail, but I see
12  those often.  Schedule of value.
13     Q.  Okay.  The next sentence says, "Once IFC
14  drawings have been developed, the contract will
15  have the opportunity to apply the pricing to the
16  updated plan set quantities to firm up the project
17  cost."
18      What is IFC drawings?
19     A.  Issued for construction.
20     Q.  Okay.  So are those the design drawings
21  that the contractor would have in his hand to
22  actually know the detail of building the -- the
23  project that they -- that was involved in this
24  case?  Is that what I need, sort of the blueprints?

Page 61

1   A.   Yes.
2       Q.   Is the issue for construction documents
3   part of the 40 percent that isn't included in that
4   initial 60 percent model?
5   A.   Yes.
6       Q.   When was the issue for construction
7   documents due to bidders so they could provide the
8   estimate referred to in this paragraph?
9           MR. MICHAELS:   Objection.
10  Misrepresents the text of the document.
11      Q.   Do you understand the question, Mr. Dunn?
12  A.   Yes.  Could you repeat the question,
13  please?
14      Q.   Okay.  So -- so let me make it simpler so
15  even us lawyers can understand it.  That's pretty
16  simple.
17          The -- we have a 60 percent model that
18  are provided to bidders, and then we have reference
19  here to these issued for construction drawings, and
20  the statement that the contractor will have the
21  opportunity to apply pricing to the updated plan
22  sets to firm up project costs.
23          Was it your understanding that a
24  contractor would be selected and then update its

Page 62

1   pricing when the IFC designs were provided, or that
2   there would be a supplemental opportunity for
3   contractor to see IFC drawings before CNX selected
4   the winning bidder?
5           MR. MICHAELS:   Objection to form.
6           You can answer, Kevin.
7   A.   Yeah, it was -- it was -- the IFCs would
8   have come after contractor selection.
9           MR. BRUMLEY:   Where is that?  Okay.
10  All right.
11      Q.   So if I understand it correctly, you were
12  going to get the bids, select a contractor, and
13  then IFC design drawings were going to be provided,
14  and then you were going to work on it from there;
15  is that fair?
16  A.   Yes.
17      Q.   So tell me precisely what your role --
18  once -- once they started work, what was Kevin
19  Dunn's role on the project?
20  A.   So I was just to oversee the quality of the
21  work, to interface with the contractor as far as
22  scheduling's concerned.  Any work outside of the
23  scope would be discussed and approved by myself,
24  and coordinate -- coordinate, you know, delivery of

Page 63

1   equipment and (audio distortion.)
2       Q.   Okay.  I don't know if you broke up on me
3   there, or you were just away from the mic, but --
4   so if you -- if you scroll down the document a
5   little bit, it lists the communication people for
6   the company, and you are the construction foreman
7   per that list in part 2 -- or category 2
8   communication in this document, correct?
9   A.   Yes.
10      Q.   So eventually ACS obviously was awarded
11  this job.  Who did you work with mainly to
12  communicate regarding scope and proposed changes on
13  this project while you were there?
14  A.   James Putman.
15      Q.   Okay.  And is it your understanding as
16  changes were proposed or identified by Mr. Putnam
17  (sic) that you were the person in charge of
18  approving those changes or not?
19  A.   Yes, that's correct.
20      Q.   Okay.  You made reference a couple seconds
21  ago to identifying whether changes were within --
22  something was within the original scope or was a
23  change.
24          Is that part of what your job was?

Page 64

1   A.   Yes.
2       Q.   All right.  So tell me what you used to
3   define what the scope was in order to determine
4   whether something was within the scope or was a
5   change?
6   A.   Several things.  I used the model.  I used
7   the PNID drawings.  I used the isometric drawings,
8   and I would use the -- the ortho drawings.
9       Q.   What of those drawings were available to
10  bidders when they laid out their initial bid price
11  for the project?  Was it just the model, or were
12  other drawings available to them?
13  A.   I don't remember to be honest with you.
14      Q.   Okay.  The -- at some point after the bids
15  were submitted -- and just for representation, I
16  think that ACS's bid was in the $14,100,000 range.
17          Are you aware that CNX asked for
18  contingencies to be removed from that bid amount to
19  lower the price?
20  A.   I was aware that the price was lowered.  I
21  don't -- I didn't remember -- or I don't remember
22  why.
23      Q.   Okay.  Well, who at CNX would have
24  requested that that price be lowered?

Page 65

1    A.   I'm not sure.

2    Q.   And you don't know the reasoning why that
3    request was made?

4    A.   No.

5    Q.   So if -- take me through, Mr. Dunn, what
6    information and interaction you would have with the
7    ACS representative, James Putnam (sic).  Was this
8    like a daily meeting or a weekly meeting?

9         I mean, tell me how you guys worked
10   together to get this project built.

11   A.   James was my main point of contact, my
12   first point of contact, I would say.  Him and I
13   both were on site daily.  We met daily several
14   times a day.  They -- we normally met in the
15   evening to -- to clarify any -- any -- anything
16   that -- you know, any outstanding issues of the
17   day, you know, things that were needed for the next
18   day, the next week, the next month, and so forth.

19        Kind of -- so we met, you know, at
20   least at minimum every -- every afternoon or every
21   evening near the end of the shift.  You know, I was
22   out on location and out of my office, and I'll --
23   you know, where the work was being done often.  I
24   would communicate with James, you know.  Him and I

Page 66

1    would both walk the site together and, you know,
2    bounce ideas off each other of what -- you know,
3    what direction it needed to go from there, you
4    know, because there were some things that were kind
5    of unclear, but -- that we had to kind of work out
6    in the field, such as tie in points and outage --
7    outage days and certain things like that.

8    Q.   So if you look in the document that we are
9    using as Exhibit 1, it talks about what the
10   contractor is to do, and you see in the first
11   paragraph as far as the scope statement, it's to
12   provide labor, materials, tools, and equipment
13   necessary for the expansion of the Morris
14   Compressor Station.

15        Was it your understanding that the
16   contractor would have any design responsibilities
17   in this project?

18   A.   No.

19   Q.   Okay.  As the project developed, did you
20   find it necessary to work with the contractor to do
21   field design solutions to make up gaps that weren't
22   included in the Orbital design documents?

23   A.   Yes.

24   Q.   Okay.  Give me some examples of those.

Page 67

1    A.   There were times -- or there was a time
2    that I had a discussion with Frank (audio
3    distortion) about using a reducing tee in several
4    places in lieu of a weldolet.

5    Q.   Okay.  So let's -- using that as an
6    example, I assume that there's a number of those.
7    You don't recall each and every one of them; is
8    that fair?

9    A.   That's fair, yeah.

10   Q.   Okay.  Did you end up having to use any
11   other design professionals besides Orbital on this
12   project?

13   A.   Not that I can recall.

14   Q.   Okay.  Did -- did CEC have any involvement
15   in this project?

16   A.   Yes.

17   Q.   What was their role?

18   A.   Their role was to help with field measuring
19   to -- so we could, you know, get measurements to
20   the shop for accuracy you might say.

21   Q.   Okay.  Were -- was the -- what point did
22   they become involved in this project?  Were they
23   intended to be involved from the outset, or is that
24   a need that developed during the project itself?

Page 68

1    A.   That's a need that developed as the project
2    unfolded.

3    Q.   And explain for me why that was a need in
4    this project and wasn't part of the Orbital design
5    itself.

6    A.   I believe it was the contractor was
7    responsible for field measuring to do -- to do the
8    checks and balances to make sure that the -- that
9    the isos were correct, and, you know, to field --
10   to field verify any and all isos.

11        They were -- well, CEC was brought in
12   to help ACS do that at CNX's expense actually.

13   Q.   Any other design work that you -- or
14   technical work like CEC that you needed to use on
15   this project that wasn't covered by Orbital?

16   A.   I mean, I -- Carissa Hansen was our project
17   engineer who made this -- who made decisions at
18   times.

19   Q.   The project was proposed -- if you look at
20   the schedule, initially the award date for this
21   project was the first of November of 2018 and was
22   moved back a week.

23        Do you know why that was, why the
24   award date was pushed back?

1      MR. MICHAELS:  Are we on page 3 of
2  this doc -- or page 4 of this document?
3      MR. BRUMLEY:  Yes.
4   A.  Is that Table 1, Morris Bid Schedule?
5   Q.  Yes.
6   A.  I don't recall why that got pushed back.
7   Q.  All right.  So as far as you recall, you
8  don't know of any other design professionals
9  besides CEC that was used on this project, right?
10  A.  I don't recall.
11  Q.  Okay.  The contractor had an obligation to
12  field measure as you've just mentioned, correct?
13  A.  Correct.
14  Q.  Did you find that there was an extreme
15  amount of field measurement due in this project
16  because of the lack of Orbital detail in design
17  that led to CEC's involvement?
18      MR. MICHAELS:  Objection.  Assumes
19  facts not in evidence.  And objection to form.
20      Go ahead and answer, Kevin.
21  A.  I mean, any -- any and all isos were to be
22  field verified by CNX -- or I'm sorry.  I -- any
23  and all isos were to be field measured by ACS, and
24  they did not -- they were not keeping up with the

1  field measuring, and we brought in -- we, as in
2  CNX, brought in CEC to help move along the -- the
3  field (audio distortion) process.
4   Q.  Okay.  So it's your testimony that the CEC
5  measurement was just to supplement the measurement
6  of ACS for measurement and didn't build into any
7  way the field design of the project?
8   A.  That's what I recall, yes.
9   Q.  So I'd like you to take me through,
10  Mr. Dunn, the process of how a change to the
11  project scope was presented to you in a -- this is
12  more of the process, not anyone in specific, at
13  this time by ACS.
14      Take me through how that happened.
15  What was the protocol?
16  A.  If there was something that wasn't
17  identified in the -- in the model or the PNIDs or
18  in the isos or in the orthos, that item would be
19  determined by me to be out of scope.  And James
20  Putman would bring it to my attention that this was
21  needed to be done, and, you know, him and I would
22  go look at it, and I would determine that, you
23  know, it was out of scope work, and then he would
24  assign it a number of some -- some type of billing

1  number.
2      He had a numbering system for each and
3  every item, and, you know, we would -- we would
4  agree to track that.  Not -- not agree to add funds
5  to their PO, but agree to track it to see where we
6  were going to end up at the end there at the -- at
7  the -- and see if those funds were actually needed,
8  you know, to be added to the PO.
9   Q.  Okay.  So if I'm hearing you correctly,
10  when you looked and determined that materials were
11  actually a change in scope, then ACS would assign
12  it a number, you had already approved it, and it
13  would be deemed a change, but you didn't allocate
14  that as it related to -- you didn't, for instance,
15  increase the PO because you had new out of scope
16  work.  It just went to the same PO.
17  A.  That's correct.
18  Q.  All right.  Did you ever track the time and
19  material charges that were within scope?  Like did
20  you have a category of, okay, they've spent 4
21  million on in scope work and they got 500,000 of
22  out of scope work.  Did you track it by that means
23  at all?
24  A.  They would bill against the schedule of

1  values.  So their invoices would reflect the
2  schedule of value, you know, what percentage
3  complete of that particular line item, you know,
4  and then would be -- you know, it would be invoiced
5  as completed work.
6   Q.  Sure.  But I mean, if you have a change
7  order and it has a cost associated with it, it's
8  going to add to the overall cost of the project,
9  right?
10  A.  That's correct.
11  Q.  Okay.  So the change orders were being
12  billed simultaneously with the regular percentage
13  completion work, correct?
14  A.  I don't recall actually.
15  Q.  For the change order, I guess you could add
16  materials, right?
17  A.  Yes.
18  Q.  And then you could have the -- the time
19  costs, the labor, you know, the -- what makes up
20  T&M, right?
21  A.  Right.
22  Q.  And those -- that's how you calculated and
23  approved the changes.
24  A.  Well, my job was to track, to agree or

1  disagree with the manpower used, the equipment
2  used, the third-party subcontractors used, and not
3  really to agree or disagree with the actual cost.
4      Q.  Well --
5      A.  I was simply agreeing that, yes, you use
6  that manpower.  Yes, you use that equipment (Audio
7  distortion) on that particular job.  And that's --
8  that's what I was approving.  I wasn't approving
9  any dollar amount.
10     Q.  But those costs were already fixed in this
11  -- in the contract, right?  I mean, we knew what
12  the hourly charges were, and if you had to buy
13  materials, we knew that that was the cost of the
14  materials plus some markup.  I mean, those -- those
15  prices were already established.
16     A.  Yes.
17     Q.  Okay.  Did you and Mr. Putnam (sic)
18  generally reach agreement as to items being either
19  within the scope or being a change because they
20  were outside the scope?  For the most part, did you
21  guys agree on the resolution of those items?
22     A.  Yes.
23     Q.  Would you then communicate any of that
24  information to CNX Engineering or accounting?

1      A.  Yes.
2      Q.  Okay.  How would you do that?  Tell me
3  the -- tell me the process of you providing either
4  the engineering department or the -- the accounting
5  department information that they needed to follow
6  along with the -- with the project.
7      A.  There were several tools for that.  One
8  being a -- we'd have a weekly shop progress
9  meeting, and in that meeting we would keep -- or we
10  would discuss changes with -- with the engineering
11  department, and -- and construction management
12  department.
13     Q.  Okay.  Who at CNX would have been the
14  person responsible for understanding that you've
15  authorized a change that's going to result in a
16  increase of the total cost of completion?
17     A.  Well, it was -- it was understood by me
18  that if they did not cross the threshold of a
19  certain amount that was agreed to, that it would
20  not be considered extra work.  It would be included
21  in the -- in the total cost of the job.  That's --
22  that's the way I understood it.
23     Q.  Okay.  So the way you understood it, even
24  though you were identifying things as changes to

1  the work, you were -- they were monitoring and you
2  were monitoring the total time and materials costs,
3  and the only reason you would go and get more money
4  allocated to this project is if it increased the
5  bid amount.
6      A.  Yes.
7      Q.  And that happened on multiple occasions for
8  this project, right?
9      A.  Yes.
10     Q.  Okay.  Let me look through the rest of this
11  document and make sure I'm done with it there,
12  Mr. Dunn.
13         As far as the -- let's go back to the
14  change process we were discussing.
15         Were you familiar and aware of the
16  language in the main contract document for this
17  project?
18     A.  No, I wasn't.
19     Q.  Okay.  So your process was done based upon
20  your understanding of the project and not any
21  reading by yourself of how these things were
22  supposed to operate on the Morris Expansion
23  Project?
24     A.  That's correct.

1      Q.  Okay.  And is it fair to say that your base
2  understanding was that you were going to monitor
3  the work, make sure it was fair and reasonable, and
4  that those costs would be applied to this project
5  on a time and material basis?
6      A.  Yes.
7          MR. MICHAELS:  Objection to form.
8      Q.  Did this project become a concern to your
9  knowledge, Mr. Dunn, because it was exceeding what
10  CNX had as a budgeted amount for this expansion?
11     A.  I did not know what -- (Crosstalk).
12         MR. MICHAELS:  Objection.  I'm sorry.
13  I just want to get in I object.  Calls
14  for speculation.
15         Kevin, answer if you can.
16     A.  Yes.  Repeat the question, please.
17     Q.  Yeah, I wanted to know if you became aware
18  that CNX had concerns about the increased cost of
19  completion of this project.
20     A.  Yes, I was aware of that.
21     Q.  Okay.  Tell me when you became aware of
22  that and what you know about it.
23     A.  I mean, they were -- I mean, CNX was aware
24  that I was identifying certain items that were out

1 of scope, and they were -- they understood that
2 those items could possibly put us over the amount
3 that was agreed to not to exceed.
4     **Q. What is in your mind the "not to exceed"**
5 **concept? What does "not to exceed" mean to you in**
6 **these projects?**
7     A. Based on the contract information, you
8 would -- it would be done T&M. The scope of work
9 described would be done T&M, not to exceed a set
10 dollar amount. If the -- if the scope -- if it was
11 within scope and it exceeded that set dollar
12 amount, then it would be determined that the
13 contractor would be responsible for the costs.
14     **Q. Okay. So does it work this way? If the**
15 **contractor was given the scope of the project and**
16 **was given a hundred percent complete design, then**
17 **they would only get to charge the contract amount**
18 **to this job no matter how much they spent.**
19        MR. MICHAELS: Objection. Calls
20 for --
21        (Crosstalk.)
22     **Q. There's no change --**
23     A. Yeah, that was a break up there. Sorry.
24 Can you repeat it?

1        MR. MICHAELS: One of the factors of
2 Zoom here, but you can't -- objection. I objected
3 on basis of circulation. Calls for a hypothetical.
4        MR. BRUMLEY: Sure.
5     **Q. Go ahead, Mr. Dunn. Am I -- did I -- am I**
6 **understanding that "not to exceed" correctly, that**
7 **if there were no changes to scope, if the**
8 **contractor would have had all the information and**
9 **it didn't modify at all, that the contract price**
10 **was the maximum amount that they would make on this**
11 **project under the "not to exceed" concept?**
12     A. No, that's not correct.
13     **Q. Okay. Tell me where I'm -- where I'm off**
14 **base with that then.**
15     A. So it would be -- it would be tracked as
16 T&M, and if -- if the job was completed under the
17 set amount, then that would be what would be
18 awarded to the con -- you know, paid to the
19 contractor.
20     **Q. Okay. So but -- so if this project was**
21 **initially bid out at 12 point -- 12 million**
22 **dollars, and they were able to do all the work with**
23 **no changes for 11, they would only be paid 11**
24 **million, right?**

1     A. That's correct.
2     **Q. And if there were no changes to the work**
3 **and their T&M was 14, they still would only be paid**
4 **12 million, correct? Because it's not to exceed**
5 **that price in your mind. So --**
6     A. Not exactly.
7     **Q. I'm sorry.**
8     A. (Audio distortion.)
9     **Q. Okay. So did you track the work that was**
10 **within scope in T&M versus the work that was**
11 **changed in scope T&M?**
12     A. It -- yes. I mean, it was tracked through
13 the invoicing process.
14     **Q. Okay. So the only way I would know that is**
15 **if James Putnam (sic) and you agreed it was a**
16 **change, and they would bill it out as a change,**
17 **then it's added to the change category, and it**
18 **doesn't -- it would be extra over the "not to**
19 **exceed" price?**
20     A. Yes. If -- if the -- the extras that we
21 were identifying caused the job to go over the 12
22 million plus threshold, then that -- those changes
23 would be used. Those -- those approved changed
24 items would be calculated and would weigh into the

1 final payment the way I saw it. If they --
2     **Q. So they --**
3        (Crosstalk.)
4     **Q. I'm sorry.**
5     A. If they were to complete the project,
6 including the changes, and came in under that
7 amount, they would only be paid, you know, the 11
8 million that you --
9     **Q. I understand.**
10     **So in the change order world, there**
11 **were a number of small changes, but the first**
12 **change order for this project was like 1.9 or 1.6**
13 **million dollars.**
14     **Tell me how the change orders that**
15 **increased the PO amount came to be. How did that**
16 **process work?**
17     A. Well, I think several things weighed into
18 that. One of them being when the -- when the 100
19 percent drawings -- or when the -- issued for
20 construction, the IFC drawings come out, there were
21 changes that needed made. Obviously there were --
22 there were additional items that were not included
23 in their original bid, and those items were
24 identified and calculated.

1        And then there were also the day-to-
2  day items that we were -- that James Putman and
3  myself were identifying as outside of scope, and I
4  would sign off on those.
5        But I don't think change order is the
6  right word, even though it was -- I think we were
7  using a change order letterhead or a change order
8  format.  In my mind, we were tracking with those
9  forms that I was approving.  We were tracking the
10  cost and we were going to use it if we went over
11  the 12 plus, you know, contract amount.  And I
12  believe those -- you know, between those items and
13  the items identified in the IFCs, that's what
14  created the change order that was actually -- that
15  actually increased the PO.
16    Q.  Okay.  So when I see that first change
17  order taking us from, you know, the 12 million
18  number up to 14 million number, that was really --
19  that work had already been done in the field,
20  right?  That was just changing the PO amount?
21    A.  I'm not sure if the IFC increase was
22  already completed at the time of the PO increase,
23  but the -- but I believe that all the -- I believe
24  that part of that anyway was what -- the ones that

1  I signed off on were included in that first PO.
2  First and second, I believe.  I don't have that
3  information in front of me, though.
4    Q.  In the -- in the scope and in the other
5  areas of this project, for instance, it refers to
6  contractor establishing field personnel, field
7  office, storage of field -- materials in the field
8  is -- where is that?  What is the, quote, field?
9    A.  I don't understand your question.
10    Q.  Well, in the documents that refers to field
11  design, things of that nature, I just want to know
12  from you what is the, quote, field?  Is that the
13  project site?
14    A.  Yes.
15    Q.  The -- when -- so you went through the
16  process.  When -- do you remember when in the job
17  process that the IFC documents became available to
18  contractor?
19    A.  I don't remember exactly when that
20  occurred.
21    Q.  Okay.  It seems that based on Orbital's
22  production, they were releasing stages of design as
23  the project went along.  Is that your recollection
24  of how Orbital provided more detailed designs in

1  the project?
2    A.  Yes.
3    Q.  Okay.  Was that the intent from the
4  beginning that Orbital would provide design some
5  time frame prior to that particular work being
6  done?
7    A.  I really don't know what the intent was
8  from Orbital, so I really can't comment on that.
9    Q.  Okay.  Did you ever find yourself as the --
10  you know, being in charge of the project from CNX
11  waiting on Orbital design components?
12    A.  Not from the field.  I mean, not -- not
13  really like firsthand on the field.  I know there
14  were some delays on -- for isos as far as shop
15  fabrication.
16    Q.  Okay.  Explain what that -- explain in lay
17  terms what that means.
18    A.  So the pipe that was coming to the job and
19  fabricated at AFC shop was coming in slower than
20  anticipated, let's say.  The delivery.  And it --
21  they were saying it was caused by not having the
22  isos -- the isometric drawings as needed.
23    Q.  Who is "they"?
24    A.  ACS.

1    Q.  When -- I want to fast-forward for just a
2  second, Mr. Dunn.  But when you left the project in
3  July of 2019, you said three of the five units had
4  been completed.
5        Did you understand where the AC&S time
6  and materials totals were for the original scope of
7  the work when you left?
8    A.  Please repeat that.
9    Q.  Yeah.
10        So when you left -- I just quantified
11  it a little bit.  You told me that the project was
12  -- had three of the five units completed when you
13  left in July of '19.
14        When you left the project, were you
15  aware of the dollar amount that AC&S had in the
16  project for time and materials that was within what
17  you considered the original scope of the project?
18    A.  Yes.
19    Q.  What was that?  Tell me where they were
20  with that at that point.
21    A.  In dollar amounts?
22    Q.  Or percentage of the contract amount,
23  whatever way you monitored it.
24    A.  Yeah.  I mean, I don't remember exactly,

1 you know, what -- what had been invoiced and what
2 had been paid.
3     **Q.  Okay.  So -- so you understand that it had**
4 **been invoiced, but you didn't know, for instance,**
5 **if the original scope in the contract amount was 12**
6 **million dollars, you didn't know how much of that**
7 **had been billed to the project at that point in**
8 **time?**
9     A.  Yes.  I knew -- I knew how much the
10 invoices totaled up to.
11     **Q.  Okay.**
12     A.  Yes.
13     **Q.  But did you know which -- what I'm trying**
14 **to get at:  Did you know what the invoices were**
15 **that related exclusively to the original scope?**
16     A.  I did at the time, but I don't remember
17 exactly, you know, how it broke down to the
18 schedule of values.
19     MR. BRUMLEY:  All right.  I need to
20 take a quick break here, so let's take five
21 minutes.
22     MR. MICHAELS:  Do you want to take a
23 little bit longer?  It's noon here.  Did you want
24 to think about lunch and give Kevin a chance

1 here -- (Audio distortion) --
2     MR. BRUMLEY:  I'm willing to do
3 whatever you guys want to do.  Do you want to do a
4 lunch -- lunch break 30 minutes?  We can't go
5 anywhere, but yeah.
6     MR. MICHAELS:  Well, hey, Kevin's in
7 his house, so he --
8     (Crosstalk.)
9     MR. BRUMLEY:  Have Robin make us some
10 lunch or something and show it to us so we --
11     THE VIDEOGRAPHER:  Going off the
12 record.  The time is 11:53 a.m.
13     (A recess was taken after which the
14         following proceedings continued as
15         follows.)
16     THE VIDEOGRAPHER:  Now begins media
17 unit 3 in the deposition of Kevin Dunn.  We're back
18 on the record.  The time is 12:32 p.m.
19 BY MR. BRUMLEY:
20     **Q.  Okay, Mr. Dunn.**
21     MR. BRUMLEY:  And, Greg, we're going
22 to use Exhibit X next.  It's only one page, so
23 we're going to put it up on the screen.
24     MR. MICHAELS:  Okay.  Kevin should

1 have that.  Kevin, it would have been the last
2 e-mail I just sent you, would have X in it.
3     MR. BRUMLEY:  Yeah.  So mark this as 2
4 for the court reporter.
5     And, Kevin, it's a one-page document,
6 so I don't think you have to open the exhibit.  You
7 can read it on the screen that's in front of you.
8     A.  Yes, I can read it.
9     DUNN DEPOSITION EXHIBIT NO. 2
10     (Project Status Report from Orbital
11         was marked for identification as Dunn
12         Deposition Exhibit No. 2.)
13     **Q.  Okay.  Tell me what Exhibit 2 is.**
14     A.  If you give me a second, I'll digest it.
15     **Q.  Take -- take your time.  Yeah, take**
16 **whatever time you need to review it.**
17     A.  So this is I guess what it says it is.
18 Project Status Report from Orbital.  I -- I don't
19 recall ever seeing this before.
20     **Q.  Okay.  Well, that was my next question.**
21     **So in your work as the -- the CNX**
22 **project manager, you didn't get these reports from**
23 **Orbital?**
24     A.  No.

1     **Q.  Okay.  You'll have to speak up there.  Is**
2 **that a "no"?**
3     A.  That's no, yes.
4     **Q.  Okay.  Well, then, just -- I've highlighted**
5 **some issues on here.  You don't -- they're not**
6 **going to relate to this document, but in the Work**
7 **Plan, Phase 1, the schedule is by January 14th of**
8 **'19, the civil, including electrical and grounding**
9 **design.**
10     **Do you know whether or not Orbital had**
11 **that portion of the design done by January 14th?**
12     A.  I don't recall.
13     **Q.  Okay.**
14     A.  And just to make a point.  I -- I was
15 not -- I was there but I wasn't overseeing directly
16 the electrical portion which would be electrical
17 and grounding.
18     **Q.  Okay.  Well, then let's look at the next**
19 **one.  By the end of January, the 31st, mechanical.**
20 **Was the mechanical design done by January 31st?**
21     A.  I don't recall.
22     **Q.  The -- do you know what the -- when they**
23 **refer -- when it refers to Phase 1 and Phase 2, did**
24 **you have a characterization of phases for this**

1 project?

2    A.   No.

3    Q.   Okay.  So to you, it was just one project.

4 You didn't have it broke down into phases.

5    A.   That's correct.

6    Q.   Okay.  Civil design of February 11, 2019.

7 Do you know whether the civil design was completed

8 at that point?

9    A.   I -- I don't recall the date that it was

10 complete.

11    Q.   Mr. Dunn, did you experience delays in the

12 field due to waiting on Orbital design components?

13    A.   No.  Not that I remember.

14    Q.   Okay.  All right.  So you're saying that

15 there was never a time delay on the project waiting

16 on Orbital design materials.

17    A.   Well --

18         MR. MICHAELS:  Objection.

19         Assumes (audio distortion.)

20    A.   -- there may have been --

21         MR. MICHAELS:  -- testimony.  He

22 testified that he was not aware of -- of that.

23    Q.   Go ahead, Mr. Dunn.

24    A.   No, he -- I mean, there may -- there were

1 things that the shop was waiting on, but we -- we

2 had plenty of work in front of us.  I mean, I don't

3 remember the job ever slowing down or stopping in

4 any way, shape, or form due to lack of material or

5 lack of information.

6    Q.   Do you recall ever having to field modify

7 designs that Orbital provided to make the project

8 work, like meet up with piping or connections and

9 things of that nature?

10    A.   Yes.

11    Q.   In the -- when we were discussing earlier

12 the world of scope, within scope and out of scope,

13 would those field changes be additional scope

14 materials on this project?

15    A.   Yes.

16    Q.   Do you have -- we talked a little bit about

17 you having project file still available to you.

18 What does that file contain?  I mean, what could

19 you go back -- if you went to study it, what's in

20 there?

21    A.   I've never seen it.  I do not know what's

22 in it.

23    Q.   So it's just materials you've kind of

24 accumulated during your supervision of this

1 project?

2    A.   My wife has a way of collecting things that

3 I have that need to be saved, and she just collects

4 it and files it away, and keeps it -- certain

5 things that -- it's not things that I've told her

6 to collect or save.

7         I may have a pile of things on my desk

8 that she would gather up and keep, you know, on her

9 own behalf because she likes to keep things like

10 that.  I usually, you know, have them right there

11 on my desk but she'll put them away.

12         So I don't know what she has in there.

13 I haven't -- I haven't looked.  Again, I moved on

14 to other things and never looked back.

15    Q.   Okay.  Well, then let's go from your -- I

16 mean, it sounds to me like you made infield

17 determinations as to what was within the original

18 scope as bid and what was a change and add to the

19 project.

20         Would -- do you recall in the project

21 ever having a delay due to lack of permitting or

22 permits being held?

23    A.   Again, I've been on several large projects

24 recently that have had permit issues as well, and I

1 do not recall exactly what -- if there were any and

2 what those issues may have been.

3    Q.   Okay.  Well, then let's do it -- since you

4 don't recall specifically, let's do it out of a

5 conceptual basis.

6         If the project work was delayed due to

7 a lack of permits being obtained, then would ACS be

8 entitled to a change for that condition?

9         MR. MICHAELS:  Objection.  Calls for

10 speculation.

11    Q.   You can answer.

12    A.   If -- if there was other work that -- I

13 mean, if there was work being done, if it -- if it

14 hadn't stopped work or slowed down work, I would

15 say no.

16    Q.   Yeah.  So it's -- if the condition actually

17 caused the project to not move forward, then it's a

18 delay change.  But if it didn't, then it's not; is

19 that fair?

20    A.   That's fair.

21         MR. MICHAELS:  Object to form.

22         You can answer, Kevin.

23    A.   Yeah, that's fair.

24    Q.   Let's talk -- what about -- what about

1 weather delays? Did this project, being that it
2 was done in a good deal of early winter 2019, were
3 there weather delays on this project?
4    A.   There were inefficiencies due to weather.
5 The job was never shut down because of weather.
6    Q.   Was the job -- so you're saying that there
7 was, to your knowledge, no calculable delay due to
8 weather on the project.
9    A.   I mean, as a contractor, you have to assume
10 certain weather delays in southwestern Pennsylvania
11 that's part of the project.
12    Q.   That would be a contingency, right?  We'd
13 build that into our project costs?
14    A.   That's correct.
15       MR. BRUMLEY:  Take this off the
16 screen.
17    Q.   And you told me, I think, earlier in the
18 deposition that you weren't aware as to the
19 reasoning why CNX asked bidders and ACS to remove
20 contingencies from their original bid price, right?
21    A.   That's correct.
22    Q.   So if I had those contingencies in the
23 original bid and I reduced it by removing those,
24 isn't that a change to the new contract price?

1       MR. MICHAELS:  Objection.  Calls for a
2 legal conclusion.
3       Objection.  Calls for speculation.
4    Q.   Go ahead.
5    A.   I'm not aware that that's why the price was
6 reduced.  If that is the -- I mean, if that is the
7 reason.  I don't remember why the price was
8 reduced, the -- the contingency.
9    Q.   What about was there any delays to the
10 project due to CNX making the site unavailable
11 during the construction time frame?
12    A.   I don't -- I don't recall any time when I
13 was there that the site was unavailable.
14    Q.   Do you recall having any safety stand-downs
15 or safety related interruptions?
16    A.   Yes.
17    Q.   And would that be time that the contractor
18 could work?
19    A.   Yes, but it was to be assumed by the
20 contractor that's normal -- that's normal
21 procedure in a operating facility.
22    Q.   So the -- do you recall there being a fire
23 at the facility relating in a safety stand-down?
24    A.   Yes.

1    Q.   Okay.  So your -- is it your testimony that
2 ACS should have assumed in their project plan that
3 there would be a fire and a -- and a  site would be
4 unavailable for that purpose?
5       MR. MICHAELS:  Objection to form.
6       Go ahead, Kevin.
7    A.   The fire did not happen during work hours.
8 It happened at night when nobody was there and did
9 not affect -- did not affect what they were doing.
10       We -- we probably -- (Video
11 distortion) -- we probably had a stand-down and
12 discussed the issue at hand, the -- the reason
13 there was a fire, and why it's important, you know,
14 to pay attention to these reasons, and you know,
15 which is part of the safety -- you know, the
16 morning safety meetings, and, you know, that type
17 of thing, but --
18    Q.   Did the --
19       (Crosstalk.)
20    A.   -- to extend the delay as far as that's
21 concerned.
22    Q.   Did a compressor burn up in the fire
23 project?
24    A.   Yes, sir.  Yes, it did.

1    Q.   Did AC&S need to remove that burned
2 compressor?
3    A.   Yes.
4    Q.   Do you consider that an ACS acceptable
5 change to the project or should they --
6    A.   Yes.
7    Q.   -- have considered that in their --
8    A.   Yes, I do.
9    Q.   How many -- what's -- first of all, what's
10 an ESD?
11    A.   Emergency shutdown.
12    Q.   Okay.  Do you -- can you tell me how many
13 of those occurred on this project from its startup
14 until you left in mid-July of '19?
15    A.   No, I can't tell you how many.  There were
16 several.  Some of them were caused by ACS.  Some of
17 them were caused -- were caused by CNX.
18    Q.   During the time you were on the project,
19 Mr. Dunn, did AC -- did CNX extend the completion
20 date?
21    A.   I don't recall.
22    Q.   Okay.  Let's look at -- let's open --
23       MR. BRUMLEY:  Greg, let's use Exhibit
24 R next as Deposition Exhibit 3.

Page 97

1 DUNN DEPOSITION EXHIBIT NO. 3
2 (ACS Extra Work Field Report dated
3 March 26th, 2019 was marked for
4 identification as Dunn Deposition
5 Exhibit No. 3.)
6 MR. MICHAELS: Kevin, R is in the
7 second e-mail I sent you on -- around -- you should
8 be able to find that here. I just sent it in
9 sequence around 12:30.
10 Did you find it, Kevin?
11 THE DEPONENT: No, I'm still looking.
12 I'll have it here in a second.
13 Would it be the 10:31 a.m. -- no, it
14 wouldn't have been that one.
15 MR. MICHAELS: Here, you know what,
16 I'll shoot it to you right now again just to be --
17 make it easy.
18 Headed your way now.
19 THE DEPONENT: Which exhibit are we
20 looking for?
21 MR. MICHAELS: Exhibit R. I just sent
22 it to you here. Left my inbox at 12:50 sent to
23 you.
24 THE DEPONENT: Okay. It hasn't -- it

Page 98

1 hasn't came yet.
2 MR. MICHAELS: Well, I sent it to
3 you -- if you have my earlier e-mails, it's in
4 there as well.
5 THE DEPONENT: I'm looking through the
6 last two you sent me, and I have, you know, F, G,
7 H -- okay, hold on -- there's T, E. That one
8 started out --
9 MR. MICHAELS: Okay. if you have --
10 if you have Exhibit T, Exhibit R was with it.
11 If you scroll down on that.
12 THE DEPONENT: Exhibit G, you say?
13 MR. MICHAELS: No, no. Exhibit R.
14 The first one I sent you -- I sent you
15 these all at 12:30 in succession with every
16 document. So if you're looking at Exhibit G, then
17 go to the next e-mail from me and that R should be
18 included in that e-mail.
19 THE DEPONENT: I only have two e-mails
20 from you. (Unintelligible).
21 MR. MICHAELS: All right.
22 THE DEPONENT: Yeah. The first one at
23 12:35 has X. Exhibit Z as well.
24 MR. MICHAELS: Well, do you want to --

Page 99

1 Chris, to keep it moving, do you want to put it up
2 there and share the screen and let him scroll it
3 through real quick? It's only two pages.
4 MR. BRUMLEY: Sure. Sure. Let's --
5 BY MR. BRUMLEY:
6 Q. Okay. That's page 1, Mr. Dunn. It's the
7 ACS Extra Work Field Report dated March 26th, 2019.
8 A. Okay. I'm just trying to get back to my
9 full screen here. There we go. Okay. All right,
10 I see the Extra Work Field Report.
11 MR. BRUMLEY: Scroll down, Evan, so he
12 can see that on the next page.
13 A. Okay.
14 Q. So this Exhibit, Mr. Dunn, tell me what it
15 is.
16 A. Extra Work Field Report from ACS that
17 describes anchor bolts for compressors from a
18 certain company, Robert Rowan & Associates that we
19 asked ACS to purchase.
20 Q. Okay. So would this be an example of
21 something that you directed ACS to do that was
22 outside of their original scope of contract?
23 A. Yes.
24 Q. And is this Extra Work Field Report --

Page 100

1 excuse me -- how ACS would present to you items
2 that they believed to be extra work?
3 A. Yes.
4 Q. In general.
5 A. In general.
6 Q. And then if you scroll down on that page,
7 at the bottom of the page, you signed that on
8 5/13/19.
9 Is that how you would indicate
10 approval as the project manager for the extra work,
11 deeming it extras?
12 A. Yes.
13 Q. Okay. And would you be provided -- at the
14 time you would sign it, the page 2 which is the
15 actual invoice cost --
16 A. Yes.
17 Q. -- you would have that information when you
18 signed it, correct? You would know that that was a
19 --
20 (Crosstalk.)
21 Q. -- material purchase?
22 A. Yeah, not necessarily would have the
23 invoice. That would be backup documentation for
24 when they invoiced for this work.

1    Q.   Uh-huh.
2    A.   I was just signing that, that field ticket,
3  approving for them to go ahead and purchase those
4  bolts.  I didn't know how -- I mean, they had a
5  cost, I think, associated.  It may not have been an
6  exact cost.  This -- this invoice would follow in
7  the actual, you know, backup documentation.
8    Q.   Okay.  Would -- tell me how this extra work
9  approval would be billed.  Is that just billed from
10  ACS directly to the project?
11   A.   Yes.
12   Q.   Did you notify anybody at CNX when you
13  approved extra work items such as this exhibit?
14   A.   Yes.  We -- we had a -- like an extra work
15  log that we were keeping.  Like I said, the -- it
16  was assigned a number by ACS, you know, for billing
17  purposes.
18        Management was aware of these items
19  and they were discussed in our weekly meeting.
20  They were, yes, kept track of on a log, so to
21  speak, on an extra work log.
22   Q.   Okay.  So at least while you were there, I
23  could look at the extra work log and it would
24  identify the items that AC&S provided you and you

1  approved as extra work?
2    A.   That's correct.
3    Q.   What about after you left, are you aware as
4  to whether that practice continued?
5    A.   I am not aware, no.
6    Q.   Let's use -- let's use Exhibit B next if we
7  can locate that one.  If you can't -- this one is
8  two pages.  If you can't find it, we can use it on
9  the screen.  Just let me know.
10   A.   Oh, yeah.  I'm -- I thought you were
11  bringing it up.  I can -- I can go to it here.
12  Let's see here.
13        Which particular one are we looking
14  for?
15        MR. MICHAELS:  Exhibit B.
16        THE DEPONENT:  B?
17        MR. MICHAELS:  It's an Excel
18  spreadsheet, Kevin.  It would have been the first
19  e-mail I sent you -- well, wait a minute.
20        Here, I'll send it to you, Kevin.
21        THE DEPONENT:  Okay.
22        MR. MICHAELS:  I just sent it to you
23  again, Kevin, but if you're comfortable with
24  working with it on the screen, that's fine as well.

1        THE DEPONENT:  Yeah, that's fine.  We
2  can just go with the screen.
3    Q.   Okay.  So we discussed earlier, Mr. Dunn,
4  SOV meant schedule of values is --
5        MR. BRUMLEY:  And, Court Reporter,
6  remind me what -- if this is marked as the next
7  exhibit, which I intend to, what is the number?
8        MR. BRUMLEY:  Court reporter might be
9  on mute.
10        MR. MICHAELS:  Chris, are you marking
11  Exhibit R as Exhibit 3?
12        MR. BRUMLEY:  Yes.
13        COURT REPORTER:  I think Number 4, but
14  since I'm not marking them, I'm not keeping track.
15  I don't know.
16        MR. BRUMLEY:  Okay.
17        THE VIDEOGRAPHER:  This is the
18  videographer.  I've been keeping notes.  I believe
19  this is Exhibit 4.
20        MR. BRUMLEY:  Okay.  So what is
21  disseminated between us as Exhibit B will be
22  Exhibit 4.
23        DUNN DEPOSITION EXHIBIT NO. 4
24        (Schedule of Values was marked for

1        identification as Dunn Deposition
2        Exhibit No. 4.)
3  BY MR. BRUMLEY:
4    Q.   Mr. Dunn, what we're looking at on the
5  screen now, is this the schedule of values that we
6  were referring to earlier?
7    A.   Yes.
8    Q.   Okay.  And this would be a part of the
9  original bid items from contractor ACS and others
10  for this project?
11   A.   It appears to be.  I can't see the whole
12  thing.
13   Q.   Okay.  Well, did you use a Schedule of
14  Values document to determine what was within and
15  what was an extra as it relates to scope on this
16  project?  Like did you actually use this document?
17   A.   Yes, along with others.
18   Q.   Okay.  Tell me how you would use this
19  document, the Exhibit 4.
20   A.   Survey supports, foundations.  I mean, that
21  -- because that -- for the quantity of 2, let's say
22  on 2.2 --
23   Q.   Uh-huh.
24   A.   -- 72 inch horizontal slug catchers, it

1 calls out two of them.
2     Q.   Okay.  So, for example --
3     A.   It represents as to itemizing, you know,
4 what -- what was talked about in the original
5 scope.
6     Q.   All right.  So would -- let me -- let's use
7 2.2 just as an example to help me understand.  So
8 if you -- the -- this looks like we have two
9 foundations for the 72-inch horizontal type slug
10 catchers.
11         If during the project, you or somebody
12 in charge determined that you needed four of those
13 instead of two, then the two extra would be an
14 actual extra to the project, correct?
15     A.   That's correct, yes.
16     Q.   Okay.  And I know we've discussed this, but
17 I'm just not sure I still understand it.  If indeed
18 that was determined, how does that make its way to
19 a change of contract price or change order?
20         I know you said you used change order
21 in terminology but (audio interruption) quite
22 accurate.
23         How does -- how would that change make
24 it?

1     A.   So once -- we -- we were -- I was under the
2 impression the entire time through upper management
3 that this was the 12.4, I believe it was, not to
4 exceed, and so anything within those -- within the
5 drawings of the model would fall into that.
6         These outside items would come into
7 play whenever they completed that scope of work.
8 Then if they went over the 12.4, then obviously
9 they were -- they were deemed as extra work.  If
10 they came in under that, then they would -- it
11 didn't happen that way, so assuming they would
12 apply that savings to the change orders.
13     Q.   I don't follow the last sentence:  Apply
14 that savings to the change --
15         So you're saying if they were under
16 the contract price for the scope work, then you
17 would get -- there was money available between the
18 contract price and the actual T&M spent on scope
19 that could apply to change orders.
20     A.   Correct.
21     Q.   Now, we're not here because they came in
22 under budget, right?  We're aware of that.
23         Tell me how it's calculated if they
24 did the scope of work for the 12.4, how can I go

1 back and calculate what the extras were?
2     A.   Based on the field -- on the field reports,
3 the field tickets that were signed --
4     Q.   Okay.
5     A.   -- by me.
6     Q.   All right.  Scroll down to the second page
7 then.  I want you to look at item 3.9.
8     A.   Okay.
9     Q.   Now that's a line item.  What is hydro
10 testing?
11     A.   It's when you fill the piping with water
12 and you pressurize it to one and a half times the
13 design strength and hold it for a certain amount of
14 time to -- you know, to see if there's any failure.
15 If there's no failures, then it passes the test of
16 one and a half times and it can be put in,
17 installed.
18     Q.   Okay.  So it's essentially a pressure test
19 to make sure that the components can operate with
20 the safety factor at the pressures they're
21 intended.
22     A.   Correct.
23     Q.   Okay.  Is that for piping or all equipment
24 as far as the hydro testing?

1     A.   That's for piping.  The equipment is tested
2 by the manufacturer.
3     Q.   Okay.
4     A.   (Audio distortion) through the paperwork,
5 you know, and all, so.
6     Q.   So there's one unit indicated in item 3.9.
7 Do you see that?
8     A.   Yes.
9     Q.   Do you know what LS means in the -- in --
10 the designation "LS"?
11     A.   I need to see what that column is titled.
12     Q.   It's titled Units at the top and then
13 quantity is 1.  And this is the blank form that,
14 you know, contractors were provided to bid, right?
15     A.   Right.
16     Q.   So it doesn't have the prices in it.
17     A.   I honestly don't recall what LS -- I'm
18 drawing a blank.
19     Q.   Okay.  That's -- that's all right.  We'll
20 figure it out from some other means.
21         So in 3.9, what does it mean when it
22 says "includes drying on discharge lines, fuel gas,
23 and instrument air"?
24     A.   So that means that when those items are

Page 109

1 hydro tested, that they need to be dried because
2 there's -- that liquid cannot be part of that
3 system because it would damage the -- the
4 instrumentation that's involved with that.
5    Q. Got you.
6       When we got to the point of the
7 project where hydro testing was done, was it indeed
8 field hydro tested or was it tested off-site?
9      MR. MICHAELS: One second here.
10      Chris, if I can object. I think we're
11 going a little bit far afield of the scope of what
12 this deposition was (interruption) of execution.
13      MR. BRUMLEY: We're actually not
14 because I'm going to ask him about this being a
15 change, and the change in the mechanics of that go
16 to the contract itself.
17      MR. MICHAELS: Well, to some extent I
18 would agree if we're going to get into individual
19 items, I think we're going a little bit afield --
20 far afield of that since the purpose of this was
21 still regarding whether this was CNX's belief that
22 this is a T&M, not to exceed and then ACS's that it
23 was a T&M.
24      So we're -- we're moving a little bit

Page 110

1 far afield of that, but for the purposes of
2 continuing the expediency of this deposition, I'm
3 okay with it going forward. I just want to put
4 that objection on the record.
5      MR. BRUMLEY: Okay.
6 BY MR. BRUMLEY:
7    Q. Do you recall the question, Mr. Dunn?
8    A. No. Would you restate that, please?
9    Q. Yeah.
10      So 3.9, as you read it and I can read,
11 it, it says, "Field hydro testing." Was the hydro
12 testing on this project done in the field or was it
13 done off-site?
14    A. There was some hydro testing that was done
15 in the field. Most of it -- all the large bore was
16 done off-site. Some of the small bore was done on
17 location, not necessarily installed, but it was
18 done previous to the fabrication of it.
19    Q. Okay. So as it relates to the scope of
20 hydro testing, is there anywhere -- well, first of
21 all, how was the determination made that hydro
22 testing would be done off-site?
23    A. I don't know that answer, but there was
24 no -- there was no way -- practical way to do it on

Page 111

1 location being that it was a operating facility and
2 we had time constraints. We had other work going
3 on that was consuming any extra space, and there
4 was no way we could have done it there on location.
5      It -- it -- they -- I believe they
6 wanted to do it in the rack as it was installed and
7 that was definitely not an option. It was -- it
8 wasn't safe or feasible to do that.
9    Q. Okay. Is there -- is there anything in the
10 bid documentation that would indicate that hydro
11 testing would be done not only at the field but
12 would also have to be done off-site?
13    A. The part that says the -- being, you know,
14 qual -- you know, we're looking for qualified,
15 experienced contractors, they would know that. You
16 can't do that in the rack. It could have been done
17 on-site if we had room, which we didn't, but it
18 could not have been done in the rack.
19    Q. Okay. Well, you're not saying that every
20 project the hydro testing is done off-site, right?
21    A. No.
22    Q. Okay. And this says field hydro testing
23 which is at the site. How would ACS account for
24 the costs of doing this work off-site?

Page 112

1    A. Their experience and expertise in the
2 business.
3    Q. When is it that they were advised that
4 there wouldn't be suitable on-site space to do that
5 work?
6      MR. MICHAELS: Object again. We're
7 going outside the scope of what this deposition was
8 originally intended.
9    Q. Go ahead, Mr. Dunn.
10    A. Being their expertise and building
11 compressor stations, knowing how much space you
12 need to do hydro testing, what equipment's
13 involved, what dangers are incurred, and knowing --
14 being a professional compressor station builder,
15 that you -- you know, you have all these other
16 overlapping activities going on such as foundation
17 work and equipment setting and demolition of
18 existing structure and all these things happening,
19 case-ons and all other things, and knowing that
20 would -- looking at the schedule, knowing that you
21 don't have room to do it on-site, and certainly
22 knowing as a -- as a professional that there's no
23 way you could do that in -- in the structure. You
24 can't install the pipe and do it for various

Page 113

1 reasons.

2    Q.  During the project, did you have to make
3 the determination that this testing wasn't going to
4 be done at this location?

5    A.  Yes, sir.

6    Q.  And you had to advise AC&S of that?

7    A.  Yes, sir.

8    Q.  And was it clear to you that they under --
9 that they did not intend to do off-site hydro
10 testing until you advised them to do so?

11    A.  It was clear to me that one person in that
12 company didn't understand it.

13    Q.  At the --

14    MR. BRUMLEY:  You can take that
15 document down.

16    Q.  Mr. Dunn, were -- were you ever made aware
17 that CNX asked that only one change order be issued
18 at the end of the project; that they wanted all of
19 the extras at the end put into one final change
20 order?

21    A.  I was not aware of that, no.

22    Q.  Okay.  So you -- you were never part of an
23 e-mail or conversation -- just to be clear -- where
24 CN&S said, "We can only have one more change order

Page 114

1 on this job so don't come back two times"?

2    A.  I do not recall that at all.

3    Q.  Okay.  Hold on a second.  I'm going to
4 switch it.

5    Mr. Dunn, as the CNX project manager,
6 did you have the authority to direct that
7 additional labor man hour resources be placed on
8 this project?

9    MR. MICHAELS:  I'm going to object.

10    I believe he said he was the foreman,
11 not the project manager.

12    MR. BRUMLEY:  Okay.

13    Q.  Whatever your role was, Mr. Dunn, could
14 you -- was it within your authority to say, "Hey,
15 we need more -- we need to work longer hours, add
16 more men," you know, add a shift, whatever needed
17 done?

18    A.  It was -- it was in my authority to discuss
19 that with Mr. Putman and determine, you know, we
20 weren't going to meet certain dates without that,
21 and, yes, suggest that we do that.  Certainly.

22    Q.  Okay.

23    A.  I think it's within my power to insist or
24 demand that they bring the extra manpower.  I can

Page 115

1 only show them where they're lacking, you know, and
2 discuss the fact that, you know, more manpower,
3 more equipment would be helpful.

4    Q.  Okay.  Do you recall ever directing AC&S to
5 get more manpower and equipment or that you would
6 take care of that?

7    A.  No, I don't remember anything specifically.

8    Q.  You'd mentioned working with Mr. Putnam
9 (sic).  Did you also work with Mr. Jim Glass --

10    A.  Yes.

11    Q.  -- with respect to any requests for change
12 in the scope or a change order?

13    A.  Yes.

14    Q.  Did you hear the question, Mr. Dunn?

15    A.  Yes, I answered it.

16    Q.  I didn't hear your answer.  I must have cut
17 off.  What was the answer?

18    A.  Yes.

19    Q.  Okay.  What would be the difference between
20 working with Mr. -- on what occasions did you work
21 with Jim Glass as opposed to James Putnam (sic)?

22    A.  I don't know Jim Glass's title, but I saw
23 him as the project manager, and I would deal with
24 James Putman on a day-to-day basis at the

Page 116

1 superintendent level and I would see Jim Glass less
2 often.

3    He would visit the site.  In the
4 beginning he was there a lot.  In fact, he had a
5 desk there at the job site, and -- but he was not
6 there full time.  There was a time he may come
7 daily for some period of time.  Maybe not -- (audio
8 distortion) but most of the time it was done via
9 e-mails and whatnot.

10    Q.  Okay.  So it wasn't by type of change
11 order, or, you know, some things were in
12 Mr. Glass's area and others were in Mr. Putnam's
13 (sic).  It was just when he was there, he would
14 submit that information to you or e-mail you that
15 type of information.

16    A.  Yeah.  If there was anything I felt was --
17 I would have went to Jim on issues with, let's say,
18 invoicing.  If I didn't agree with something, I
19 would talk to Jim Glass directly on that.  And
20 scheduling, you know, cranes and what have you.
21 The need for certain cranes on-site and whatnot,
22 you know, we would -- we would discuss that.

23    There were times I had discussions
24 with him directly.  Yes, on-site and -- and e-mail.

1   Q.   All right.  So the -- the initial project
2 completion date pursuant to the -- what we saw was
3 June 1 of 2019; is that accurate?
4   A.   Yes.
5   Q.   Okay.  And you were there through July, so
6 it was at least even for when your -- your role in
7 the project it was six weeks or so longer than the
8 initial completion date, right?
9   A.   It appears to be that way, yes.
10   Q.   Okay.  When you were there in July, were
11 you still receiving design documents from Orbital?
12   A.   Yes.
13   Q.   What was the -- what was the reason for the
14 extended completion time?
15   A.   I honestly don't know the actual root --
16 root cause or root reason for that.  It could have
17 been several things that played into that.  I don't
18 recall.
19   Q.   I -- I think I know this answer, but, like,
20 to the extent that the CNX Engineering Group was
21 contending that Orbital was late on design phases,
22 that's outside of your knowledge base, right?
23   A.   Yes.
24   Q.   Okay.

1         Mr. Dunn, you mentioned earlier that
2 you thought that this project had a not to exceed
3 component.  Do you recall that discussion --
4   A.   Yes.
5   Q.   -- that we had?
6         When did you learn of that?
7   A.   Early on it was relayed to me that it would
8 be not to exceed.  Before -- before ACS mobilized.
9   Q.   Was it before ACS was awarded the bid?
10   A.   I'm not sure.
11   Q.   Were you provided the documentation from
12 ACS on their ongoing cost of completion estimates?
13   A.   Could you rephrase that, please?
14   Q.   Yeah.
15         So were you provided -- Mr. Larkin
16 provided cost of completion estimates throughout
17 the project.  Were you provided that information?
18   A.   Yes.
19   Q.   Okay.  When you left the project, what did
20 you understand the cost of completion amount to be?
21   A.   19 million.
22   Q.   Okay.  Based on that number, did you do any
23 calculation as to whether that price should be
24 reduced because of the end scope costs of the

1 project?
2   A.   No.
3   Q.   All right.  So as far as you know, if the
4 cost to completion was 19 million, you had no
5 reason to dispute that?
6   A.   Not at that time, no.
7   Q.   Okay.  Do you have any reason to dispute it
8 currently?
9   A.   Lack of backup documentation.
10   Q.   What does that mean?
11   A.   Well, the whole time during the project
12 while I was there, we were tracking very closely
13 the extra work and -- and it was signed off on.  It
14 was discussed and signed off on, discussed in
15 weekly meetings, and I believe everything that I
16 signed for was paid for in one or two of those
17 change orders.
18         And it seemed like a pretty clear
19 break from the time I left that that -- that
20 tracking of that was no longer being done, and
21 there was work being done without approval, and I
22 had no way of knowing what was being done being
23 that I was reassigned to another project.
24   Q.   Sure.

1         Who was there to direct the work after
2 you left like you did when you were in charge of
3 this project?
4         MR. MICHAELS:  I'm going to object
5 again that we are going outside the scope of what
6 this deposition was originally determined to be.
7   Q.   Go ahead, Mr. Dunn.
8   A.   I don't know who they assigned to fill my
9 position.
10   Q.   Where did you gain the understanding that
11 the lack of documentation and tracking of the work
12 is an issue for this project?
13   A.   I can't --
14         (Crosstalk.)
15   A.   Go ahead.  I'm sorry.
16         MR. MICHAELS:  Same objection.
17   Q.   Go ahead, Mr. Dunn.
18   A.   I can't quote the exact title of the
19 document.  It's a -- I think it's an extra work log
20 that explains the number system that ACS applied to
21 each and every extra.  It gives a brief
22 description.  There's a line that says whether or
23 not it was approved, and if you follow that down, I
24 believe that all of the ones that I was involved

1 with were approved by me, and there's a pretty
2 distinct stop, you know, where that stopped
3 happening at some point.
4    Q.  Have you reviewed the proposed extra work
5 that AC&S contends was done after you left the
6 project?
7    A.  No.
8    Q.  We discussed the stage of completion that
9 was of 3 of 5 units when you left.  Would you
10 expect the completion of the last two units to be
11 any way materially different than the first three
12 that you were there for?
13       MR. MICHAELS:  Objection.  Calls for
14 speculation.
15    A.  No.  I -- I would not expect them to be a
16 difference.
17    Q.  We talked about instances in the field
18 where the project design drawings from Orbital --
19 Orbital had to be altered in order to make the
20 project work.  Do you recall that?
21    A.  Yes.
22    Q.  Did you find that to be more prevalent in
23 this project than others you've worked on?
24    A.  No.  I mean, you -- no, you always have

1 that.  I mean, it's -- it's very -- it's very
2 common.
3    Q.  Well, how about the volume and the number
4 of instances, was that more in this project than
5 you're used to?
6    A.  Well, they -- it goes up exponentially.  So
7 the bigger the project the more the problems.
8    Q.  Mr. Dunn, do you remember any specific
9 instances where you and Mr. Putnam (sic) disagreed
10 as to whether something was within the scope or was
11 an extra?
12    A.  Something that sticks out in my mind is
13 very, very small.  It's (audio distortion.)
14    Q.  I'm sorry?
15    A.  There -- there was one instance that I can
16 remember that -- that I gave pushback on, and it
17 was a very fairly insignificant item in -- in the
18 grand scheme of things here.
19    Q.  Okay.  Do you remember what that instance
20 was off the top of your head?
21    A.  They were billing us for small tools.
22    Q.  Okay.  And you thought that they needed
23 tools anyway, that's within original scope?
24    A.  Correct.

1    Q.  Okay.  Do you know whether CNX utilized any
2 of the field designs that you were involved with on
3 the project in other projects?
4    A.  I don't know that.
5    Q.  Are you familiar with the engineering -- or
6 group TEK?
7    A.  Yes.
8    Q.  What do they do?
9    A.  They're very similar to ACS.  They're --
10 they're a industrial contractor specializing in oil
11 and gas.
12    Q.  Did they ever appear on this project, to
13 your knowledge?
14    A.  Not to my knowledge, no.  Not that I
15 remember.
16    Q.  When -- when you started this project and
17 were aware of the initial contract price of 12.1
18 million, did you believe that the project could be
19 done for that amount?
20    A.  No.
21    Q.  Actually, I think it was 12.8.  My bad.
22       But -- so you didn't think that the
23 project had a chance of being done for 12.8, did
24 you?

1    A.  No.
2    Q.  Okay.  Why not?
3    A.  Because I wasn't in favor of awarding the
4 bid to ACS.  I was -- I believed -- I thought their
5 number was too low.
6    Q.  Were the other bids materially higher, to
7 your knowledge?
8    A.  Yes.  They were -- there were others that
9 were higher, yes.
10    Q.  Were there any that were lower?
11    A.  There was none that was lower than the
12 final price.
13       MR. BRUMLEY:  Okay.  Greg, I want to
14 take a break here for a couple minutes.
15       MR. MICHAELS:  Okay.
16       THE VIDEOGRAPHER:  Going off the
17 record.  The time is 1:37 p.m.
18       (A recess was taken after which
19       the following proceedings continued
20       as follows:)
21       THE VIDEOGRAPHER:  Now begins media
22 unit 4 in the deposition of Kevin Dunn.  We're back
23 on the record.  The time is 1:44 p.m.
24 BY MR. BRUMLEY:

1    Q.  Mr. Dunn, do you recall any instances where
2 piping ordered and delivered through the CNX vendor
3 system arrived on-site was incorrect for the
4 design?
5    A.  I don't recall specifically.  I mean, it
6 happens a lot, so I mean -- on other projects, so,
7 you know, I just don't remember that specific one.
8    Q.  Okay.  So you don't -- you don't recall any
9 specific instances on this job where material,
10 specifically pipe, would have arrived causing ACS
11 to do a field redesign.
12    A.  No, I don't remember that.
13    Q.  Okay.  What about the -- the -- any delay
14 related to the motor control center installation?
15 Do you have any recollection of that issue on this
16 job?
17    A.  Yes.
18    Q.  What -- tell me what that involved.
19    A.  Again, I -- I was not the electrical
20 supervisor or foreman, let's say, and I am not sure
21 what the delay was.  I just know there was a delay.
22 I don't know what --
23        (Crosstalk)
24    Q.  Did the delay of that motor control

1 center's installation affect project time frames?
2        MR. MICHAELS:  Objection to scope
3 again.
4        Can I just have a standing objection
5 to this line of questioning?
6        MR. BRUMLEY:  Absolutely.
7    Q.  Go ahead, Mr. Dunn.
8    A.  Yes.
9    Q.  Okay.  A delay based on that issue to ACS,
10 would that be an extra on this project?
11    A.  Again, I wasn't approving the -- the
12 electrical portion --
13    Q.  Uh-huh.
14    A.  -- or any -- any of that work, so I -- I
15 don't know.
16    Q.  Who was?
17    A.  It was Will Kish and Aston Rang (phonetic).
18    Q.  From the electrical standpoint, would those
19 gentlemen have approved extra work on the project?
20        MR. MICHAELS:  Objection.  Calls for
21 speculation.  As he said, he was not in charge of
22 that nor was he aware of who was -- well, he said
23 he was approving, but not what -- or what was
24 approved.

1    Q.  Are you aware if they did any extra work
2 approval, Mr. Dunn?
3    A.  There -- there were extra work approvals
4 for the electrical.  I don't know the specifics of
5 that.
6    Q.  So when you left the project in mid-July,
7 Mr. Dunn, I take it you -- did you have a
8 transition meeting or some type of hand-off process
9 so that the project could continue in your absence?
10    A.  No.
11    Q.  Well, how could it that the project that
12 you ran for seven months continue without your
13 insight to the completion?
14    A.  I have no idea.
15        MR. MICHAELS:  Objection.
16 Speculation.
17    Q.  Were you ever asked after you left whether
18 items being performed at the Morris site were
19 considered the scope or out of scope as you
20 understood those terms on the project?
21    A.  Yes.
22    Q.  Tell me, who asked you and what -- tell me
23 the details of that.
24    A.  So it was soon after I had left the other

1 project I got a visit to that project by a Sabrena
2 Carlisle (phonetic) who was office manager for ACS
3 there on location, and she had brought me a handful
4 of field tickets, extra work orders, for lack of a
5 better word, to sign off on.
6    Q.  Were they for work done after you'd left
7 the project?
8    A.  There were -- out of, let's say, five or
9 six, there were two, I think, that I signed because
10 I was aware of that work before I had left and I
11 signed them, but the other ones, I did not sign
12 because I wasn't there to witness the work.
13    Q.  Okay.  Were you aware of the nature of the
14 work from the extra work order?
15    A.  I don't recall.
16    Q.  I'm sorry?  You broke up on me there.
17    A.  I don't recall, sir.
18    Q.  Okay.  Are you aware of the request for
19 additional manpower to complete the concrete work
20 on the project?
21    A.  I do not recall that, no.
22    Q.  Mr. Dunn, there were RFP responses on this
23 project during the bid stage.  Were you part of
24 answering any inquiries from potential bidders on

Page 129

1 this project?

2    A.  I may have been consulted on some of those
3 items, but I don't remember answering any of them
4 specifically.  I don't -- I don't even remember the
5 questions actually.

6    Q.  Okay.  Fair enough.

7        I'm going to ask if we can make
8 Exhibit P --

9        MR. BRUMLEY:  Is it more than one
10 page?

11        MR. ALDRIDGE:  Yes.

12        MR. BRUMLEY:  Where is it now; do you
13 remember?  For the hyperlink.

14        MR. ALDRIDGE:  It's going to be pretty
15 high up.

16        MR. BRUMLEY:  It might be up through
17 here.

18    Q.  Okay.  Mr. Dunn, I don't know if you have
19 it up yet.  We put it on the screen.  It's multiple
20 pages, so it might be better if you can open it.

21    A.  Yeah, I'm trying to locate it.

22    Q.  Okay.  Just let me know when you do.

23    A.  Exhibit P as in Paul?

24    Q.  Correct.

Page 130

1        MR. MICHAELS:  Kevin, did you find it?
2 My e-mail?

3        THE DEPONENT:  I'm on the fourth
4 e-mail here.  I haven't found it yet.  R, S. --
5 yeah.

6        MR. MICHAELS:  It should be in that
7 one with R, S, just keep scrolling to the bottom.
8 It comes up as like the last attachment.

9        THE DEPONENT:  Okay.  I've got
10 it.

11        DUNN DEPOSITION EXHIBIT NO. 5
12        (ACS Revised Pricing was marked
13        for identification as Dunn
14        Deposition Exhibit No. 5.)

15 BY MR. BRUMLEY:

16    Q.  Just let me know when you've got that,
17 Mr. Dunn.

18    A.  I've got it.

19    Q.  You got it?

20    A.  Yes.

21    Q.  Okay.  This letter from ACS to C -- is
22 addressed to CNX Morris team.  Have you seen
23 this before today?

24    A.  I see a lot of things like this, so I

Page 131

1 mean I don't recall this one specifically.

2    Q.  Okay.  So I've got a couple questions about
3 the subject matter in here.

4        First, we discussed earlier a 60
5 percent model that was submitted in October for
6 people to develop bids.  And in this letter,
7 there's reference to a 90 percent issue package.

8        Do you know how we get from 60 percent
9 to 90 percent?

10    A.  I'm just reading a little bit here.

11        Yes.  I -- I don't know what context
12 he's speaking of here, so I can't comment on it.

13    Q.  Yeah.  Okay.  Well, based on your -- this
14 is, you know, before the bid's awarded.

15        Based on your knowledge of the design
16 documents that you received during the course of
17 the project, do you believe that it's accurate that
18 90 percent of the design drawings were available
19 prior to bid award?

20    A.  No, I don't believe that.

21    Q.  Then if you go down to the two paragraphs
22 below that, Mr. Glass lays out their original bid
23 of 14.1 million and how they got to 12.8 million.

24        Can you read that -- if you need to

Page 132

1 read those three paragraphs, please do so.

2        Have you gotten through that or are
3 you still looking at it?

4    A.  Yes, I -- I have.

5    Q.  Okay.  So this goes to -- and what I want
6 to ask you about is our discussion where you
7 indicated what a professional contractor should
8 account for in their bid documents, right?

9    A.  Yes.

10    Q.  You see in the middle paragraph where
11 they're talking about the 10 percent contingency
12 number that includes construction activities,
13 weather delays, equipment and material delays,
14 schedule slips regarding tie-ins?

15    A.  Yes, I see that.

16    Q.  Okay.  So in soliciting the reduced bid
17 from 14.1 down to 12.8, wouldn't you agree that
18 those things were removed to get CNX down to the
19 12.8 number?

20        MR. MICHAELS:  Objection.  Calls for
21 speculation.  He's not the author of this document,
22 nor has he testified that he had seen this before
23 this.

24    Q.  Go ahead.

1    A.   Yes.  I see that the 10 percent contingency
2 number, if it's pulled out, it would end up at a
3 12.8.  I do see that, yes.
4    Q.   Okay.  So if we use the 12.8 number,
5 changes that fall within the con -- contingencies
6 would be extra work, correct?
7         MR. MICHAELS:  Objection.  Calls for a
8 potentially legal conclusion and speculation on his
9 part.
10   Q.   Go ahead.
11        MR. MICHAELS:  I don't think he can
12 know that from this document.
13   Q.   Do you understand the question, Mr. Dunn?
14   A.   Yeah.  Could you repeat the question,
15 please?
16   Q.   Sure.
17        If we use the 12.8 number that removed
18 those listed contingencies that I just read out of
19 this letter to you, then items that fall within
20 those items would be extra work to the 12.8 number,
21 correct?
22        MR. MICHAELS:  Same objection.
23   A.   I -- yes, I would think so, yes.
24   Q.   And, again, you don't have any information

1 as to what prompted CNX to want this bid revision
2 from the 14.1 to the 12.8 if they indeed did,
3 right?  You don't have that information?
4    A.   I do not.
5    Q.   Okay.  Who could I ask about that?  Who do
6 you think is the person that would say, "Yeah, we
7 wanted this because of that"?
8    A.   I imagine the team that was involved.  I
9 guess, like, take your pick.
10   Q.   Okay.  I just wondered if you could help me
11 figure out who would be the best person --
12   A.   Well, I -- I could repeat the team that was
13 involved, if you'd like.
14   Q.   Well, but that doesn't -- that just gives
15 me a number of people.  That doesn't give me one.
16        MR. BRUMLEY:  Can you put the photo on
17 the screen?
18        MR. ALDRIDGE:  Yeah.
19        MR. BRUMLEY:  We'll mark that as an
20 exhibit.  What is that?  6?
21        DUNN DEPOSITION EXHIBIT NO. 6
22        (Photograph was marked for
23        identification as Dunn Deposition
24        Exhibit No. 6.)

1    Q.   Okay.  This is the next exhibit we don't
2 have, but it's just a photograph, Mr. Dunn.  This
3 is contained in our response and pleading in this
4 case.
5         Do you know what we're looking at in
6 what's marked as Exhibit D on the photo, but can
7 you see that photo?
8         MR. MICHAELS:  I'm going to again
9 object that this is outside the scope.  If we're
10 talking about an individual instance within this,
11 this goes well beyond what the contract execution
12 formation was which is the scope of this
13 deposition.
14        I suggest though, we move along and
15 complete this deposition.
16   Q.   Go ahead, Mr. Dunn.
17   A.   I'm still looking at the letter.
18   Q.   Okay.  Well, -- well, let's -- when you're
19 done, let us know.
20   A.   Okay.  Let's -- okay, let me get back to --
21 to that.
22        Okay.  I have the picture up.
23   Q.   Okay.  So Mr. Dunn, do you know what is in
24 the photo dated at the top April 16th?

1    A.   I don't have an exact date in my mind
2 when -- but it appears that this -- I think I know
3 what it is, but I'm not sure.
4    Q.   Okay.  Well, what do you think it is?
5    A.   It looks like this could have been our
6 second outage where we had a -- an incident with a
7 backflash that caused -- that caused this smoke
8 here.
9    Q.   Okay.  And the reason I'm asking you about
10 this isn't really the details of this incident, but
11 did this incident cause a work stoppage on the
12 site?
13   A.   Yes.
14   Q.   Was this incident ACS's fault?
15   A.   No.
16   Q.   So any work stoppage that created the delay
17 due to this incident, that would be an extra,
18 correct?
19        MR. MICHAELS:  Objection.  Calls for
20 speculation.  And potentially a legal conclusion.
21   Q.   Go ahead, Mr. Dunn.
22   A.   Yes, it appears so, yes.
23   Q.   And if you or somebody at CNX directed that
24 we add employees and man hours to make up time for

Page 137

1 delays such as this, that extra man hours would be
2 an extra on this project, correct?
3        MR. MICHAELS:  Objection.
4    A.  I -- yeah, I don't know that.
5    Q.  Well, go ahead.
6    A.  I mean, I wasn't -- I don't know the --
7 that was ever asked for extra man hours.
8    Q.  Okay.  And I'm not saying precisely related
9 to this it was.  My question to you relates to
10 scope, and if it was directed that we add persons
11 or hours to make up for lost time due to causes
12 outside of AC&S's fault, that would qualify as an
13 extra under this contract, right?
14    A.  Yes.
15    Q.  So were you in any part, Mr. Dunn, involved
16 in the audit of costs done of ACS by CNX in this
17 case or this project?
18    A.  No.
19    Q.  So as far as what ACS contends were extras
20 following your work there, you have no information
21 or knowledge about that?
22    A.  That's correct.
23    Q.  During -- so during the project time you
24 were there, was there anything that AC&S was asked

Page 138

1 to do that was completely unrelated to this
2 project?
3        MR. MICHAELS:  Same objection as to
4 scope.
5    A.  Yes.
6    Q.  What was that?
7    A.  Unrelated in the point that it wasn't
8 discussed early in the bidding process.
9    Q.  Okay.  What -- what was it?
10    A.  One of -- one of the items was moving soil
11 - spoils we call them - excavated materials from
12 the concrete work to removing them off location.
13    Q.  Okay.  Mr. Dunn, are you aware as to
14 whether the facility is operating in the manner in
15 which it was intended pursuant to this expansion?
16    A.  Yes, it is.
17    Q.  Okay.  So the final product handed over by
18 AC&S at the end of this project was an operational
19 functioning facility as it was intended, correct?
20    A.  As far as I know, yes.
21    Q.  Do you have any reason to believe that the
22 project costs as contended by AC&S of 19.1 million
23 are contained or not within the approved changes of
24 this project.

Page 139

1        MR. MICHAELS:  I'm going to object to
2 that.  He already said he was not part of this
3 audit process or the --
4        MR. BRUMLEY:  I'm not asking about the
5 audit.  I'm just talking about with the -- with the
6 contingency --
7        (Crosstalk)
8        MR. MICHAELS:  You're asking what's
9 beyond when he was there at this point.
10        (Crosstalk.)
11        MR. BRUMLEY:  -- you can answer pretty
12 quickly, but your continuing objections are
13 indicating desired answers at this point.  I don't
14 believe that's correct.
15 BY MR. BRUMLEY:
16    Q.  Mr. Dunn, do you understand the question?
17    A.  Would you repeat it, please?
18    Q.  Yeah.
19        AC&S -- ACS contends that the total
20 project completion costs for this thing were 19.1
21 million dollars based on a T&M basis.  Do you have
22 any reason to disagree with that?
23    A.  I can't answer that because of lack of
24 information.

Page 140

1    Q.  So it's fair to say all you can testify to
2 is that the changes you approved before you left
3 and the two that you approved that you said someone
4 brought to you following your departure, those were
5 all true and accurate.
6    A.  That's correct.
7    Q.  And nobody's asked you to look at all the
8 proposed changes since you left with the work
9 descriptions to get you to say whether you thought
10 they were within the original scope or not.
11    A.  No.
12    Q.  Could -- would you be able to do that?
13    A.  I could look at it.  I -- yeah, of course I
14 could look at it.
15    Q.  I mean, you made the determination of in
16 scope/out of scope for seven-plus months on this
17 project.  Is there any reason you couldn't look at
18 the work done after that and determine whether you
19 deemed it in scope, out of scope like it processed
20 for those seven months?
21    A.  I don't know how the scope changed, you
22 know, when I left.  I don't -- I wasn't part of any
23 of the conversations, you know, about extra work,
24 you know.  I could probably tell if it was extra or

1 not based on my experience.

**2 Q. Did you ask that this or direct that this**
**3 project be 3D modeled?**

4 A. No.

**5 Q. Do you know if anybody else did?**

6 A. I believe it was 3D modeled. I mean, I
7 didn't ask for it, though. The model that we speak
8 of is a 3D model.

**9 Q. So CEC didn't do any additional modeling?**

10 A. Oh, I -- I have no idea.

11 THE VIDEOGRAPHER: I'm sorry to
12 interrupt. The court reporter needs to go off the
13 record. She's having an audio problem.

14 MR. BRUMLEY: Okay. Take five.

15 THE VIDEOGRAPHER: Let's go off the
16 record. The time is 2:15 p.m.

17 (A recess was taken after which
18 the following proceedings continued
19 as follows:)

20 THE VIDEOGRAPHER: Now begins media
21 unit 5 in the deposition of Kevin Dunn. We're back
22 on the record. The time is 2:27 p.m.

23 BY MR. BRUMLEY:

**24 Q. Okay, Mr. Dunn. I'm trying to get wrapped**

**1 up here. A couple more areas of inquiry.**

**2 We're going to use Exhibit H in the**
**3 packet next. We can put it on the screen,**
**4 Mr. Dunn, if you don't want to open it because it's**
**5 only a short e-mail.**

6 A. Okay.

7 DUNN DEPOSITION EXHIBIT NO. 7
8 (Email dated October 2, 2019 was
9 marked for identification as Dunn
10 Deposition Exhibit No. 7.)

**11 Q. All right. Can -- take -- take a**
**12 second. The e-mail I'm asking you about is**
**13 the -- from Adam Beck to Carissa, you, Ryan**
**14 Aubuchon, Dennis Koscho, David Chase, and Todd**
**15 Shumaker of October 2, 2019. So it's not very**
**16 long. Just give it a quick read.**

17 A. Okay. I -- I've read it.

**18 Q. Okay. So you're on this e-mail string but**
**19 clearly it's after you left the project. Mr. Dunn,**
**20 did you have any communication regarding the**
**21 subject matter of this e-mail?**

22 A. I'm sorry, I see there's some stuff at
23 the bottom like below the caution, but I can't
24 see all of that. I don't recall -- I don't

1 recall attending this meeting.

2 Scroll down, please.

3 That's good.

4 No, back up.

**5 Q. Okay.**

6 A. It's good right there.

**7 Q. Yeah. You're not on the initial e-mail**
**8 from Mr. Alvarez to Carissa and crew, but you're on**
**9 the Adam Beck e-mail with those three paragraphs**
**10 above.**

**11 So my first question would be: Do you**
**12 recollect getting this e-mail, the one -- the one**
**13 from Adam Beck to Carissa and you?**

14 A. I mean, it rings a bell but not
15 specifically.

**16 Q. Okay.**

17 A. You know, I was -- I was transferred to
18 another project which was very demanding and
19 complex, and I was consumed with that project and
20 --

**21 Q. Uh-huh.**

22 A. -- wasn't giving this any attention.

**23 Q. Well, that project was Dry Ridge, right?**

24 A. That's correct.

**1 Q. And it's mentioned in this e-mail.**

**2 Were there change of scope issues in**
**3 the drawing phase with Orbital?**

4 A. Could you rephrase the question, please?

**5 Q. Yeah, the -- it refers to -- we have change**
**6 of scope drawing change risk at Dry Ridge for**
**7 Buckland.**

**8 First of all, did you have -- I mean,**
**9 we have change orders from Orbital. Were you**
**10 getting design changes during the project from**
**11 Orbital at the Morris facility?**

12 A. Yes.

**13 Q. Yeah. And work that AC&S did in response**
**14 to design changes would be an extra, correct?**

15 A. Yes.

**16 Q. The next paragraph is on crane costs. They**
**17 used cranes while you were there, correct?**

18 A. Yes.

**19 Q. Did you think that AC&S had an overuse of**
**20 crane time on the project?**

21 MR. MICHAELS: Objecting again to the
22 scope, but you can go ahead and answer, Kevin.

23 A. Yeah, there -- there was a crane -- a very
24 expensive crane. The hourly rate is very high.

1 It's quite a large machine and it was used -- it's
2 used primarily for -- for unusual circumstances.
3 It's quite a large crane.
4         It was left on location because what I
5 was told, it was left there because they didn't
6 have anywhere to take it.  They didn't want to haul
7 it back to their shop and then take it to another
8 project.  They wanted to just take it straight from
9 that project to another project, and that crane was
10 used often and it wasn't needed.
11        I mean, that -- the work could have
12 been done with a smaller unit, less expensive unit,
13 but because that one was there, the crane company
14 had -- I assume they had some kind of deal with ACS
15 that "We'll use this one since it's there," you
16 know, so yes.
17        Back to your original question, yes.
18 In that -- in that regard, yes.
19    Q.  Do you know whether ACS procured a reduced
20 rate for that crane since it was already on-site?
21    A.  I do not know that.
22    Q.  Okay.
23    A.  Again that was after I left.
24    Q.  Can we -- can we agree, Mr. Dunn, that work

1 incurred by AC&S due to inaccuracy or ambiguity in
2 the Orbital documents would be an extra?
3         MR. MICHAELS:  Objection.  Calls for a
4 legal conclusion.  Speculation.
5    Q.  Go ahead.
6    A.  Yes.  I would have to, you know, see that,
7 review that, you know, on a case-by-case situation
8 is normally how I would do that.
9    Q.  Okay.  And that's -- you did that on
10 occasion while you were in charge of the project,
11 right?
12    A.  Yes.
13    Q.  Do you remember any instance on this
14 project where ACS came to you and said, "We've
15 incurred additional time or cost because of an
16 Orbital drawing mistake, ambiguity, or lack of a
17 drawing" that you failed to approve the extra work
18 order?
19    A.  No, I don't.
20    Q.  Now, I want to get back to something we
21 discussed earlier with relation to CEC.  And if I
22 recollect your testimony --
23         MR. BRUMLEY:  You can take that
24 document off.

1    Q.  -- you said that CEC was brought in to
2 assist ACS and was paid for by CNX.  Is that -- do
3 you recall that?
4    A.  Yes.
5    Q.  Now, the measurement that CEC was doing,
6 was it needed to complete project work because of
7 the lack of design or inaccurate design from
8 Orbital?
9    A.  I don't know that.  They were brought in to
10 help with field verification, and I'm not sure how
11 much of it was needed and how much of it wasn't,
12 but it was all done as part of the job.  Every
13 piece was verified, and -- yeah.  I'm not sure
14 where there were -- where there were measurement
15 busts, so to speak.  Those were passed onto the fab
16 shop, and if they were caught ahead of time, it
17 wouldn't have caused extra work, you know.  It
18 would have -- it would have been caught on the
19 spot.
20    Q.  Do you recall instances where you were
21 involved during the project and ACS had to actually
22 do field designs for connections, tie-ins, and that
23 type of work because there were no detailed Orbital
24 designs laying out how to do that?

1         MR. MICHAELS:  Objection to form.
2 Objection to scope.  Outside the scope.
3    A.  Yes.
4    Q.  And would that be an extra?
5    A.  Yes.
6    Q.  Mr. Dunn, did you ever have communications
7 with anybody at CNX regarding Orbital's performance
8 and production of design documents on this project.
9    A.  No.
10    Q.  Are you aware for some of -- I guess you
11 wouldn't have been in the loop for design changes
12 that Orbital submitted, whether they originated
13 from CNX Engineering or were something that Orbital
14 decided needed changed; is that fair?
15    A.  Yes.  I would not have been part of that
16 design.
17    Q.  So, Mr. Dunn, were you aware whether or not
18 there were meetings regarding design changes during
19 the ongoing construction project?
20         MR. MICHAELS:  Objection.  Outside of
21 scope.
22    A.  Yes.
23    Q.  Can you help me understand why you, as the
24 person that knew the project best, wasn't included

1  in those meetings?

2      A.  I'm asked -- I'm asked -- in my role, I'm

3  asked to perform the job as it's handed to me.

4  I'm -- I'm not an engineer.  I'm not a designer.

5  I'm the guy that gets it done once it's designed.

6          So as -- as these designs came out and

7  I received them, you know, once -- once I received

8  them and approved drawings, I realized the scope,

9  you know, what needed done, and we, you know,

10  initiated the work, you know, to be done, (Audio

11  distortion) and I am not -- though I have a lot of

12  knowledge about the design, I'm not included in

13  those conversations.

14      Q.  How much lead time was there between --

15  on -- during the course of the project between work

16  that needed to be done and receiving the Orbital

17  design?  Like would they get those a couple days

18  before that portion of the work, or a week or --

19  you know --

20      A.  I mean, it was -- I mean, the work was done

21  soon after the design was -- was -- came out, you

22  know, as an approved IFC drawing.

23      Q.  Okay.  And help me understand the IFC

24  drawings, like, the design.  We have designs that

1  are being provided on June 7th of 2019.  Is that

2  design document an IFC drawing?

3      A.  I don't know.  If they're presented -- are

4  they presented as an approved drawing, or is it a

5  concept drawing, or is it -- you know, I don't

6  know.

7      Q.  It would depend on the drawing then?

8      A.  I don't know the gist of it, so, you know,

9  I was -- I may be talking to Carissa about the

10  project and she may mention to me that something is

11  coming up, you know, "We're going to add a valve

12  here," or a -- you know, it was normally a surprise

13  to me that, you know, there was -- you know, the

14  (Audio glitch) coming.

15          And then, you know, later on down the

16  road, I may ask, you know, "Well, what about those

17  drawings, you know.  Are we still going to do

18  that?"  "Yes, it's coming."  The drawings would

19  show up and, you know, we'd order the materials

20  immediately because of the time frame, and, you

21  know, get started on it.

22          It may involve equipment, it may

23  involve piping that had to be ordered.  It may

24  involve, you know, valves and that kind of thing,

1  so, you know, the order would go in that there

2  could be a lead time getting the purchased

3  equipment, and that would give us time to fabricate

4  the pipe.  So that's normally how it's done.  But I

5  wasn't part of like deciding who -- you know, what

6  was needed where.  I -- you know, that kind of

7  thing.

8      Q.  Sorry about that.  That question was really

9  good.  I wish I wasn't muted when I said it.

10          Are you aware that if CNX had its own

11  internal calculations of cost of completion during

12  the progress of this project?

13          MR. MICHAELS:  Objection.  Outside the

14  scope.

15      A.  Could you repeat the question, please?

16      Q.  Yeah.

17          Did CNX have its own internal cost of

18  completion estimates for this project?

19      A.  Yes.

20      Q.  Okay.  Who -- who did those?

21      A.  I'm not sure who did it at the -- at the

22  corporate level, but we provided the information

23  from the field to a person who compiled it, and

24  then -- with other projects and would, you know,

1  submit that to upper management.

2      Q.  Is that how funds were allocated to the

3  project?

4      A.  I don't know how funds are allocated to the

5  project.

6      Q.  Do you know what those cost of completion

7  estimates were at any point in time?  Were you made

8  aware of those numbers?

9      A.  Yes.

10      Q.  How were you --

11          (Crosstalk.)

12      Q.  How were you aware of them?

13      A.  Basically using the David Larkin cost of

14  completion form that he would submit.  I think

15  there were three of them maybe that I saw.  And

16  (audio distortion) we would use that as a basis to

17  put together a cost tracking spreadsheet and submit

18  that to upper management.

19      Q.  Was the -- was the cost of completion that

20  you referred to on the internal spreadsheet

21  something that was discussed with you?

22      A.  No.  Like I said, my -- my wife was working

23  in the office as an admin -- you know, like an

24  office clerk, administrator, whatever, and she

1 would get that information. I would see it and
2 pass it on to her. She would compile it on a
3 spreadsheet and then forward it on to -- to the
4 management team, and I don't know what happened to
5 it after that.
6    Q. Do you know whether -- do you recall
7 whether those numbers that you're referring to were
8 in line with or tracked the Larkin cost of
9 completion estimates or not?
10    A. Yes, they were.
11    Q. So it wasn't any -- you were aware on
12 behalf of CNX as well as the others in that
13 communication loop as to how the cost of
14 completions were being modified.
15       MR. MICHAELS: Objection. Calls for
16 speculation. That wasn't his testimony about
17 whether something was modified.
18    Q. Go ahead, Mr. Dunn.
19    A. Yes, but the backup doc -- you know, the
20 process had to stay intact of identifying extras,
21 creating a field ticket, creating a change order,
22 (Audio distortion) signing off on it, and that --
23 that process was not followed through with.
24 Therefore, I couldn't be sure that that's the right

1 number or not because it was not tracked after a
2 certain point in time.
3       It's only an estimate. So the -- the
4 Larkin is an estimate. The Larkin CAC was an
5 estimate, and, yes, we used his estimate to
6 forecast -- you know, to warn the upper management
7 that, hey, these -- these invoices will be showing
8 up, you know, at some point, but, you know, what
9 they did with that information is -- I don't know.
10    Q. And in -- the work on those invoices, to
11 your knowledge, was complete and --
12       MR. MICHAELS: Objection.
13       (Crosstalk.)
14       MR. MICHAELS: Those documents aren't
15 before him. Calls for speculation.
16    Q. Go ahead, Mr. Dunn.
17    A. Every document that I signed, I -- I was --
18 I understood it to be extra work. I understood it
19 to be -- to be paid for, and anything that I did
20 not sign, I -- I cannot speak to because I
21 wasn't -- I didn't see it happen. I don't -- you
22 know, I don't know how many, how often, how -- you
23 know, what equipment, so I was not able to sign off
24 on those.

1    Q. Okay. Well, so from -- you know, you've
2 done other projects similar to this one, correct?
3    A. Yes.
4    Q. And when you left in July, the charges to
5 this contract were in the 14 million range based on
6 the work left to be done. Does the 19 million
7 number seem out of line to you?
8       MR. MICHAELS: Objection. Calls for
9 speculation. Improper hypothetical.
10    A. Yes, I -- I wouldn't know without being
11 there.
12    Q. As far as the status of the design
13 documents in this case, Mr. Dunn, do you find that
14 they were less developed than the other projects
15 that you've worked on?
16    A. Yes.
17    Q. Did you ever raise that issue with
18 management at CNX?
19    A. No.
20    Q. Did ACS provide additional services to make
21 up for that deficiency in this project?
22    A. Yes.
23    Q. I think last question, Mr. Dunn, would you
24 be able to go back and look at the billings from

1 the time you were on the project and identify how
2 much of those billings were original scope work?
3    A. Yes. It would take some time, though.
4    Q. You didn't do that because you didn't need
5 to track it, as if you were under the contract
6 amount, it didn't matter whether it was original
7 scope work or extras, correct?
8       MR. MICHAELS: Objection to form. A
9 compound question.
10    A. Yes, that's correct.
11    Q. All right. I think I'm done.
12       MR. BRUMLEY: Hold on one second,
13 Greg.
14       (Discussion held off the record.)
15       THE VIDEOGRAPHER: Do you want to go
16 back on the record?
17       MR. BRUMLEY: Yeah.
18       THE VIDEOGRAPHER: I'm sorry. We
19 never went off the record.
20       MR. BRUMLEY: I didn't think we did.
21       THE VIDEOGRAPHER: My fault.
22       MR. BRUMLEY: I don't have any further
23 questions at this time, Mr. Dunn. I want to thank
24 you for bearing with us today on the video format.

1 It's way harder to do that -- this by video than it
2 is in person where we could show each other
3 documents and have a more natural conversation.  So
4 thank you for your effort with us here today.
5          THE DEPONENT:  You're welcome.
6          MR. MICHAELS:  I just do have a few
7 here, Chris, if you are done.
8          MR. BRUMLEY:  Unless you raise some
9 issues that I need to redirect, I'm done.
10          EXAMINATION
11 BY MR. MICHAELS:
12     Q.  Okay.  Kevin, thank you very much for your
13 time today hearing us both as we navigated these
14 technological issues.
15          Just to be -- just to be clear.  This
16 project, the expansion of the Morris Compressor
17 Station was bid on a time and materials basis with
18 a not to exceed price.
19     A.  That's correct.
20     Q.  And it was awarded by CNX to ACS on a time
21 materials basis with a not to exceed price; is that
22 correct?
23     A.  Yes.
24     Q.  And anything that would be deemed outside

1 the scope was to be addressed using the change
2 order process.
3     A.  Yes, that's correct.
4     Q.  And that process was followed while you
5 were in place as foreman with ACS?
6     A.  Yes.
7     Q.  And was that captured through any
8 particular log?
9     A.  Yes.
10     Q.  What log was that?
11     A.  There was a change order log that was kept.
12     Q.  Is that different or the same as the extra
13 work log that's been referred to?
14     A.  I believe it's different.
15     Q.  Okay.  But in your understanding what you
16 had signed off on was in the -- not -- not in
17 contract log?
18     A.  Yes.
19     Q.  And you had been asked by counsel about
20 some hypotheticals and specifically was the -- I
21 want to say that was Exhibit 7, or what was -- or I
22 guess it was Exhibit P.  I don't know the number.
23 I apologize for that.
24          ACS's explanation for how they arrived

1 at their 12 million price.  You're not aware of or
2 you don't have firsthand knowledge about why they
3 lowered their price or arrived at that number.
4     A.  No, I do not.
5     Q.  And you don't have any knowledge of how
6 they got down there or what contingencies they
7 removed or assumed or anything of that nature.  You
8 don't have personal knowledge of that.
9     A.  No, I don't.
10     Q.  Now, the hypotheticals asked by you of
11 counsel were some scenarios of what qualified as
12 extra work potentially outside the scope, and he
13 asked generally what they were.
14          If that was to be considered, you
15 would look at those -- let me rephrase that.
16          What would you look at to consider
17 that on an individual basis?
18     A.  I would have to compare the bid documents
19 to the actual work that was performed, the specific
20 nature of each -- each particular item.
21     Q.  So in some instances, something that could
22 be considered extra work in one instance, based
23 upon the circumstances, could be not extra work
24 under different circumstances,

1     A.  Yes.
2     Q.  So it would take an individual assessment
3 of the circumstances involved with each and every
4 aspect of that.
5     A.  Yes.
6     Q.  Okay.  So we can't make a blanket statement
7 saying anything due to weather is necessarily
8 something a delay that would constitute extra work.
9     A.  Yes, I would agree.
10     Q.  And, likewise, that would be -- come for
11 different delays maybe in design drawings being
12 provided.
13     A.  I'm sorry, Greg, please repeat.
14     Q.  I apologize for that.  That was poorly
15 worded.
16          But that would be the same
17 circumstance that whether a design drawing was
18 provided on time or on a different time frame, that
19 would be assessed on an individual basis whether
20 that constituted extra work or something outside
21 the scope.
22     A.  Yes.
23     Q.  Mr. Dunn, are you aware of any time that
24 this project was no longer a T&M with a not to

Page 161

1 exceed pricing?

2    A.  No.

3        MR. MICHAELS:  That's all my

4 questions.

5        MR. BRUMLEY:  No follow-up.

6        THE VIDEOGRAPHER:  This concludes the

7 deposition of Kevin Dunn.  We're now off the

8 record.  The time is 3:01 p.m.

9        (Deposition concluded.)

10        (Having indicated he would like to

11        waive his right to read the deposition

12        before filing, further this deponent

13        saith not.)

14

15            --oOo--

16

17

18

19

20

21

22

23

24

Page 163

1 STATE OF WEST VIRGINIA

2 COUNTY OF KANAWHA, to wit;

3

4        I, Teresa Evans, owner of Realtime

5 Reporters, LLC, do hereby certify that the attached

6 deposition transcript of KEVIN DUNN meets the

7 requirements set forth within article twenty-seven,

8 chapter forty-seven of the West Virginia Code to

9 the best of my ability.

10

11        Given under my hand this _____ day of

12 _____, 20_____.

13

14

15            /s/ Teresa Evans

16

17        _____

        Registered Professional

18        Reporter/Certified Realtime Reporter

19

20

21

22

23

24

Page 162

1 STATE OF WEST VIRGINIA

2 COUNTY OF CABELL, to wit;

3

4    I, Jaime L. Stroud, a Notary Public within and
for the County and State aforesaid, duly

5 commissioned and qualified, do hereby certify that
the foregoing deposition of KEVIN DUNN was duly

6 taken by me and before me at the time and place and
for the purpose specified in the caption hereof,

7 the said witness having been by me first duly
sworn.

8

9    I do further certify that the said deposition
was correctly taken by me in shorthand notes, and

10 that the same were accurately written out in full
and reduced to typewriting to the best of my

11 ability, and that the witness did not request to
read his transcript.

12

13    I further certify that I am neither attorney or
counsel for, nor related to or employed by, any of

14 the parties to the action in which this deposition
is taken, and further I am not a relative or

15 employee of any attorney or counsel employed by the
parties, or financially interested in the action,

16 and that the attached transcript meets the
requirements set forth within article twenty-seven,

17 chapter forty-seven of the West Virginia Code.

18

    My commission expires February 19, 2023.

19

20    Given under my hand and seal this _____ day

21 of _____, 20____.

22

23

24 Jaime L. Stroud, RPR, Notary Public

**Exhibits**

**Exhibit 1**  4:3,4 57:6, 8,11 66:9

**Exhibit 2**  87:9,12,13

**Exhibit 3**  96:24 97:1, 5 103:11

**Exhibit 5**  130:11,14

**Exhibit 7**  142:7,10 158:21

---

**$**

**$14,100,000**  64:16

---

**-**

**--ooo--**  161:15

---

**1**

**1**  5:4,23 49:10 57:6,8, 11 66:9 69:4 88:7,23 99:6 108:13 117:3

**1.6**  80:12

**1.9**  80:12

**10**  132:11 133:1

**10/29/57**  13:22

**100**  22:7 80:18

**10:14**  36:13

**10:25**  36:19

**10:31**  97:13

**10:44**  56:3,11

**10:54**  56:5

**10:57**  56:21

**11**  78:23 80:7 89:6

**11:05**  57:3

**11:53**  86:12

**12**  78:21 79:4,21 81:11,17 85:5 159:1

**12.1**  123:17

**12.4**  106:3,8,24

**12.8**  123:21,23 131:23 132:17,19 133:3,4,17, 20 134:2

**12:30**  97:9 98:15

**12:32**  86:18

**12:35**  98:23

**12:50**  97:22

**1395**  8:17

**14**  15:6,7 20:10 49:10, 16 79:3 81:18 155:5

**14.1**  131:23 132:17 134:2

**14th**  20:9 88:7,11

**15301**  8:17

**16th**  135:24

**17th**  20:10

**18**  24:1 36:24 37:4 45:20

**19**  32:14 33:13,22 84:13 88:8 96:14 118:21 119:4 155:6

**19.1**  138:22 139:20

**1:37**  124:17

**1:44**  124:23

---

**2**

**2**  15:18 36:18 63:7 87:3,9,12,13 88:23 100:14 104:21 142:8, 15

**2.2**  104:22 105:7

**20**  14:5

**2010**  18:21

**2011**  18:20,21

**2013**  15:4 20:7

**2014**  22:15

**2018**  24:1 50:2,8 68:21

**2019**  24:2 84:3 89:6 93:2 97:3 99:7 117:3 142:8,15 150:1

**2020**  5:9

**22nd**  5:9

**23-year**  27:24

**25**  8:20

**26th**  58:9 97:3 99:7

**29**  14:5

**2:15**  141:16

**2:20-CV-00290**  5:6

**2:27**  141:22

---

**3**

**3**  57:2 69:1 86:17 96:24 97:1,5 103:11 121:9

**3.9**  107:7 108:6,21 110:10

**30**  14:5 15:9,23,24 86:4

**31st**  88:19,20

**3:01**  161:8

**3D**  141:3,6,8

---

**4**

**4**  15:19 69:2 71:20 103:13,19,22,23 104:2,19 124:22

**40**  41:13 61:3

---

**5**

**5**  36:9 121:9 130:11, 14 141:21

**5/13/19**  100:8

**50**  22:7 39:4 40:17

**500,000**  71:21

**57**  15:21

---

**6**

**6**  134:20,21,24

**60**  33:18 41:9,11,18, 21,23 42:9,23 45:6 48:3,15,20 58:18 59:1 61:4,17 131:4,8

---

**7**

**7**  142:7,10 158:21

**70**  45:6

**72**  104:24

**72-inch**  105:9

**73**  15:18

**77**  15:20

**7th**  150:1

---

**8**

**80**  45:6

---

**9**

**90**  131:7,9,18

**9:30**  5:14

**9th**  50:8

---

**A**

**a.m.**  5:14 36:13,19 56:21 57:3 86:12 97:13

**ability**  11:4 29:8

**absence**  127:9

**Absolutely**  126:6

**AC**  96:19

**AC&S**  84:5,15 96:1 101:24 113:6 115:4 121:5 137:24 138:18, 22 139:19 144:13,19 146:1

**AC&S's**  49:21 137:12

**acceptable**  96:4

**access**  41:5 47:7

**account**  111:23 132:8

**accounting**  73:24 74:4

**accumulated**  90:24

**accuracy**  67:20

**accurate**  12:1 17:6,7 23:16 105:22 117:3 131:17 140:5

**achieve**  44:3

**acquainted**  6:11

**ACS**  5:19 6:13 8:2 26:7,12 39:24 40:9 41:4 63:10 65:7 68:12 69:23 70:6,13 71:11 83:24 92:7 93:19 95:2 96:4,16 97:2 99:7,16, 19,21 100:1 101:10, 16 104:9 111:23 118:8,9,12 120:20 123:9 124:4 125:10 126:9 128:2 130:12, 21 137:16,19 139:19 145:14,19 146:14 147:2,21 155:20 157:20 158:5

**ACS's**  64:16 109:22 136:14 158:24

**Action**  5:5

**active**  52:13

**activities**  112:16 132:12

**actual**  8:1 9:6,21 73:3 100:15 101:7 105:14 106:18 117:15 159:19

**Adam**  5:10 40:8 142:13 143:9,13

**add**  71:4 72:8,15 91:18 114:15,16 136:24 137:10 150:11

**added**  30:18 44:20 71:8 79:17

**adding**  28:23,24

**addition**  40:9

**additional**  80:22 90:13 114:7 128:19 141:9 146:15 155:20

**address**  8:16,19 24:22 54:13

**addressed**  130:22 158:1

**admin**  152:23

**administrator**  152:24

**admonition** 27:9

**advise** 113:6

**advised** 33:19 112:3 113:10

**AFC** 83:19

**affect** 11:4 95:9 126:1

**affiliated** 17:23

**afield** 109:11,19,20 110:1

**afternoon** 65:20

**agree** 12:19 71:4,5 72:24 73:3,21 109:18 116:18 132:17 145:24 160:9

**agreed** 59:15 74:19 77:3 79:15

**agreeing** 73:5

**agreement** 7:7,8,13 8:1 12:21 59:16 73:18

**ahead** 12:3 42:16 55:5 57:22 69:20 78:5 89:23 94:4 95:6 101:3 112:9 120:7,15,17 126:7 132:24 133:10 135:16 136:21 137:5 144:22 146:5 147:16 153:18 154:16

**air** 108:23

**Aldridge** 5:19 129:11,14 134:18

**allocate** 71:13

**allocated** 75:4 152:2, 4

**altered** 121:19

**Alvarez** 13:9 143:8

**ambiguity** 146:1,16

**America** 8:23

**amount** 59:20 64:18 69:15 73:9 74:19 75:5 76:10 77:2,10,12,17 78:10,17 80:7,15 81:11,20 84:15,22 85:7 107:13 118:20 123:19 156:6

**amounts** 7:22 49:12 84:21

**anchor** 99:17

**answering** 27:20 128:24 129:3

**answers** 22:6 139:13

**anticipated** 83:20

**apologize** 23:11 158:23 160:14

**appeared** 24:22

**appears** 6:19 104:11 117:9 136:2,22

**applied** 5:4 76:4 120:24

**apply** 60:15 61:21 106:12,13,19

**approval** 100:10 101:9 119:21 127:2

**approvals** 127:3

**approve** 146:17

**approved** 62:23 71:12 72:23 79:23 101:13 102:1 120:23 121:1 126:19,24 138:23 140:2,3 149:8, 22 150:4

**approving** 63:18 73:8 81:9 101:3 126:11,23

**April** 135:24

**area** 29:18 59:13 116:12

**areas** 82:5 142:1

**arrived** 125:3,10 158:24 159:3

**aspect** 160:4

**assessed** 160:19

**assessment** 160:2

**assign** 70:24 71:11

**assigned** 21:8 101:16 120:8

**assist** 147:2

**assistant** 24:7

**Associates** 99:18

**assume** 15:18 49:1 67:6 93:9 145:14

**assumed** 94:19 95:2 159:7

**Assumes** 69:18 89:19

**assuming** 106:11

**assumptions** 60:3

**Aston** 126:17

**attachment** 57:5 58:2 130:8

**attended** 37:13

**attending** 143:1

**attention** 34:10 70:20 95:14 143:22

**Aubuchon** 40:8 142:14

**audio** 8:19 26:14 49:3 54:16 55:15 57:21 63:1 67:2 70:3 73:6 79:8 86:1 89:19 105:21 108:4 116:7 122:13 141:13 149:10 150:14 152:16 153:22

**audit** 137:16 139:3,5

**author** 132:21

**authority** 114:6,14,18

**authorized** 74:15

**Avenue** 8:17

**avoid** 58:6

**award** 68:20,24 131:19

**awarded** 63:10 78:18 118:9 131:14 157:20

**awarding** 124:3

**aware** 36:22 37:7,10 45:24 64:17,20 75:15 76:17,20,21,23 84:15 89:22 93:18 94:5 101:18 102:3,5 106:22 113:16,21 123:17 126:22 127:1 128:10,13,18 138:13 148:10,17 151:10 152:8,12 153:11 159:1 160:23

**B**

**back** 7:18 13:14 27:22 30:11 35:6 36:18 44:19 45:19 57:2 58:15 68:22,24 69:6 75:13 86:17 90:19 91:14 99:8 107:1 114:1 124:22 135:20 141:21 143:4 145:7, 17 146:20 155:24 156:16

**backflash** 136:7

**background** 14:24 15:8,17 17:10

**backup** 100:23 101:7 119:9 153:19

**bad** 28:6 123:21

**balances** 68:8

**base** 12:18 37:2 43:15 76:1 78:14 117:22

**based** 21:3 33:16 48:6 58:24 60:4 75:19 77:7 82:21 107:2 118:22 126:9 131:13, 15 139:21 141:1 155:5 159:22

**basic** 28:9

**basically** 26:19 152:13

**basing** 31:19

**basis** 25:22 76:5 78:3 92:5 115:24 139:21 152:16 157:17,21 159:17 160:19

**bearing** 156:24

**Beck** 40:8 142:13 143:9,13

**bedtime** 37:12

**beginning** 15:6 83:4 116:4

**begins** 36:17 57:1 86:16 124:21 141:20

**behalf** 5:19 91:9 153:12

**belief** 109:21

**believed** 100:2 124:4

**bell** 143:14

**benefit** 27:13

**bid** 37:5,17 40:1,10, 21,23 41:4,5,7,22,23 45:19,20 46:8 47:4,16 49:6,18,21 57:9,18 58:8,9 59:5,19 64:10, 16,18 69:4 75:5 78:21 80:23 91:18 93:20,23 104:9 108:14 111:10 118:9 124:4 128:23 131:19,22 132:8,16 134:1 157:17 159:18

**bid's** 131:14

**bidder** 62:4

**bidder's** 37:19

**bidders** 41:1,20 45:22 49:20 58:16 60:9,10 61:7,18 64:10 93:19 128:24

**bidding** 40:19 41:8 42:1 138:8

**bids** 17:11 19:18 37:3,14 39:16,23 40:6 41:2 46:9 47:1,2,24 49:3 50:1,7,10 62:12 64:14 124:6 131:6

**big** 13:17 16:3 39:5,7

**bigger** 122:7

**bill** 71:24 79:16

**billed** 72:12 85:7 101:9

**billing** 70:24 101:16 122:21

**billings** 155:24 156:2

**birth** 6:19 13:21

**bit** 17:10 23:4,9 46:16, 19 63:5 84:11 85:23 90:16 109:11,19,24 131:10

**blank** 108:13,18

**blanket** 160:6

**blueprints** 60:24

**board** 42:16,20

**bolts** 99:17 101:4

**bore** 110:15,16

**born** 15:21

**bottom** 100:7 130:7 142:23

**bounce** 66:2

**break** 13:3,5,10 36:6 77:23 85:20 86:4 119:19 124:14

**briefly** 36:1

**bring** 50:7 70:20 114:24

**bringing** 102:11

**broad** 14:9,15 29:16

**broke** 63:2 85:17 89:4 128:16

**brought** 68:11 70:1,2 128:3 140:4 147:1,9

**Brumley** 5:18 6:9,13 36:4,8,20 46:23 50:6, 16 51:14,17 54:18 55:3 56:18 57:4,12 58:6 62:9 69:3 78:4 85:19 86:2,9,19,21 87:3 93:15 96:23 99:4,5,11 103:5,8,12, 16,20 104:3 109:13 110:5,6 113:14 114:12 124:13,24 126:6 129:9,12,16 130:15 134:16,19 139:4,11,15 141:14, 23 146:23 156:12,17, 20,22 157:8 161:5

**Buckland** 19:20 20:1 144:7

**budget** 106:22

**budgeted** 59:20 76:10

**build** 18:1 42:22 70:6 93:13

**builder** 112:14

**building** 14:10 48:7 60:22 112:10

**buildout** 19:21 48:16

**buildouts** 19:11

**built** 18:13 19:1 65:10

**burn** 95:22

**burned** 96:1

**business** 9:14,16 14:6 112:2

**busts** 147:15

**busy** 42:18

**button** 27:15 52:15

**buy** 73:12

**C**

**CAC** 154:4

**calculable** 93:7

**calculate** 107:1

**calculated** 72:22 79:24 80:24 106:23

**calculation** 118:23

**calculations** 151:11

**call** 7:19 26:11 27:11 28:10 56:16 138:11

**called** 6:5 14:1 40:22 41:9

**calls** 31:19 76:13 77:19 78:3 92:9 94:1, 3 105:1 121:13 126:20 132:20 133:7 136:19 146:3 153:15 154:15 155:8

**camera** 46:15

**capabilities** 29:1

**capacity** 30:6

**captured** 158:7

**care** 115:6

**career** 13:15,18 21:15

**Carissa** 25:17,23 38:19,24 39:5 40:7 43:2 44:23 68:16 142:13 143:8,13 150:9

**Carlisle** 128:2

**case** 7:20 9:19,22 11:14 19:19 23:7 24:15 30:14 60:24 135:4 137:17 155:13

**case-by-case** 146:7

**case-ons** 112:19

**catchers** 104:24 105:10

**category** 63:7 71:20 79:17

**caught** 147:16,18

**caused** 79:21 83:21 92:17 96:16,17 136:7 147:17

**causing** 125:10

**caution** 142:23

**CB** 27:14

**CEC** 67:14 68:11,14 69:9 70:2,4 141:9 146:21 147:1,5

**CEC's** 69:17

**center** 125:14

**center's** 126:1

**certificate** 6:19

**certificates** 21:17,18

**chance** 24:16 51:12 85:24 123:23

**change** 7:22 20:18 21:3 45:13,16,17 63:23 64:5 70:10 71:11,13 72:6,11,15 73:19 74:15 75:14 77:22 79:16,17 80:10, 12,14 81:5,7,14,16 91:18 92:8,18 93:24 96:5 105:19,20,23 106:12,14,19 109:15 113:17,19,24 115:11, 12 116:10 119:17 144:2,5,6,9 153:21 158:1,11

**changed** 9:4 20:24 21:1 79:11,23 140:21 148:14

**changing** 8:24 81:20

**characterization** 88:24

**charge** 63:17 77:17 83:10 105:12 120:2 126:21 146:10

**charges** 71:19 73:12 155:4

**Chase** 40:8 142:14

**chatroom** 11:16

**checks** 68:8

**Chilcote** 5:22

**chin** 46:19

**Chris** 5:18 6:13,22 51:11 53:16 58:1 99:1 103:10 109:10 157:7

**Chris's** 56:16

**circulation** 78:3

**circumstance** 160:17

**circumstances** 145:2 159:23,24 160:3

**civil** 5:5 14:14 88:8 89:6,7

**clarification** 38:23 40:23

**clarified** 47:10

**clarify** 12:11 65:15

**clean** 29:19

**clear** 113:8,11,23 119:18 157:15

**clerk** 152:24

**client** 33:17

**client's** 49:6

**closely** 119:12

**CN&S** 113:24

**CNX** 5:3,22 6:15 8:2, 22 9:2,15,17 11:20 13:14,15,18 16:2 17:24 18:22 19:10,13, 14 20:4,11 21:14 22:2,14,22 23:14,17 24:18 25:1 31:3,5,7, 19 37:8 38:5,8,10,17 39:3 43:7 45:14 47:1 50:1,9 54:9 55:1 62:3 64:17,23 69:22 70:2 73:24 74:13 76:10,18, 23 83:10 87:21 93:19 94:10 96:17,19 101:12 113:17 114:5

117:20 123:1 125:2 130:22 132:18 134:1 136:23 137:16 147:2 148:7,13 151:10,17 153:12 155:18 157:20

**CNX's** 68:12 109:21

**CNXM** 58:23

**coal** 16:9

**coffee** 36:9

**cognizable** 11:6

**collect** 91:6

**collecting** 91:2

**collects** 91:3

**college** 15:10

**column** 108:11

**comfortable** 55:7 102:23

**comment** 83:8 131:12

**common** 122:2

**communicate** 43:23 63:12 65:24 73:23

**communicated** 34:24

**communicating** 44:24

**communication** 25:23 26:7,10 38:20 43:17 45:15 63:5,8 142:20 153:13

**communications** 10:17 34:17,20 148:6

**companies** 40:1

**company** 13:16,17, 24 14:11 29:24 58:24 63:6 99:18 113:12 145:13

**compare** 47:24 159:18

**compared** 59:19

**competition** 40:18

**compile** 153:2

**compiled** 151:23

**complete** 41:10,24 42:23 72:3 77:16 80:5 89:10 128:19 135:15 147:6 154:11

**completed** 72:5 78:16 81:22 84:4,12 89:7 106:7

**completely** 60:4 138:1

**completion** 33:12 72:13 74:16 76:19 96:19 117:2,8,14 118:12,16,20 119:4 121:8,10 127:13 139:20 151:11,18 152:6,14,19 153:9

**completions** 153:14

**complex** 143:19

**component** 118:3

**components** 44:21 83:11 89:12 107:19

**compound** 156:9

**compress** 28:16

**compression** 28:23 30:20 33:16

**compressor** 10:9 17:5 28:16 29:12 48:7 50:10 66:14 95:22 96:2 112:11,14 157:16

**compressors** 99:17

**con** 78:18 133:5

**concept** 49:14 77:5 78:11 150:5

**conceptual** 92:5

**concern** 76:8

**concerned** 62:22 95:21

**concerns** 76:18

**concluded** 161:9

**concludes** 161:6

**conclusion** 94:2 133:8 136:20 146:4

**concrete** 128:19 138:12

**condition** 92:8,16

**conditions** 11:4

**conduct** 7:15

**conducted** 5:7

**conferencing** 5:8

**confirm** 5:15

**confusion** 58:6

**connected** 56:9

**connection** 6:11 28:6

**connections** 90:8 147:22

**considered** 21:2 74:20 84:17 96:7 127:19 159:14,22

**constitute** 7:7 160:8

**constituted** 160:20

**constraints** 42:6 111:2

**constructed** 24:1

**construction** 15:4 11:20 14:8 15:10 16:1,6,20 19:4,5 21:8, 12,13,15 22:14 32:23 33:12 39:23 40:11 44:19 46:10 59:13 60:19 61:2,6,19 63:6 74:11 80:20 94:11 132:12 148:19

**consulted** 129:2

**consumed** 143:19

**consuming** 111:3

**contact** 43:20 65:11, 12

**contained** 135:3 138:23

**contended** 138:22

**contending** 117:21

**contends** 121:5 137:19 139:19

**context** 131:11

**contingencies** 64:18 93:20,22 133:5,18 159:6

**contingency** 93:12 94:8 132:11 133:1 139:6

**continue** 127:9,12

**continued** 36:15 56:23 86:14 102:4 124:19 141:18

**continuing** 110:2 139:12

**contract** 7:6 17:11 60:14 73:11 75:16 77:7,17 78:9 81:11 84:22 85:5 93:24 99:22 105:19 106:16, 18 109:16 123:17 135:11 137:13 155:5 156:5 158:17

**contractor** 14:1,12 25:3 42:15,19 47:7 48:4 59:19 60:2,21 61:20,24 62:3,8,12,21 66:10,16,20 68:6 69:11 77:13,15 78:8, 19 82:6,18 93:9 94:17,20 104:9 123:10 132:7

**contractors** 18:13 41:4 108:14 111:15

**control** 17:1 125:14, 24

**conv** 14:14

**conversation** 11:10 25:11,16 113:23 157:3

**conversations** 10:15,17 22:21 140:23 149:13

**coordinate** 62:24

**coordinating** 44:15

**coordinator** 20:19

**copied** 35:4,7

**core** 9:1

**corner** 52:10

**corporate** 8:23 151:22

**correct** 11:12,18 12:2 15:5,22 17:2 20:6 24:24 25:9 31:8 32:12

37:3 43:16 58:19 63:8,19 68:9 69:12,13 71:17 72:10,13 75:24 78:12 79:1,4 89:5 93:14,21 100:18 102:2 105:14,15 106:20 107:22 122:24 129:24 133:6,21 136:18 137:2,22 138:19 139:14 140:6 143:24 144:14,17 155:2 156:7,10 157:19,22 158:3

**correctly** 28:17 62:11 71:9 78:6

**cost** 47:14 48:12 49:1 59:10 60:17 72:7,8 73:3,13 74:16,21 76:18 81:10 100:15 101:5,6 118:12,16,20 119:4 146:15 151:11, 17 152:6,13,17,19 153:8,13

**costs** 49:1 61:22 72:19 73:10 75:2 76:4 77:13 93:13 111:24 118:24 137:16 138:22 139:20 144:16

**counsel** 5:14 10:18 22:21 158:19 159:11

**County** 50:11

**couple** 36:6 37:13 63:20 124:14 131:2 142:1 149:17

**court** 5:11 6:1 7:5 27:9,12,17 38:23 57:7 87:4 103:5,8,13 141:12

**covered** 68:15

**covers** 21:14

**crane** 144:16,20,23, 24 145:3,9,13,20

**cranes** 116:20,21 144:17

**created** 81:14 136:16

**creating** 153:21

**crew** 143:8

**cross** 74:18

**crossed** 50:24

**Crosstalk** 7:2 9:24 17:17 21:21 31:17 51:5,13 59:14 76:11 77:21 80:3 86:8 95:19 100:20 120:14 125:23 139:7,10 152:11 154:13

**cup** 36:8

**current** 8:21 59:1

**cursor** 52:13

**cut** 115:16

**cutting** 46:19

**D**

**daily** 32:1,5 65:8,13 116:7

**damage** 109:3

**dangers** 112:13

**date** 13:20 20:7 56:10 68:20,24 89:9 96:20 117:2,8 136:1

**dated** 50:7 97:2 99:7 135:24 142:8

**dates** 58:10 114:20

**Dave** 13:9

**David** 142:14 152:13

**Davis** 40:8

**day** 5:9 13:2 20:9 32:19 65:14,17,18 81:2

**day-to-** 81:1

**day-to-day** 115:24

**days** 66:7 149:17

**deal** 93:2 115:23 145:14

**December** 5:9

**decide** 44:4

**decided** 34:13 40:1 148:14

**deciding** 37:18 151:5

**decision** 33:3,6 39:18 48:10

**decisions** 68:17

**deemed** 71:13 106:9
140:19 157:24

**deeming** 100:11

**defendant** 5:3 6:5

**deficiency** 155:21

**define** 64:3

**degrees** 21:17

**dehy** 29:1,8 30:17

**dehydration** 29:10
30:18,20

**dehys** 48:8

**delay** 89:15 91:21
92:18 93:7 95:20
125:13,21,24 126:9
136:16 160:8

**delayed** 10:21 92:6

**delays** 43:4 83:14
89:11 93:1,3,10 94:9
132:13 137:1 160:11

**delivered** 125:2

**delivery** 62:24 83:20

**demand** 114:24

**demanding** 143:18

**demo** 50:5

**demolition** 112:17

**Dennis** 33:9 40:7
142:14

**departing** 35:21

**department** 21:12
74:4,5,11,12

**departure** 140:4

**depend** 150:7

**Depo** 57:6

**deponent** 36:7,11
46:17,20 52:22 53:6,
13,19,22 54:2,6,15
55:2,10,18 56:1,6,9
97:11,19,24 98:5,12,
19,22 102:16,21
103:1 130:3,9 157:5
161:12

**deposed** 23:8

**deposition** 5:2,7
6:14 7:11 9:8,19

10:12 23:16 25:8,19,
22 36:18 49:13 57:2,
8,10 86:17 87:9,12
93:18 96:24 97:1,4
103:23 104:1 109:12
110:2 112:7 120:6
124:22 130:11,14
134:21,23 135:13,15
141:21 142:7,10
161:7,9,11

**depositions** 27:11

**describe** 24:4 28:19
47:20,22

**describes** 57:23
99:17

**description** 45:23
120:22

**descriptions** 140:9

**design** 37:24 38:4,10,
11,18 40:24 41:24
42:10 43:5,8 44:20
45:16 58:18 59:1
60:20 62:13 66:16,21,
22 67:11 68:4,13
69:8,16 70:7 77:16
82:11,22 83:4,11
88:9,11,20 89:6,7,12,
16 107:13 117:11,21
121:18 125:4 131:15,
18 144:10,14 147:7
148:8,11,16,18
149:12,17,21,24
150:2 155:12 160:11,
17

**designation** 108:10

**designed** 149:5

**designer** 38:4,8
149:4

**designs** 62:1 82:24
90:7 123:2 147:22,24
149:6,24

**desirable** 41:24

**desired** 139:13

**desk** 91:7,11 116:5

**detail** 8:5 44:20
60:11,22 69:16

**detailed** 58:23 82:24
147:23

**details** 46:2 127:23

136:10

**determination**
110:21 113:3 140:15

**determinations**
91:17

**determine** 45:9 64:3
70:22 104:14 114:19
140:18

**determined** 70:19
71:10 77:12 105:12,
18 120:6

**determining** 40:5

**Devco** 5:4,23

**develop** 131:6

**developed** 42:11
60:14 66:19 67:24
68:1 155:14

**developing** 28:14

**Dickie** 5:22

**difference** 115:19
121:16

**difficulties** 13:4

**digest** 87:14

**direct** 25:1,4 38:20
42:21 43:17 114:6
120:1 141:2

**directed** 7:5 99:21
136:23 137:10

**directing** 115:4

**direction** 66:3

**directly** 88:15 101:10
116:19,24

**disagree** 73:1,3
139:22

**disagreed** 122:9

**discharge** 108:22

**discovery** 7:6 23:14

**discuss** 74:10 114:18
115:2 116:22

**discussed** 62:23
95:12 101:19 103:3
105:16 119:14 121:8
131:4 138:8 146:21
152:21

**discussing** 75:14
90:11

**discussion** 10:12
67:2 118:3 132:6
156:14

**discussions** 116:23

**dispute** 119:5,7

**disseminated**
103:21

**distinct** 121:2

**distortion** 8:19 26:14
49:3 54:16 55:16
57:21 63:1 67:3 70:3
73:7 79:8 86:1 89:19
95:11 108:4 116:8
122:13 149:11 152:16
153:22

**division** 14:13,14

**divulge** 10:17

**doc** 69:2 153:19

**document** 50:18 51:9
55:7 57:13,15 58:5,7,
10,13,14,17 60:4,9
61:10 63:4,8 66:8
69:2 75:11,16 87:5
88:6 98:16 104:14,16,
19 113:15 120:19
132:21 133:12 146:24
150:2 154:17

**documentation** 60:5
100:23 101:7 111:10
118:11 119:9 120:11

**documents** 23:13,17
24:21 41:5,7,23 43:5,
9 48:4 58:24 61:2,7
66:22 82:10,17
117:11 131:16 132:8
146:2 148:8 154:14
155:13 157:3 159:18

**dollar** 49:12 73:9
77:10,11 84:15,21

**dollars** 78:22 80:13
85:6 139:21

**download** 54:7

**drawing** 108:18
144:3,6 146:16,17
149:22 150:2,4,5,7
160:17

**drawings** 37:22
60:14,18,20 61:19
62:3,13 64:7,8,9,12
80:19,20 82:22 106:5
121:18 131:18 149:8,
24 150:17,18 160:11

**dried** 109:1

**driver's** 6:19

**dry** 29:13,14 32:24
33:1,5,21 34:21 35:14
143:23 144:6

**drying** 108:22

**due** 61:7 69:15 89:12
90:4 91:21 92:6 93:4,
7 94:10 136:17
137:11 146:1 160:7

**duly** 6:6

**Dunn** 5:2 6:4,10,21,
24 7:3 8:10 12:10
22:5 25:2 27:10 34:2
36:18,21 46:14 50:17
51:15 55:4 57:2,6,8,
10,13 58:15 61:11
65:5 70:10 75:12 76:9
78:5 84:2 86:17,20
87:9,11 89:11,23
96:19 97:1,4 99:6,14
103:3,23 104:1,4
110:7 112:9 113:16
114:5,13 115:14
118:1 120:7,17 122:8
124:22 125:1 126:7
127:2,7 128:22
129:18 130:11,13,17
133:13 134:21,23
135:2,16,23 136:21
137:15 138:13 139:16
141:21,24 142:4,7,9,
19 145:24 148:6,17
153:18 154:16
155:13,23 156:23
160:23 161:7

**Dunn's** 12:12 62:19

**duties** 31:22

---

**E**

**e-mail** 24:21 26:10,16
34:16 35:9,16 51:15,
24 52:8 53:9 54:13
55:1,10 87:2 97:7
98:17,18 102:19

113:23 116:14,24 130:2,4 142:5,12,18, 21 143:7,9,12 144:1

**e-mails** 24:14,22 35:6,20,22 50:14 51:23 98:3,19 116:9

**earlier** 26:16 90:11 93:17 98:3 103:3 104:6 118:1 131:4 146:21

**early** 15:6 93:2 118:7 138:8

**easier** 15:24 51:9 53:21

**easy** 97:17

**education** 15:11

**educational** 15:8

**efficiently** 30:7

**effort** 44:15 157:4

**electrical** 14:13 88:8, 16 125:19 126:12,18 127:4

**elements** 7:9

**email** 142:8

**Emergency** 96:11

**employee** 25:1,4 26:20

**employees** 26:19 136:24

**employer** 8:21

**encompass** 47:18

**end** 34:2 65:21 67:10 71:6 88:19 113:18,19 118:24 133:2 138:18

**energy** 14:18

**engineer** 38:19 39:1 44:24 68:17 149:4

**engineering** 38:4 39:1,3 43:8 73:24 74:4,10 117:20 123:5 148:13

**engineers** 39:4

**entire** 106:2

**entities** 39:16 41:7 46:10

**entitled** 92:8

**entity** 15:2

**equipment** 18:3,10 63:1 66:12 73:1,6 107:23 108:1 112:17 115:3,5 132:13 150:22 151:3 154:23

**equipment's** 112:12

**escape** 52:17

**ESD** 96:10

**essentially** 18:12,23 30:5,12 58:7 107:18

**establish** 8:1 37:1 42:19

**established** 73:15

**establishing** 82:6

**estimate** 22:4,8,13 48:15 61:8 154:3,4,5

**estimated** 47:13

**estimates** 118:12,16 151:18 152:7 153:9

**evaluating** 46:9 49:2

**evaluation** 47:1

**Evan** 5:19 50:6 53:16 99:11

**evening** 65:15,21

**events** 23:3

**eventually** 63:10

**evidence** 69:19

**exact** 32:19 49:7,9 101:6 120:18 136:1

**EXAMINATION** 6:8 157:10

**examples** 66:24

**excavated** 138:11

**excavation** 18:5

**exceed** 77:3,4,5,9 78:6,11 79:4,19 106:4 109:22 118:2,8 157:18,21 161:1

**exceeded** 77:11

**exceeding** 76:9

**Excel** 102:17

**exchange** 30:21

**exchanged** 26:12

**excluded** 47:9

**exclusively** 55:16 85:15

**excuse** 100:1

**execution** 109:12 135:11

**exhibit** 50:6 54:3,4 55:1,12,16 57:6,8,11 58:3 66:9 86:22 87:6, 9,12,13 96:23,24 97:1,5,19,21 98:10, 12,13,16,23 99:14 101:13 102:6,15 103:7,11,19,21,22,23 104:2,19 129:8,23 130:11,14 134:20,21, 24 135:1,6 142:2,7,10 158:21,22

**exhibits** 51:17 54:20

**existed** 7:13 8:2 41:3

**existing** 44:8 112:18

**exit** 52:15 53:6

**expanding** 28:14

**expansion** 6:16 17:5 23:23 25:12 30:13 36:22 37:7 39:17 50:10 66:13 75:22 76:10 138:15 157:16

**expect** 7:10 121:10, 15

**expediency** 110:2

**expense** 68:12

**expensive** 144:24 145:12

**experience** 11:17,19 15:9 16:1 17:12 48:5, 7 60:5 89:11 112:1 141:1

**experienced** 111:15

**expertise** 112:1,10

**explain** 29:5 33:11 68:3 83:16

**explained** 34:6

**explains** 120:20

**explanation** 33:24 34:7 158:24

**exponentially** 122:6

**extend** 95:20 96:19

**extended** 117:14

**extensively** 16:7,9, 18

**extent** 35:20 109:17 117:20

**extra** 74:20 79:18 97:2 99:7,10,16,24 100:2,10 101:8,13,14, 21,23 102:1 104:15 105:13,14 106:9 111:3 114:24 119:13 120:19,21 121:4 122:11 126:10,19 127:1,3 128:4,14 133:6,20 136:17 137:1,2,7,13 140:23, 24 144:14 146:2,17 147:17 148:4 154:18 158:12 159:12,22,23 160:8,20

**extras** 79:20 100:11 107:1 113:19 137:19 153:20 156:7

**extreme** 69:14

**eyes** 50:24

---

**F**

**fab** 147:15

**fabricate** 151:3

**fabricated** 83:19

**fabrication** 83:15 110:18

**facilitate** 24:20

**facilities** 14:10 31:7

**facility** 13:8 17:13 18:13,24 19:10 20:19 21:9 28:10,14,21 32:4 94:21,23 111:1 138:14,19 144:11

**facility's** 29:19

**fact** 115:2 116:4

**factor** 107:20

**factors** 49:2 78:1

**facts** 69:19

**failed** 146:17

**failure** 107:14

**failures** 107:15

**fair** 11:9 12:19 22:8 24:23 30:7 46:6,7 62:15 67:8,9 76:1,3 92:19,20,23 129:6 140:1 148:14

**fairly** 122:17

**fall** 106:5 133:5,19

**familiar** 17:15 29:6 52:2 60:8 75:15 123:5

**fashion** 43:9

**fast-forward** 84:1

**fault** 27:14 136:14 137:12 156:21

**favor** 124:3

**feasible** 111:8

**February** 89:6

**feel** 48:21

**felt** 116:16

**field** 16:20,23 66:6,21 67:18 68:7,9,10 69:12,15,22,23 70:1, 3,7 81:19 82:6,7,8,10, 12 83:12,13 89:12 90:6,13 97:2 99:7,10, 16,24 101:2 107:2,3 109:8 110:11,12,15 111:11,22 121:17 123:2 125:11 128:4 147:10,22 151:23 153:21

**figure** 12:2 108:20 134:11

**figures** 27:18

**file** 54:5 90:17,18

**files** 24:3,6,7 54:9 55:20 91:4

**filing** 161:12

**fill** 34:14 60:4 107:11 120:8

**filled** 60:10

**final** 29:21 48:6,14,16 80:1 113:19 124:12 138:17

**find** 66:20 69:14 83:9 97:8,10 102:8 121:22 130:1 155:13

**fine** 102:24 103:1

**finish** 27:19,22

**fire** 94:22 95:3,7,13,22

**firm** 38:5,14 60:16 61:22

**firsthand** 12:12 83:13 159:2

**fixed** 59:5,8 73:10

**folder** 24:9 25:6

**folders** 56:10

**follow** 7:10 52:5 74:5 101:6 106:13 120:23

**follow-up** 161:5

**forecast** 48:11 154:6

**foreman** 21:2,4,5,8 31:11 45:4 63:6 114:10 125:20 158:5

**foresaw** 48:18

**form** 42:12 62:5 69:19 76:7 90:4 92:21 95:5 108:13 148:1 152:14 156:8

**formally** 24:18 35:14

**format** 81:8 156:24

**formation** 135:12

**forms** 81:9

**forward** 42:24 92:17 110:3 153:3

**forwarded** 50:15

**found** 130:4

**foundation** 18:8 112:16

**foundations** 104:20 105:9

**fourth** 36:24 37:12 130:3

**frame** 18:18 42:3 83:5 94:11 150:20 160:18

**frames** 126:1

**Frank** 67:2

**frequently** 32:5

**front** 22:1 82:3 87:7 90:2

**froze** 34:3

**fuel** 108:22

**full** 6:18 52:16,19,21 53:4,6,12 99:9 116:6

**fun** 50:5

**function** 29:9,19

**functioning** 138:19

**funds** 71:4,7 152:2,4

---

**G**

**gain** 120:10

**gaps** 66:21

**gas** 14:19,22 16:16,18 19:5 29:10,13,15,17, 20 108:22 123:11

**gather** 91:8

**gathering** 29:17

**gave** 27:7 122:16

**geared** 44:2

**general** 10:23 14:12, 19 28:20 100:4,5

**generalization** 30:8

**generally** 10:8 21:6 31:11 39:6 41:6 57:15 59:13 73:18 159:13

**gentlemen** 126:19

**gig** 16:19

**gist** 150:8

**give** 22:8 23:10 26:18 40:18 44:16 51:12,23 55:15,23 66:24 85:24 87:14 134:15 142:16 151:3

**giving** 143:22

**glass** 16:10 115:9,21

**Glass's** 115:22 116:12

**glitch** 34:1 150:14

**goals** 44:3

**good** 24:16 48:21 93:2 143:3,6 151:9

**gotta** 54:7

**graduate** 15:19

**graduated** 15:18

**grand** 122:18

**Green** 50:11

**greenfield** 18:2

**Greg** 7:4 10:12,15 36:4 50:9 51:16 54:18 55:11 56:2 86:21 96:23 124:13 156:13 160:13

**Gregory** 5:21

**grounding** 88:8,17

**group** 9:1,3 16:3 35:4 37:24 38:11 39:6,24 40:5 117:20 123:6

**groups** 40:17

**grow** 15:12

**guess** 10:10 22:6 23:3 30:9 40:13 44:23 51:3 72:15 87:17 134:9 148:10 158:22

**guidance** 35:12

**guy** 19:13 149:5

**guys** 65:9 73:21 86:3

---

**H**

**habit** 8:24 27:24

**Hager** 5:10

**half** 22:3 107:12,16

**halfway** 58:22

**hand** 21:21 52:10 60:21 95:12

**hand-off** 127:8

**handed** 138:17 149:3

**handful** 128:3

**handle** 28:15

**Hansen** 25:17 38:20, 24 40:7 68:16

**happen** 95:7 106:11 154:21

**happened** 70:14 75:7 95:8 153:4

**happening** 112:18 121:3

**happy** 56:17

**hard** 35:8

**harder** 157:1

**Hartman** 14:2 16:3,8, 19 17:13,17,19,22 18:12,22 19:9,13,15, 21 20:3 21:14 30:11 31:3,5

**haul** 145:6

**head** 122:20

**Headed** 97:18

**hear** 11:5 27:18 115:14,16

**hearing** 71:9 157:13

**heat** 30:21

**held** 91:22 156:14

**helped** 45:3,8,9

**helpful** 115:3

**helps** 24:20

**hey** 53:15 54:12 58:1 86:6 114:14 154:7

**Hide** 52:23

**high** 15:13,19 129:15 144:24

**higher** 49:21 124:6,9

**highlighted** 88:4

**hired** 19:1,3 20:12 38:5

**hit** 52:1,23 53:8

**hitting** 52:17

**hold** 21:22 22:10 27:15,21 47:20 49:12 98:7 107:13 114:3

**handful** 156:12

**honest** 9:7 11:10 35:15,18 59:23 64:13

**honestly** 108:17 117:15

**hope** 13:1

**Hopewell** 30:18

**hoping** 28:21

**horizontal** 104:24 105:9

**hour** 114:7

**hourly** 43:15 73:12 144:24

**hours** 20:5,16 43:14 95:7 114:15 136:24 137:1,7,11

**house** 86:7

**hundred** 48:12 77:16

**hydro** 107:9,24 109:1, 7,8 110:11,14,20,21 111:10,20,22 112:12 113:9

**hyperlink** 129:13

**hypertechnical** 17:9

**hypothesize** 48:5

**hypothetical** 78:3 155:9

**hypotheticals** 158:20 159:10

**hyrdrocarbons** 29:11

---

**I**

**idea** 40:18 44:16 45:1 49:8 127:14 141:10

**ideas** 66:2

**identification** 57:10 87:11 97:4 104:1 130:13 134:23 142:9

**identified** 63:16 70:17 80:24 81:13

**identify** 101:24 156:1

**identifying** 39:15 63:21 74:24 76:24

79:21 81:3 153:20

**identities** 8:24

**IFC** 60:13,18 62:1,3, 13 80:20 81:21 82:17 149:22,23 150:2

**IFCS** 62:7 81:13

**imagine** 134:8

**immediately** 150:20

**important** 49:13 95:13

**importantly** 50:21

**impression** 106:2

**Improper** 155:9

**improvement** 30:5

**inaccuracy** 146:1

**inaccurate** 147:7

**inbox** 97:22

**inch** 104:24

**incident** 136:6,10,11, 14,17

**include** 31:22 60:3

**included** 30:20 61:3 66:22 74:20 80:22 82:1 98:18 148:24 149:12

**includes** 108:22 132:12

**including** 80:6 88:8

**incorrect** 125:3

**increase** 28:22 71:15 74:16 81:21,22

**increased** 75:4 76:18 80:15 81:15

**incurred** 112:13 146:1,15

**indicating** 139:13

**individual** 25:2 54:20 109:18 135:10 159:17 160:2,19

**industrial** 14:1,8,12, 20 15:9,24 16:6,20 123:10

**industrial-type** 19:5

**industry** 16:10,11,12 19:6

**inefficiencies** 93:4

**infield** 91:16

**influence** 11:2

**information** 10:19 19:18 26:12 37:6 41:20 43:6,7,10 45:2, 7 47:23 65:6 73:24 74:5 77:7 78:8 82:3 90:5 100:17 116:14, 15 118:17 133:24 134:3 137:20 139:24 151:22 153:1 154:9

**initial** 42:22 49:6,18 58:8 61:4 64:10 117:1,8 123:17 143:7

**initially** 68:20 78:21

**initiated** 149:10

**initiation** 45:23

**injury** 10:4

**input** 28:15 43:1

**inquiries** 128:24

**inquiry** 7:12 142:1

**insight** 127:13

**insignificant** 122:17

**insist** 114:23

**install** 112:24

**installation** 125:14 126:1

**installed** 18:3 33:17 107:17 110:17 111:6

**installing** 33:16

**instance** 23:13 43:6 47:15 71:14 82:5 85:4 122:15,19 135:10 146:13 159:22

**instances** 121:17 122:4,9 125:1,9 147:20 159:21

**instructed** 33:7 54:14

**instrument** 108:23

**instrumentation** 109:4

**intact** 153:20

**intend** 103:7 113:9

**intended** 67:23 107:21 112:8 138:15, 19

**intensive** 23:9

**intent** 83:3,7

**intention** 10:13

**intentional** 27:23

**interacting** 38:17

**interaction** 26:22 42:21 65:6

**interface** 62:21

**interject** 6:23 27:21

**interjected** 35:17

**internal** 151:11,17 152:20

**internally** 6:15

**interpretations** 59:12

**interrupt** 46:14 141:12

**interrupting** 57:22

**interruption** 105:21 109:12

**interruptions** 94:15

**introduce** 5:14

**invitation** 50:7,9 57:9,18

**invoice** 100:15,23 101:6

**invoiced** 72:4 85:1,4 100:24

**invoices** 72:1 85:10, 14 154:7,10

**invoicing** 79:13 116:18

**involve** 150:22,23,24

**involved** 14:11 17:4 22:13 30:23 37:11 39:15 46:9 60:23 67:22,23 109:4 112:13 120:24 123:2 125:18 134:8,13

137:15 147:21 160:3

**involvement** 19:10 67:14 69:17

**involves** 17:4 21:13

**isometric** 64:7 83:22

**isos** 68:9,10 69:21,23 70:18 83:14,22

**issue** 9:15 27:4 28:13 61:2,6 95:12 120:12 125:15 126:9 131:7 155:17

**issued** 45:14 60:19 61:19 80:19 113:17

**issues** 11:13 34:9 65:16 88:5 91:24 92:2 116:17 144:2 157:9, 14

**item** 70:18 71:3 72:3 107:7,9 108:6 122:17 159:20

**itemizing** 105:3

**items** 45:10 73:18,21 76:24 77:2 79:24 80:22,23 81:2,12,13 100:1 101:13,18,24 104:9 106:6 108:24 109:19 127:18 129:3 133:19,20 138:10

**J**

**Jaime** 5:11 57:4

**James** 26:17 27:6 63:14 65:7,11,24 70:19 79:15 81:2 115:21,24

**January** 88:7,11,19, 20

**Jeff** 43:21,24 44:6

**Jim** 115:9,21,22 116:1,17,19

**job** 14:23 19:20 20:12 21:5,6,7,9 23:4 31:15 32:23 37:10 42:24 44:1,2 45:5 63:11,24 72:24 73:7 74:21 77:18 78:16 79:21 82:16 83:18 90:3 93:5,6 114:1 116:5

125:9,16 147:12 149:3

**jobs** 21:4 31:12

**joining** 8:10

**July** 32:14,20 33:13, 21 84:3,13 117:5,10 155:4

**June** 117:3 150:1

**K**

**keeping** 69:24 101:15 103:14,18

**Kevin** 5:2 6:4,21 12:10,12 36:5,18 42:13 50:12 52:4 53:17 54:12,24 57:2 62:6,18 69:20 76:15 85:24 86:17,24 87:1,5 92:22 95:6 97:6,10 102:18,20,23 124:22 130:1 141:21 144:22 157:12 161:7

**Kevin's** 86:6

**key** 16:15 52:18

**keyboard** 52:18

**kind** 8:24 16:22 17:20 44:16 45:12 46:18 48:18 58:4 65:19 66:4,5 90:23 145:14 150:24 151:6

**Kish** 126:17

**knew** 19:2 37:10 73:11,13 85:9 148:24

**knowing** 22:8 112:11,13,19,20,22 119:22

**knowledge** 11:17 12:13,15 18:23 19:4 38:7 41:16 48:5,7 76:9 93:7 117:22 123:13,14 124:7 131:15 137:21 149:12 154:11 159:2,5,8

**Koscho** 33:9 40:7 142:14

**L**

**labeled** 54:5

**labor** 23:9 59:5,8
66:12 72:19 114:7

**laborer** 16:23

**lack** 69:16 90:4,5
91:21 92:7 119:9
120:11 128:4 139:23
146:16 147:7

**lacking** 115:1

**laid** 64:10

**lamb** 23:11

**language** 75:16

**large** 22:16 91:23
110:15 145:1,3

**Larkin** 118:15 152:13
153:8 154:4

**late** 24:1 117:21

**lawsuit** 23:15,24
25:14

**lawyers** 61:15

**lay** 47:20,22 83:16

**layers** 16:24

**laying** 147:24

**layperson** 33:11

**lays** 131:22

**lead** 39:1 149:14
151:2

**leading** 18:6

**learn** 118:6

**leave** 15:4 52:1

**leaving** 34:17

**led** 45:20 69:17

**Lee** 6:21

**left** 15:3 20:3 32:17
33:13 34:12,20 35:14
84:2,7,10,13,14 96:14
97:22 102:3 118:19
119:19 120:2 121:5,9
127:6,17,24 128:6,10
140:2,8,22 142:19
145:4,5,23 155:4,6

**legal** 5:10 7:8 94:2
133:8 136:20 146:4

**legs** 36:9

**lengthy** 22:17

**letter** 130:21 131:6
133:19 135:17

**letterhead** 81:7

**letting** 54:8

**level** 116:1 151:22

**license** 6:20

**lieu** 67:4

**likes** 91:9

**likewise** 12:8 160:10

**limitations** 42:8

**limited** 7:1,12 38:12
43:1

**lines** 29:17 108:22

**liquid** 29:10 109:2

**list** 21:23 22:1 37:19
55:20 63:7

**listed** 133:18

**lists** 63:5

**lived** 17:18

**locate** 102:7 129:21

**location** 17:14,16,19,
23 65:22 110:17
111:1,4 113:4 128:3
138:12 145:4

**lock** 54:9

**log** 101:15,20,21,23
120:19 158:8,10,11,
13,17

**long** 8:18 9:2 13:15
14:3 21:23 37:5
142:16

**longer** 85:23 114:15
117:7 119:20 160:24

**looked** 23:20 24:11
37:3 71:10 91:13,14

**loop** 148:11 153:13

**lost** 137:11

**lot** 8:4 11:13 48:9
116:4 125:6 130:24

**legal** 149:11

**low** 124:5

**lower** 49:21 64:19
124:10,11

**lowered** 64:20,24
159:3

**LP** 5:4,23

**LS** 108:9,10,17

**lump** 59:18,21,24

**lunch** 85:24 86:4,10

**M**

**machine** 145:1

**made** 41:1 42:9 63:20
65:3 68:17 80:21
91:16 110:21 113:16
140:15 152:7

**main** 65:11 75:16

**maintain** 23:22 35:1

**maintaining** 9:1

**Majorsville** 10:9
30:19,22

**make** 12:5 29:6,20
42:23 51:7,9 53:20
61:14 66:21 68:8
75:11 76:3 78:10 86:9
88:14 90:7 97:17
105:18,23 107:19
113:2 121:19 129:7
136:24 137:11 155:20
160:6

**makes** 72:19

**making** 36:23 48:10
94:10

**man** 114:7 136:24
137:1,7

**manage** 38:15

**managed** 19:14

**management** 9:1
11:21 20:24 21:1
31:22 74:11 101:18
106:2 152:1,18 153:4
154:6 155:18

**manager** 31:16 87:22
100:10 114:5,11

**managing** 19:6 45:11

**manner** 138:14

**manpower** 45:12
73:1,6 114:24 115:2,5
128:19

**manufacturer** 108:2

**marathon** 12:24

**March** 20:9,10 97:3
99:7

**mark** 57:4,6 87:3
134:19

**marked** 57:9 87:11
97:3 103:6,24 130:12
134:22 135:6 142:9

**market** 42:17

**marking** 103:10,14

**markup** 59:5,8,15,16
73:14

**Master** 59:16

**material** 59:14 71:19
76:5 90:4 100:21
125:9 132:13

**materially** 121:11
124:6

**materials** 19:17
31:14 34:15 59:6,9
66:12 71:10 72:16
73:13,14 75:2 82:7
84:6,16 89:16 90:14,
23 138:11 150:19
157:17,21

**matter** 5:3 9:14,16
43:11 77:18 131:3
142:21 156:6

**maximize** 51:8

**maximum** 78:10

**Maymont** 31:1

**Mccamey** 5:22

**Mcquay** 30:24

**means** 59:10,12 60:1
71:22 83:17 108:9,20,
24

**meant** 103:4

**measure** 69:12

**measured** 69:23

**measurement** 69:15
70:5,6 147:5,14

**measurements**
67:19

**measuring** 67:18
68:7 70:1

**mechanical** 14:13
88:19,20

**mechanics** 109:15

**media** 36:17 57:1
86:16 124:21 141:20

**medical** 11:3

**medications** 11:3

**meet** 50:2 90:8
114:20

**meeting** 26:11 65:8
74:9 101:19 127:8
143:1

**meetings** 37:13
95:16 119:15 148:18
149:1

**men** 114:16

**mention** 150:10

**mentioned** 58:2
69:12 115:8 118:1
144:1

**menu** 52:14

**message** 26:11 35:4

**met** 6:10 38:18 65:13,
14,19

**Metzger** 43:21,24

**mic** 63:3

**Michaels** 5:21 6:22
22:21 25:10 42:12
50:12 51:11,19 52:4
53:15,20,24 54:4,12,
16,22 55:13,22 56:4,
8,12,16 58:1 61:9
62:5 69:1,18 76:7,12
77:19 78:1 85:22
86:6,24 89:18,21
92:9,21 94:1 95:5
97:6,15,21 98:2,9,13,
21,24 102:15,17,22
103:10 109:9,17
112:6 114:9 120:4,16

121:13 124:15 126:2, 20 127:15 130:1,6 132:20 133:7,11,22 135:8 136:19 137:3 138:3 139:1,8 144:21 146:3 148:1,20 151:13 153:15 154:12,14 155:8 156:8 157:6,11 161:3

**mid-july** 96:14 127:6

**middle** 58:11 132:10

**Midstream** 5:4,23

**million** 49:16 71:21 78:21,24 79:4,22 80:8,13 81:17,18 85:6 118:21 119:4 123:18 131:23 138:22 139:21 155:5,6 159:1

**mind** 23:4 77:4 79:5 81:8 122:12 136:1

**mine** 20:18

**minimize** 52:3,5,7,9 53:7,9,22

**minimum** 65:20

**mining** 16:10

**minute** 13:11 36:6 53:17 55:23 56:17,19 102:19

**minutes** 6:12 36:10 85:21 86:4 124:14

**Misrepresents** 61:10

**misstatement** 31:18 32:2

**mistake** 146:16

**mix** 31:3,5

**mixed** 49:22,23

**mobilized** 118:8

**model** 37:21 41:9,10, 14,15,18,21 42:22 58:17,18 61:4,17 64:6,11 70:17 106:5 131:5 141:7,8

**modeled** 141:3,6

**modeling** 141:9

**modifications** 19:11

**modified** 153:14,17

**modify** 78:9 90:6

**money** 7:20 20:5,16 75:3 106:17

**monitor** 76:2

**monitored** 84:23

**monitoring** 75:1,2

**month** 65:18

**months** 127:12 140:16,20

**morning** 95:16

**Morris** 6:16 17:3,14, 15,23 18:24 20:2 23:23 25:11 26:15 27:2 28:10,11,21 29:18 30:5,13 31:15, 24 32:4,15,17,22 33:4,12,20 34:12,17 35:2,13 36:21 37:7,23 39:17 50:10 66:13 69:4 75:22 127:18 130:22 144:11 157:16

**motor** 125:14,24

**move** 13:6 16:23 52:13 70:2 92:17 135:14

**moved** 68:22 91:13

**moving** 99:1 109:24 138:10

**muddy** 7:19

**multiple** 45:13 75:7 129:19

**mute** 13:10 103:9

**muted** 151:9

**N**

**named** 31:2

**names** 8:24

**narrowed** 40:21

**natural** 157:3

**nature** 11:14 43:22 82:11 90:9 128:13 159:7,20

**navigated** 157:13

**necessarily** 100:22

110:17 160:7

**needed** 34:8,9 45:10 48:19 65:17 66:3 68:14 70:21 71:7 74:5 80:21 83:22 105:12 114:16 122:22 145:10 147:6,11 148:14 149:9,16 151:6

**newer** 13:17

**night** 95:8

**nitty-gritty** 7:19

**nobody's** 140:7

**noon** 85:23

**normal** 94:20

**notes** 103:18

**notice** 6:6

**notify** 101:12

**November** 50:1 68:21

**number** 5:5 22:11,17 48:14,16 49:7,9 67:6 70:24 71:1,12 80:11 81:18 101:16 103:7, 13 118:22 120:20 122:3 124:5 132:12, 19 133:2,4,17,20 134:15 154:1 155:7 158:22 159:3

**numbering** 71:2

**numbers** 152:8 153:7

**O**

**oath** 10:24 12:9

**object** 10:21 76:13 92:21 109:10 112:6 114:9 120:4 135:9 139:1

**objected** 78:2

**Objecting** 144:21

**objection** 5:16,20,23 42:12 61:9 62:5 69:18,19 76:7,12 77:19 78:2 89:18 92:9 94:1,3 95:5 110:4 120:16 121:13 126:2, 4,20 127:15 132:20

133:7,22 136:19 137:3 138:3 146:3 148:1,2,20 151:13 153:15 154:12 155:8 156:8

**objections** 139:12

**obligation** 69:11

**obligations** 70:5

**obtained** 92:7

**occasion** 146:10

**occasionally** 44:2

**occasions** 75:7 115:20

**occurred** 82:20 96:13

**occurs** 28:7

**October** 37:4 45:20 50:8 58:9 131:5 142:8,15

**off-site** 109:8 110:13, 16,22 111:12,20,24 113:9

**offering** 48:3

**office** 24:7 65:22 82:7 128:2 152:23,24

**oil** 14:18,22 16:15,18 19:5 123:10

**on-site** 32:1,4 111:17 112:4,21 116:21,24 125:3 145:20

**one-page** 87:5

**ongoing** 118:12 148:19

**online** 47:5

**open** 51:20,24 52:8, 20 54:5,8,11,21 55:4 87:6 96:22 129:20 142:4

**opened** 52:22

**operate** 30:6 75:22 107:19

**operating** 94:21 111:1 138:14

**operational** 138:18

**operationally** 49:15

**operations** 21:10

**opinion** 42:14

**opportunity** 60:15 61:21 62:2

**opposed** 42:10 52:19 115:21

**option** 53:4 111:7

**options** 52:23

**Orbital** 37:24 38:7,17, 21 39:8 41:16 42:22 43:5,18 44:24 45:3, 14,16 66:22 67:11 68:4,15 69:16 82:24 83:4,8,11 87:10,18,23 88:10 89:12,16 90:7 117:11,21 121:18,19 144:3,9,11 146:2,16 147:8,23 148:12,13 149:16

**Orbital's** 38:3 82:21 148:7

**order** 45:17 64:3 72:7,15 80:10,12 81:5,7,14,17 105:19, 20 113:17,20,24 115:12 116:11 121:19 128:14 150:19 151:1 153:21 158:2,11

**ordered** 125:2 150:23

**orders** 7:23 45:13 72:11 80:14 106:12, 19 119:17 128:4 144:9

**original** 18:1,3 19:21 63:22 80:23 84:6,17 85:5,15 91:17 93:20, 23 99:22 104:9 105:4 122:23 131:22 140:10 145:17 156:2,6

**originally** 112:8 120:6

**originated** 148:12

**ortho** 64:8

**orthos** 70:18

**OSHA** 21:17

**outage** 44:12 66:6,7 136:6

**outcome** 48:6

outline 7:24

outset 67:23

outstanding 65:16

overlapping 112:16

oversaw 19:14

oversee 62:20

overseeing 88:15

overseen 30:10

overuse 144:19

overview 45:23

owed 7:21

**P**

p.m. 86:18 124:17,23 141:16,22 161:8

PA 8:17 15:12

package 131:7

packages 40:21

packet 142:3

packets 37:6

pad 18:6 29:12 31:24 32:2

pages 99:3 102:8 129:20

paid 78:18,23 79:3 80:7 85:2 119:16 147:2 154:19

panel 52:23

paper 24:6

papers 24:8

paperwork 108:4

paragraph 58:22 61:8 66:11 132:10 144:16

paragraphs 131:21 132:1 143:9

Park 8:17

part 7:12,20 11:23,24 28:18 38:22 39:24 42:24 45:2,15,18,21 48:10 49:13 50:18 61:3 63:7,24 68:4

73:20 81:24 93:11 95:15 104:8 109:2 111:13 113:22 128:23 133:9 137:15 139:2 140:22 147:12 148:15 151:5

parties 7:7,15

party 7:13

pass 153:2

passed 147:15

passes 107:15

past 39:14

pattern 7:14

Paul 129:23

pauses 28:4

pay 43:14 95:14

payment 80:1

Pennsylvania 8:12 93:10

people 11:15 12:11 38:14,16 39:3 47:2 48:1 63:5 131:6 134:15

percent 33:18 41:10, 11,13,18,21,23 42:9, 23 45:7 48:4,12,15,20 58:18 59:1 61:3,4,17 77:16 80:19 131:5,7, 8,9,18 132:11 133:1

percentage 72:2,12 84:22

perfect 46:21 51:10

perform 149:3

performance 148:7

performed 57:24 127:18 159:19

period 116:7

permit 91:24

permits 91:22 92:7

permitting 91:21

person 10:1 23:9 27:15 47:20,22 63:17 74:14 113:11 134:6, 11 148:24 151:23 157:2

personal 10:4 159:8

personally 6:10

personnel 82:6

persons 137:10

pertinent 8:7

phase 18:10,15,16 88:7,23 144:3

phases 14:16 18:16 30:22 88:24 89:4 117:21

phone 26:11 28:6

phonetic 126:17 128:2

photo 134:16 135:6,7, 24

photograph 134:22 135:2

pick 134:9

picture 135:22

piece 147:13

pile 91:7

pipe 14:10 83:18 112:24 125:10 151:4

piping 18:10 44:8 90:8 107:11,23 108:1 125:2 150:23

place 5:8 158:5

places 67:4

plan 28:20 60:16 61:21 88:7 95:2

plant 30:20,24

plants 16:13 48:8

play 106:7

played 117:17

pleading 135:3

plenty 90:2

PNID 64:7

PNIDS 70:17

PO 71:5,8,15,16 80:15 81:15,20,22 82:1

point 13:5 20:24 32:8, 10 49:17 64:14 65:11,

12 67:21 78:21 84:20 85:7 88:14 89:8 109:6 121:3 138:7 139:9,13 152:7 154:2,8

points 66:6

poor 6:11

poorly 160:14

popular 16:16

portion 52:14 88:11, 16 126:12 149:18

position 120:9

posses 24:4

possibly 18:17 77:2

post 35:21

potential 43:4 45:22 128:24

potentially 133:8 136:20 159:12

power 16:12,13 114:23

Powerpoint 45:21

practical 110:24

practice 102:4

practices 7:15

precise 22:10

precisely 20:8 62:17 137:8

preparation 23:15 25:7,18

prepare 22:22

present 100:1

presented 7:24 48:11 70:11 150:3,4

pressure 107:18

pressures 28:15 107:20

pressurize 107:12

pretend 27:14

pretty 14:9,15 24:16 30:2 48:21 61:15 119:18 121:1 129:14 139:11

prevalent 16:16 121:22

previous 110:18

price 49:6 64:10,19, 20,24 78:9 79:5,19 93:20,24 94:5,7 105:19 106:16,18 118:23 123:17 124:12 157:18,21 159:1,3

prices 73:15 108:16

pricing 58:23 59:20 60:15 61:21 62:1 130:12 161:1

primarily 16:18 145:2

primary 18:5,13

prior 16:6 17:23 83:5 131:19

problem 51:21 53:12 54:17,22 141:13

problems 122:7

procedure 94:21

proceeded 44:18

proceedings 36:15 56:23 86:14 124:19 141:18

process 29:14 37:18 44:19 45:19 46:8 70:3,10,12 74:3 75:14,19 79:13 80:16 82:16,17 127:8 138:8 139:3 153:20,23 158:2,4

processed 140:19

procured 145:19

produce 41:4

produced 23:14

producing 43:5,8

product 30:3 138:17

production 29:17,21 82:22 148:8

professional 112:14, 22 132:7

professionals 67:11 69:8

progress 74:8 151:12

**prohibited** 42:9

**prohibiting** 11:9

**project** 6:15,16 7:16
9:19 10:4,6,7 16:24
17:3 18:2,11,24 19:22
21:4,5 22:20 23:23
24:5 25:12 26:2,15
28:13,20 31:15 32:11,
15,18,22,24 33:5,12,
15,18,20,21 34:8,12,
18,21 35:1,2,13,14,21
36:23 37:16,23 38:1,
11,13,19 39:2,11,22
40:10 41:2 44:21,24
45:4,14,24 46:10
47:3,10,17 49:1,14,17
60:10,16,23 61:22
62:19 63:13 64:11
65:10 66:17,19 67:12,
15,22,24 68:1,4,15,
16,19,21 69:9,15
70:7,11 72:8 74:6
75:4,8,17,20,23 76:4,
8,19 77:15 78:11,20
80:5,12 82:5,13,23
83:1,10 84:2,11,14,
16,17 85:7 87:10,18,
22 89:1,3,15 90:7,14,
17 91:1,19,20 92:6,17
93:1,3,8,11,13 94:10
95:2,23 96:5,13,18
100:10 101:10
104:10,16 105:11,14
109:7 110:12 111:20
113:2,18 114:5,8,11
115:23 117:1,7 118:2,
17,19 119:1,11,23
120:3,12 121:6,18,20,
23 122:4,7 123:3,12,
16,18,23 126:1,10,19
127:6,9,11,20 128:1,
7,20,23 129:1 131:17
137:2,17,23 138:2,18,
22,24 139:20 140:17
141:3 142:19 143:18,
19,23 144:10,20
145:8,9 146:10,14
147:6,21 148:8,19,24
149:15 150:10
151:12,18 152:3,5
155:21 156:1 157:16
160:24

**projected** 49:1

**projects** 14:17 19:14
21:8 22:12 30:10
31:4,5 38:8 39:9,12,

13 41:19 45:20 77:6
91:23 123:3 125:6
151:24 155:2,14

**prompted** 134:1

**proper** 6:18

**proposal** 47:4,6
48:17,23

**proposals** 47:12,18

**proposed** 63:12,16
68:19 121:4 140:8

**protocol** 70:15

**provide** 35:12 39:16
48:1 61:7 66:12 83:4
155:20

**provided** 23:13,18,21
34:16 41:20 45:22
46:10 60:5,9 61:18
62:1,13 82:24 90:7
100:13 101:24 108:14
118:11,15,16,17
150:1 151:22 160:12,
18

**providing** 45:2 74:3

**pulled** 133:2

**purchase** 99:19
100:21 101:3

**purchased** 151:2

**purpose** 30:12 34:23
58:12 95:4 109:20

**purposes** 7:11 30:1
42:1 101:17 110:1

**pursuant** 6:5 117:2
138:15

**pushback** 122:16

**pushed** 68:24 69:6

**put** 43:14 46:5 47:5
77:2 86:23 91:11 99:1
107:16 110:3 113:19
129:19 134:16 142:3
152:17

**Putman** 26:17 63:14
70:20 81:2 114:19
115:24

**Putnam** 63:16 65:7
73:17 79:15 115:8,21
122:9

**Putnam's** 116:12

**putting** 22:1 51:21

---

**Q**

**qual** 111:14

**qualifications** 26:22

**qualified** 111:14
159:11

**qualify** 137:12

**quality** 62:20

**quantified** 84:10

**quantities** 60:16

**quantity** 104:21
108:13

**quarter** 36:24 37:12

**question** 10:16
11:23,24 12:5,19,21
27:20 28:3 39:14 42:7
44:22 61:11,12 76:16
82:9 87:20 110:7
115:14 133:13,14
137:9 139:16 143:11
144:4 145:17 151:8,
15 155:23 156:9

**questioning** 126:5

**questions** 7:24 10:13
11:6,18 26:1 47:11
129:5 131:2 156:23
161:4

**quick** 85:20 99:3
142:16

**quickly** 139:12

**quote** 82:8,12 120:18

---

**R**

**race** 51:1

**rack** 111:6,16,18

**radio** 27:15

**raise** 13:5 155:17
157:8

**ran** 127:12

**Rang** 126:17

**range** 22:18 64:16

155:5

**ranks** 16:23

**rate** 144:24 145:20

**raw** 30:3

**reach** 73:18

**read** 35:21,24 36:1
47:6 50:24 51:22 55:6
87:7,8 110:10 131:24
132:1 133:18 142:16,
17 161:11

**readable** 50:21,23

**reading** 75:21 131:10

**ready** 55:9

**real** 99:3

**realized** 149:8

**Realtime** 36:4

**reason** 43:4 75:3 94:7
95:12 117:13,16
119:5,7 136:9 138:21
139:22 140:17

**reasonable** 76:3

**reasoning** 43:23 65:2
93:19

**reasons** 54:10 95:14
113:1

**reassigned** 119:23

**recall** 23:2 34:19 38:1
47:15 67:7,13 69:6,7,
10 70:8 72:14 87:19
88:12,21 89:9 90:6
91:20 92:1,4 94:12,
14,22 96:21 108:17
110:7 114:2 115:4
117:18 118:3 121:20
125:1,5,8 126:15,17,
21 131:1 142:24
143:1 147:3,20 153:6

**received** 35:20 40:21
41:8 49:3 50:1 58:16
131:16 149:7

**receiving** 117:11
149:16

**recently** 9:5 91:24

**recess** 36:14 56:22
86:13 124:18 141:17

**recite** 21:24

**recognize** 57:15

**recollect** 26:2 143:12
146:22

**recollection** 49:11
50:2 82:23 125:15

**recommendation**
27:7,8

**reconvene** 36:9

**record** 5:3,13 11:11
29:7 36:13,19 56:14,
15,19,21 57:3,14
86:12,18 110:4
124:17,23 141:13,16,
22 156:14,16,19
161:8

**recorded** 5:2

**records** 23:22 49:24

**redesign** 125:11

**redirect** 157:9

**reduced** 93:23 94:6,8
118:24 132:16 145:19

**reducing** 67:3

**refer** 6:15 88:23

**reference** 19:19
26:19 61:18 63:20
131:7

**referenced** 58:3

**referred** 31:15 58:17
61:8 152:20 158:13

**referring** 104:6 153:7

**refers** 82:5,10 88:23
144:5

**refine** 30:1

**reflect** 49:24 72:1

**regard** 145:18

**regular** 21:9 52:19
72:12

**relate** 25:14,21 88:6

**related** 9:19,21,23
71:14 85:15 94:15
125:14 137:8

**relates** 104:15 110:19
137:9

**relating** 6:14 7:6

23:23 43:10 94:23

**relation** 9:14 24:16 49:21 146:21

**relationship** 25:3

**relayed** 118:7

**released** 37:6

**releasing** 82:22

**remaining** 35:13

**remember** 9:18,20, 21 20:6,14 26:8 32:13,16,19 35:15,18 39:13 40:12 46:1,4 49:5,7,9 60:11 64:13, 21 82:16,19 84:24 85:16 89:13 90:3 94:7 115:7 122:8,16,19 123:15 125:7,12 129:3,4,13 146:13

**remembered** 26:1

**remind** 103:6

**remote** 5:20

**remotely** 5:8,17,24

**remove** 93:19 96:1

**removed** 64:18 132:18 133:17 159:7

**removing** 93:23 138:12

**repeat** 34:4 61:12 76:16 77:24 84:8 133:14 134:12 139:17 151:15 160:13

**rephrase** 118:13 144:4 159:15

**replaced** 34:11

**replay** 23:3

**reply** 27:5

**Report** 87:10,18 97:2 99:7,10,16,24

**reporter** 5:11 6:2 27:9,17 38:23 57:7 87:4 103:5,8,13 141:12

**reporter's** 27:12

**reports** 87:22 107:2

**represent** 5:15 6:13

**representation** 64:15

**representative** 65:7

**representing** 5:22

**represents** 105:3

**request** 27:6 65:3 128:18 146:18

**requested** 64:24

**requesting** 58:23

**requests** 19:19 115:11

**require** 10:16

**required** 60:3

**researching** 23:5

**reserve** 7:17

**resided** 8:19

**residence** 8:13

**resolution** 73:21

**resources** 8:22 9:3 114:7

**respect** 23:11 24:5 36:21 115:11

**respond** 36:2

**response** 135:3 144:13

**responses** 41:2 128:22

**responsibilities** 15:2 21:7,9 35:2 66:16

**responsible** 68:7 74:14 77:13

**rest** 75:10

**restate** 39:19 110:8

**result** 29:22 74:15

**resulted** 45:17

**resume** 15:1

**review** 25:7 40:24 41:4 47:12 51:21 87:16 146:7

**reviewed** 23:6,12 57:14 58:12 121:4

**reviewing** 37:21 48:23

**revised** 58:9,13 130:12

**revises** 58:10

**revision** 58:14 134:1

**RFP** 128:22

**Ridge** 32:24 33:1,5,21 34:21 35:14 143:23 144:6

**rings** 143:14

**risk** 144:6

**road** 18:6 150:16

**Robert** 99:18

**Robin** 24:12 86:9

**role** 31:18 34:14 37:15 38:3 62:17,19 67:17,18 114:13 117:6 149:2

**room** 27:17 111:17 112:21

**root** 117:15,16

**Rowan** 99:18

**rudely** 27:21

**rule** 10:22

**rules** 22:5

**Ryan** 40:7 142:13

**S**

**Sabrena** 128:1

**sacrificial** 23:11

**safe** 111:8

**safety** 21:18 94:14, 15,23 95:15,16 107:20

**saith** 161:13

**sale** 29:20

**save** 91:6

**saved** 91:3

**savings** 106:12,14

**scenarios** 159:11

**schedule** 45:8,11 59:1 60:7,12 68:20 69:4 71:24 72:2 85:18 88:7 103:4,24 104:5, 13 112:20 132:14

**scheduling** 116:20

**scheduling's** 62:22

**scheme** 122:18

**school** 15:13,19

**scope** 62:23 63:12,22 64:3,4 66:11 70:11, 19,23 71:11,15,19,21, 22 73:19,20 77:1,8, 10,11,15 78:7 79:10, 11 81:3 82:4 84:6,17 85:5,15 90:12,13 91:18 99:22 104:15 105:5 106:7,16,18,24 109:11 110:19 112:7 115:12 118:24 120:5 122:10,23 126:2 127:19 135:9,12 137:10 138:4 140:10, 16,19,21 144:2,6,22 148:2,21 149:8 151:14 156:2,7 158:1 159:12 160:21

**scope/out** 140:16

**screen** 50:19 51:22 52:8,9,12,14,16,20,21 53:4,7,12,16 86:23 87:7 93:16 99:2,9 102:9,24 103:2 104:5 129:19 134:17 142:3

**scroll** 51:22 63:4 98:11 99:2,11 100:6 107:6 143:2

**scrolling** 130:7

**seconds** 63:20

**secure** 42:15

**security** 54:10

**select** 62:12

**selected** 37:19 61:24 62:3

**selection** 37:18 62:8

**sell** 29:23 30:2

**send** 54:12,19 102:20

**sense** 12:6 29:16

**sentence** 59:2,4,18 60:13 106:13

**separate** 29:19

**separation** 30:21

**sequence** 97:9

**service** 28:24 59:16

**services** 155:20

**set** 44:3 57:5 59:1 60:16 77:9,11 78:17

**set all** 18:9

**sets** 61:22

**setting** 112:17

**seven-plus** 140:16

**shape** 90:4

**share** 47:5 52:12 53:4 99:2

**sharing** 52:20 53:16

**she'll** 91:11

**shift** 65:21 114:16

**shoot** 97:16

**shop** 67:20 74:8 83:14,19 90:1 145:7 147:16

**short** 142:5

**shot** 55:15

**show** 86:10 115:1 150:19 157:2

**showing** 154:7

**shown** 41:14 48:20

**shrink** 52:18

**Shumaker** 142:15

**shut** 93:5

**shutdown** 96:11

**sic** 63:17 65:7 73:17 79:15 115:9,21 116:13 122:9

**side** 22:14 26:7 38:17 40:11

**sign** 81:4 100:14 128:5,11 154:20,23

**signed** 82:1 100:7,18 107:3 119:13,14,16

128:9,11 154:17 158:16

**signing** 101:2 153:22

**similar** 38:8 123:9 155:2

**simple** 61:16

**simpler** 61:14

**simply** 73:5

**simultaneously** 72:12

**sir** 33:6 43:12 95:24 113:5,7 128:17

**sit** 20:22 21:24 41:3

**site** 18:2 29:12 44:1,7 47:5 65:13 66:1 82:13 94:10,13 95:3 111:23 116:3,5 127:18 136:12

**sitting** 11:15

**situation** 146:7

**size** 38:13 52:19

**skill** 11:17

**slips** 132:14

**slowed** 92:14

**slower** 83:19

**slowing** 90:3

**slug** 104:24 105:9

**small** 51:3 80:11 110:16 122:13,21

**smaller** 145:12

**smoke** 136:7

**soil** 138:10

**solicited** 37:4,6,15 39:16 40:1,10

**soliciting** 47:23 132:16

**solutions** 5:5 66:21

**sooner** 42:20

**sort** 23:10 47:24 56:14 60:24

**sound** 49:17

**sounds** 16:2 21:14

51:16 91:16

**southwestern** 93:10

**SOV** 60:4,6 103:4

**space** 111:3 112:4,11

**span** 13:18

**speak** 39:18 45:1,23 88:1 101:21 141:7 147:15 154:20

**SPEAKER** 49:10

**speaking** 131:12

**specialist** 5:11

**specialists** 14:22

**specialize** 14:18

**specializing** 123:10

**specific** 10:3,6 21:4 39:13 70:12 122:8 125:7,9 159:19

**specifically** 40:12 92:4 115:7 125:5,10 129:4 131:1 143:15 158:20

**specificity** 32:17

**specifics** 127:4

**speculation** 76:14 92:10 94:3 121:14 126:21 127:16 132:21 133:8 136:20 146:4 153:16 154:15 155:9

**speed** 35:5,22

**spent** 71:20 77:18 106:18

**spoils** 138:11

**spot** 147:19

**spreadsheet** 102:18 152:17,20 153:3

**stage** 33:10,11 121:8 128:23

**stages** 35:13 82:22

**stand** 60:6

**stand-down** 94:23 95:11

**stand-downs** 94:14

**standard** 41:19

**standing** 126:4

**standpoint** 126:18

**start** 20:7,9

**started** 6:17 20:11 62:18 98:8 123:16 150:21

**startup** 96:13

**state** 6:18

**statement** 61:20 66:11 160:6

**states** 57:19

**station** 10:10 17:5 28:16 29:18 30:5 36:22 50:10 66:14 112:14 157:17

**stations** 112:11

**status** 87:10,18 155:12

**stay** 56:15 153:20

**steel** 16:10

**steps** 46:24

**sticks** 122:12

**stop** 53:8,16 58:2 121:2

**stoppage** 136:11,16

**stopped** 92:14 121:2

**stopping** 90:3

**storage** 82:7

**straight** 145:8

**stream** 28:4 29:10,15

**strength** 107:13

**stretch** 36:9

**strictly** 21:11 42:14

**string** 35:9 45:15 142:18

**Stroud** 5:12

**structural** 18:9

**structure** 59:4,8 112:18,23

**study** 90:19

**stuff** 30:22 142:22

**stutters** 28:4

**subcontractors** 73:2

**subject** 43:11 131:3 142:21

**submit** 116:14 152:1, 14,17

**submitted** 47:2 64:15 131:5 148:12

**subsequent** 58:9

**substance** 10:14

**substation-type** 16:13

**succession** 98:15

**suggest** 114:21 135:14

**suggestion** 51:7

**suit** 7:5 10:4 28:13

**suitable** 112:4

**sum** 59:19,21,24

**superintendent** 11:21 15:3 17:1 31:12 116:1

**supervision** 90:24

**supervisor** 125:20

**supplement** 70:5

**supplemental** 62:2

**support** 26:22

**supports** 104:20

**supposed** 75:22

**surprise** 150:12

**Survey** 104:20

**swear** 6:2

**swearing** 5:20

**switch** 114:4

**sworn** 5:17,24 6:6

**system** 30:18 47:16 71:2 109:3 120:20 125:3

**T**

**T&m** 59:5,8,23 72:20

77:8,9 78:16 79:3,10, 11 106:18 109:22,23 139:21 160:24

**table** 37:8 69:4

**taking** 5:8 6:23 81:17

**talk** 7:21 8:5 17:10 27:16 29:8 43:3 92:24 116:19

**talked** 13:16 90:16 105:4 121:17

**talking** 18:18 27:12 132:11 135:10 139:5 150:9

**talks** 66:9

**team** 39:1,4 130:22 134:8,12 153:4

**teams** 39:24

**tech** 10:20

**technical** 11:14 12:6 13:4 21:16 34:1 68:14

**technically** 11:18 12:1

**technological** 157:14

**technology** 50:4

**tedious** 12:1

**tee** 67:3

**TEK** 123:6

**ten** 6:12 22:17

**term** 28:17

**terminology** 105:21

**terms** 29:5 83:17 127:20

**test** 107:15,18

**tested** 108:1 109:1,8

**testified** 6:7 89:22 132:22

**testify** 140:1

**testifying** 50:14

**testimony** 22:23 23:10 70:4 89:21 95:1 146:22 153:16

**testing** 107:10,24

109:7 110:11,12,14,
20,22 111:11,20,22
112:12 113:3,10

**text** 26:10 35:9 61:10

**thing** 29:4 45:11,12
95:17 104:12 139:20
150:24 151:7

**things** 7:23 8:5 12:11
16:15 24:21 26:1 64:6
65:17 66:4,7 74:24
75:21 80:17 82:11
90:1,9 91:2,5,7,9,14
112:18,19 116:11
117:17 122:18 130:24
132:18

**third-party** 38:14
73:2

**thought** 102:10 118:2
122:22 124:4 140:9

**thoughts** 35:18 44:7

**threshold** 74:18
79:22

**throughput** 28:22

**ticket** 101:2 153:21

**tickets** 107:3 128:4

**tie** 66:6

**tie-ins** 44:8,11 132:14
147:22

**tier** 28:24

**till** 37:12

**tilt** 46:15

**time** 5:13 8:7 13:2,11
18:18 19:16 21:1
25:11 26:6 27:16
36:13,19 37:9 42:2,6,
16,18 43:4 44:13
54:21 56:21 57:3
59:14 67:1 70:13
71:18 72:18 75:2 76:5
81:22 83:5 84:5,16
85:8,16 86:12,18
87:15,16 89:15 94:11,
12,17 96:18 100:14
106:2 107:14 111:2
116:6,7,8 117:14
119:6,11,19 124:17,
23 126:1 136:24
137:11,23 141:16,22
144:20 146:15 147:16

**timeline** 15:16 37:2

**timely** 43:9

**times** 9:10 13:9 19:15
28:3 29:3 65:14 67:1
68:18 107:12,16
114:1 116:23

**title** 14:23 20:12,13,
15,23 21:3 31:19
115:22 120:18

**titled** 108:11,12

**titles** 21:2

**today** 6:14 7:21 8:11
10:12,24 11:10,18
12:13,22 13:8 20:22,
23 22:5,23 25:19
130:23 156:24 157:4,
13

**today's** 7:11 25:8

**Todd** 142:14

**told** 33:7 84:11 91:5
93:17 145:5

**tools** 66:12 74:7
122:21,23

**top** 52:13 57:19
108:12 122:20 135:24

**total** 6:24 74:16,21
75:2 139:19

**totaled** 85:10

**totals** 84:6

**track** 71:4,5,18,22
72:24 79:9 101:20
103:14 156:5

**tracked** 78:15 79:12
153:8 154:1

**tracking** 81:8,9
119:12,20 120:11
152:17

**train** 39:18

**training** 21:18,23

**transcript** 29:4

**transferred** 32:10,22
33:4,20 143:17

**transition** 127:8

**transmission** 29:23

**true** 12:15 140:5

**trust** 37:2

**truth** 12:9,10

**two-thirds** 33:15

**type** 9:15 10:5 17:13
19:6 21:13,18 25:6
26:11,22 30:21 31:22
38:6 45:10 47:16
70:24 95:16 105:9
116:10,15 127:8
147:23

**types** 14:16

**typically** 41:20 52:10

**U**

**Uh-huh** 101:1 104:23
126:13 143:21

**unavailable** 94:10,13
95:4

**unclear** 66:5

**uncommon** 41:22

**understand** 8:3,4
10:22,23 11:5,19,24
12:4,14,21 15:16 17:4
22:20 35:10 37:24
44:22 45:21 61:15
62:11 80:9 82:9 84:5
85:3 105:7,17 113:12
118:20 133:13 139:16
148:23 149:23

**understanding**
25:19 28:9,12 61:23
63:15 66:15 74:14
75:20 76:2 78:6
120:10 158:15

**understood** 8:9 11:1
12:17 74:17,22,23
77:1 127:20 154:18

**undertaken** 47:1

**unfolded** 45:6,8 68:2

**UNIDENTIFIED**
49:10

**Unintelligible** 98:20

**unit** 36:18 57:2 86:17
108:6 124:22 141:21
145:12

**units** 33:16 84:3,12
108:12 121:9,10

**unrelated** 138:1,7

**unusual** 145:2

**unzip** 54:19

**update** 61:24

**updated** 60:16 61:21

**upgrades** 30:17,19,
24 31:1

**upper** 106:2 152:1,18
154:6

**useable** 29:20

**utility** 18:4

**utilized** 47:16 123:1

**V**

**values** 60:7 72:1
85:18 103:4,24 104:5,
14

**valve** 150:11

**valves** 150:24

**vendor** 125:2

**verification** 147:10

**verified** 69:22 147:13

**verify** 68:10

**versus** 5:4 79:10

**video** 5:2,11 6:11
11:15 52:23 53:8
95:10 156:24 157:1

**video-wise** 8:11

**view** 52:23

**visibility** 10:21

**visit** 44:1,6 116:3
128:1

**volume** 122:3

**W**

**wait** 44:12 102:19

**waiting** 43:7 83:11
89:12,15 90:1

**waive** 161:11

**walk** 66:1

**wanted** 44:17 51:23
76:17 111:6 113:18
134:7 145:8

**wanting** 19:7

**warn** 154:6

**Washington** 8:12,17

**watching** 28:5

**water** 29:11 107:11

**weather** 93:1,3,4,5,8,
10 132:13 160:7

**week** 25:13,23 65:18
68:22 149:18

**weekly** 65:8 74:8
101:19 119:15

**weeks** 117:7

**weigh** 79:24

**weighed** 80:17

**welding** 21:17

**weldolet** 67:4

**wells** 29:18

**whatnot** 116:9,21

**wholesale** 22:6

**wife** 24:6,12 91:2
152:22

**wife's** 54:13

**window** 51:8 52:19

**winning** 62:4

**winter** 93:2

**wondered** 24:15
134:10

**word** 20:13,15 26:18
55:6 81:6 128:5

**worded** 160:15

**words** 20:21

**work** 14:10,15 16:5,
13 18:4,8,9 19:6,8
20:4 21:11,13 24:18
38:6 40:2,19 41:18

52:24 57:21,23 58:23
62:14,18,21,22 63:11
65:23 66:5,20 68:13,
14 70:23 71:16,21,22
72:5,13 74:20 75:1
76:3 77:8,14 78:22
79:2,9,10 80:16 81:19
83:5 84:7 87:21 88:6
90:2,8 92:6,12,13,14
94:18 95:7 97:2 99:7,
10,16,24 100:2,10,24
101:8,13,14,21,23
102:1 106:7,9,16,24
111:2,24 112:5,17
114:15 115:9,20
119:13,21 120:1,11,
19 121:4,20 126:14,
19 127:1,3 128:4,6,
10,12,14,19 133:6,20
136:11,16 137:20
138:12 140:8,18,23
144:13 145:11,24
146:17 147:6,17,23
149:10,15,18,20
154:10,18 155:6
156:2,7 158:13
159:12,19,22,23
160:8,20

**worked** 16:7,8,9,12
17:18 19:2 38:1 39:8,
14 65:9 121:23
155:15

**working** 102:24
115:8,20 152:22

**works** 38:11

**world** 10:20 11:21
80:10 90:12

**wrapped** 141:24

**wrong** 12:20

---

### Y

**year** 15:15,19 26:17

**years** 8:20 9:13 13:19
14:5 15:23,24 16:17
22:4

**years'** 15:9

**you-all** 56:13

---

### Z

**zip** 54:9

**Zoom** 5:8 26:11
27:11,18 51:9 52:19
53:11 78:2

**EXHIBIT G**
*Certificate of Service to*
*Defendant's First Set of Interrogatories, Requests for Production,*
*and Requests for Admission*
*June 26, 2020*

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

**CNX MIDSTREAM DEVCO I, LP,**

|  |  |
|---|---|
| **Plaintiff,** | **Civil Action No.: 2:20-CV-290** |
|  | **Judge Lisa Pupo Lenihan** |
| **v.** |  |

**APPLIED CONSTRUCTION SOLUTIONS, INC.,**

      **Defendant.**

<u>**CERTIFICATE OF SERVICE**</u>

    I, Evan S. Aldridge, counsel for Defendant, Applied Construction Solutions, Inc. do hereby certify that on this 26th day of June 2020, a true and correct copy of the foregoing "**Defendant's First Set of Interrogatories, Requests for Production, and Requests for Admission**" was served upon the following counsel of record via email:

William D. Clifford, Esquire
Gregory C. Micaels, Esquire
DICKIE, MCCAMEY & CHILCOTE, P.C.
Two PPG Place, Suite 400
Pittsburgh, PA  15222-5402
*Counsel for Plaintiff*

By:   /s/ Evan S. Aldridge, Esq.    
Evan S. Aldridge, Esq. (*Admitted Pro Hac Vice*)
FLAHERTY SENSABAUGH BONASSO PLLC
200 Capitol Street
P.O. Box 3843
Charleston, WV 25338
T: (304) 345-0200
F: (304) 345-0260
ealdridge@flahertylegal.com

**EXHIBIT H**

*CNX's Response to ACS's Discovery Requests*
*Served February 3, 2021 (no COS filed)*
*Requests for Admission deemed admitted due to the passage of time.*

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CNX MIDSTREAM DEVCO I, LP**,** | : | CIVIL DIVISION |
| | : | |
| Plaintiff, | : | Docket No.: 2:20-CV-00290-AJS |
| | : | |
| v. | : | |
| | : | |
| APPLIED CONSTRUCTION SOLUTIONS, INC., | : | |
| | : | |
| Defendant. | : | |

**ANSWERS AND RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION OF DOCUMENTS, AND REQUESTS FOR ADMISSION**

NOW COMES the Plaintiff, CNX Midstream DEVCO I, LP ("CNX"), by and through its attorneys, Dickie, McCamey & Chilcote, P.C. and serves the following Answers and Responses to Defendant's First Set of Interrogatories, Requests for Production of Documents, and Requests for Admission:

**ANSWERS TO INTERROGATORIES**

**INTERROGATORY NO. 1.** Please state the name and Company Title for each individual assisting with responses to these Discovery Requests.

**ANSWER:** **The Answers to Interrogatories of CNX are answered by representatives of CNX with the assistance of counsel.**

**INTERROGATORY NO. 2.** Please state the name and Company Title of each person involved in submitting CNX's request for proposal, analyzing the submitted proposals/bids, and awarding the Project to ACS.

**ANSWER:** **Carissa Hansen, Senior Facilities Engineer**
**Kevin Dunn, Senior Foreman Construction**
**Chase Davis, Strategic Sourcing Specialist**
**Adam Beck, VP of Midstream Engineering and Construction**
**Brent Ellis, Director of Engineering**
**Ryan Aubuchon, Supervisor of Engineering**

William Kish, Construction Superintendent
Dennis Koscho, Pipeline Construction Manager
Cory Strennen, Senior Facilities Engineer
Aston Ring, Electrical Construction Foreman


**INTERROGATORY NO. 3.**  Please describe the process of Orbital's Project design from when Orbital was first contacted to design the Project, through design submissions, until Orbital's role on the Project concluded. A responsive answer should include, but is not limited to, an analysis of the requested design, the schedule for designing the Project, a description of any significant design setbacks incurred by CNX or Orbital, whether this Project was ready to submit requests for proposal between October and December 2018, why the final drawing was not submitted until June 7, 2019, and why project designs were changed throughout the project.

**ANSWER:**     **CNX objects to this Interrogatory as overly broad, vague, ambiguous, unduly burdensome, not reasonably limited in time or scope, as seeking information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. CNX further objects to any directive from Defendant as to how CNX must answer the Interrogatory.**

**Subject to and without waiving the foregoing objections, Orbital was selected on April 11, 2018 as the engineering firm to design the expansion of the Morris Compressor Station.  From the time of the selection of Orbital, CNX worked with Orbital and oversaw the preparation of drawings for each aspect of the expansion of the Morris Compressor Station.  Orbital issued 30% design drawings on August 6, 2018 and Orbital issued 60% drawings on September 20, 2018.  Orbital issued 90% drawings on September 20, 2018. As construction of the expansion of the Morris Compressor Station progressed, Orbital would issue updated drawings as needed and as requested by CNX as well as ACS. By way of further response, see transmittals from Orbital to CNX produced herewith.**

**INTERROGATORY NO. 4.** Please explain how CNX determined the status and percentage of IFC or P&ID drawings described as 60% complete on or about October 4, 2018 and later described as 90% complete on or about October 26, 2018. Please clarify the discrepancy between these percentages and the 80% complete estimate by Orbital Engineering on or about December 11, 2018.

ANSWER:       CNX objects to this Interrogatory as overly broad, vague, ambiguous, unduly burdensome, not reasonably limited in time or scope, as seeking information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. CNX further objects to any directive from Defendant as to how CNX must answer the Interrogatory.

Subject to and without waiving the foregoing objections, for drawings package to be determined a certain percentage complete, CNX uses the following guidelines:

- Drawings are considered 30% complete at the General Arrangement stage and after a first pass at P&ID drawings based on initial equipment designs;
- Drawings are considered 60% complete when P&ID drawings are issued for review and substantial mechanical and civil 3D model and drawings. Most major equipment drawings are IFC at this point.
- Drawings are considered 90% complete when P&ID drawings and 3D model and drawing package are mostly unchanging. At 90% complete, CNX conducts a PHA to determine if any safety related design changes are required. A first round of electrical drawings are available at this time with final drawings at IFC. The largest changes would be electrical at this point and detailed designs based on the P&IDs.

By way of further response, the scope of work for ACS and Orbital on the Project was different. Orbital's scope of work included a control room building, arc flash study and bulk storage tanks, but these items were not in the scope of work for ACS. The percentage of work complete by Orbital is subjective based upon PM meetings with the Project team and based upon remaining deliverables along with the percentage spent. Further, the December 11, 2018 update provided by Orbital noted changes to the nozzles on the storage tanks with significant piping updates, however, CNX was able to reuse most of the pipe from the existing tank battery which removed fabrication work from ACS' scope of work.

**INTERROGATORY NO. 5.** Please identify every change to the project designs that occurred after October 26, 2018. For purposes of this question, if multiple changes are made to one page of design drawings, CNX may treat the entire page as one change, unless itemized changes are needed for clarity. For each change:

        (a)    identify who ordered the design (i.e. CNX or Orbital Engineering, Inc.);

        (b)    describe why the design was changed;

        (c)    quantify the change in terms of material (i.e. lineal feet of pipe, number of instruments, etc.);

        (d)    identify if Orbital indicated the change was out of scope; and

        (e)    identify if CNX considers the change out of scope.

**ANSWER:** **CNX objects to this Interrogatory as overly broad, vague, ambiguous, unduly burdensome, not reasonably limited in time or scope, as seeking information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. CNX further objects to any directive from Defendant as to how CNX must answer the Interrogatory.**

**Subject to and without waiving the foregoing objections, in lieu of a response, CNX directs ACS to the design drawings, the NOT IN CONTRACT LOG and Request for Change Order Nos. 1 and 2 prepared by ACS.**

**INTERROGATORY NO. 6.** Describe how the document listed as Exhibit A to the Complaint was executed by the Parties, identify whether any signed copy exists, and indicate the exact location of any language in Exhibit A itself which states there is a not to exceed ("NTE") price, a cap on the project price, a lump sum figure, a guaranteed maximum price, or other restriction on the total amount this project would cost. For purposes of this question, please exclude any documents incorporated by reference under Exhibit A, Article 2.

**ANSWER:** **CNX objects to this Interrogatory as overly broad, vague, ambiguous, unduly burdensome, not reasonably limited in time or scope, as seeking information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. CNX further objects to any directive from Defendant as to how CNX must answer the Interrogatory.**

**Subject to and without waiving the foregoing objections**, the Purchase Order was issued by CNX to ACS via HUBWOO on December 5, 2018 at 9:56 p.m. See document from HUBWOO memorializing this fact produced herewith at Bates No. CNX 049077. Pursuant to the "explicit" terms of the Purchase Order, if ACS received the Purchase Order through HUBWOO, which it did, the Purchase Order could only be accepted by ACS by sending the Purchase Order back to CNX via HUBWOO. As required by the Purchase Order, ACS accepted the Purchase Order by sending it back to CNX via HUBWOO on December 21, 2018 at 3:30 p.m. See attached document from HUBWOO memorializing this fact produced herewith at Bates No. CNX 049077. Pursuant to the "explicit" terms of the Purchase Order, the offer and acceptance of the Purchase Order was effectuated by electronic transmission via HUBWOO. There was no requirement or relevance to "signing" the Purchase Order. Further, the Purchase Order does not explicitly state that there is a Not To Exceed price on this Project. In this regard, Article 4 of the Purchase Order sets forth a lump sum budget for the Project of $12,418,545. Pursuant to Article 2 of the Purchase Order, CNXM RFP questions dated November 5, 2018 are "explicitly" incorporated into the Purchase Order. The CNXM RFP question dated November 5, 2018 "explicitly" provides that the Purchase Order is a time and materials contract with a Not To Exceed amount based upon the lump sum budget submitted by ACS.

**INTERROGATORY NO. 7.** Please detail any response from CNX or CNX personnel to Jim Glass's conditional requirement in a November 7, 2018 email that ACS needs 100% complete drawings or drawings that "CNX is will[ing] to accept as 100% for purposes of establishing a firm price on." Indicate whether 100% drawings were supplied by CNX or whether CNX accepted the "90% complete" drawings it uploaded on October 26, 2018 as 100% complete for purposes of establishing a "firm price."

**ANSWER:** **CNX objects to this Interrogatory as overly broad, vague, ambiguous, unduly burdensome, misleading, not reasonably limited in time or scope, as seeking information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.**

**Subject to and without waiving the foregoing objections, CNX never requested and ACS never supplied a firm price for this Project. As stated in the Contract, this Project was bid on a T&M basis with a Not to Exceed price.**

**INTERROGATORY NO. 8.**  Please describe why the Project was not awarded on November 11, 2018, why CNX requested revised bids, and what changes CNX made or requested contractors make to lower the revised bids from the original submission.

**ANSWER:**  **CNX objects to this Interrogatory as overly broad, vague, ambiguous, unduly burdensome, not reasonably limited in time or scope, as seeking information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.**

**Subject to and without waiving the foregoing objections, bids for the Project were due on November 6, 2018 and the Project was to be awarded on November 9, 2018. The Project was not awarded on November 9, 2018, because CNX asked contractors what additional information was needed to clarify the Project. CNX also took time to meet with some of the subcontractors that contractors were proposing to use on the Project.  Further, updated drawings for the Project were issued on November 13, 2018 and November 15, 2018.  CNX did not request that bidders lower their bids, but instead, CNX requested that bidders revise their bids based upon the updated drawings.**

**INTERROGATORY NO. 9.**  Please describe why CNX submitted Project payments to ACS on a T&M basis and also accepted ACS's invoice support on a T&M basis.

**ANSWER:**  **CNX objects to this Interrogatory as overly broad, vague, ambiguous, unduly burdensome, not reasonably limited in time or scope, as seeking information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.**

**Subject to and without waiving the foregoing objections, CNX submitted Project payments to ACS on a T&M basis and also accepted ACS' invoice support on a T&M basis, because it was in accordance with the terms of the Contract. The basis of the Contract between the parties was for the Contract to be billed on a T&M basis with a Not To Exceed price.  Pursuant to the terms of the Contract, ACS could invoice CNX on a T&M basis up to the Not To Exceed price.**

**INTERROGATORY NO. 10.**  Please state if CNX agrees that ACS spent at least $19,578,615.76 on the Project, and if not, what CNX alleges is the actual Project cost and where CNX believes the differences are.

**ANSWER:**     **CNX objects to this Interrogatory as vague, ambiguous and seeking a legal conclusion and expert opinion from CNX.**

**INTERROGATORY NO. 11**.  Please quantify the amount of material bid on the project and the amount of material installed on the project. If you disagree with the figures presented in ACS's mediation statement Table 1, please identify the basis for your disagreement.

**ANSWER:**     **CNX objects to this Interrogatory as overly broad, vague, ambiguous, unduly burdensome, not reasonably limited in time or scope, as seeking information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. CNX further objects to any directive from Defendant as to how CNX must answer the Interrogatory.**

**Subject to and without waiving the foregoing objections, the amount of the material bid on the project was set forth in the drawings package and the amount of materials to be installed on the project was set forth in the Purchase Order and Change Orders. Further, the information sought by ACS is in its possession in its bid and its invoices.  ACS should be aware of the amount of its material bid on the project and the amount of the material installed on the project.  Further, discovery is ongoing. CNX will supplement its Answer to this Interrogatory to extent necessary in accordance with the Federal Rules of Civil Procedure and the Local Rules for the U.S. District Court for the Western District of Pennsylvania.**

**INTERROGATORY NO. 12.** Please identify every occasion where material or equipment were delayed from reaching the site because CNX did not have the necessary permits. (e.g. certain compressors could not cross the state line until CNX obtained the adequate permit.). Quantify the amount of days it took to resolve this occurrence.

**ANSWER:** **CNX objects to this Interrogatory as overly broad, vague, ambiguous, unduly burdensome, not reasonably limited in time or scope, as seeking information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. CNX further objects to any directive from Defendant as to how CNX must answer the Interrogatory.**

**Subject to and without waiving the foregoing objections, CNX is only aware of the transport of two coolers to the Morris Station was delayed over one weekend, because of a permitting issue preventing the coolers from crossing the state line. Two other coolers to be installed at the Morris Station were stored offsite, because at the time of delivery, ACS was not prepared to install the coolers so any delay resulting from transport was inconsequential.**

**INTERROGATORY NO. 13.** Please identify every occasion where material or labor that was supposed to be provided by CNX was delayed from reaching the site or inaccessible on site.

**ANSWER:** **CNX objects to this Interrogatory as overly broad, vague, ambiguous, unduly burdensome, not reasonably limited in time or scope, as seeking information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.**

**Subject to and without waiving the foregoing objections, CNX does not agree that any delay of material or labor to the construction site occurred due to the actions or omissions of CNX which affected ACS. By way of further response, the dehydration package was delayed, but such delay was communicated to ACS and there was no effect to ACS as ACS was focused on the completion of the new tank farm so ACS could install certain compressors at the site.**

**INTERROGATORY NO. 16.**  Please identify when and why Kevin Dunn was removed from the Project.

**ANSWER:**     **CNX objects to this Interrogatory as seeking information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.**

**Subject to and without waiving the foregoing objections, Kevin Dunn was reassigned from the Project so that CNX could utilize Kevin Dunn on a different CNX project.**

**INTERROGATORY NO. 17.**  Please state why CNX directed ACS to withhold any change order or financial requests to submit as one final change order because CNX on-site personnel represented to ACS that CNX's field team could only go back to CNX's operational or financial team to request one (1) more monetary request.

**ANSWER:**     **CNX objects to this Interrogatory to as overly broad, vague, ambiguous, as seeking information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.  CNX further objects to the extent the term "financial requests" is undefined and identity of "CNX's field team" is not identified by ACS.**

**Subject to and without waiving the foregoing objections, CNX denies that it directed ACS to withhold any change order or financial request. During the course of ACS's work on the Project, it submitted Requests for Change Orders based upon ACS's assertion that the actual scope-of-work for the Project was more extensive than the scope-of-work required by the Purchase Order.  ACS submitted these requests for change order prior to performing the work as required by Article 10 of the Purchase Order. CNX agreed that certain of the Requests for Change Order submitted by ACS related to work that was outside of the scope-of-work of the Purchase Order.  CNX signed off on these Requests for Change Orders. CNX agreed that these Requests for Change Orders would be billed by ACS on a T&M basis.  ACS and CNX kept track of these Requests for Change Orders on a "Not In Contract" log.  Ultimately, CNX and ACS agreed that ACS performed work that was beyond the scope-of-work of the Purchase Order. In this regard, CNX issued Change Orders Nos. 1 and 2 to the Purchase Order.**

**INTERROGATORY NO. 18.**  Please describe CNX's audit process on the Project in terms of:

      (a)      What individuals were actively involved;

      (b)      What information was reviewed;

      (c)      What the findings of the audit process revealed;

      (d)      What the total Project cost supported by the audit was; and

      (e)      Whether the audit process verified that ACS's process for assembling invoices (regardless of figures) was a supportable and recreatable process.

**ANSWER:**      **CNX objects to this Interrogatory as the term "audit process" is undefined.**

      **Subject to and without waiving the foregoing objections, an audit was not performed.  CNX personnel reviewed the invoices submitted by ACS as a part of internal review of the Project.  The review did not reach a conclusion regarding a comparison of the projected costs of the Project and actual cost of the Project or if ACS under billed CNX for any work as the Project was bid with a Not to Exceed price.**

**INTERROGATORY NO. 19.**  Please identify every expert or consultant CNX has used or will use on the Project or this lawsuit. Identify the individual's contact information, field of specialty, CV, any report generated, and if CNX intends for this individual to testify at trial.

**ANSWER:**      **CNX has not yet made this trial determination. CNX will supplement its Answer to this Interrogatory in accordance with local rules and Federal Rules of Civil Procedure.**

## RESPONSE TO REQUEST FOR PRODUCTION OF DOCUMENTS

**REQUEST NO. 1.** Please provide a copy all correspondence, contracts, reports, schedules, designs, draft designs, redlined designs, and other documents between Orbital and CNX relating to the Project.

**RESPONSE:** **CNX objects to this Request as overly broad, vague, ambiguous, unduly burdensome, not reasonable limited in time or scope, seeking information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. CNX further objects to this Request to the extent it seeks information and documents which are protected from disclosure by the attorney-client privilege and/or work product doctrine.**

**Subject to and without waiving the foregoing objections, see documents produced with CNX's Initial Disclosures, produced previously in this matter and the documents produced herewith.**

**REQUEST NO. 2.** Please provide all internal or external CNX correspondence relating to the following subject matters:

(a)     The status of the Project design prior to bid;

(b)     The decision to delay Project award and request revised bids;

(c)     Orbital Engineering's performance and Project;

(d)     Emergency shutdowns, accidents, explosions, near misses, and flaring on the Project;

(e)     Internal and external budgeting correspondence regarding the Project (between October 2018 and January 2020);

(f)     Change orders, invoices, and requests for payment;

(g)     Changes to project designs throughout the Project;

(h)     Additional work, out-of-scope work, work not in the original designs, and work directives;

(i)     Correspondence about the alleged NTE aspect of the Project and correspondence about the Project being purely T&M; and

(j)     The audit process and audit results.

**RESPONSE:** **CNX objects to this Request as overly broad, vague, ambiguous, unduly burdensome, not reasonable limited in time or scope, seeking information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. CNX further objects to the extent this Request seeks information and documents protected from disclosure by the attorney-client privilege and/or work product doctrine. CNX further objects to the extent the terms "audit process" and "audit results" are not defined in this Request.**

**Subject to and without waiving the foregoing objections, see documents produced previously in this matter.**

**REQUEST NO. 3.** Please also provide all correspondence by the following individuals that relate to the Project between project inception (prior to submitting the Project to design or requests for proposal) and present:

      (a)     Kevin Dunn,

      (b)     Carissa Hansen,

      (c)     Chase Davis,

      (d)     Todd Shumaker,

      (e)     Adam Beck,

      (f)     Ryan Aubuchon,

      (g)     Will Kish, and

      (h)     Dennis Koscho.

**RESPONSE:** **CNX objects to this Request as overly broad, vague, ambiguous, unduly burdensome, not reasonable limited in time or scope, seeking information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. CNX further objects to the extent this Request seeks information and documents protected from disclosure by the attorney-client privilege and/or work product doctrine.**

**Subject to and without waiving the foregoing objections, see documents produced previously in this matter.**

**REQUEST NO. 4.** Please provide all documents and information generated by CNX, at CNX's direction, or otherwise provided to CNX in relation to the audit. For purposes of this request, CNX may omit producing the documents provided by ACS.

**RESPONSE:** **CNX objects to this Request as overly broad, vague, ambiguous, unduly burdensome, not reasonable limited in time or scope, seeking information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. CNX further objects to the extent this Request seeks information and documents protected from disclosure by the attorney-client privilege and/or work product doctrine.**

**Subject to and without waiving the foregoing objections, an audit was not performed. CNX personnel reviewed the invoices submitted by ACS as a part of internal review of the Project. By way of further response, see documents produced previously in this matter.**

**REQUEST NO. 5**. Please produce any construction or operation permits in effect between October 2018 and October 2019 on the Morris Station.

**RESPONSE:** **See General Operating Permit produced herewith at Bates Nos. CNX 048967-049000.**

**REQUEST NO. 6.** Please provide the full expert file of any expert you retained in this matter.

**RESPONSE:** **CNX has not yet made this trial determination. CNX will supplement its Response to this Request for Production in accordance with local rules and Federal Rules of Civil Procedure.**

**REQUEST NO. 7.** Please provide all photographs, videotapes, or other visual or audio recordings, which CNX may have of the Project that it intends to use to support its claims or defend against ACS's claims.

**RESPONSE:** **CNX has not yet made this trial determination and CNX will supplement its Response in accordance with the Federal Rules of Civil Procedure and local rules.**

**REQUEST NO. 8**. Please produce all relevant documents, files, or recordings of all emergency shutdowns, explosions, accidents, incidents, near miss, flaring, citations, notices of violation, and safety violations that occurred at the Morris Station between October 2018 and October 2019.

**RESPONSE:** **CNX objects to this Request as overly broad, vague, ambiguous, unduly burdensome, not reasonable limited in time or scope, seeking information that is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.**

**Subject to and without waiving the foregoing objections, see ESD sheet produced herewith.**

**REQUEST NO. 9.** Please provide any written or recorded statements in your possession, custody, or control, or taken on your behalf, from any person with knowledge of the facts surrounding the Project or ACS's demand for payment related to the Project.

**RESPONSE:** **None.**

**REQUEST NO. 10.** Please produce any document, item, correspondence, or other tangible thing that CNX relied upon to answer these Discovery Requests, or otherwise referenced or alluded to in its Answers/Responses.

**RESPONSE:** **See CNX's Answers to Interrogatories and Responses to Requests for Production of Documents.**

<u>**RESPONSE TO REQUEST FOR ADMISSIONS**</u>

**REQUEST NO. 1.** Please admit that Exhibit A to CNX's Complaint does not explicitly state there is an NTE price on this Project.

**RESPONSE:** **Denied. To the contrary, initially, Exhibit A to CNX's Complaint is a version of the Purchase Order that was a printed version of the electronic version that was referenced for ease of reading. It is denied that the Purchase Order does not explicitly state that there is a Not To Exceed price on this Project. In this regard, Article 4 of the Purchase Order sets forth a lump sum budget for the Project of $12,418,545. Further,**

pursuant to Article 2 of the Purchase Order, CNXM RFP questions dated November 5, 2018 are "explicitly" incorporated into the Purchase Order. The CNXM RFP question dated November 5, 2018 "explicitly" provides that the Purchase Order is a time and materials contract with a Not To Exceed amount based upon the lump sum budget submitted by ACS.

**REQUEST NO. 2.** Please admit that neither CNX nor ACS ever signed the document identified as Exhibit A to CNX's Complaint.

**RESPONSE**: **Plaintiff objects to this Request on the basis that it is misleading and assumes a fact not proven to be true.**

**Subject to and without waiving the foregoing objections, the Request is denied. By way of further response, the Purchase Order was issued by CNX to ACS via HUBWOO on December 5, 2018 at 9:56 p.m. Produced herewith at Bates No. CNX 049077 is a document from HUBWOO memorializing this fact. Pursuant to the "explicit" terms of the Purchase Order, if ACS received the Purchase Order through HUBWOO, which it did, the Purchase Order could only be accepted by ACS by sending the Purchase Order back to CNX via HUBWOO. As required by the Purchase Order, ACS accepted the Purchase Order by sending it back to CNX via HUBWOO on December 21, 2018 at 3:30 p.m. Produced herewith at Bates No. CNX 049077 is a document from HUBWOO memorializing this fact. Pursuant to the "explicit" terms of the Purchase Order, the offer and acceptance of the Purchase Order was effectuated by electronic transmission via HUBWOO. There was no requirement or relevance to "signing" the Purchase Order.**

**REQUEST NO. 3.** Please admit that Exhibit A to CNX's Complaint contains its own Exhibit A titled "Cost Breakdown of Project Scope of Work" which contains line item 3.9 "Field Hydro Testing."

**RESPONSE:** **It is admitted that Exhibit A to CNX's Complaint and the printout of the exact version of the Purchase Order contains an Exhibit A entitled "Cost Breakdown of the Project Scope-of-Work" which contains a line 3.9 "Field Hydro Testing." Any remaining averments or averments to the contrary are denied.**

**REQUEST NO. 4.** Please admit that the aforementioned Exhibit A line item 3.9 "Field Hydro Testing" references that the Project's hydro testing was proposed to be performed in the field.

**RESPONSE:** **It is admitted that Exhibit A to CNX's Complaint and the printout of the exact version of the Purchase Order at line 3.9 states "Field Hydro Testing." By way of further response, Field Hydro Testing was never proposed or accepted as testing the pipe in the racks. This method of testing is dangerous to other installed pipes that could actually explode the racks itself. Field-testing involves testing the pipe on the site but not in the racks. Any remaining averments or averments to the contrary are denied as stated.**

**REQUEST NO. 5.** Please admit that Exhibit A to CNX's Complaint contains its own Exhibit A titled "Cost Breakdown of Project Scope of Work" which contains line items that include the suffix "LS 1" which stands for lump sum.

**RESPONSE:** **It is admitted that Exhibit A to CNX's Complaint and the printout of the exact version of the Purchase Order contains the letters LS1 which is intended to represent "lump sum." Any remaining averments or averments to the contrary are denied as stated.**

**REQUEST NO. 6.** Please admit CNX uploaded a spreadsheet titled "CNX Midstream – Schedule of Values" to its Hubawoo system for contractors to complete as part of their proposal, and this spreadsheet is incorporated into that Exhibit A to CNX's Complaint's own Exhibit A titled "Cost Breakdown of Project Scope of Work."

**RESPONSE:** **It is admitted that CNX placed a Schedule of Values for the Project on HUBWOO and that the Schedule of Values with dollar amounts provided by ACS is contained as Exhibit A to Exhibit A to CNX's Complaint and the exact version of the Purchase Order. Any remaining averments or averments to the contrary are denied.**

**REQUEST NO. 7.** Please admit that the spreadsheet titled "CNX Midstream – Schedule of Values" that CNX uploaded to its Hubawoo system for Contractor's to complete as part of their proposal contained line item 3.9 "field hydro testing" and the spreadsheet's line items

are either on a lump sum basis or quantified by "each" occurrence necessary, but not by manhour.

**RESPONSE:** **It is admitted that Exhibit A to CNX's Complaint and the exact version of the Purchase Order at item 3.9 provides for a "lump sum number" or "each." However, it is denied that Line 3.9 provides that this line item is not to be billed on a man-hour basis. In this regard, pursuant to the Purchase Order, all items on the Schedule of Values were to be bid on a T&M basis with an amount not to exceed placed on the Schedule of Values. This requirement is "explicitly" provided in the Purchase Order that "explicitly" incorporates the CNXM RFP questions dated November 5, 2018. In this document it is "explicit" that the Schedule of Values is to be completed on a "T&M not to exceed" basis. Any remaining averments or averments to the contrary are denied.**

**REQUEST NO. 8.** Please admit that through this aforementioned spreadsheet, CNX requested bids at lump sum pricing for purposes of comparing bids, but the project would be performed on a T&M basis (with or without an NTE component).

**RESPONSE:** **See Response to Request for Admission No. 7.**

**REQUEST NO. 9.** Please admit that ACS submitted a "Schedule of Equipment and Labor Rates" on or about November 11, 2018 as part of its original proposal, and this "Schedule of Equipment and Labor Rates" described how certain items would be billed.

**RESPONSE:** **Denied. To the contrary, ACS submitted its original proposal for the Project on November 6, 2018. ACS also submitted a schedule of T&M rates for labor and equipment.**

**REQUEST NO. 10.** Please admit that ACS again submitted the "Schedule of Equipment and Labor Rates" on or about November 30, 2018 – prior to CNX awarding the project.

**RESPONSE:** **Upon information and belief, it is admitted that ACS submitted a schedule of T&M rates for labor and equipment on November 30, 2018. Any remaining averments or averments to the contrary are denied.**

**REQUEST NO. 11.** Please admit that CNX accepted this "Schedule of Equipment and Labor Rates" and T&M items should be billed under these rates.

**RESPONSE: Admitted.**

**REQUEST NO. 12.** Please admit that CNX would not approve the original Project proposals due to the cost, so CNX's Project specific personnel requested that all or certain contractors reduce their bid for purposes of getting CNX to approve a lower amount for the same project.

**RESPONSE: Denied. To the contrary, CNX requested contractors to submit revised bids based upon the updated drawings provided to contractors on November 13, 2018 and November 18, 2018.**

**REQUEST NO. 13.** Please admit that the Project drawings were not 90% designed when CNX accepted ACS's Project proposal on or about November 20, 2018.

**RESPONSE: Denied. To the contrary, all bidders were aware of that the Project design was not 100% complete as of the date of the bid submittal. In this matter, an estimate regarding the level of completion of the design at the time of bid was 90%. Irrespective of the actual percent complete of the Project design upon which ACS's bid was based, the lump sum Not To Exceed number submitted by ACS was based upon the design completion as it existed as of the date of its bid. To the extent that the further development of the design of the Project subsequent to ACS's bid resulted in an increased scope-of-work for the Project, the Purchase Order at Article 10 provided for the Not To Exceed number to be increased by change order to pay for the additional work required of ACS as the result of further development of the Project design following submission of its bid.**

**REQUEST NO. 14.** Please admit that CNX knew the Project was not 90% designed when CNX uploaded what CNX represented were 90% complete drawings to the Hubawoo system on or about October 26, 2018.

**RESPONSE: See Response to Request for Admission No. 13.**

**REQUEST NO. 15.** Please admit that prior to project award on or about November 30, 2018, Orbital told CNX that the Project designs were not 90% complete.

**RESPONSE:** **CNX objects to this Request as vague, ambiguous, overly broad and lacking the requisite specificity for CNX to respond. Therefore, CNX is unable to admit or deny the Request.**

**REQUEST NO. 16.** Please admit that any work not included in the drawings as they existed on or about November 26, 2018 (when ACS submitted its revised Project proposal) is out-of-scope work.

**RESPONSE:** **See Response to Request for Admission No. 13.**

**REQUEST NO. 17.** Please admit that the decision to delay the Project beginning from December 2018 to early 2019 was prudent due to incomplete Project designs and the winter season.

**RESPONSE:** **CNX objects to this Request as it seeks an opinion from CNX.**

**Subject to and without waiving the foregoing objection, the Request is denied.**

**REQUEST NO. 18.** Please admit that ACS informed CNX that ACS was waiting to begin the Project until it had more complete Project designs, and CNX later requested ACS to begin the Project despite incomplete designs.

**RESPONSE:** **Denied.**

**REQUEST NO. 19.** Please admit that the Project designs that were submitted contained deficiencies, such as inaccurate measurements and pipe sizes, that required ACS to make changes to the design to ensure the Project was built as intended.

**RESPONSE:** **See Response to Requests for Admission No. 13.**

**REQUEST NO. 20.** Please admit the Project designs were delivered late throughout the entire project.

**RESPONSE:** **CNX objects to this Request as vague, ambiguous, overly broad and not reasonably specific in terms of time and scope. As a result, CNX is unable to admit or deny this request at this time.**

**REQUEST NO. 21.** Please admit that ACS could not complete the Project prior to June 1, 2019 because the final drawing was delivered to ACS on June 7, 2019.

**RESPONSE:** **Denied as stated. To the contrary, CNX agreed to extension of time to July to allow for ACS' completion of Phase I the Project.**

**REQUEST NO. 22.** Please admit that in January 2020, ACS demonstrated approximately 120 pages of changed drawings to CNX in a presentation.

**RESPONSE:** **CNX objects to this Request as vague, ambiguous and as referring to an unspecified presentation and unidentified purported pages of drawings which are not further defined in the Request. Therefore, CNX is unable to admit or deny the Request.**

**REQUEST NO. 23.** Please admit that multiple emergency shutdowns caused ACS to incur delays when forced to evacuate the Project site – at no fault to ACS.

**RESPONSE:** **Denied. To the contrary, CNX does not have any knowledge as to what caused ACS to incur unacceptable delays.**

**REQUEST NO. 24.** Please admit that CNX directed ACS to perform out-of-scope or additional work.

**RESPONSE:** **Admitted.**

**REQUEST NO. 25.** Please admit that CNX directed ACS to perform additional work on multiple occasions based on the representation that ACS would be compensated on a T&M basis, so a formal change order was not necessary.

**RESPONSE:** **It is admitted that during the course of ACS's work on the Project, it submitted Requests for Change Orders to CNX based upon ACS's assertion that the actual scope-of-work for the Project was more extensive than the scope-of-work required by the Purchase Order. ACS submitted these Requests for Change Orders prior to performing the work as required by Article 10 of the Purchase Order. CNX agreed that certain of the Requests for Change Orders submitted by ACS related to work that was outside of the scope-of-work of the Purchase Order. CNX signed off on the Requests for Change Orders. CNX agreed that these Requests for Change Orders would be billed by ACS on a T&M basis. ACS and CNX kept tracked of these Requests for Change Orders on a "Not in Contract" log. Ultimately, CNX and ACS agreed that ACS performed work beyond the scope-of-work of the Purchase Order. In this regard, CNX issued Change Order Nos. 1 and 2 to the Purchase Order. Any remaining averments or averments to the contrary are denied.**

**REQUEST NO. 26.** Please admit that Kevin Dunn had the authority to bind CNX to directives given to ACS on site.

**RESPONSE:** **It is admitted that Kevin Dunn had authority to agree to change orders on the Project. Any remaining averments or averments to the contrary are denied.**

**REQUEST NO. 27.** Please admit that CNX is bound to compensate ACS for additional or out-of-scope worked that Kevin Dunn directed ACS to perform.

**RESPONSE:** **See Response to Request for Admission No. 25.**

**REQUEST NO. 28.** Please admit that CNX directed ACS to increase its manpower on site and increase the number of shifts ACS worked.

**RESPONSE:** **It is admitted that at times CNX requested ACS to provide more manpower and shifts for the Project. By way of further response, Jim Glass of ACS stated that such request would shift ACS' manpower curve, but not affect overall man hours for the Project. Any remaining averments or averments to the contrary are denied.**

**REQUEST NO. 29.** Please admit that CNX paid multiple invoices or requests for payment on a T&M basis.

**RESPONSE:** **See Response to Request for Admission No. 25.**

**REQUEST NO. 30.** Please admit that CNX never warned ACS that the Project was approaching or exceeded an alleged NTE price until after the fact.

**RESPONSE:** **CNX admits that it never warned ACS that the Project was approaching or exceeding the Not to Exceed price for the Project. By way of further response, ACS accepted a Not to Exceed price and therefore, CNX was under no obligation to track ACS's costs in completing the Project for the benefit of ACS. Any remaining averments or averments to the contrary are denied.**

**REQUEST NO. 31.** Please admit that on or about July 24, 2019, David Larkin emailed Robin Dunn a cost at completion estimate of $17,036,340.

**RESPONSE:** **Admitted.**

**REQUEST NO. 32.** Please admit that on or about August 12, 2019, David Larkin emailed Carissa Hansen a cost at completion estimate of $18,101,790.00.

**RESPONSE:** **Admitted.**

**REQUEST NO. 33.** Please admit that no CNX personnel attempted to address, mitigate, control, reduce, or otherwise affect the increasing cost of this project until after the Project was completed.

**RESPONSE:** **Denied.**

**REQUEST NO. 34.** Please admit that the audit CNX performed revealed that ACS underbilled CNX and the project cost was actually higher than the amount previously believed.

**RESPONSE:** **CNX objects to this Request as the term "audit" is undefined.**

**Subject to and without waiving the foregoing objection, the Request is denied. To the contrary, an audit was not performed. CNX personnel reviewed the invoices submitted by ACS as a part of internal review of the Project. The review did not reach a conclusion regarding a comparison of the projected costs of the Project and actual cost of the Project or if ACS under billed CNX for any work as the Project was bid with a not to exceed price.**

Respectfully submitted,

DICKIE, McCAMEY & CHILCOTE, P.C.


By: /s/ William D. Clifford
     William D. Clifford, Esquire
     PA I.D. #34959

     Gregory C. Michaels, Esquire
     PA I.D. #205948

DICKIE, McCAMEY & CHILCOTE, P.C.
Firm #067
Two PPG Place, Suite 400
Pittsburgh, PA 15222-5402
412-281-7272
*Counsel for Plaintiff*
*CNX Midstream DEVCO I, LP*

## **VERIFICATION**

I, Carissa Hansen, am authorized to execute this Verification on behalf of CNX Midstream DEVCO I, LP and has knowledge of the matters set forth in the foregoing Plaintiff CNX Midstream DEVCO I, LP's Answers to Interrogatories and Responses to Request for Admissions and verifies that the same are true and accurate to the best of my information and belief, and that to the extent the matters set forth in said answers and response are based upon information and belief, and believe the answers and response to be true and accurate to the best of my knowledge.

I verify under penalty of perjury that the foregoing is true and correct.

_____
Carissa Hansen

DATED: 1-29-2021

**CERTIFICATE OF SERVICE**

I, William D. Clifford, Esquire, hereby certify that a true and accurate copy of the foregoing ***Answers and Responses to Defendant's First Set of Interrogatories, Requests for Production of Documents, and Requests for Admission*** has been served this 3rd day of February, 2021, via electronic mail.

Christopher A. Brumley, Esquire
Evans S. Aldridge, Esquire
Flaherty Sensabaugh Bonasso PLLC
200 Capital Street, P.O. Box 3843
Charleston, WV 25338

DICKIE, McCAMEY & CHILCOTE, P.C.

By */s/ William D. Clifford*
     William D. Clifford, Esquire
     PA I.D. #34959

     Gregory C. Michaels, Esquire
     PA I.D. #205948

Attorneys for Plaintiff
CNX Midstream DEVCO I, LP