**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

CNX MIDSTREAM DEVCO I LP,          )
                                   )          Civil Action No. 20-0290
                    Plaintiff,     )
                                   )
          v.                       )          Magistrate Judge Lenihan
                                   )
APPLIED CONSTRUCTION SOLUTIONS,    )
                                   )
INC.,                              )
                                   )          ECF Nos. 45, 48, 51
                    Defendant.     )

**MEMORANDUM OPINION ON THE PARTIES' MOTIONS**
**FOR SUMMARY JUDGMENT**

Presently before the Court are three Motions for Summary Judgment: one filed by CNX

Midstream Devco I LP ("CNX" or "Plaintiff") requesting partial summary judgment on grounds

that "the Purchase Order between the parties is a time and materials contract with a price not to

exceed ('T&M NTE')", and two filed by Defendant Applied Construction Solutions, Inc.

("ACS" or "Defendant") requesting summary judgment on grounds of either (a) the contractual

absence/inapplicability of an NTE term or (b) unjust enrichment in the alternative.  For the

reasons discussed below, all motions will be denied.[1]

---

[1] As CNX notes, "initial discovery in this matter was limited . . . to 'whether the contract is time and materials or time and materials with costs not to exceed,' and 'issues of whether the contract contained a not to exceed price term or what form of contract arose between the parties.'").  ECF No. 54 at 9 (citing ECF Nos. 35 and 41).  Plaintiff's substantive Response to the Motion for Summary Judgment on grounds of unjust enrichment was filed at ECF No. 55.

The Court observes ACS' contention - within certain filings made with regarding to the parties' motions for summary judgment - that its Requests for Admission directed to CNX were admitted by operation of law.  It also notes CNX's response noting, for example, this Court's prior directions regarding the scope and time frames of

## I.  FACTS

Throughout October and November 2018, CNX Midstream Devco I LP ("CNX",

"Plaintiff" or "Company") solicited bids for the construction of the Morris Natural Gas

Compressor Station ("Morris Project"). On November 5, 2018, CNX posted a document ("NTE

Q&A Document"), for all bidders to see, containing questions from bidders (without origination

information) along with answers to those questions. The relevant questions and answers are as

follows:

[Question:] Can you please clarify if this contract will be T&M or a Lump Sum contract?
[Answer:] T&M
[Question:] Do you want all [Schedule of Value] lines as T&M Not to Exceed?
[Answer:] Yes
[Question:] If it is T&M, is this T&M not to exceed amount based upon your submitted lump sum budget?
[Answer:] Yes.

ECF No. 47 at 334. [2]  One day after the Q&A document was posted (November 6, 2018), ACS

submitted an initial bid. ECF No. 49 at 3. After some correspondence, ACS submitted, at CNX's

request, a revised bid ("Revised Bid") that removed various "contingencies" in order to provide

CNX a lower price as requested. ECF No. 49 at 4. The Revised Bid contained the following

language:

Our Original proposal of $14,108,760.00 . . . was a number that sought to mitigate all concerns . . .  and other unforeseen issues. Essentially, we included contingencies and risk against tie-in delays and subsequent schedule delays and slippages. We included a contingency for inclement weather, snow or rain. Our goal was to take care of any makeup days. Basically, we tried to cover all possible issues to avoid any addition [*sic*] cost to CNX.

---

initial, limited discovery and motions; the parties' discovery exchanges; the strong preferability of decisions on the merits; and other procedures under Fed. R. Civ. P. 36.  The Court is in general accord with CNX's response and deems it unnecessary to address this contention further in ruling on the motions before it.  See ECF No. 54 at 6-9; see also ECF No. 64.

[2] The documents appended with ECF No. 47 are not designated as 47-1, 47-2 *etc.*, so the PDF's running page number is designated.

When asked we responded that our number was a Plus Minus 10% Number and after further review of the documents that were provided since the bid due day. That statement is true still. After reviewing the documents, we feel we have a viable number that provides a budget to CNX that they can be used [*sic*] for budgeting purposes. It allows for construction activities, weather delays, equipment and material delays, schedule slips regarding tie ins.

If ACS removes the 10% contingency our number is $12,826,145.50 and obviously removes the mitigation controls mentioned above. Also when removing delays related to tie ins included our number the total further reduces.

ACS management has had several rounds of discussion and feel that with in depth planning, and holding agreed upon dates for equipment & tie-ins, our number would be closer to $11.5 million than to $12 million. Obviously at this level any change or deviation from scope as it stands now, or schedule would be addressed very transparently between ACS and CNX.

ECF No. 59-1 at 62-63. CNX then awarded the contract to ACS, and in early December, CNX electronically issued a purchase order ("Purchase Order") to ACS through their electronic system, "HUBWOO". ECF No. 53 at ¶¶ 9, 10. Article 2 of the Purchase Order incorporates about 150 documents by reference, including both ACS's Revised Bid and the NTE Q&A Document. ECF No. 48-1 at 3. ACS acknowledged the Purchase Order, but there are no signed copies.[3] The project designs were incomplete at the time that ACS was awarded the contract and were not finalized until seven months after the bid was accepted. ECF No. 49 at 11.

During the course of construction, ACS submitted requests for Change Orders, and the parties kept track of the work that was approved in these orders in a "Not in Contract Log." (ECF No. 47 at 337–38. Based on the second page adding the totals, ACS calculated $3,554,977.74 in out-of-scope work, and CNX calculated $2,807,312.13; this brought the total contract price to $15,225,857.13 in CNX's view and $15,973,522.74 in ACS's view. ECF No. 47 at 338. ACS

---

[3] ACS asserts that it "checked a box" acknowledging the Purchase Order, but disputes that this was true acceptance, instead now questioning who checked the box and whether that person had the power to bind ACS. ECF No. 49 at 5; ECF No. 60 at ¶ 11. The Purchase Order provides that the method of acceptance must be saving the Purchase Order and sending it back through HUBWOO. The Court notes the parties' performance to date, the litigation motions and rulings to date, and that is denying all motions for summary judgment presently before it.

invoiced a total of $19,578,615.76 based on certain costs incurred or price increases, and CNX refused to pay any amount over $15,225,857.13.  ECF No. 52 at 9.

CNX brought suit in January 2020 "seeking declaratory relief to prevent ACS from exercising its statutory rights to place a lien on the Morris Station."  ECF No. 49 at 1.  As noted, there are three Motions for Summary Judgment before the Court. The first was filed by CNX on the issue of whether there is a T&M NTE contract. The other two motions were filed by ACS, first asking the court to hold that the contract does not contain an NTE term, and the second asking the court to hold that ACS is entitled to compensation under a theory of unjust enrichment in the alternative.

## I.  LEGAL STANDARD

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, the pleadings, documents, electronically stored information, depositions, answers to interrogatories and admissions on file, together with any affidavits or declarations, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56 (a), (c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact; that is, the movant must show that the evidence of record is insufficient to carry the non-movant's burden of proof. *Id.* Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial". *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). An issue is genuine only "if the evidence is

such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty-Lobby, Inc.*, 477 U.S. 242, 248 (1986). In *Anderson*, the United States Supreme Court noted the following:

> [A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. . . . [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Id*. at 249–50 (internal citations omitted).

## III. ANALYSIS

### A. CNX's Motion for Summary Judgment

CNX asks this Court to find that the Purchase Order, together with its multitude of incorporated Contract Documents, is a time and materials contract with a price not to exceed $12,418,545.00 ("T&M NTE"); and CNX alleges there is no genuine issue of material fact with respect to that position. Because that position is clearly inconsistent with the evidence of record – in particular, evidence of the parties' joint election to proceed in their respective contractually-contemplated roles in a multi-million dollar construction project, some of the incorporated written terms of which appear to have remained unclear, ambiguous and/or contradictory – CNX's Motion for Summary Judgment will be denied.

#### 1. *General Overview of Applicable Contract Law*

Although "contract interpretation requires a determination of the intent of the parties based on their 'situation . . . and the circumstances connected with the transaction, . . . [w]here the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms.'" *Suffolk Constr. Co. v. Reliance Ins. Co.*, 221 A.3d 1205, 1212 (Pa. 2019) (quoting *Tallmadge Bros., Inc. v. Iroquois Gas Transmission Sys., L.P.*, 746 A.2d 1277,

1288 (Conn. 2000)). "The whole instrument must be taken together in arriving at contractual intent," *Great Am. Ins. v. Norwin Sch. Dist.*, 544 F.3d 229, 243 (3d Cir. 2008) (quoting *Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418, 429 (Pa. 2001)), and "[c]ourts are not to interpret one provision of the contract in a way that annuls a different provision of it." *Trinity Indus., Inc. v. Greenlease Holding Co.*, 903 F.3d 333, 350 (3d Cir. 2018) (quoting *Capek v. Devito*, 767 A.2d 1047, 1050 (Pa. 2001)).

"[W]here an ambiguity exists, parol evidence is admissible to explain or clarify or resolve the ambiguity . . . ." *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (Pa. 1986). "A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Id.* "The court, as a matter of law, determines the existence of an ambiguity and interprets the contract whereas the resolution of conflicting parol evidence relevant to what the parties intended by the ambiguous provision is for the trier of fact." *Id.* Any ambiguity in a contract "must emanate from the language used in the contract rather than from one party's subjective perception of the terms." *Suffolk Constr. Co.*, 221 A.3d at 1212 (quoting *Iroquois Gas*, 746 A.2d at 1288).

The rule of *contra proferentem* states that "any ambiguous language in a contract is construed against the drafter and in favor of the other party *if the latter's interpretation is reasonable*." *Sun Co. v. Penn. Turnpike Comm'n*, 708 A.3d 875, 878–79 (Pa. Commw. Ct. 1998) (quoting Restatement (Second) of Contracts § 206) (emphasis added). However:

> Where a document is found to be ambiguous, inquiry should always be made into the circumstances surrounding the execution of the document in an effort to clarify the meaning that the parties sought to express in the language which they chose. . . . It is only when such an inquiry fails to clarify the ambiguity that [*contra proferentem*] . . . should be used to conclude the matter against that party responsible for the ambiguity, the drafter of the document.

*Burns Mfg. Co. v. Boehm*, 356 A.2d 763, 766 n.3 (Pa. 1976).

6

*2. Incorporation of the NTE Q&A Document*

CNX's motion raises several questions.  The first is whether an NTE term was incorporated into the Purchase Order. Indeed, Article 2 of the Purchase Order unambiguously incorporates approximately *150* forms and documents by reference (the "Contract Documents"), including Plaintiff's NTE Q&A document indicating that *the contract bids* were to be set out as T&A Not to Exceed.[4]

*3. ACS's Awareness and Access to the NTE Q&A Document*

The second question is whether ACS had access to and was (or should have been) aware of the NTE Q&A document.  It appears on the present record that Defendant certainly had access and was, or at the very least should have been, aware of the NTE Q&A. The document had three "sections": one with no heading, and two with the headings "Morris" and "Archer", the two projects for which CNX was then soliciting bids.  ECF No. 47 at 333–35. The relevant questions for this motion were not under a specific project heading. Seven days after the NTE Q&A Document was posted, an email from Jim Glass, a Vice President at ACS, to Chase David of CNX indicates that Glass would "not be able to submit a T&M NTE number on the 20th [of November for the Archer project]."  Although ACS asserts that it is ambiguous whether the NTE-related answers applied to the Morris or Archer projects (or both), this email is ACS' response regarding an NTE bid for the Archer project, *i.e.*, the form of bid specified in the NTE Q&A Document. A reasonable factfinder could certainly conclude that ACS knew or should have known of the applicability of the NTE answers to the Morris Project as well.  Moreover,

---

[4] Despite ACS' objections to this document as undated and unsigned, ECF No. 47 at 333–34 shows the document is called "CNXM Morris Expansion RFP Questions 20181105", and it is reasonable to assume that 20181105 can be broken out into 2018, 11, and 05, which is November 5, 2018 in year/month/day format. (This would also resolve the parties' dispute over paragraph 13 of ECF 53.)  Nothing in the facts of record indicates an invalidation of the document for lack of signature.

ACS's Revised Bid mentions questions being "asked and answered," also suggesting that ACS was aware of Q&A documents and their relatedness to both projects. *See also* ECF No. 56 at 6-7 (citing evidence of ACS' October 2018 awareness of applicability of the T&M NTE nature of the Morris Project bid).

    *4.* *Inconsistencies in the Documents Comprising the Contract*

The third question is whether there is an inconsistency, either between the NTE Q&A Document and the Purchase Order, or between the NTE Q&A Document and the Revised Bid, and if so, whether the parties' contract provides a clear resolution. A reasonable factfinder could certainly find these answers to be, respectively, "yes" and "no".

More specifically, Article 2 of the Purchase Order states that in the event of an inconsistency between a Contract Document and the Purchase Order, the Purchase Order controls. It further provides that "particular provisions" control over provisions in "general specifications or conditions incorporated by reference." ECF No. 47 at 18.[5] It does not, however, expressly contemplate (beyond noting the standard "particular over general" hierarchy) inconsistencies between the Contract Documents themselves as to provisions not controlled by the Purchase Order.[6] This omission seems particularly unfortunate where CNX elects to supplement its rather abbreviated Purchase Order by simply rolling-in hundreds of additional pages as further contract terms for a multi-million dollar construction project.

---

[5] "THE PROVISIONS OF THIS CONSTRUCTION AGREEMENT SUPERSEDE ALL INCONSISTENT PROVISIONS OF OTHER CONTRACT DOCUMENTS, AND THE PARTICULAR PROVISIONS OF OTHER CONTRACT DOCUMENTS SUPERSEDE ALL INCONSISTENT PROVISIONS CONTAINED IN GENERAL SPECIFICATIONS OR CONDITIONS INCORPORATED BY REFERENCE." (quoted in ECF No. 49 at 10).

[6] Thus where, for example, particular provisions of incorporated contract documents are, as here, apparently inconsistent with each other, on matter(s) not otherwise clearly controlled or resolvable by express terms of the Purchase Order, then material fact questions necessarily arise. The record strongly suggests that the present contract and unjust enrichment litigation was the foreseeable result of the parties' course of actions with regard to Plaintiff's Morris Project.

Article 4 – "Contract Price" states: "Company shall pay Contractor . . . subject to any additions or deductions *permitted by the contract documents*, in accordance with the uniform bid sheet schedules plus the sum of: $12,418,545.00." (emphasis added) The Court finds Article 4 inartful and ambiguous, particularly in the presence of contract documents which part company in their arguably apparent intentions regarding risk assignment and resultant permissible adjustments in the form of additional charges.[7]  As a consequence of its poor draftsmanship, the article clearly reflects little more than an intent that the price be subject to adjustments to the initial lump sum dollar amount noted.

Further complicating the parties' disputes are the provisions of Article 10 – "Changes in the Work", which states in relevant part: "Company . . . may order extra work or make changes by altering, adding to, or deducting from the work . . . . Extra work is any work performed which is beyond the scope of the work defined in these contract documents. Except in any emergency . . . no extra work or change shall be made unless pursuant to Company's written purchase or change order, and no claim for an addition to the contract sum shall be valid unless so ordered." ECF No. 47 at 24.  Article 10 requires CNX to both request and approve any out-of-scope work.[8]

---

[7]  As explicated in text, CNX apparently intended, via an NTE, to enter into a Morris Project contract under which the winning bidder would bear all weather/tie-in and other cost-increase risks; yet CNX apparently accepted a Revised Bid which apparently intended to counter-offer a lower lump sum bid recalculated based on CNX's assumption of the specified cost-increase risks. *Cf.* ECF No. 49 at 4, n. 3 ("The lower bid was created by removing contingency protections from the final price. That is contrary to how an NTE price is implemented."). In addition, in its review of the record the Court has noted no documents entitled "Uniform Bid Sheet Schedules" nor any explanation of the parties' course of conduct regarding this provision in the briefings. Clearly, there is no shortage of material fact questions at present.  It is not entirely clear to this Court whether "Bid Sheet Schedules" refers to the "time & material rate sheet known as the 'Schedule of Equipment & Labor Rates' provided to CNX at bid".  ECF No. 49 at 14-15. *See also* ECF No. 59 at 12 ("A T&M contract is billed pursuant to a rate sheet which requires the contractor to identify the activity, connect it to the proper billing category, and show it was connected to the Project.").

[8]  ACS has raised material fact questions as to CNX's adherence to its own Change Order policy as well (*e.g.*, that the project foreman Dunn was without knowledge of the contract terms and employed different processes).  ECF No. 49 at 5-6.

The Purchase Order thus both looks to the Contract Documents for permitted adjustments to the contract lump sum price in Article 4, but also specifies that Change Orders are required for adjustments to that contract sum (albeit in the context of a provision expressly relating to the authorization of the scope and cost of extra work) in Article 10.[9]

As noted, Article 2's sweeping incorporation included both the NTE Q&A Document and ACS's Revised Bid as Contract Documents. The Revised Bid presents the basis for Defendant's proffered price reduction as primarily the removal of "contingencies" and "mitigation controls" such as tie-in and schedule delays, inclement weather, and equipment and material delays. While ACS could most certainly have been clearer in assertedly "rejecting" the NTE Q&A Document, one possible reasonable reading of the Revised Bid frames ACS as recognizing the NTE term as CNX's proposed risk allocation and countering it with its own Morris Project-bid-specific risk allocation. In other words, it might be found that in accepting the lower bid, CNX intended to assume the risk of cost increases incurred as a result of the identified conditions which the original bid mitigated against (via ACS' "Plus Minus 10% Number").[10] *Cf.* ECF No. 59 at 11 & n.2 (noting that the Purchase Order "appears to be a template that CNX uses for all contracts created through its HUBWOO online platform" and not one "drafted [with] terms specific to this project"). A reasonable fact finder might or might not determine that CNX accepted the terms in this bid as superceeding the Q&A's conflicting bidding requirement when it awarded ACS the contract and incorporated the Revised Bid as a Contract Document. If so, any additional costs

---

[9] *Cf.* ECF No. 56 at 5 ("This manner of increasing the NTE amount with change orders relating to scope-of-work increases is precisely how the parties operated on this Project."). That the parties followed Article 10's Change Order procedures would not necessarily     preclude CNX's liability for other cost increases attributable to a risk allocation incorporated under Article 2 of the Purchase Order and determined to be controlling.

[10] *Compare* ECF No. 46 at 8 ("Pursuant to the Purchase Order and the Contract Documents that comprised the Purchase Order, ACS agreed to perform the scope-of-work for the Project on a T&M NTE basis with a cost not to exceed the lump sum budget of $12,418,454.").

incurred on account of these risks might then be determined to be a contractual price adjustment intended to be permitted under Article 4 despite the Change Order language of Article 10.

Further, the Revised Bid and acceptance may also be reasonably determined to have been intended by ACS and or CNX as an "agreement to agree" on a further price determination[11] and/or risk allocation that was never fulfilled, another material fact question that is inappropriate for decision on summary judgment. There also arise material factual questions as to which costs or price adjustments in ACS's invoices are attributable to the risks assertedly assumed by CNX.[12]

   5. *Ambiguity*

The last related question raised in CNX's briefing – one already addressed in large part - is whether there is any ambiguity that requires a factfinder to resolve. The answer is "yes".

As discussed in the overview of general contract law, *supra*, a contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense, and evidence relevant to what the parties intended by an ambiguous provision is for the trier of fact.  As also discussed above, Article 4 directs the parties to the Contract Documents for permissible price adjustments. The ambiguous terms of the Purchase Order's own text, combined with the apparently conflicting risk allocations of the Contract Documents, and

---

[11] *See e.g.*, ECF No. 52 at 6-7; *id.* at 14 ("The accepted bid figure was explicitly a place holder for a later, revised price."). *Cf.* ECF No. 59 at 17-18 (analogizing *Adirondack Classic Design, Inc. v. Farrell*, 182 A.D.3d 809, 810 (2020)).

[12] The Court notes that the difference between (a) the amount invoiced by ACS (over $19.5M) and (b) the lump sum contract price adjusted by agreed-upon changes to the scope of work (between approximately $15.25 and $16M) greatly exceeds the "Plus Minus 10%" risk mitigation margin apparently anticipated in ACS' initial bid.  *But cf.* ECF No. 52 at 17-18 (asserting that CNX required ACS to field design work; perform hydro testing offsite; perform work wholly unrelated to this project; and "provide additional manpower on site so CNX could hit the deadline it wanted"  - all in addition to delays "by project design productions, weather, and emergency shutdowns").

ambiguities as to the parties' intentions and understandings, and material fact questions as to their performance, render this case quite ill-suited for summary judgment.[13]

   6. *Other Arguments*

   The parties' secondary arguments are inapposite and/or do not require further analysis at this juncture given the Court's denial of all summary judgment motions. For example, CNX argues that Article 10, the Change Order provision, would be superfluous if the NTE term were not incorporated into the contract.  ECF No. 46 at 9.  Even absent an NTE, however, the contract would still have a defined scope that, should the parties agree, would be alterable by a Change Order which would serve to document that modification to their contract terms (by, *e.g.*, specifying the additional work and time frame(s)).[14] Moreover, incompleteness of the project designs (of whatever degree), even for some time after the ACS bid was accepted, suggests a reasonable expectation of contract supplementation by Change Orders.  *See, e.g.*, ECF No. 49 at 2 (quoting the incomplete IFC drawing/design status as noted in the Invitation for Bids' Project Scope Statement); *id.* at 2 n. 1.[15]

   ACS, for example, proffers further argument for summary judgment on grounds that the bid documents were a series of offers and counteroffers, each one effectively rejecting the priors.  ECF No. 59 at 9-11.  As noted above, however, a reasonable factfinder could conclude that ACS

---

[13] The Court notes that, as this Opinion indicates, among the extensive disputes in the parties' statements of material facts, many will require determination by the factfinder.  It further notes that given the highly specialized and complex nature of the construction matters which the parties have elected to resolve at this time and in this manner, it may be appropriate to consider appointment of a Special Master in future.

[14] *See* ECF No. 46 at 3-4 (quoting Article 10's provision regarding extensions of time caused by changes in the scope of work). Further, a change in scope and a change in price are technically independent.  While price is generally adjusted with scope, there are many variables that go into determining price such that an increase in one might not affect an increase in the other.

[15] *See also* ECF No. 59 at 13-14 ("ACS agrees this change order process was completely unnecessary and superfluous. . . . ACS ["a small minority-owned company"] viewed this as a purely bureaucratic requirement from a publicly traded multi-billion-dollar corporation.").

should have clearly stated its bid as a counter-offer removing any NTE term rather than

responding with other language arguably not expressly setting aside that CNX bidding

requirement, and that CNX was left with a reasonable expectation the parties were entering into

an NTE contract (despite ACS' inclusion of what a factfinder might deem an ambiguous

expression of the rationale for its Plus Minus 10% Number that falls short of effecting a transfer

of the risk).  Conversely, CNX could, for example, have clearly included an NTE term in Article

4 or reiterated that the contract was to be a T&M NTE agreement when presented with the

Revised Bid arguably proffering a different risk allocation, rather than - by simply accepting the

Revised Bid - leaving ACS with the reasonable expectation that risks had been reassigned as

proposed.  Whether the parties proceeded with their contract documents in such apparent

disarray by inattention or by design, the resultant absence of contractual clarity is the same.

Nothing prevented either from reading, negotiating, and fully clarifying their entire agreement,

particularly given their relative sophistication.

ACS also argues that "[t]here was never a meeting of the minds that ACS would

perform this work with an NTE component."  ECF No. 59 at 11.  An absence of a meeting of the

minds on one or more essential terms would, of course, potentially give rise to an entitlement to

restitution under Defendant's alternative theory of unjust enrichment.  On the other hand,

limited-effect disagreements regarding contract terms (including even the existence of an NTE

and the compensability of certain work) does not necessarily render a contract unenforceable,

and may be resolvable by the factfinders and by determinations such as reasonable expectations

in light of the surrounding context and the parties' course of conduct.[16]  Again, as this case is rife

with material fact questions, summary judgment in either party's favor is inappropriate.

---

[16] *See e.g., generally, Atlantic Richfield Co. v. Razumic*, 480 Pa. 366, 376, 390 A.2d 738 (1978) (course of
performance is "always relevant in interpreting writing" and is "perhaps the strongest indication of what the writing

**B.   ACS's Motion for Summary Judgment: "Contractual Elements"**

ACS asks this court to find that the Purchase Order does not contain an NTE term and ACS is owed $4,357,712.54, or in the alternative, that even with an NTE cap, ACS is owed that amount because the NTE term only applies to the "original" scope of work. For reasons already largely set forth in Section III(A), ACS's contractual summary judgment motion will be denied. Section III(A) highlights some of the material fact questions precluding summary judgment on the effective incorporation of an NTE term in the parties' contractual agreement.  The Court further notes:

  *1. Absence of NTE Term*

In asserting that the NTE term is not incorporated, ACS contends that an NTE term is "only feasible when the bidding contractor has all information necessary to appropriately appraise the project."  ECF No. 49 at 5. As sensible a general assessment as this may be, it is one which should guide but does not constrain a bidding contractor's conduct, and it is the parties' particular understandings and undertakings that the Court considers on summary judgment.  ACS had every opportunity to raise this very consideration – *i.e.*, the critical importance of complete information to an *accurate* NTE bid – in negotiation with CNX but did not. What ACS did do is submit a Revised Bid that apparently contradicted but did not expressly resolve important aspects of CNX's required bidding protocol.[17]

---

means") (citing *Restatement (Second) of Contracts*, § 228). *See also Allied Fire & Safety Equipment, Co. v. Dick Enterprises, Inc.,* 972 F. Supp 922 (E.D. Pa. 1997) (stating that if the parties' conduct evidences an agreement, an implied-in-fact contract could arise) (citing *United States v. St. John's General Hospital,* 875 F.2d 1064, 1074 n.8 (3d Cir. 1989)).

[17] ACS also notes that the contract was "unilaterally drafted by CNX without ACS's input," and that there are "no signed copies." ECF No. 49 at 15. To the extent it is intended, any contract of adhesion argument is meritless given the parties' sophistication level and the eight-figure price tag of the project, opportunities for negotiation, and the parties' course of conduct. As to an assertion of construction against the drafter, *see* the statement of general law, *supra*. The Court observes in response to ACS' other arguments that acceptance of the contract did not require a

ACS also argues that summary judgment "is appropriate because regardless of how the contract is interpreted, CNX is contractually obligated to pay ACS either the time and material spent on the job or the difference in cost between the scope/schedule of the Project at bid versus the Project as realized a[t] project completion." That this assertion is beyond dispute is, like the parties' other grounds for summary judgment, inconsistent with the evidence of record.

Even assuming, *arguendo*, that the Revised Bid's risk allocation language were ultimately determined to control and supersede the NTE Q&A Document as part of the terms of an enforceable contract, a reasonable factfinder could find that the Revised Bid's language did not intend/does not permit *every* additional cost incurred by ACS to be passed onto CNX. Article 4 of the Purchase Order lists the price and notes it is subject to additions or deductions "as permitted by the Contract Documents" and the documents together could reasonably be read as expressing intent to limit allowable price adjustments to the specific examples listed in the Revised Bid's plain language (such as tie-in delays, equipment delays, inclement weather, *etc.*). Thus, a cost incurred by ACS in performing its obligations but not incurred as a result of a risk assumed by CNX may not be recoverable from CNX.[18]

### 2. *NTE's Purported "Original Scope" Limitation*

ACS' assertions to the contrary notwithstanding, it is clear that if an NTE term were found to be both incorporated and effective in the contractual agreement, it would not only apply to the "original" scope of the work. As discussed above, the agreement's scope was subject to

---

signature from a specific individual. The parties' conduct speaks for itself, and ACS did, at the very least, acknowledge the contract on CNX's HUBWOO platform.  *Cf.* ECF No. 46 at 2.

[18] In Document 49 starting on page 12, ACS lists out actual costs incurred as compared to the bid price. If the Revised Bid does effect contractual allowance of risk-based price adjustments, a factfinder would likely have to evaluate each increase to determine whether it is permissible under the Revised Bid or any other Contract Document. These additional charges are not automatically compensable merely because they are out-of-scope, and certainly not at this juncture of the case.

amendment/expansion through Change Orders. A Change Order adjusts the scope of work and related background terms (such as price and completion); it does not create an entirely separate stand-alone agreement.  It would be frivolous at best to assert that a change in scope removed the subject additional work from the ambit of the parties' original contractual terms.[19]

For the above reasons together with those set forth in Section III(A), ACS's Motion for Summary Judgment will be denied.

**C. <u>ACS's Motion for Summary Judgment: Unjust Enrichment</u>**

ACS further asks this Court to hold, in the alternative, that there is no genuine issue of material fact regarding the unenforceability of the Purchase Order, or regarding ACS' entitlement to compensation under a theory of unjust enrichment. For the reasons set forth above and below, this Motion is also denied.[20]

A contract implied-in-law, known as a "quasi-contract" or "unjust enrichment", is a legal fiction created by common law courts to permit recovery by contractual remedy in cases where there is found to be, in fact, no contract, but where circumstances are such that justice warrants a recovery as though there had been a promise.  See *Restatement (Second) of Contracts*, § 4 (1981).  Thus, a party with an otherwise adequate remedy at law cannot claim unjust enrichment.[21]  However, as there are sometime inadequacies in contractual remedies at law, it is widely accepted practice to pursue unjust enrichment in the alternative at the pleading stage.

---

[19] *See* Purchase Order, Article 10 (providing that "changes shall be executed under the conditions of the original Contract Documents" excepting time of performance and cost adjustments). ACS' Revised Bid statement that "any change or deviation from scope as it stands now, or schedule would be addressed very transparently" does not advance this argument.

[20] The Court concurs with Plaintiff's observation that this motion is premature, and provides this substantive analysis in response to the briefings for the benefit of the parties.  *See* ECF No. 55 at 5.

[21] Thus, CNX notes that "a claim for unjust enrichment cannot stand in the face of a valid and enforceable contract between the parties," citing *Allied Fire & Safety Equipment, Co. v. Dick Enterprises, Inc*., 972 F. Supp 922 (E.D. Pa. 1997).

Indeed, Federal Rule of Civil Procedure 8(d) permits the pleading of such alternative legal theories. *See, e.g., Vantage Learning (USA), LLC v. Edgenuity, Inc*., 246 F. Supp. 3d 1097, 1100 (E.D. Pa. 2017) (citing Rule 8(d)(2)); *Southersby Dev. Corp. v. Twp. of S. Park*, 2015 WL 1757767, at *15 (W.D. Pa. Apr. 17, 2015) ("[P]laintiffs may plead an unjust enrichment claim in the alternative . . . where there is some dispute as to whether a valid, enforceable written contract exists.") (citations omitted). *See also* ECF No. 52 at 11-12 ("Relevant is that 'the test for enforceability of an agreement is whether both parties have manifested an intention to be bound by its terms and whether the terms are sufficiently definite to be specifically enforced.'" (quoting *Channel Home Ctrs. v. Grossman,* 795 F.2d 291, 298–99 (3d Cir.1986)).

A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity for one to retain a benefit which has come to him at the expense of another. To state a claim for unjust enrichment under Pennsylvania law, ACS must allege: (1) benefits conferred on CNX by ACS; (2) appreciation of such benefits by CNX; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for CNX to retain the benefit without payment of value. *See, e.g.*, *Sovereign Bank v. BJ's Wholesale Club, Inc*., 533 F.3d 162, 180 (3d Cir. 2008).[22] "Unjustness" is a quality that turns on reasonable expectations.

In asserting entitlement to reimbursement under a theory of unjust enrichment in the alternative, ACS asserts, *e.g.*, that the contractual price term is unclear and not sufficiently

---

[22] *See also Lauren W. ex rel. Jean W. v. Deflamin*, 480 F.3d 259, 277 (3d Cir. 2007) (citing *Allegheny Gen. Hosp. v. Philip Morris, Inc*., 228 F.3d 429, 447 (3d Cir. 2000)); *Roethlin v. Portnoff Law Assocs*., 81 A.3d 816, 825 n.8 (Pa. 2013) ("Unjust enrichment is the retention of a benefit conferred by another, without offering compensation, in circumstances where compensation is reasonably expected, and for which the beneficiary must make restitution."). *Cf. Braun v. Wal-Mart Stores, Inc.,* 2011 PA Super 121, 24 A.3d 875, 896 (Pa. Super. Ct. 2011) ("In order to recover for unjust enrichment, a party must show 'both (1) an enrichment, and (2) an injustice resulting if recovery for the enrichment is denied.'" (quoting *Meehan v. Cheltenham Twp.*, 189 A.2d 593, 595 (Pa. 1963))).

definite to be enforced.  ECF No. 52 at 13, 14 (citing *Greene v. Oliver Realty, Inc.*, 526 A.2d 1192, 1194 (Pa. Super. Ct. 1987)).[23] The "bid figure was explicitly a place holder for a later, revised price," and, ACS argues, CNX "warranted" that there would be an "opportunity to revise its price based on IFC drawings." ECF No. 52 at 14. ACS goes on to assert that the "parties agreed to parameters on how the price would be calculated . . . but deferred agreeing on the total price until the full . . . designs were available." *Id. Cf. supra* (discuss the abundance of material fact questions regarding the parties' reasonable expectations and undertakings).

But even assuming, *arguendo,* the absence of an enforceable contract - for, *i.e.*, want of essential terms and circumstances precluding a reasonable factfinder's determination of the parties' mutually intended contract or implied-in-fact contract; the absence of an enforceable contract is but one step in the analysis of ACS' potential entitlement to recovery under an implied-in-law theory of unjust enrichment. It is far from determinative.  Here, as elsewhere, a number of material fact questions require resolution and preclude a holding by this Court on summary judgment.

## IV.  CONCLUSION

For the above reasons, all three Motions for Summary Judgment before the Court will be denied. An appropriate Order will follow.

---

[23]  As the Pennsylvania Superior Court observed in *Greene,* "a contract is enforceable when the parties reach mutual agreement, exchange consideration, and have outlined the terms of their bargain with sufficient clarity." 526 A.2d at 1194. "An agreement is sufficiently definite if the parties intended to make a contract and there is a reasonably certain basis upon which a court can provide an appropriate remedy." *Id.*  The record presently fails to provide sufficient certainty as to, *e.g.*, the parties' mutual agreement or the intended terms of their bargain.  It does not even appear entirely clear that they intended to effect a binding contract.

18

Dated: September 2, 2021

BY THE COURT:

LISA PUPO LENIHAN
United States Magistrate Judge